UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SIDNEY GORDON AND JEFFREY TAUBER,

                                     Plaintiffs,

                   v.

SONAR CAPITAL MANAGEMENT LLC, ET AL.

                                     Defendants.

11-cv-09665 (JSR)


**MEMORANDUM OF LAW OF DEFENDANTS SONAR CAPITAL MANAGEMENT
LLC, SONAR PARTNERS, LP, SONAR INSTITUTIONAL FUND, LP, SONAR
OVERSEAS FUND LTD. AND NEIL DRUKER IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS
REPRESENTATIVES AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................. 1

Relevant Facts .............................................................................................................. 4

Argument ..................................................................................................................... 9

I.      Standard on Class Certification ........................................................................ 9

II.     Plaintiffs Do Not Satisfy The Requirements of Rule 23(a)(4) ........................... 9

      A.     Tauber Has Failed To Be "An Unusually Careful, Active, Punctilious, Mindful Representative"...................................................................... 11

            1.     Tauber – A Former Judge – Certifies To False Statements ......................... 11

            2.     Tauber Lacks Basic Knowledge Of This Case And Has Failed To Jointly Monitor and Supervise His Attorneys With Gordon ...................... 12

      B.     Gordon Is a "Willing Pawn" of Counsel.................................................. 13

            1.     Gordon's Concealement Of Mr. Spirt Raises Concerns About Class Conflict................................................................................. 13

            2.     Gordon Lacks Basic Knowledge Of This Case And Has Failed To Jointly Monitor and Supervise His Attorneys With Tauber ..................... 14

III.     Plaintiffs Do Not Satisfy The Typicality Requirements of Rule 23(a)(3) ........................... 16

      A.     Tauber Has No Losses And Thus No Financial Interest In This Case ................... 16

      B.     Tauber Is An In And Out Trader And Cannot Demonstrate Loss Causation .......... 19

      C.     Both Plaintiffs Are Subject To Unique Defenses Concerning Reliance................. 20

IV.     Plaintiffs Have Not Shown Common Issues Of Law Or Fact Predominate ...................... 22

      A.     There Is No Price Impact ........................................................................ 23

      B.     The Affiliated Ute Presumption Raises Individualized Issues Of Reliance ........... 24

V.     Plaintiffs' Proposed Class Period Dates Should Be Rejected............................................ 25

Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page No.**

**Federal Cases**

*Abrahamson v. Fleschner*,
    568 F.2d 862 (2d Cir. 1975).......................................................................... 18

*Affiliated Ute Citizens v. U.S.*,
    406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972)..................................... 20, 24, 25

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
    222 F.3d 52 (2d Cir. 2000)............................................................................. 10, 16, 20

*Basic Inc., v. Levinson*,
    485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 194 (1988)........................................ 20, 21, 23

*In re BearingPoint, Inc. Sec. Litig.*,
    232 F.R.D. 534 (E.D. Va. 2006) ..................................................................... 19

*Beck v. Status Game Corp.*,
    No. 89-cv-2923, 1995 U.S. Dist. LEXIS 9978 (S.D.N.Y. July 14, 1995)...................... 13

*Blank v. Jacobs*,
    No. 03-cv-2111, 2009 U.S. Dist. LEXIS 91605 (E.D.N.Y. Sept. 30, 2009) ................. 21

*Burke v. Jacoby*,
    981 F.2d 1372 (2d Cir. 1992)  ........................................................................ 24

*In re CIGNA Corp. Secs. Litig.*,
    459 F. Supp. 2d 338 (E.D. Pa. 2006) .............................................................. 18

*In re CMED Secs. Litig.*,
    No. 11-cv-9297, 2012 U.S. Dist. LEXIS 47785 (S.D.N.Y. Apr. 2, 2012) .................... 17

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) ..................................................... 9, 22

*Darvin v. Int'l Harvester Co.*,
    610 F. Supp. 255 (S.D.N.Y. 1985)................................................................... 12

*Du Pont v. Brady*,
    828 F.2d 75 (2d Cir. 1987).............................................................................. 20, 24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)................................ 18, 19

*In re eSpeed, Inc. Secs. Litig.*,
    232 F.R.D. 95 (S.D.N.Y. 2005) ........................................................................ 17

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
    574 F.3d 29 (2d Cir. 2009).................................................................. 16, 19, 20

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    903 F.2d 176 (2d Cir. 1990)........................................................................ 16

*George v. China Auto. Sys. Inc.*,
    No. 11-cv-7533, 2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013) ........... 9, 19, 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398, 189 L. Ed. 2d 339 (2014) .................................................. 23

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    No. 11-cv-4209, 2013 U.S. Dist. LEXIS 155136 (S.D.N.Y. Oct. 29, 2013) ........... 19, 22

*In re IMAX Secs. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) ........................................................... 14, 16

*Kline v. Wolf*,
    702 F.2d 400 (2d Cir. 1983).......................................................................... 10

*Levine v. Berg*,
    79 F.R.D. 95 (S.D.N.Y. 1978) .................................................................... 16

*In re Lloyd's Am. Trust Fund Litig.*,
    No. 96-cv-1262, 1998 U.S. Dist. LEXIS 1199 (S.D.N.Y. Feb. 6, 1998)................. 10, 15

*Markewich v. Eresk*,
    No. 80 Civ. 3247, 1983 U.S. Dist. LEXIS 19347 (S.D.N.Y. Feb. 10, 1983) ................ 21

*In re Monster Worldwide Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ......................................................... 3, 10, 13

*In re Moody's Corp. Secs. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) .................................................................. 19

*In re Moody's Corp. Secs. Litig.*,
    No. 07-cv-8375, 2013 U.S. Dist. LEXIS 122449 (S.D.N.Y. Aug. 23, 2013)................ 22

*In re NYSE Specialists Sec. Litig.*,
    240 F.R.D. 128 (S.D.N.Y. 2007) ....................................................... 10, 11, 12

iii

*In re Puda Coal Secs. Inc.,*
  11 Civ. 2598, 2013 U.S. Dist. LEXIS 142081 (S.D.N.Y. Oct. 1, 2013) ...................... 22

*In re Refco Inc. Secs. Litig.,*
  No. 07-MDL-1902, 2013 U.S. Dist. LEXIS 116700 (S.D.N.Y. July 31, 2013)............. 18

*Savino v. Computer Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1998)........................................................................................... 10

*Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*,
  224 F.R.D. 353 (S.D.N.Y. 2004) ........................................................................... 13, 16

*In re SMART Techs. Inc. S'holder Litig.*,
  No. 11-cv-7673, 2013 U.S. Dist. LEXIS 4717 (S.D.N.Y. Jan. 11, 2013) ...................... 19

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) .................................................................... 9

*Weisman v. Darneille*,
  78 F.R.D. 669 (S.D.N.Y. 1978) .................................................................................... 12

## Statutes & Rules

Fed. R. Civ. P. 23 ...................................................................................... 1, 8, 9, 16, 22

Private Securities Litigation Reform Act (PSLRA) (1995)........................... 1, 3, 5, 6, 11, 16, 17

## Other Authorities

ERISA Opinion Letter No. 2013-03A ....................................................................... 16

Defendants Sonar Capital Management LLC ("Sonar"), Sonar Partners, LP, Sonar Institutional Fund, LP, Sonar Overseas Fund, Ltd., and Neil Druker ("Druker") (together, the "Sonar Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel ("Class Certification Motion").

**Preliminary Statement**[1]

It would be hard to find a pair of lead plaintiffs less deserving to represent a class. Simply put, co-lead plaintiffs Sidney Gordon ("Gordon") and Jeffrey Tauber ("Tauber") have abdicated control to their attorneys, have flouted the requirements of Fed. R. Civ. P. Rule 23, the PSLRA and this Court's admonitions that Plaintiffs ensure that "the lawyers [are not] the real ones running the show."  (Ex. D at 15:9-10).  Gordon and Tauber are not merely ignorant of key facts, issues and developments in this case, they have demonstrated an appalling lack of candor to the Court and are subject to unique defenses that make each unfit to represent any class.

Gordon and Tauber represented to the Court that they would monitor this action and co-lead counsel in consultation with each other.  But Tauber has betrayed his assurance to this Court that he would give his counsel "more management and supervision than they are looking for." (Ex. D at 16:21-22).  Not only have Gordon and Tauber not been in contact with each other for possibly two years, Tauber could not recall Gordon's name.  Nor could Tauber even name his attorney, David Brower, who was sitting next to him at his deposition.  Tauber admitted that he could not recall key facts about his trading in Sigma because "[i]t's something that [I] kind of put out of my mind" (Ex. B at 109:19-20), and conceded that his bizarre near-

---

[1]   Exhibit ("Ex.") references here are to exhibits annexed to the Affidavit of Mark J. Hyland, Esq., sworn to February 13, 2015 submitted in opposition to the Class Certification Motion ("Hyland Aff.").  The Sonar Defendants also have submitted a disk containing pertinent clips of videotaped testimony of Tauber and Gordon.  It is attached as Exhibit A to the Hyland Aff.

simultaneous buying and selling of Sigma was not rational but rather a result of his "cold feet" or

simply "changing [his] mind."  Indeed, Gordon had no clue that there were issues with Tauber's

trading – even though that was one of the reasons given to this Court for why Gordon and Tauber

should be co-lead plaintiffs -- and he expressed concern about Tauber serving as a plaintiff here.

Gordon did not know the Court had dismissed the First Amended Complaint, did not see the

Third Amended Complaint before it was filed, confused Noah Freeman with Druker, and could

not correctly describe or even identify the class he purports to represent.

   Gordon and Tauber also have repeatedly concealed key facts from this Court and

the Sonar Defendants.  At his deposition on January 23, 2015, Gordon revealed for the first time

that, since before this case was even filed, he has been relying on the advice of another attorney,

David Spirt, Esq., who has been promised a share of the fees here.  That arrangement has been

hidden from this Court (and, until now, the Sonar Defendants) despite the Court's inquiries at the

lead plaintiff hearing.[2]  While the Sonar Defendants propounded an interrogatory seeking

information about fee arrangements, Gordon never disclosed his arrangement with Mr. Spirt, nor

did Plaintiffs produce any documents reflecting the fee arrangement until last night.

   While the Court rebuked Tauber at the September 26, 2013 argument for failing

to supervise his attorneys after he certified the wrong trade dates and failed -- multiple times over

20 months even after the Sonar Defendants had pointed out discrepancies -- to correct them,

Tauber shrugged off the fact that he swore to false trading information at his deposition.

Compounding this problem, Tauber – a former judge – also swore to false interrogatory

---

[2] The Court expressly inquired about Gordon's retainer and fee arrangements at the lead
plaintiff hearing, but Plaintiffs did not disclose their arrangement with Mr. Spirt.  (Ex. D at 46:6-
47:5).  The Court later cited the retainer agreements in its Opinion and Order appointing co-lead
plaintiffs and co-lead counsel.  (Dkt. No. 34 at 5, n.2).  The Sonar Defendants respectfully
submit that the Court would have deemed it important to know this information.

responses during discovery about prior litigations.  When confronted at his deposition, he again expressed little concern that he made false statements.  To certify a class led by these two would be an affront to Rule 23 and the PSLRA and make this Court "party to [a] sham."  *In re Monster Worldwide Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008) (Rakoff, J.).

Further, Gordon and Tauber are each subject to unique defenses that make them atypical of the purported classes.  Tauber was a net buyer during the "Seller Class" and a net seller during the "Buyer Class."  He ultimately profited from his trading in Sigma during the relevant period, leaving him with no loss here.  Moreover, Tauber is an in and out trader and he agreed that his wild trading patterns were not rational.  Gordon and Tauber both indicated that the purported material, non-public information ("MNPI") would not have affected their decision to trade, and Tauber admitted his irrational trading activity hinged on superstition and caprice.

The fallout from Freeman's arrest devastated Sonar and Druker.  But despite Freeman's "cooperation," after a thorough investigation involving one of the most intensely scrutinized insider trading cases of our time, resulting in some 80 convictions, no government action was taken against Sonar or Druker.  And, when Freeman was sentenced, the Government excluded Sigma (and Abaxis) trading in setting his sentencing guidelines range and calculating criminal forfeiture because Freeman admittedly had no idea whether the purported tipper received a benefit, a key element under *U.S. v. Newman* that should be grounds to dismiss this action on summary judgment.  (*See* Ex. O at 4, n.2).  But this Court should reject now Plaintiffs' attempt to use the class action vehicle to prosecute this meritless case and harass Druker and Sonar when the two lead plaintiffs are nothing more than "the willing pawn[s] of counsel," with serious credibility issues.  *In re Monster*, 251 F.R.D. at 136.

3

## Relevant Facts

**I.      Plaintiffs Commence This Action With Little Background**

On September 28, 2007, Gordon sold 500 shares of Sigma Designs, Inc.

("Sigma") held in a custodial IRA account.  (Ex. C at 217:17-25).  In 2010, Gordon responded to

an internet solicitation concerning trading in Sigma. (*Id*. at 26:9 – 27:10).  After Edward Haber,

Esq. of Shapiro Haber & Urmy LLP ("Shapiro Haber") called him in response, Gordon consulted

with his longtime family attorney (and cousin), David Spirt, Esq. and put Mr. Spirt in touch with

Mr. Haber.  (*Id*. at 27:4-16; 37:2 -13; 44:8-45:21).  At or about that time, Mr. Spirt and Shaprio

Haber agreed that Mr. Spirt would receive 5% of any attorneys' fees awarded to Shapiro Haber

here.  (*Id*. at 32:12-20).  Gordon then agreed to bring this action and, on December 27, 2011, he

signed a retainer agreement with Shapiro Haber and Kronenberger Rosenfeld LLC

("Kronenberger") as referral counsel; Mr. Spirt is not mentioned.  (*Id*. at 37:7-40:16).[3]  Gordon

did not (and has not) reviewed any of the news reports, transcripts, complaints or other materials

on which the complaint's allegations are based. (*Id*. at 88:14-89:24; 181:2-184:21).  Two days

after signing the retainer with Shapiro Haber and Kronenberger, on December 29, 2011, Gordon

filed a class action complaint on behalf of himself and a class who sold shares of Sigma from

July 13, 2007 through November 28, 2007.  (Dkt. No. 1).  On March 2, 2012, Gordon sought to

be appointed lead plaintiff.  (Dkt. Nos. 22, 23, 24).

Tauber bought and sold Sigma shares from three accounts held at Fidelity: an

individual account, an IRA, and a 401(k).  (Ex. B at 46:3-47:10).  While Tauber's Sigma trading

was profitable in during the class period, he ultimately wiped out $2.5 million thereafter.  (*Id*. at

93:6-18; 238:10-239:8).  In January 2012, Tauber reached out to Brower Piven after his brother-

in-law saw a notice concerning Sigma.  (*Id*. 106:17-107:3, Ex. D at 2:22-3:19).  Tauber spoke

---

[3]      Shapiro Haber will share 10% of its fees with Kronenberger.  (Ex. D at 46:17-21).

with Mr. Piven, and they entered into an engagement letter dated January 20, 2012. (Ex. D at 22:16-23:19). On March 5, 2012, Tauber moved to be appointed lead plaintiff. (Dkt. Nos. 25, 26, 27). On March 16, 2012, Messrs. Gordon and Tauber filed an Amended Motion to Appoint Sidney Gordon and Jeffrey Tauber to Serve as Lead Plaintiff(s) (Dkt. Nos. 30-33), and on March 29, 2012, the Court held a hearing on the joint motion ("Lead Plaintiff Hearing"). (Ex. D).

## II.    Plaintiffs Are Appointed Co-Lead Plaintiffs Under Specific Instructions To Supervise Counsel

Gordon and Tauber sought to be appointed co-lead plaintiffs to avoid a battle over who had the largest financial interest. There was a concern that Tauber's trading activity would jeopardize his adequacy and typicality, and Plaintiffs felt the appointment of Gordon as co-lead plaintiff would ensure the class had adequate representation, and did not want to take "positions that we would not want to be taking at the class certification stage." (*Id*. at 38:20-21).

The Court questioned Plaintiffs about their co-lead plaintiff proposal. The Court noted its concern that Gordon and Tauber had submitted virtually identical declarations in support of their joint motion and questioned them about their ability to supervise counsel. (*Id*. at 6:22-23). The Court explained, for example:

> Congress, when they passed the PSLRA … wanted to create the situation where the client would really be overseeing what happens. Because, historically, the lawyers ran the show…. Congress unequivocally said we want the client to run the show. So obviously, a very attractive part of your application is you're the kind of person who, by background, would take that kind of initiative. But I just want to make sure that you understand if I appoint you, that I am relying on you to take that initiative at every stage….

(*Id*. at 17:1-13). Plaintiffs assured the Court that they would and could jointly monitor counsel and their combined business and legal experience (Gordon was a small business owner and Tauber is a former judge) would enable them to make informed decisions about this case. (*Id*. at 18:3-16, 19:16-24, 20:2-5). Tauber touted his experience as a state court judge, stating that "in

some ways, I think Mr. Brower and Mr. Piven may be getting more management and supervision than they are looking for." (*Id*. at 16:21-22). The Court also questioned both Plaintiffs about the terms of their engagement with their counsel. While Plaintiffs disclosed the fee sharing relationship with Kronenberger, Gordon and his counsel did not disclose the arrangement with Mr. Spirt. (*Id*. at 46:6-21).

By Order dated April 5, 2012, the Court appointed Gordon and Tauber as co-lead Plaintiffs, observing that while Tauber had a larger financial interest, appointing both as co-lead Plaintiffs would insulate against arguments that one or the other was an inadequate or atypical representative relating to their trading activity. (Dkt. 34 at 3-4, n.1). The Court relied on Tauber's "significant legal credentials" and noted that Tauber "impressed the Court at the hearing as someone who will supervise his attorneys closely." (*Id*. at 3).

## III.    After Tauber Misrepresents His Trade Dates, The Court Admonishes Plaintiffs About Their Duty To Supervise Counsel

On April 24, 2012, Plaintiffs filed the First Amended Class Action Complaint ("FAC") (Dkt. No. 39). Sonar and Druker moved to dismiss it on May 15, 2012, arguing, *inter alia*, that Tauber suffered no losses and cannot rely on the "fraud on the market" presumption because 113 out of his 114 trades during the class period fell outside of market prices. (Dkt. No. 43, at 11). At oral argument, Plaintiffs' counsel suggested that Tauber's trades were outside of market prices because he "regularly traded after hours, so the prices at which he traded might in fact be within the market range if after-hours prices were included." (Dkt. No. 92 at 28:18-29:8). The Court granted the motion with leave to re-plead on February 8, 2013 by bottom-line order (Dkt. No. 63), followed by a written opinion and order dated June 12, 2013. (Dkt. No. 76).

While the motion was pending (and discovery stayed under the PSLRA), Plaintiffs negotiated a class settlement with Freeman providing for, in pertinent part (1) a

6

payment of $550,000 by Freeman; and (2) Freeman's full cooperation with Plaintiffs.  (Dkt. No. 57, Ex. A, ¶ 2.8)  The Court approved the partial settlement and entered a Final Judgment and Order of Dismissal as to Freeman on June 7, 2013.  (Dkt. No. 65, 73).  After meeting with Freeman, Plaintiffs' counsel filed a Second Amended Complaint ("SAC") on July 22, 2013 on behalf of Gordon and Tauber.  (Dkt. No. 79)  Plaintiffs' counsel added another putative class, the Buyer Class, which includes those who bought Sigma shares from December 20, 2007 through March 12, 2008.  (*Id.* ¶ 141)  As Gordon had a single sale of Sigma on September 28, 2007, the Buyer Class Period is premised solely upon Tauber's trades.  (*Id.*, Exs. B, C)  In the SAC, Plaintiffs' counsel relied on the same erroneous trade information Tauber provided in the FAC.

        The Sonar Defendants moved to dismiss the SAC on August 30, 2013.  (Dkt. Nos. 81, 82, 85)  The Sonar Defendants again vigorously argued the issue of Tauber's trade dates, noting that Tauber's trades did not occur at prices within the after-hours market as Plaintiffs' counsel suggested.  (Dkt. No. 82 at 22)  Then, in their opposition brief, Plaintiffs admitted that the trade dates they had provided to the Court were actually Tauber's settlement dates and, for the first time, provided a list of actual trade dates.[4]  (Dkt. No. 86 at 6)  At oral argument on September 26, 2013, the Court stated, "[l]et me say right up front that the reason I held that hearing on the appointment of plaintiffs' counsel is because this Court takes it very seriously, and whether or not this is being raised on a motion to dismiss, the Court *sua sponte*, if it feels it has been misled, will reopen that matter regardless of the status of the motion."  (Dkt. 92 at 8:9-

---

[4]    At oral argument, Mr. Brower acknowledged that "when the issue first came up regarding the potential differential in prices, [Tauber] basically believed that it was because of the overnight prices.  He provided that information to counsel.  When it came up again, he went back to the documentation, re-reviewed the documentation."  (Dkt. No. 92 at 8:24-9:3)  Thus, it appears that Tauber guessed about the cause of the disparity, his counsel represented that to the Court as truth, and only after the Sonar Defendants disproved what he represented did he bother to correct the information he previously certified was true and correct under penalty of perjury.

14)  The Court further stated that "this was something he certified under oath, which a former judge certainly knows the importance of," and that "at the time the Court fully credited, that he was going to be an unusually careful, active, punctilious, mindful representative…[a]nd so it's very disturbing to me to know that, at a minimum, he's been quite careless." (*Id*. at 11:8-12, 11:16-17).  Nevertheless, by bottom-line order, the Court denied the Sonar Defendants' Second Motion to Dismiss on November 1, 2013.  (Dkt. No. 90).  On December 30, 2014, Plaintiffs' counsel filed the Third Amended Complaint (the "TAC").  (Dkt. No. 105).

**IV.    The Motion for Class Certification**

On January 23, 2015, Tauber and Gordon file the Class Certification Motion seeking to certify one or more of the following two putative periods as suitable for class treatment under Fed. R. Civ. P. 23(a) and (b)(3): a "Seller Class Period" comprised of those who sold shares of Sigma between July 13, 2007 through November 28, 2007[5] on the listed dates:

| | |
|---|---|
| **July 2007** | 13, 16-20, 23-27, 30, 31 |
| **August 2007** | 1-3, 6-9, 15-17, 20-24, 27, 28 |
| **September 2007** | 11-14, 17-21, 24-28 |
| **October 2007** | 1-5, 8-11, 17-19, 22-26, 29-31 |
| **November 2007** | 1, 2, 5-7, 9, 12-16, 20, 21, 23, 26-28 |

and a "Buyer Class Period" comprised of all those who bought shares of Sigma between December 20, 2007 through March 12, 2008 on the listed dates:

| | |
|---|---|
| **December 2007** | 20, 21, 24, 26-28, 31 |
| **January 2008** | 2-4, 7-11, 14, 15, 31 |
| **February 2008** | 1, 4-8, 11, 12-15, 19-22, 25-29 |
| **March 2008** | 3-7, 10-12 |

(Dkt. No. 118 at 1, Ex. A).[6]

---

[5]   Plaintiffs' original class certification brief designated September 28, 2007 as the end of the Seller Class Period.  (Dkt. 116 at 1).  Plaintiffs belatedly filed a corrected brief.  (Dkt. 118 at 1).
[6]   Plaintiffs have now changed the putative class periods three times.  The FAC proposed a single "Seller Class" from July 13 to November 28, 2007.  (FAC, ¶82).  The SAC added a "Buyer Class" and split the Seller Class into two subgroups, from July 13 to August 28, 2007

**Argument**

## I.     Standard on Class Certification

As the U.S. Supreme Court recently explained:

> The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23. The Rule does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515, 521 (2013) (internal citations and quotations omitted). The court must engage in a "rigorous" analysis which may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374, 390 (2011). "Given the enormous ramifications of certifying a class – turning potential losses from relatively small amounts into potentially massive exposure – careful analysis of the factors under Rule 23 is required." *George v. China Auto. Sys. Inc.*, 11-cv-7533, 2013 U.S. Dist. LEXIS 93698, *2 (S.D.N.Y. July 3, 2013).

## II.     Plaintiffs Do Not Satisfy The Requirements of Rule 23(a)(4)

Plaintiffs have failed to show by a preponderance of the evidence that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).[7] Despite this Court's explicit instructions at the Lead Plaintiff Hearing, both Plaintiffs have demonstrated a disturbing lack of candor in their dealings with the Court and a flippant attitude in making false and incomplete disclosures in sworn statements. Plaintiffs have little knowledge of case

---

and from September 11 to November 28, 2007. (SAC, ¶140)  Now, at class certification, Plaintiffs propose to splinter the classes into dozens of subgroups.

[7]    Notably, Plaintiffs have not submitted any affidavits from Gordon or Tauber in support of their Class Certification Motion.

developments, are ignorant or confused about basic information about each other and key issues in this action. And, as set forth in Section III, they each are subject to unique defenses.

The Rule 23(a)(4) adequacy inquiry addresses more than simply whether the interests of a purported class representative are "antagonistic" to those of the class. Courts also consider "the honesty and trustworthiness of the named plaintiff," (*Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification)); whether the lead plaintiff possesses "a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation" (*In re Lloyd's Am. Trust Fund Litig.*, 96-cv-1262, 1998 U.S. Dist. LEXIS 1199, *32 (S.D.N.Y. Feb. 6, 1998)); and whether a proposed class representative "could become the focus of cross-examination and unique defenses at trial, to the detriment of the class." *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007).

As this Court recognized in *In re Monster*, "[a] class representative must not simply lend his name to a suit controlled entirely by the class attorney, as the class is entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." 251 F.R.D. at 135-136 (internal citations and quotations omitted). Thus, "class certification may properly be denied 'where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *Id.* at 135 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000)). Where there are serious concerns about a plaintiff's diligence and integrity, courts will deny class certification. *See Kline v. Wolf*, 702 F.2d 400, 402-03 (2d Cir. 1983) (denying class certification due to concerns about plaintiff's credibility, diligence and integrity).

## A.  Tauber Has Failed To Be "An Unusually Careful, Active, Punctilious, Mindful Representative"

This Court placed its confidence in Tauber, a former judge, to be "an unusually careful, active, punctilious, mindful representative" (Dkt. No. 92 at 11:9-10).  He has failed.

### 1.    Tauber – A Former Judge – Certifies To False Statements

After Plaintiffs disclosed that Tauber's PSLRA certification was wrong, the Court noted at oral argument on September 26, 2013 that "this was something he certified under oath, which a former judge certainly knows the importance of," and that "it's very disturbing to me to know that, at a minimum, he's been quite careless." (Dkt. 92 at 11:16-17, 11:11-12).  The Court warned Plaintiffs that "the Court *sua sponte*, if it feels it has been misled, will reopen that matter [of lead plaintiff appointment] regardless of the status of the motion."  (*Id*. at 8:12-14).[8]  Tauber, when confronted at his deposition about his failure on multiple occasions over 20 months to correct his false PSLRA certification, could only say that it was "unfortunate" but was not "unfair" (Ex. B at 179:25-180:07) -- not the attitude of a responsible representative.

Tauber learned nothing from the Court's admonition.  Less than four months later, on January 22, 2014, Tauber falsely certified under oath that "[o]ther than the present litigation, Tauber has not during the last ten years been involved as a named party or class representative in a litigation or arbitration in any jurisdiction or before any tribunal or administrative agency." (Ex. G at 12).  Tauber has in fact filed at least three suits: (1) ███████████████

████████████████████████████████████████████████████

█████████████████████ ; (2) a suit against the California State Bar Association (Ex. B at 76:14-79:10, 81:3-83:10) and (3) a suit against Pacific Gas and Electric

---

[8]    Under the PSLRA, courts have "a continuing duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members."  *In re NYSE Specialists,* 240 F.R.D. at 133 (internal quotations omitted).

Company (*Id*. at 83:11-85:15).  Confronted with yet another false certification under oath, former

judge Tauber gives a remarkable explanation as to what constitutes the "truth":

> Q: That answer is not truthful, is it?
>
> A: It is truthful, if truth -- if truth means that one is doing one's best to tell the truth.  If it's factual, I would say no, it is not factual.

(*Id*. at 81:14-19).[9]

Where a purported class representative has serious credibility issues courts will

refuse to appoint them as a class representative.[10]  *See In re NYSE Specialists*, 240 F.R.D. at 144

("characteristics such as honesty, trustworthiness, and credibility" used to judge adequacy of

class representative); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985)

(inconsistent testimony grounds to deny class certification); *Weisman v. Darneille*, 78 F.R.D.

669, 670-71 (S.D.N.Y. 1978) (plaintiff failed to disclose prior criminal conviction).

**2.      Tauber Lacks Basic Knowledge Of This Case And Has Failed To Jointly Monitor and Supervise His Attorneys With Gordon**

Tauber affirmed that he "intend[s] to oversee [ ] counsel and monitor the progress

of the litigation," and that "Mr. Gordon and I have expressed an intention to regularly

communicate with counsel and each other …. We have agreed upon how we will collegially

make decisions . . . by consensus between us."  (Dkt. 32, ¶ 5, 7).  He has failed to do so:

- Within the first few minutes of his deposition, Tauber could not identify his attorney, David Brower ("Dave, what's your last name?" (Ex. B at 5:18-6:15)) or his co-lead plaintiff Sidney Gordon ("Clark?  I –  I'm not – I'm not sure of the last name."  (*Id*. at 6:23-7:4)).  Tauber has not spoken with Gordon in two years.  (*Id*. at 7:8-12).

- Tauber could not recall the facts about his trading in Sigma because, "[i]t's something that I kind of put out of my mind."  (*Id*. at 109:18-20).

---

[9]    Notably, Tauber's interrogatory responses also track Gordon's word for word– another case of duplication by counsel that this Court admonished at the Lead Plaintiff Hearing. (Ex. D at 7:5-7; *compare* Ex. G *to* Ex. H).

[10]    Tauber's claim that these litigations simply did not come to mind is belied by the fact that he recalled on his own the Pacific Gas and Electric Company dispute.  *Id*. at 83:11-85:15.

- Tauber had no idea whether he was a net buyer or seller during the Seller Class Period, notwithstanding that his trading has been a major issue in this case.  (*Id.* at 11:5 – 13:25).[11]  He still does not understand the difference between a settlement date and a trade date.  (*Id.* at 168:7-169:14).

- Tauber does not know the Class Periods, saying with respect to the Buyer Class Period, "I think we're talking about the summer through the end of the year and in – perhaps into the first – first month of 2008."  (*Id.* at 10:20-23) (Actually the TAC identifies the putative Buyer Class Period as December 20, 2007 to March 12, 2008).

- Tauber cannot articulate how the Sonar Defendants' purported conduct harmed him, or any other investors.  (*Id.* at 210:18-215:10).  In fact, Tauber admitted that Sonar's purchases appeared to increase the price of Sigma stock during the Seller Class Periods, and thus "sellers [like himself] would get more money."  (*Id.* at 215:7-80).

Tauber's lack of knowledge of the key issues here, coupled with his self-professed disinterest in the facts central to his case, make him a fundamentally inadequate representative.  *See, e.g., Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356-57 (S.D.N.Y. 2004) (denying class certification when plaintiffs unfamiliar with facts and nature of the case); *Beck*, 1995 U.S. Dist. LEXIS 9978 at *19 (denying class certification; plaintiff had only rudimentary knowledge of facts of the case and failed to control counsel).

## B.  Gordon Is a "Willing Pawn" of Counsel

Where a proposed class representative does not know key facts (such as the name of the defendant), or whether motions to dismiss and summary judgment had been filed, and had not seen the complaint before it was filed, this Court has found "beyond a doubt that [the plaintiff] has no interest in, genuine knowledge of, and/or meaningful involvement in this case and is simply the willing pawn of counsel."  *In re Monster*, 251 F.R.D. at 136.

### 1.  Gordon's Concealment Of Mr. Spirt Raises Concerns About Class Conflict

At deposition on January 23, 2015, Gordon disclosed for the first time that his

---

[11] ██████████████████████████████████████████████
████████████████████████████████████████████████
███████████████).

longtime personal attorney and cousin, David Spirt, is advising him in this matter and that Mr.

Sprit has an arrangement with Shapiro Haber that he would receive 5% of any fees awarded to

Shapiro Haber.  (Ex. C at 30:8-23, 32:12-20, 44:8-45:21, 47:20-48:4).  Shapiro Haber

and Gordon not only failed to disclose this to the Court at the Lead Plaintiff Hearing (Ex. D at

46:7-47:5), but also concealed this in his interrogatory responses, which asked Gordon to

identify any third party with whom he communicated about this action as well as any third party

who had a fee sharing arrangement in this action. [12]  (Ex. C at 105:4-14, 173:4-174:5, 175:4-

176:25, 186:15-190:15).  Mr. Spirt's involvement as a secret advisor to Gordon underscores that

the true lead plaintiff here is not Gordon but his attorneys.[13]  Plaintiffs' concealment of Mr. Spirt

from the Court and the Sonar Defendants, the close personal and business relationship between

Gordon and Mr. Spirt, coupled with Mr. Spirt's economic interest in this case, also gives rise to a

potential for conflict between Gordon and the class, as well as the appearance of impropriety.

*See In re IMAX Secs. Litig.*, 272 F.R.D. 138, 156-157 (S.D.N.Y. 2010) (close business and

personal ties to plaintiff's undisclosed personal attorney raised concerns of class conflict and

appearance of impropriety).

### 2.    Gordon Lacks Basic Knowledge Of This Case And Has Failed To Jointly Monitor and Supervise His Attorneys With Tauber

Gordon, like Tauber, lacks basic information about this case:

---

[12]   Last night, Plaintiffs produced for the first time copies of redacted emails between Shapiro Haber and Spirt from December 2011 reflecting the fee arrangement.  (*See* Ex. R.)

[13]   Gordon's testimony about the fee arrangement was disturbingly erratic.  He first testified that he did not know when the fee arrangement came into being but that Mr. Haber told him about it.  (*Id*. at 32:12-33:13).  Then he said he only learned of the fee arrangement the day before the deposition and denied that Mr. Spirt had told him about it.  (*Id*. at 187:1-23).  After a break, he claimed that he knew since the outset of the action because Mr. Spirt told him, and was reminded of that fact immediately prior to his deposition by Mr. Haber.  (*Id*. at 194:4-195:8).

- Gordon believes he represents a class of buyers and sellers, that the class period is spring of 2006 through fall of 2007 (Ex. C at 13:23-14:8, 22:5-20, 152:19-153:6).[14] This is wrong: he seeks to represent only the Seller Class, between July 13 and November 28, 2007. (Dkt. 118 at 6).

- Gordon confused former defendant Freeman with defendant Druker; believed that plaintiffs had settled with Druker (which testimony Gordon corrected only after conferring with his counsel at a break).  (*Id*. at 18:17-22, 78:19-79:2).

- Gordon did not know that the FAC had been dismissed by the Court.  (*Id*. at 143:9-12, 145:2-10).  Nor did he know why the SAC was filed.  (*Id*. at 154:22-155:6).  He did not know the outcome of the motion to dismiss the SAC.  (*Id*. at 168:10-20).  He did not receive a copy of the TAC before it was filed, only seeing it the day before the deposition.  (*Id*. at 242:22-243:7).

- Gordon does not know whether Tauber bought or sold Sigma stock or both, did not speak with him about his trading activity because he "didn't think it was my business," conceded that Tauber's trading made him dissimilar to Gordon because Gordon was "a small fish in a … very large river, and [Tauber] may be the shark," and erroneously believed that Tauber did not purport to represent a different class. (*Id*. at 23:16-24, 84:8-86:7).

- Gordon did not know that the Sonar Defendants had raised issues concerning Tauber's trading in their motion to dismiss the FAC and again in their motion to dismiss the SAC, did not recall seeing the Sonar Defendants' motions or Plaintiffs' reply, or discussing the oral argument on the motions.  In fact, Gordon expressed a concern about Mr. Tauber serving in the lead plaintiff role based on his trading.  (*Id*. at 125:4-129:15, 139:9-140:9).

- Gordon has not reviewed any of the docket sheets, complaints, informations, transcripts, news articles or other external information on which the allegations are based, notwithstanding this Court's advice in the Order appointing Gordon as lead plaintiff.  (Dkt. No. 34 at 5; Ex. C at 88:14-25, 89:1-90:15, 182:8-184:21).

- Gordon has not disclosed Mr. Spirt to Tauber.  (*Id*. Ex. C at 107:23-25).  Prior to his deposition, he had not spoken with Shaprio Haber for months.  (*Id*. at 111:16-20).

A plaintiff who is unfamiliar with significant events in the case – like the outcome of a motion to dismiss, or that a pleading was filed – cannot be a class representative.  *See In re Lloyd's Am. Trust Fund Litig.*, 1998 U.S. Dist. LEXIS 1199 at *33-35 (plaintiff unfamiliar with case events like motion to dismiss, unfamiliar with terms of her insurance policy and dealings

---

[14]   Gordon's testimony was "corrected" only at the end of the deposition when cross examined by his attorney.  (*Id*. at 245:8-19).

with Lloyds was inadequate); *Scott*, 224 F.R.D. at 356-57; *Levine v. Berg*, 79 F.R.D. 95, 97-98

(S.D.N.Y. 1978) (where "the only aid that plaintiff can render counsel is her willingness to act on

behalf of a class and bear whatever costs such action might entail" class certification denied).

### III.   Plaintiffs Do Not Satisfy The Typicality Requirements of Rule 23(a)(3)

To satisfy the typicality requirement of Fed. R. Civ. P. 23(a)(3), Gordon and

Tauber each must show "that [their] claims are typical of the claims of the class, and that [they

are] 'not subject to any unique defenses which threaten to become the focus of the litigation.'" *In*

*re IMAX Secs. Litig.*, 272 F.R.D. at 147 (quoting *In re Flag Telecom Holdings, Ltd. Secs. Litig.*,

574 F.3d 29, 40 (2d Cir. 2009)); *see also Baffa*, 222 F.3d at 59-60.  "Regardless of whether the

issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its

representation . . . there is a danger that absent class members will suffer if their representative is

preoccupied with defenses unique to it."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).  Because both Plaintiffs are subject to

unique defenses they should not be appointed as class representatives.[15]

### A.  Tauber Has No Losses And Thus No Financial Interest In This Case

At the Lead Plaintiff Hearing, Plaintiffs' counsel begged this Court to forego an

inquiry into which of Gordon and Tauber had the largest financial interest in this case, a required

element of the PSLRA lead plaintiff analysis, because they did not want to take "positions that

we would not want to be taking at the class certification stage."  (Dkt. 37 at 38:20-21).  The

reason: Tauber not only does not have the largest financial interest when compared to Gordon, he

has none at all because he profited over $309,000.

---

[15]   At the threshold, each has a major standing problem.  Gordon traded Sigma only through his
IRA, and two of Tauber's three accounts in which he traded Sigma were an IRA and a 401(k).
(Ex. B at 217:17-25; Ex. C at 46:3-47:10.)  While Plaintiffs purport to bring their claims in their
individual capacity, the claims properly belong to their IRA and 401(k) accounts.  *See, e.g.,*
ERISA Op. Letter 2013-03A (assets in which plan has beneficial interests are "plan assets").

In the context of assessing the potential lead plaintiff with the greatest losses under the PSLRA, courts in the Southern District have a "strong preference" for the last-in-first-out methodology, which calculates loss by assuming that the stocks purchased most recently were sold first. "The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price." *In re CMED Secs. Litig.*, 11 Civ. 9297, 2012 U.S. Dist. LEXIS 47785, *11-12 (S.D.N.Y. Apr. 2, 2012) (internal citations and quotations omitted*); see also In re eSpeed, Inc. Secs. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005). Applying LIFO to Tauber's trades – which Plaintiffs desperately wanted to avoid at the Lead Plaintiff Hearing – reveals that Tauber made over $309,000 in profits on Sigma in his individual account during the Class Periods. (*See* Ex. K.) Tauber ended the Seller Class Period owning 17,890 more shares than at the beginning of the Seller Class Period.[16] (Ex. I.) Whatever losses he purportedly incurred by selling shares at an "artificially deflated" price, Tauber offset by purchasing more shares at an artificially deflated price, benefiting from the price bounce upon disclosure, thus putting him at odds with the Seller Class. Tauber also ended the Buyer Class a net seller of 42,000 shares. (Ex. J.) Tauber sold all of the shares he purchased during the Buyer Period three months before the purported corrective disclosure, profiting from the alleged artificially inflated price. (*Id*.) Indeed, Tauber admitted that he earned money based on his Sigma trading in 2007 (██████████████████████ ██████████████), and that he would not be surprised to learn that he made money on Sigma during the Class Periods. (Ex. B at 152:11-20).

Plaintiffs seek to sidestep this fatal flaw by asserting that (1) because Tauber had "significant holdings of Sigma shares as of the beginning of each Class Period," he suffered a

---

[16]   Even if one were to look at only the scattering of dates in the Seller Class Period, Tauber still ends up a net buyer. (*See* Ex. P, ¶¶39, n.92, 40, n.93).

loss, (2) Tauber's trading activity is irrelevant because Plaintiffs seek a disgorgement measure of damages, and (3) the Court should not offset Tauber's losses by his gains, relying on *In re CIGNA Corp. Secs. Litig.*, 459 F. Supp. 2d 338 (E.D. Pa. 2006).  (*See* Dkt. 118 at 6, n.10.)  These arguments are meritless.  First, that Tauber held Sigma holdings at the beginning of a Class Period does not lead to the conclusion he suffered a loss.  Rather, Tauber was a net buyer during the Seller Class Period and a net seller during the Buyer Class Period and thus suffered no economic loss following the earnings announcements that end the Class Periods.  Nor does Plaintiffs' disgorgement claim excuse Tauber from satisfying the "economic loss" element of his predicate Section 10(b) and Rule 10b-5 claims.  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577, 584-85 (2005) (listing elements of Section 10(b) and Rule 10b-5 claims).  *In re CIGNA* is not controlling in this Circuit and is distinguishable.[17]  The Second Circuit instructs that a plaintiff may not "recover for losses, but ignore his profits, where both result from a single wrong."  *Abrahamson v. Fleschner*, 568 F.2d 862, 878 (2d Cir. 1977). This Court has also explained that:

> As a general rule, plaintiffs cannot claim damages where the same fraud alleged to be the cause of a loss also permitted a countervailing gain.  In other words, where both a plaintiff's losses and gains derived from a single causal event, the losses it sustains are netted against all of that plaintiff's gains.  For instance, losses resulting from a securities fraud are netted against recovered gains where both follow from a single disclosure.

*In re Refco Inc. Secs. Litig.,* 07-MDL-1902, 2013 U.S. Dist. LEXIS 116700, *37-38 (S.D.N.Y. July 31, 2013) (Rakoff, J.) (citations omitted).  Aside from his serious credibility issues, Tauber could not be a worse representative from a unique defense standpoint.

---

[17]  *In re CIGNA* dealt with a motion for summary judgment on the economic loss issue, and its enumeration of cases that refuse to offset gains by losses all predate *Dura*, and thus are inapposite here.  *See* 459 F. Supp. 2d at 339; 350-51.

### B.  Tauber Is An In And Out Trader And Cannot Demonstrate Loss Causation

In addition to being a net winner on Sigma, Tauber is an in out trader subject to the unique defense of lack of loss causation because he completely replaced the shares that he sold during the Seller Class Period, and sold all of the shares that he bought during the Buyer Class Period, all before the alleged corrective disclosures were made.  *See Dura Pharms., Inc.,* 544 U.S. at 342-43 (plaintiff suffers no loss due to alleged misrepresentation or omission either at the instant the transaction takes place, or when he sells shares quickly before the relevant truth begins to leak out); *In re Flag Telecom,* 574 F.3d at 40-41 (in and out plaintiffs could not establish loss causation, excluded from the certified class); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 11-cv-4209, 2013 U.S. Dist. LEXIS 155136, *58-62 (S.D.N.Y. Oct. 29, 2013) (in and out trader plaintiffs could not show typicality or adequacy); *George*, 2013 U.S. Dist. LEXIS 93698 at *15-18 (in and out traders subject to unique defenses, could not show typicality or adequacy); *In re SMART Techs. Inc. S'holder Litig.*, 11-cv-7673, 2013 U.S. Dist. LEXIS 4717, *25-27 (S.D.N.Y. Jan. 11, 2013) (in-and-out traders subject to unique defense); *In re Moody's Corp. Secs. Litig.*, 274 F.R.D. 480, 487-88 (S.D.N.Y. 2011) (in-and-out traders cannot serve as class representatives).

While this Court has indicated that it is "possible" that Plaintiffs could show Tauber's loss causation if they can establish that the tipped information leaked into the market before a full corrective disclosure was made (*see* Dkt. No. 76 at 9-10),[18] Plaintiffs do not assert

---

[18]   This Court has referenced *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534 (E.D. Va. 2006), for the proposition that in-and-out traders could prove loss causation under certain circumstances. (*See* Dkt. No. 76 at 9-10).  In *BearingPoint*, incomplete corrective information was "leaked" into the market, and the court recognized that in and out traders conceivably could show a loss if the market adjusted to the leaks before the final disclosure.  Plaintiffs do not argue there was any "leakage" here.  But even under *BearingPoint*, Tauber cannot show loss causation when he bought and sold the same amount of stock on the same day or within a short time before new information entered the market, because he exchanged securities for cash of equal value. *Dura Pharms., Inc.,* 544 U.S. at 342-43.

that there was any "leakage" here.  Instead, they continue to assert Sigma's August 29, 2007,

November 28, 2007 and March 12, 2008 earnings announcements revealed to the market news

about Sigma's revenues which caused the price to increase (or decrease).  The Sonar Defendants

have a strong defense that Tauber cannot establish loss causation.  He thus fails the Rule 23(b)(3)

typicality requirement.  *In re Flag Telecom*, 574 F.3d at 40-41.[19]

**C.  Both Plaintiffs Are Subject To Unique Defenses Concerning Reliance**

Plaintiffs advance both the *Basic* fraud on the market presumption of reliance and

the *Affiliated Ute* presumption of reliance, both of which are rebuttable.  *See Basic*, 485 U.S. at

248 ("Any showing that severs the link between the alleged misrepresentation and . . . the price

received (or paid) by the plaintiff," annuls the reliance presumption because "the basis for

finding that the fraud had been transmitted through market price would be gone."); *Du Pont v.

Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (*Affiliated Ute* presumption may be refuted by evidence

that disclosure would not have altered plaintiff's investment decision).  Where, as here, plaintiffs

are subject to unique defenses concerning their reliance, class certification is properly denied.

*See Baffa,* 222 F.3d at 59-60 (plaintiff subject to unique defenses concerning her reliance on the

market).  Here, Tauber and Gordon confirmed that they relied on factors other than the market

price in deciding to buy and sell Sigma shares, and that, even had the purported MNPI been

disclosed, their trading decisions would have remained unchanged.

Tauber had purely idiosyncratic reasons for his trading.  that "[h]olding on [to a

large stock position] is really – is really hard to do sometimes."  (Ex. B at 255:5-7)  One reason

he would engage in large scale in-and-out trades was that he would buy and then get "cold feet."

---

[19]   If Tauber (correctly) is barred from serving as class representative here, no Buyer Class can
be certified because Gordon does not seek to represent that class as he has no standing to assert a
"buyer" claim.  Nor may Gordon represent a class of sellers for the dates before the August 29,
2007 corrective disclosure – which occurred before his single September 28, 2007 sale.

(*Id*. at 261:9-20).  Another was that the recent anniversary of "Black Monday" had contributed to

his "cold feet."  (*Id*. at 255:3-12).  Indeed, Tauber made huge purchases of Sigma and then sold

them at lower prices on the same day.  (*See* Ex. I (Aug. 13, 2007); Ex. J (Dec. 26, 2007).  When

asked why he liquidated an enormous position in October 2007, Tauber said:

> As to why I sold it, there were times when I just got cold feet.  There were times when I just got really nervous.  And I just – you know, there were times when it was – it was difficult to be completely rational….

(Ex. B at 245:16-246:2).

Tauber could not explain what a "call" option is or the strategy for purchasing

options, despite engaging in significant trading in Sigma options during the relevant period.  (*Id*.

at 249:15-251:21).  Nor was he able to offer any explanation for his manic, huge purchases of

Sigma stock (*Id*. at 253:8-254:6, 256:16-259:11), or for his reckless, simultaneous purchases and

sales of Sigma stock at identical prices, other than he "chang[ed] [his] mind."  (*Id*. at 259:4-

264:22).  Because Tauber did not rely on the market price but rather on other factors in deciding

to trade Sigma, he does not obtain the *Basic* presumption of reliance and is subject to unique

defenses.  *See, e.g., Blank v. Jacobs*, 03-cv-2111, 2009 U.S. Dist. LEXIS 91605, *18-20

(E.D.N.Y. Sept. 30, 2009) (unique defense of non-reliance on market price when plaintiff relied

on other risk factors in deciding to purchase securities; class certification denied); *Markewich v.

Eresk*, 80 Civ. 3247, 1983 U.S. Dist. LEXIS 19347, *7-8 (S.D.N.Y. Feb. 10, 1983) (decision to

purchase stock driven by steep decline in price, "reckless" trading, raise unique reliance

defenses).  Tauber also made multiple "post-disclosure" sales during (and after) the Seller Class

Period and purchases after the Buyer Class Period, suggesting that he did not rely on the alleged

omissions and would still have sold (or purchased) Sigma shares had such information been

disclosed.[20]  *See, e.g., George*, 2013 U.S. Dist. LEXIS 93698 at *18-20 (post-disclosure purchases raise unique reliance defense; class certification denied).

Gordon's decision to buy Sigma was based exclusively on his father in law's recommendation.  (Ex. C at 209:2-8).  Gordon's investment strategy as "off the cuff."  (*Id*. at 212:22-25).  He had no independent knowledge of Sigma, and did not follow any news about it, and just had happened to check on Sigma in September 2007, decided the price was "high enough" and sold (though he delayed his decision by a few days).  (*Id*. at 228:23-234:22).  Gordon did not know that Sigma shares had been trading several dollars higher the week before he sold.  (*Id*. 229:16-17).  Thus, even if the MNPI had been published, Gordon, admittedly, would not have known of it and it would not have changed his decision to sell.

## IV.    Plaintiffs Have Not Shown Common Issues Of Law Or Fact Predominate

Plaintiffs cannot show that "[common questions] predominate over any questions affecting only individual [class] members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry is more demanding than inquiries under Rule 23(a), requiring that common issues can be resolved through generalized proof be more substantial than individual issues.  *Comcast*, 133 S. Ct. at 1432.  Because the Plaintiffs cannot establish the reliance presumption, they cannot show that common issues predominate over individual issues.  *See IBEW Local 90 Pension Fund*, 2013 U.S. Dist. LEXIS 155136 at *70-72 (in and out trading raised individual issues of loss causation and reliance that threatened to predominate over common issues); *In re Puda Coal Secs. Inc.*, 11 Civ. 2598, 2013 U.S. Dist. LEXIS 142081, *60-62 (S.D.N.Y. Oct. 1, 2013).

---

[20]    For example, Tauber sold 18,000 shares on October 22, 2007, following the August 29, 2007 disclosure, and 8,890 shares on December 18, 2007, following the November 28, 2007 disclosure.  He also purchased a total of 7,000 shares on April 8, 9 and 15, 2008 after the March 12, 2008 disclosure.  (*See* Exs. I, J).

## A.  There Is No Price Impact

Defendants can rebut the *Basic* presumption at the class certification stage with evidence that there was no price impact by the disclosure of the purported inside information. *See Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398, 2416-17, 189 L. Ed. 2d 339, 360 (2014).  Plaintiffs assert that Sigma's August 29, 2007, November 28, 2007 and March 12, 2008 earnings announcements were corrective disclosures resulting in next-day increases (or decreases) of Sigma stock price.  (Dkt. No. 105 at 34; 38; 41).  They have submitted an expert report that purports to show this.  (Ex. Q).  Yet Plaintiffs' expert fails to disentangle the alleged MNPI (expected revenues and a Motorola contract) from other confounding information in the same earnings reports such as costs, gross margins, design wins, competitive pressures, etc.[21] (*See* Ex. P, ¶¶29-35).  Nor does he address that Sigma's share price had been steadily increasing during the Seller Class Period, and steadily decreasing during the Buyer Class Period.  (Ex. M).

In fact, disclosure of the purported MNPI had no price impact.  For example, on August 28, 2007, the day before the earnings call, an analyst reported:

> IPTV: Large MOT order expected: For the last few weeks, we have heard what began as ambiguous speculation from several different clients as to new business opportunities with Motorola, has since become more specific regarding details from industry contacts pertaining to a large order for SIGM from MOT. This contract amounts to a six-figure order on a unit basis that could prove to be substantially larger. It is our view that if accurate, this business is not reflected in current consensus expectations. … We believe that this order is now widely known and expected by investors.

(Ex. N).  This information tracks the purported MNPI alleged in the TAC.  (Dkt. No. 105 ¶89-90).  Yet, the next trading day, August 29, 2007, Sigma shares increased by only 3.7% (as

---

[21]   Courts will find that plaintiffs fail to establish price impact of disclosure of the MNPI when plaintiffs' expert fails to account for confounding information.  *See, e.g., In re Moody's Corp. Secs. Litig.*, 07-cv-8375, 2013 U.S. Dist. LEXIS 122449, *38 (S.D.N.Y. Aug. 23, 2013) (finding no price impact when expert failed to show that factors other than the alleged fraud "did not play a significant role in Plaintiffs' economic loss").

opposed to the 10.5% increase the next day, following the earnings announcement).  (Ex. P ¶¶61-62).  Various semiconductor indexes also increased by comparable figures, suggesting there was no statistically significant price movement in Sigma on August 29, 2007.  (*Id.* ¶62 n. 59).

And, on more than one occasion, Sigma's share price dropped after the company announced revenues that beat market expectations, evidencing that Sigma's quarterly revenue numbers alone do not move price as Plaintiffs suggest.  For example, Sigma announced on March 12, 2008 that it beat market expectations concerning its revenues for the fourth quarter 2008 (contrary to the alleged tip that revenues would "substantially underperform" (*see* TAC ¶121), yet the share price *dropped* 16.47% on March 13, 2008.  Sigma also beat revenue expectations – significantly – at each of its June 4, 2007, April 20, 2007, May 31, 2006 earnings announcements, yet Sigma's stock price *dropped* on all three occasions:

| Date | Market Consensus Estimated Revenues | Reported Revenues | % Surprise in Revenues | % Change in Next Day Price |
|------|-------------------------------------|-------------------|------------------------|---------------------------|
| 6/4/2007 | $34.155M | $36.016M | 5.45% | -8.27% |
| 4/20/2007 | $29.418M | $31.228M | 6.15% | -0.41% |
| 5/31/2006 | $12.650M | $14.799M | 16.99% | -9.78% |

(*See* Ex. L).  Because there is no price impact from the disclosure of the alleged MNPI, individualized issues of reliance will predominate here, and class certification should be denied.

**B.  The *Affiliated Ute* Presumption Raises Individualized Issues Of Reliance**

Plaintiffs alternatively seek to invoke the *Affiliated Ute* presumption of reliance, which arises when a defendant had a duty to disclose information and the omitted information was material, (*Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 152-54, 92 S. Ct. 1456, 1471-72, 31 L. Ed. 2d 741, 761-62 (1972)), and can be refuted by a showing "by a preponderance of the evidence that disclosure of that information would not have altered the plaintiff's investment decision." *Du Pont*, 828 F.2d at 78.  Gordon's and Tauber's testimony rebuts the presumption. *See supra* Section III.C; *see Burke v. Jacoby*, 981 F.2d 1372, 1379-80 (2d Cir. 1992) (no

evidence plaintiff would have changed her decision had she known omitted data).  Further, *Affiliated Ute* requires individualized proof of how plaintiffs would have behaved, making this case inappropriate for classwide adjudication.

## V.  Plaintiffs' Proposed Class Period Dates Should Be Rejected

Plaintiffs seek certification of a Seller Class comprised of those who sold Sigma stock on 82 days between July 13, 2007 and November 28, 2007 (ignoring the purported corrective disclosure on August 29, 2007) and a Buyer Class of those who bought Sigma stock on 46 days between December 20, 2007 and March 12, 2008.  Plaintiffs claim that they have selected the dates that fall within five days of Sonar's relevant trades.  But, they have not.  Plaintiffs include in their purported Class Period dates that are not "contemporaneous" with Sonar's trades, including August 8, 9, 15, 16, 17, and 20, October 17, 18, 19, 22, 23, 24, 25, 26, 29, and 30, 2007, and February 15, 19, 20, 21, and 22, 2008.  (*See* Ex. P. ¶104)  Assuming any class can be certified here -- and none should be -- no class should be certified on those dates.

## Conclusion

For the reasons set forth here, the Sonar Defendants respectfully request the Court deny Plaintiffs' Class Certification Motion in its entirety.

New York, New York
February 13, 2015

Respectfully submitted,

SEWARD & KISSEL LLP

By: _____
      Mark J. Hyland
      Julia C. Spivack
      Michael W. Broz
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
*Attorneys for Defendants Sonar Capital*
*Management LLC, Sonar Partners, LP, Sonar*
*Institutional Fund, LP, Sonar Overseas Fund,*
*Ltd.  and Neil Druker*

25