1                                                          1

2         UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
3         --------------------------x

4         SIDNEY GORDON and JEFFREY TAUBER,

5                   Plaintiffs,
                                        Case No:
6              v.                       11-cv-09665(JSR)

7         SONAR CAPITAL MANAGEMENT LLC;
          NOAH FREEMAN; NEIL DRUKER;
8         PRIMARY GLOBAL RESEARCH, LLC; SONAR
          PARTNERS, LP; SONAR INSTITUTIONAL
9         FUND, LP; SONAR OVERSEAS FUND, LTD.;
          and JOHN AND JANE DOES 1 THROUGH 100,
10

11                Defendants.

          --------------------------x
12                                      January 22, 2015
                                        9:40 a.m.
13

14

15                       CONFIDENTIAL

16

17            Videotaped deposition of JEFFREY

18       TAUBER, taken by defendants, pursuant to

19       notice, at the offices of SEWARD & KISSEL

20       LLP, One Battery Plaza, New York, NY 10004,

21       before Sharon Lengel, a Registered

22       Professional Reporter and Notary Public of

23       the State of New York.

24

25

```
 1                                                       2

 2          APPEARANCES:

 3

 4          BROWER PIVEN

 5                  Attorneys for plaintiff

 6                  Jeffrey Tauber

 7                  475 Park Avenue South, 33rd Floor

 8                  New York, NY 10016

 9          BY:  DAVID A.P. BROWER

10                  BRIAN KERR

11

12          SEWARD & KISSEL LLP

13                  Attorneys for defendants

14                  Sonar Capital Management, LLC,

15                  Sonar Partners, LP,

16                  Sonar Institutional Fund, LP,

17                  Sonar Overseas Fund, Ltd.,

18                  Neil Druker

19                  One Battery Plaza

20                  New York, NY 10004

21          BY:  MICHAEL W. BROZ

22                  MARK J. HYLAND

23

24          PRESENT:

25          MATTHEW MAIORANO, videographer
```

1                                                    3

2                        STIPULATIONS

3

4            IT IS HEREBY STIPULATED AND AGREED,

5       by and between counsel for the respective

6       parties hereto, that all objections, except

7       as to form, are reserved to the time of

8       trial.

9            IT IS FURTHER STIPULATED AND AGREED

10      that the deposition may be signed and sworn

11      to before any officer authorized to

12      administer an oath.

13           IT IS FURTHER STIPULATED AND AGREED

14      that the sealing and filing of the

15      deposition be waived.

16

17

18

19

20

21

22

23

24

25

```
 1                                           4
 2              THE VIDEOGRAPHER:  Stand by,
 3         please.
 4              This is the beginning of Tape
 5         No. 1.  We are now on the record at
 6         approximately 9:40 a.m.  Today's date
 7         is January 22, 2015.  This is the
 8         opening of the deposition of Jeffrey
 9         Tauber in the matter of Gordon v. Sonar
10         Capital Management, LLC, et al.
11              The deposition is being held at
12         the law offices of Seward & Kissel at
13         One Battery Park Plaza, New York, New
14         York.
15              The court reporter is Sharon
16         Lengel with Pirozzi & Hillman.  I am
17         the legal videographer, Matt Maiorano,
18         also with Pirozzi & Hillman.
19              Will counsel please introduce
20         themselves.
21              MR. HYLAND:  Mark J. Hyland,
22         Seward & Kissel, for the Sonar
23         defendants and Defendant Neil Druker.
24              MR. BROWER:  David Brower, Brower
25         & Piven for the Plaintiff Tauber in the
```

```
 1                   Tauber - Confidential              5

 2           class.

 3                   MR. KERR:   Brian Kerr, also for

 4           the plaintiff.

 5                   MR. BROZ:   Michael Broz also for

 6           the Sonar defendants and Neil Druker.

 7                   THE VIDEOGRAPHER:   Will the court

 8           reporter please swear in the witness.

 9       JEFFREY TAUBER,

10            called as a witness, having been duly

11             sworn, testified as follows:

12       EXAMINATION

13       BY MR. HYLAND:

14                   THE VIDEOGRAPHER:   You may

15           proceed.

16           Q.     Good morning, Mr. Tauber.

17           A.     Good morning.

18           Q.     Did you meet with anybody in

19       preparation for your testimony today?

20           A.     Yes.

21           Q.     And who did you meet with?

22           A.     I met with my attorneys.

23           Q.     And who were they?

24           A.     They are the gentlemen to my

25       right.
```

```
1                    Tauber - Confidential              6

2          Q.    What's his name?

3          A.    Mr. Kerr and --

4                THE WITNESS:  Dave, what's your

5          last name?

6                MR. BROWER:  Brower.

7          A.    Brower.  It's Brower.

8          Q.    Okay.  While you're answering

9    questions and under oath, you're not

10   permitted to ask anybody else information

11   for your answers.  You just have to give me

12   your best recollection, okay?

13         A.    I thought that was foundational,

14   and it was -- it was appropriate.  I will

15   follow your instruction.

16         Q.    Thank you.

17               Was anyone else present at the

18   meeting?

19         A.    No.

20         Q.    Okay.

21               MR. BROWER:  Could you speak up a

22         little bit.

23         Q.    Is there another plaintiff in the

24   action in which you are the plaintiff?

25         A.    I believe there is.
```

```
1                    Tauber - Confidential              7
2           Q.     Who is that?
3           A.     Clark?  I -- I'm not -- I'm not
4      sure of the last name.
5           Q.     Okay.  Have you ever spoken with
6      the person before?
7           A.     Yeah.
8           Q.     When is the last time you spoke
9      with him?
10          A.     It would have been on -- by
11     phone, probably within -- probably around
12     perhaps two years ago.
13          Q.     Was it at about the time that you
14     had made a motion to be designated as the
15     lead representative?
16          A.     It was after that.
17          Q.     All right.  So you haven't spoken
18     to the coplaintiff in the last two years?
19          A.     I have spoken to him on several
20     occasions in the months subsequent to the
21     hearing on -- and I also made attempts to
22     contact him and was not able to do so on
23     several occasions.
24          Q.     Okay.  When is the last time you
25     spoke to him?
```

```
1                   Tauber - Confidential              8
2              A.    I'd have to give you my best
3         guesstimate because I don't have a clear
4         recollection.  I believe it would have been
5         in 2012.
6              Q.    Okay.  Thank you.  That's fine.
7                    Was there anyone else present
8         when you were preparing to meet for your
9         deposition besides Mr. Brower and Mr. Kerr?
10                   MR. BROWER:  Asked and answered.
11             Q.    You can answer.
12             A.    No.
13             Q.    Okay.  Does your coplaintiff have
14        separate counsel?
15             A.    I believe he does.
16             Q.    Do you know who represents him?
17             A.    Huber or Haber I believe is the
18        last name.
19             Q.    Okay.  Anyone else?
20             A.    Not to my knowledge.
21             Q.    Okay.  And can you summarize the
22        allegations that you are making on behalf
23        of the class in this action.
24             A.    I believe that the nature of this
25        action is the allegation that there was
```

1                    Tauber - Confidential                9

2          insider information and insider trading

3          which adversely affected the class -- the

4          classes that I represent.

5               Q.    Okay.  And what was the nature of

6          the alleged insider information?

7               A.    Well, I can tell you what I have

8          learned through documents and through

9          discussions with my attorneys.  At least I

10         could summarize what I understand them to

11         be.  Basically, as I understand it, there

12         was someone within the Sigma Corporation

13         who provided information to individuals

14         outside, and those individuals -- one of

15         whom I understand was a gentleman by the

16         name of Freeman or Furman.  Another

17         individual who was given this information

18         was a gentleman by the name of Druker, and

19         that that information was used to affect

20         their buying and selling of stocks in a way

21         that was adverse to my interest and the

22         classes I represent.

23              Q.    Can you describe the classes that

24         you represent.

25              A.    I represent buyers of Sigma stock

1                  Tauber - Confidential            10

2            during periods when the insider trading and

3            individuals were relying on insider trading

4            were selling stock based upon information

5            that they had.  And I represent sellers who

6            were selling stock at the time, that

7            individuals who had insider trading were

8            buying the stock of members of that class

9            because of the information that they had to

10           the detriment of my class.

11                Q.    How many class periods are

12           involved?

13                A.    Well, I understand that the

14           sellers suit involves I believe two -- two

15           periods in 2007, and if I'm not mistaken,

16           the buyers involve a single period.

17                Q.    And when is that period?

18                A.    I couldn't give you exact dates.

19                Q.    Okay.

20                A.    I think we're talking about the

21           summer through the end of the year and in

22           -- perhaps into the first -- first month of

23           2008.

24                Q.    So is it correct that for two

25           periods, you represent or purport to

```
 1                Tauber - Confidential          11

 2        represent a class of sellers, and for one

 3        period, a class of buyers?

 4            A.    That's correct.

 5            Q.    All right.  And during the

 6        periods where you purport to represent

 7        sellers, were you selling securities?

 8                 MR. BROWER:  Object to the form.

 9            A.    I believe that's correct.

10            Q.    Were you also buying securities

11        in Sigma?

12            A.    During -- could you -- can you

13        restate the question?

14            Q.    Yes.  During -- during the seller

15        class, you were selling securities of

16        Sigma, correct?

17            A.    Correct.

18            Q.    During the seller class, were you

19        also buying securities issued by Sigma?

20            A.    Yes.

21            Q.    And during the seller class, were

22        you selling more than you were buying, or

23        were you buying more than you were selling?

24            A.    I'm not sure I could give you an

25        answer to that.  I was trying to purchase
```

1                  Tauber - Confidential              12

2         stock or -- and sell stock and make a

3         profit at it.  I have not gone over and

4         reviewed that information.

5              Q.    So you have not at any time added

6         up the purchases and sales during the class

7         periods to figure out if you were a net

8         buyer or a net seller?

9              A.    I believe that I had done that

10        earlier in the case, but I don't have a

11        recollection as to which -- which was

12        greater.  I do know that -- that in regards

13        to this -- this action, that there are

14        more -- there were more relevant sales and

15        purchases, I believe.

16             Q.    During what period?

17             A.    During the period from the summer

18        through -- well, during the period of the

19        buying and selling that's -- that's

20        alleged.

21             Q.    Well, we've -- you -- you --

22        you've brought an action where you purport

23        to represent three classes of plaintiffs,

24        correct?

25             A.    I think there are two classes and

```
1                   Tauber - Confidential              13

2          three periods.

3                Q.    All right.  And, so, as you sit

4          here today, can you testify during period

5          one whether you purchased more securities

6          of Sigma than you sold, or you sold more

7          than you purchased?

8                A.    That's not information that I --

9          that I have -- that I've reviewed recently.

10         So I cannot answer that question.

11               Q.    Okay.  And for Period No. 2 as

12         you sit here today, can you state whether

13         you purchased more Sigma securities than

14         you sold, or you sold more than you

15         purchased?

16               A.    Once again, that's not

17         information that I reviewed recently, and

18         I'm not -- I do not have the answer to

19         that.

20               Q.    I'm going to ask the same

21         question for Period No. 3, whether you, as

22         you sit here today, can testify as to

23         whether you purchased more Sigma securities

24         or sold more during that period.

25               A.    I have the same answer.
```

```
 1                    Tauber - Confidential           14
 2          Q.      Okay.
 3                  MR. HYLAND:  I call this Tauber
 4          Exhibit 1.
 5                  (A notice of deposition was
 6          marked as Tauber 1 for identification.)
 7                  THE WITNESS:  Thank you.
 8          Q.      Mr. Tauber, do you recognize
 9      Tauber Exhibit 1?
10          A.      It may be a document that I have
11      received.  I don't recognize it.
12          Q.      Okay.  And it's actually a
13      two-page document, if you turn over the
14      other side.
15          A.      No.
16          Q.      Okay.  And looking at it, do you
17      understand that you're appearing here today
18      pursuing to this notice of deposition?
19          A.      I understand that.
20          Q.      Okay.  Now, when did you meet
21      with Mr. Brower and Mr. Kerr in preparation
22      for your deposition?
23          A.      Yesterday.
24          Q.      For how long?
25          A.      Perhaps two -- two hours.
```

```
1              Tauber - Confidential          15
2          Q.    All right.  Had you met them
3     before that?
4          A.    Of course.
5          Q.    Okay.  And when had you last met
6     with Mr. Brower or Mr. Kerr before
7     yesterday?
8          A.    Do you mean whether -- when did I
9     communicate with them, or when did I
10    actually meet with them physically?
11         Q.    Let's talk about meeting first,
12    okay?
13         A.    Okay.  That would go back to when
14    I was in New York.  I'm a Californian and
15    have been for sometime.  So it would go
16    back to the time period when we were in
17    front of the Federal Court, and the Court
18    was deciding as to whether or not -- who
19    would be the lead plaintiff in this matter.
20         Q.    Okay.  And was that the last time
21    you met either Mr. Brower or -- or
22    Mr. Kerr?
23         A.    Personally, yeah.
24         Q.    Okay.  And have you been in
25    contact with them telephonically or
```

1              Tauber - Confidential            16

2      electronically since then?

3           A.    Yes.

4           Q.    About how often?

5           A.    With -- with some frequency and

6      regularity, I understood that it was my

7      obligation to have a supervisory role.

8      And, so, I received documents from them

9      regularly, especially at the beginning of

10     the case.  I had numerous conversations,

11     mostly with Mr. Kerr.  And certainly in the

12     first six months, it was probably every few

13     weeks and sometimes more than once a week.

14              In the last two years, there have

15     been numerous occasions, I would -- I would

16     say monthly, but then there have been times

17     when I have not heard from them, and I have

18     contacted Mr. Kerr because of my obligation

19     to do so.  And we've had discussions, and

20     he has, on some occasions, just indicated

21     there was -- there was nothing happening,

22     and that we would discuss the case further

23     when there was some change of

24     circumstances.

25              So there were times when perhaps

1                    Tauber - Confidential              17

2        we did not talk for -- for two months.  But

3        we were in frequent contact.  There were

4        documents to review.  I often called him

5        back and asked him questions about the

6        documents.  I have a legal background, as

7        you may know, but it's not in a civil area,

8        and it's certainly not in a financial area.

9        So while I am curious and interested in

10       knowing what is going on and made inquiry,

11       he was always quick to get back to me and

12       to consult with me about the proceedings in

13       the case and decisions that needed to be

14       made.

15            Q.    Did -- were you provided drafts

16       of documents that would be served on the

17       defendants in this case before they went

18       out?

19            A.    Yes.

20            Q.    And did you comment on them?

21            A.    Yes.

22            Q.    Okay.  And you reviewed, for

23       example, document requests before they were

24       served?

25            A.    I'm not sure what you mean by

```
 1                Tauber - Confidential           18

 2        "document requests."

 3             Q.    Okay.  Are you aware of a process

 4        known as discovery?

 5             A.    I am.

 6             Q.    Okay.  And what mechanisms are

 7        you aware of that can be used during the

 8        discovery process?

 9             A.    That would go back to law school

10        and federal procedure.  So I'm not really

11        familiar with the federal process or the

12        federal discovery of process beyond the

13        fact that there is such a process and that

14        it's available to both parties and that the

15        Court controls it.

16             Q.    Do you recall reviewing drafts of

17        requests for the production of documents?

18             A.    I do -- I do believe that I've

19        reviewed documents of that nature.

20             Q.    And do you know what an

21        interrogatory is?

22             A.    Yes, I do.

23             Q.    And did you review drafts of

24        interrogatories before they were served?

25             A.    I cannot say that I have.
```

```
1                    Tauber - Confidential              19

2           Q.    Okay.  And did you provide

3      responses, for example, to document

4      requests that were served by the

5      defendants?

6                    MR. BROWER:  On him.

7                    MR. HYLAND:  On -- yes, yes.

8           Q.    On you.

9                    MR. HYLAND:  Fair.

10          A.    I believe so.

11          Q.    Okay.  And did you review

12     interrogatories that were served upon you

13     by the defendants?

14          A.    I believe I actually did that,

15     yes.

16          Q.    Okay.  Are you aware of any

17     depositions that have taken place in this

18     case?

19          A.    I'm aware of one.

20          Q.    What's that?

21          A.    I believe it was of a Mr. Druker.

22          Q.    Okay.  And are you aware of any

23     depositions that are currently scheduled?

24          A.    I -- I think I heard you

25     gentlemen discuss one earlier today, but I
```

```
 1                   Tauber - Confidential              20

 2         don't know of who -- of who it was.

 3              Q.    Okay.  Are you currently, you

 4         know, taking any medication that possibly

 5         could affect your recall or your ability to

 6         answer truthfully?

 7              A.    No, I'm not taking any medication

 8         that could -- could affect me.

 9              Q.    Okay.  It's just a standard

10         question.

11              A.    No, that's -- that's quite --

12         that's quite all right.  I'm not

13         particularly good with names, and --

14              Q.    Okay.

15              A.    -- and sometimes dates are very

16         difficult as well.

17              Q.    Okay.  Can you describe your

18         educational background.

19              A.    I'd be delighted.

20                    I went to P.S. 188 in Coney

21         Island through the fifth grade.  I then

22         went to P.S. 209 through the -- was it the

23         ninth grade, And then I went to Abraham

24         Lincoln High School in Brooklyn through

25         high school.  I went to Brooklyn College
```

```
 1                    Tauber - Confidential          21

 2         for four years.  I went to Boston

 3         University of Law School and graduated in

 4         1971, I believe.

 5                   As to further education, I -- I

 6         have taken -- I have gone to the judicial

 7         college in California.  That was a

 8         week-long college on what a judge needs to

 9         or ought to -- ought to know.  I've taught

10         at the judicial college.  I've also trained

11         hundreds of judges in the area of

12         alternative treatments to prison for drug

13         addicts, persons with mental disabilities,

14         individuals who have various problems that

15         can be best dealt with in a noncustodial

16         setting.  And that has been something that

17         I have been -- been doing actively for over

18         20 years.

19              Q.    Okay.  And Brooklyn College --

20         you graduated from Brooklyn College.

21              A.    That's correct.

22              Q.    When?

23              A.    I think it was '68.

24              Q.    So you went directly from college

25         to law school?
```

```
1                  Tauber - Confidential              22
2           A.      Correct.
3           Q.      And then upon graduating from
4      Boston University in 1971, what did you do?
5           A.      I went to work -- I actually had
6      an unusual situation.  I was working for
7      Ralph Nader, and I believe it was the
8      center for -- I'm trying to remember now --
9      I think Center for Democratic Action.  I
10     wrote a book on water pollution law for him
11     and also for the National Resources Defense
12     Council.  And I -- I worked for both
13     companies -- well, certainly, Ralph Nader
14     wasn't a company, but it was a -- they were
15     both non-profits -- from 1971 through
16     sometime in '72, perhaps early -- early
17     '72.
18          Q.      Okay.  And what did you do after
19     that?
20          A.      Okay.  After that, I -- I took a
21     trip.  It was an opportunity.  I took the
22     bar exam, and I passed the bar exam in
23     California.  And -- and I had an
24     opportunity to take a trip and with -- and
25     I did take a trip.  I traveled perhaps to
```

```
1                  Tauber - Confidential          23

2        40 countries over a period of a year and

3        four months, returning to the United States

4        in 1974, and had -- and looked for a job

5        specifically in -- in the criminal law.

6                  I don't know if -- if this

7        anecdote is appropriate or not, but in

8        Nepal, as I was preparing to -- to climb --

9        to -- to take -- to do a climb in the

10       Himalayas, I happened to -- to run into a

11       public defender from Oakland, which is

12       where I was living.  And, so, over the next

13       30 days, I was regaled with stories about

14       criminal law and decided that it was

15       something that I was interested in.  And

16       when I came back, I applied for a number of

17       jobs in the Bay area, which was where I was

18       living, and I -- I took a job in Santa

19       Clara County.

20                 I'm assuming you want me to

21       continue?

22       Q.    I just want to go through your --

23       your education and your work history

24       briefly, you know.  That's okay.

25       A.    Okay.
```

```
 1              Tauber - Confidential        24
 2         Q.    So --
 3         A.    We can go into great detail as
 4    well.
 5         Q.    No, that's okay.  Just -- I'd
 6    just like a general chronology, if I could,
 7    of your -- of your work history.
 8              So you came back from the trip,
 9    and you got involved in criminal law?
10         A.    I got -- I became a public
11    defender in Santa Clara County.  I was
12    there for perhaps two and a half years.  I
13    had applied for a job in Alameda County
14    because of -- I was living in Alameda
15    County in Oakland.  It was a far shorter
16    commute by far.
17              And I was -- I applied for and
18    I -- I was accepted as a public defender in
19    Alameda County.  I was there for -- for
20    less than a year.  And I went into private
21    practice.  I was in private practice with a
22    law firm of Talbert Ellis.  Luke Ellis was
23    my partner for -- and we added a third
24    attorney.  Her first name eludes me.  Her
25    last name is Frederick.  It will come to me
```

1
2      in a moment.
3               Q.    Okay.
4               A.    And we did almost all criminal
5      law.  That was -- that was my background.
6      I've done some civil in the family law
7      area, but almost entirely criminal since I
8      have been a lawyer in California.
9                     And so I did that, oh, perhaps
10     10 -- 10 years, 10 to 12 years.  And in
11     1985, I believe, I was selected to be a
12     commissioner, which, I suppose, is similar
13     to a magistrate in the federal system,
14     which means that you're doing the work the
15     judges don't want to do.
16                     And I did that through '88, I
17     think it was about for two and a half,
18     three years.  At that point, I -- there was
19     a judgeship that had opened up, and -- it
20     was about to open up.  There was a -- the
21     judge who was -- was reaching the end of
22     his term, and this background, I suppose,
23     would be helpful.
24                     At that time, in California, a
25     judge had to resign by the age of 70 or he

```
1                  Tauber - Confidential          26
2        would lose something like -- I don't know
3        if it was 40 or 50 percent of the pension.
4        So it was quite a penalty.  That's been
5        changed to a significant extent -- extent
6        since then.  But at the time, that was the
7        case.  Anyway, he was running for eight
8        months -- for an eight-month term, and I
9        decided that I might consider running.  And
10       I spoke to a number of people about that
11       possibility.  And there was an election
12       that I won with 68 percent of the vote and
13       became the judge in that -- in that
14       district.
15                  I could go on about that
16       election --
17            Q.    No, that's okay.
18            A.    -- at great length, if you'd
19       like.
20            Q.    No, I --
21            A.    It was quite an interesting
22       experience.
23                  MR. BROWER:  Nice job.
24            Q.    Yeah.  No, that's all right.
25                  In -- in what -- in what court
```

```
 1                   Tauber - Confidential              27

 2         did you become a judge in?

 3              A.     It was the Oakland Piedmont

 4         Emeryville Municipal District.

 5              Q.     And that's -- that's an elected

 6         position.

 7              A.     Yes, sir.

 8              Q.     And for -- what is the term?

 9              A.     Six years.

10              Q.     And you served as a municipal

11         district judge for a six-year term?

12              A.     I did.  And then I was elected

13         again.

14              Q.     To the same court.

15              A.     That's correct.

16              Q.     Okay.  And what types of cases

17         did the municipal district court hear?

18              A.     Well, it's pretty much everything

19         except felony jury trials.  We were going

20         through a transition, and so a number of

21         courts were allowing the municipal courts

22         to do superior court trials.  This was done

23         on a case-by-case, county-by-county basis

24         which the Administrative Office of Courts

25         was controlling.  I'm not sure that I did a
```

```
 1              Tauber - Confidential          28

 2       felony trial.  I mean, I did many felony

 3       trials as a -- as a defense attorney.  But

 4       as a judge, I did, oh -- I did many, many

 5       misdemeanor trials.  I couldn't tell you if

 6       it was more -- more or less than 100 trials

 7       --

 8            Q.    That's okay.  But --

 9            A.    -- at the time.

10            Q.    -- did the municipal district

11       court just hear criminal cases, or did it

12       hear civil cases also?

13            A.    You know, it heard small claims,

14       of course.  It heard civil cases, unlawful

15       detainers, as I recall, and similar cases.

16       The jurisdiction for civil cases in

17       municipal court -- I'm trying to recall

18       now, because I was not really doing them.

19       That was not my -- my responsibility.  I

20       think it was $25,000 at the time.

21            Q.    All right.

22            A.    In 1997, the municipal court was

23       eliminated, and all judges in California

24       became superior court judges.  There is no

25       municipal court since then.
```

```
1                    Tauber - Confidential            29

2           Q.    And did you become a superior

3      court judge then?

4           A.    I became a superior court judge

5      through my work.  My designation is a

6      municipal court judge.  But for the past

7      13 years, I have sat as a superior court

8      judge only.  And I have sat probably

9      something -- at least 50 percent of the

10     time in the last 12 years.  But I've --

11     I've skipped quite a bit.  I don't know if

12     you want -- if you want the whole story.

13               In 19 -- I was elected, and in

14     1995, the chief justice granted me a leave

15     of absence.  It was the second time it had

16     ever been granted in California to go to

17     Washington to set up a training and

18     education institute for judges and other

19     criminal justice personnel and other -- and

20     other personnel dealing with drug, alcohol,

21     mental health, and other alternative

22     treatments to prison.  And, so, I was given

23     a year's leave, and I left in '96.  And in

24     '97, by constitutional edict, one either

25     has to return to the bench or resign.  And
```

```
 1                   Tauber - Confidential          30

 2         I chose to resign and stay in -- and stay

 3         in Washington, D.C. and -- and continue

 4         with the work I was doing.

 5                   When I got to -- to Washington, I

 6         think there might have been 50 at most of

 7         these courts.  When I left Washington in

 8         2001 or 2002, there were over a thousand.

 9         It was a very productive time and an

10         extraordinary opportunity that I've always

11         felt very positive about.  I felt really

12         blessed to have that opportunity.  There

13         were obviously sacrifices involved when you

14         do something like that as well.  But it

15         was, I think, extremely successful.

16                   Today, that organization is

17         called National Association of Drug Court

18         Professionals, has a membership -- or in

19         terms of the number of courts, there's over

20         3,000 courts in the United States that are

21         providing this -- this service.

22                   To get back to myself as a judge,

23         sometime right after I resigned, within a

24         year, I believe, all judges became superior

25         court judges.  When I returned to
```

1          Tauber - Confidential          31

2          California, I was asked to become a -- an

3          assigned judge.

4                  And I'm sure you're familiar with

5          the concept where if I'm available, and

6          there's a need for a judge, I would be

7          asked to -- to sit on -- on a -- on a

8          court.  And I did so, as I mentioned,

9          probably in -- at least 50 percent of the

10         time over the next 12 or 13 years, probably

11         closer to 60 or 70 percent.  And at all

12         times during that period of time, I was a

13         superior court judge.

14         Q.     Do you still sit as a superior

15         court or any other kind of judge?

16         A.     I only sit as a superior court

17         judge.

18         Q.     You still do as of today?

19         A.     Well, an assigned judge -- well,

20         I'm also a senior judge as -- and that's

21         more an issue of age than anything else.

22         But I sit as an assigned judge.  I most

23         recently served for over a year in Marin

24         County.  And in November, they indicated

25         that they no longer needed a criminal

1              Tauber - Confidential          32

2        judge, and they wanted a civil judge.  And,

3        so, that association changed.  Most of the

4        -- or many of the courts I sat on, I've sat

5        on for years.  I was on the San Francisco

6        Superior Court for four years.

7              Q.    When was that?

8              A.    That would have been from 2008

9        through 2011, through the end of 2011.  I

10       think it ended in October or November, if

11       I'm not mistaken.

12             Q.    All right.  And you talked about

13       your -- your resigning as a judge, I think

14       you said pursuant to constitutional edict;

15       is that right?

16             A.    Yeah.

17             Q.    When was that?

18             A.    That would have been January --

19       well, a year would have been in January.  I

20       left -- I was given that -- that year's

21       leave starting in January of 2006.  So I

22       would have proffered my resignation, no

23       doubt, in January of 2007.

24             Q.    And --

25             A.    I received -- obviously, they

```
 1                Tauber - Confidential          33

 2        accepted my resignation.  They also

 3        provided me with a -- with a commendation

 4        for the work I had done in Washington, D.C.

 5        and around the world in -- on behalf of

 6        offenders and individuals with drug and --

 7        and other serious problems.  So it was a --

 8        it was a fairly happy sendoff.

 9             Q.    And what is your age?

10             A.    67.

11             Q.    Okay.  So when you tendered your

12        resignation, that was in or about -- as a

13        judge -- in or about 2007?

14             A.    Yeah.  It was --

15             Q.    Whatever, give or take.

16             A.    -- probably within the first --

17             Q.    Okay.

18             A.    -- first week, I would think.

19             Q.    So you were about 60 years old at

20        the time, thereabouts?

21             A.    No.  Let's -- let me think.  Let

22        me go back.  I was more like -- was it 51?

23        I'm just -- I haven't even thought of this

24        in such a long time.  I remember in my

25        first year, I turned 50.  So, I mean, my
```

```
1                    Tauber - Confidential            34

2        first year in Washington.  So I believe it

3        was something like 51.  I think I was in

4        Washington through 2001.

5              Q.    Okay.

6              A.    So I was in my early 50s.

7              Q.    When you resigned.

8              A.    When I resigned, yeah.

9              Q.    What was the constitutional edict

10       that required you to resign as a judge?

11             A.    Well, you know, I never -- I

12       never researched it.  I was told by the

13       Administrative Office of the Court that --

14       that I would either have to return, which

15       they would gladly have me do, or resign.

16       And I had been given that information by

17       more than one individual, not only from the

18       AOC, but from my court.  And on that basis,

19       I resigned.

20                   And the fact is that the work

21       that I was doing in Washington was -- was

22       having such an extraordinary effect and, to

23       some extent, unexpected.  It was -- it was

24       perhaps at the right time, being in the

25       right place at the right time.  And the
```

1                    Tauber - Confidential            35

2      organization itself is probably the most

3      influential in the criminal justice field

4      in the United States at this time.  And

5      being at the beginning of that and helping

6      to create that was something that seemed to

7      me more important than returning to be a

8      superior court judge or a municipal court

9      judge.

10          Q.    I think you said you were granted

11     a leave of absence to go to Washington to

12     work on the -- the drug and

13     substance-related issues?

14          A.    Yeah.

15          Q.    Right?

16                And who granted you that leave of

17     absence?

18          A.    It was the chief justice.

19          Q.    And who was that?

20          A.    Ron George.

21          Q.    Had you requested a leave of

22     absence?

23          A.    It was requested -- I'm trying to

24     remember.  I know that -- that there were a

25     number of judges that -- that were

1

2         supporting that -- that request.  I was --

3         at the time, I was chairman of the board of

4         this organization.  But it was a fledgling

5         organization that, basically, I was running

6         out of the courtroom, rather, the courtroom

7         than other out of my chambers.  So it

8         was -- it was clear that there was an

9         opportunity that -- for a national

10        grassroots organization to take off, and

11        someone would have to go to Washington to

12        make it happen, and I was willing to do it.

13             Q.    Right.  But did you ask for the

14        leave of absence so you would be able to do

15        that?  Was that something --

16             A.    Did Ron George ask me?

17             Q.    I'm sorry?

18             A.    Is that the question?

19             Q.    Yeah.  In other words, you said

20        you were granted a leave of absence.

21                   Did you request it, or were you

22        asked to do it?

23             A.    I was asked to do it by my

24        contemporaries --

25             Q.    Okay.

```
 1                    Tauber - Confidential              37

 2              A.      -- and my colleagues and the

 3         members of the organization that I -- that

 4         I was chair of at the time.

 5              Q.      Right.  Okay.

 6                      So -- and was the concept of drug

 7         courts and, you know, reform, which you

 8         testified to, was that something that you

 9         were interested in at the time?

10              A.      Yeah.  I thought it was -- it was

11         an extraordinarily important reform.

12              Q.      Okay.  And you said that there

13         were sacrifices involved in your, you know,

14         leaving the West Coast and going to the

15         East Coast.

16                      What sacrifices did you have in

17         mind?

18              A.      Well, the most obvious is -- is

19         leaving your home and leaving your -- your

20         employment.

21              Q.      Are you -- are you currently

22         employed?

23              A.      I'm currently -- I'm currently an

24         assigned judge or a member of the Assigned

25         Judges Program, which means that I am -- I
```

1                    Tauber - Confidential              38

2          don't know what the best way -- how to put

3          this.  But if you are part of that program,

4          and you've fulfilled the obligations of

5          education and -- and so forth, then you are

6          eligible to be requested by a jurisdiction.

7          And, so, I have probably -- in the last 12

8          or 13 years, I have probably sat in easily

9          20 courtrooms and 12 counties in Northern

10         California.

11                Q.    Okay.  How do you get paid?  Do

12         you receive a salary, or do you get paid by

13         the case?

14                A.    No.  You get -- you get paid by

15         the day.  It's basically per diem.

16                Q.    Right.  Okay.

17                      And, so, when is the last time

18         that you had just a regular salary that was

19         a steady salary that was paid to you on a

20         regular basis?

21                A.    That would probably be when I was

22         president of the National Association of

23         Drug Court Professionals, which would

24         have -- which would have been in 2001.

25                Q.    2001?

```
 1                 Tauber - Confidential          39
 2           A.      Yeah.
 3           Q.      Okay.  So since 2001, is it fair
 4      to say that you've -- you've been paid on a
 5      per-diem basis when -- when requested and
 6      when you serve on a particular case?
 7           A.      It's not a case.
 8           Q.      Okay.
 9           A.      You're -- you're often asked
10      to -- to step in when a judge becomes ill,
11      dies, is elevated, is on -- for some
12      reason, is not available to the court.  So
13      -- and some courts just have a great deal
14      of -- of work.  And --
15           Q.      Right.
16           A.      -- they can't -- they can't deal
17      with it, and so they ask for someone to
18      assist.
19           Q.      All right.
20                   And you get paid on a per-diem
21      basis.
22           A.      Correct.
23           Q.      And what's the per diem that you
24      get paid?
25                   MR. BROWER:  Objection.
```

```
 1                Tauber - Confidential           40
 2          A.    I think it's -- it's just under
 3     $700 a day.
 4          Q.    $700 a day?
 5          A.    $700 a day, I think.
 6          Q.    Okay.  And what was it back in
 7     2007?
 8          A.    Probably about the same.  I don't
 9     think there have been too many raises since
10     then.
11          Q.    Right.  Okay.
12                And where do you live?
13          A.    I live in a small town called
14     Albany, which is just outside of Berkeley,
15     California, which is in the East Bay of the
16     San Francisco Bay.
17          Q.    And what's your address?
18          A.    843 Washington Avenue.
19          Q.    843 Washington Avenue?
20          A.    Yeah.
21          Q.    Okay.  And how long have you
22     lived there?
23          A.    Approximately a year.
24          Q.    One year?
25                All right.  Do you own it?
```

```
 1                    Tauber - Confidential             41
 2              A.    No, I don't.
 3              Q.    You pay rent?
 4              A.    I live there with my girlfriend,
 5        and we share rent.
 6              Q.    Okay.  So you're not married.
 7              A.    I am not remarried.
 8              Q.    Have you ever been married?
 9              A.    Yes, I have.
10              Q.    During what period of times --
11        time?
12              A.    '91 through '99, '98, '99.
13              Q.    Any other time that you were
14        married?
15              A.    Do you want to know her name?
16              Q.    That's okay.
17              A.    Okay.  What would you like to
18        know?
19              Q.    You were married from '91 to '99?
20              A.    I believe.
21              Q.    Approximately, right?
22              A.    Approximately.
23              Q.    Other than that, have you ever
24        been married?
25              A.    No.
```

Tauber - Confidential                    42

1

2          Q.      Do you have any children?

3          A.      No.

4          Q.      Have you -- have you ever been

5     convicted of any kind of a crime?  And that

6     would include misdemeanor.

7          A.      No.

8          Q.      Have you ever had any sort of

9     crime expunged from your record?

10         A.      No.

11         Q.      Have you ever been charged with

12    any kind of substance-related offense?

13         A.      No.

14         Q.      Okay.  Never been charged with a

15    DWI or anything like that?

16         A.      No.

17         Q.      Okay.  Have you ever sought

18    treatment for any kind of substance abuse?

19         A.      No.

20         Q.      And before you lived at your

21    current residence, where did you live?

22         A.      1357 Marin Avenue in Albany, not

23    far from where I currently live.

24         Q.      Okay.  And did you own that

25    residence?

1                  Tauber - Confidential            43

2          A.    No, I did not.

3          Q.    You paid rent?

4          A.    I did.

5          Q.    And how about -- how long did you

6     live there?

7          A.    I think it was almost five years.

8          Q.    And how about before that?

9          A.    I lived in Berkeley Hills.  I had

10    a home that I did own.  It was on Cragmont

11    Avenue, but I couldn't tell you the -- I

12    couldn't tell you the address.

13         Q.    Okay.  So you owned that, and you

14    lived there?

15         A.    Yeah.

16         Q.    And you sold it?

17         A.    I did.

18         Q.    When did you sell it?

19         A.    I sold it in 19 -- excuse me --

20    not 19.  It would be probably 2008.

21         Q.    Okay.  Do you currently trade in

22    the stock market?

23         A.    No.

24         Q.    You don't?

25         A.    No.

1                   Tauber - Confidential                44

2          Q.    You don't have any brokerage

3     accounts --

4          A.    No.

5          Q.    -- that are active?

6          A.    I think Fidelity may have $150 in

7     an IRA, but that's -- as far as I know,

8     that's the only thing I have.

9          Q.    Okay.  Was there a time when you

10    traded securities?

11         A.    There was.

12         Q.    And during what period of time

13    did you trade securities?

14         A.    Well, I had an IRA, and -- during

15    my career, and, so, I had -- I had

16    securities, but I -- but they weren't

17    anything that I controlled.  In other

18    words, they were -- they were part of a --

19    of a -- I forgot the word -- just --

20         Q.    A discretionary account?

21         A.    No.

22         Q.    No.

23         A.    Not a discretionary account.  I

24    think they were -- I think I had it with --

25    well, it was -- you know, you -- quite

```
 1                 Tauber - Confidential              45
 2          frankly, you just put money -- you put
 3          money into an account, and, basically, it's
 4          something that -- that is taken care of
 5          without any interference.  And I know
 6          that's not a very sophisticated
 7          description.  But it -- it was a -- and I'm
 8          just trying to remember who I had it with.
 9          But I -- I can't -- it was one of the
10          larger -- one of the -- it was a fund.
11          Okay.  It was a fund.
12              Q.    Okay.  So you had a -- you had a
13          Fidelity account, correct?
14              A.    Right.
15              Q.    And you made investment decisions
16          with respect to the assets in that account,
17          correct?
18              A.    Correct.
19              Q.    Meaning you would -- you would
20          make the decision to buy or sell the
21          securities that were held in that account,
22          correct?
23              A.    Yes.
24              Q.    And how many -- and that was at
25          Fidelity?
```

1                    Tauber - Confidential              46

2            A.      Yeah.

3            Q.      How many Fidelity accounts did

4     you have?

5            A.      I had three.

6            Q.      Three?

7                    And what were they?

8            A.      One was an individual account.

9     One was, I believe, an IRA, and the other

10    one was a 401k, I think, if I'm not

11    mistaken.

12           Q.      Okay.  So two were

13    retirement-type accounts.

14           A.      Yeah.

15           Q.      And one was just an individual

16    account?

17           A.      Right.

18           Q.      All right.  And did you have --

19    when you traded, did you have any sort of

20    investment thesis that you followed?

21           A.      I was interested in the tech

22    field, and I thought that -- that that was

23    an area where there was the possibility of

24    significant investment --

25           Q.      Okay.

1                    Tauber - Confidential              47

2          A.     -- opportunities.

3          Q.     Did you -- did your investment

4    thesis differ whether you were trading your

5    -- your own personal account or your two

6    retirement accounts?

7          A.     Not really.

8          Q.     You basically traded them the

9    same way, the three accounts?

10         A.     Yeah.

11         Q.     Okay.  And for how long did you

12   trade securities?

13         A.     I'm trying to remember.  I

14   believe I started the Fidelity account in

15   2004/2005.

16         Q.     All right.  Before that, before

17   2004/2005, had you traded securities?

18         A.     Never.

19         Q.     Never?

20         A.     Only as I indicated through a --

21   through a fund.

22         Q.     Right.  Okay.

23                And when you say through a fund,

24   you purchased shares in a fund, and the

25   fund had its own thesis and would buy and

```
 1                  Tauber - Confidential            48
 2         sell securities.
 3              A.     Yeah, yeah.
 4              Q.     All right.  Like -- and was that
 5         with Fidelity?
 6              A.     You know, it wasn't.  It was --
 7         it was with one of the -- one of the -- the
 8         large funds that went out of business
 9         during the recession.  So --
10              Q.     Okay.  And you say that you don't
11         trade securities anymore?
12              A.     No.
13              Q.     And why not?
14              A.     Well, as they say, hindsight is
15         20/20.  I -- looking back on -- on my -- my
16         career in trading stocks, I can see that
17         even though I -- I tried to be diligent,
18         and I did everything I could to be as
19         knowledgeable as possible, that the stock
20         market is a very difficult mechanism for
21         making money, and one can lose a good deal
22         of money as well as make a good deal of
23         money.
24              Q.     And -- and what happened to the
25         three accounts that you had at Fidelity, or
```

1                    Tauber - Confidential          49

2          two retirement-type accounts and your

3          individual account?

4               A.    I -- I lost a great deal of

5          money, especially with my Sigma account.

6          And I think I closed them out perhaps two

7          years ago.  But there were just a few

8          thousand dollars left.  They had -- they

9          had diminished greatly over the period of

10         time.  I -- I think that's probably the

11         best way to describe it.

12              Q.    So is it fair to say that your

13         three Fidelity accounts -- your two

14         retirements accounts, and your individual

15         account -- they were depleted because of

16         losses in trading?

17              A.    Yes.

18              Q.    Had you made any withdrawals from

19         those accounts?

20              A.    Well, it depends when you --

21         when.  I made withdrawals after 2008, but I

22         don't think they were very large.

23              Q.    All right.  By very -- you don't

24         think they were very large.

25                    What number are you talking

```
 1                Tauber - Confidential            50

 2      about?

 3           A.    I can't imagine that they would

 4      be more than $20,000.

 5           Q.    Okay.  All right.

 6                 And you said you -- you lost

 7      mainly your, quote, Sigma account?

 8           A.    Mainly.

 9           Q.    All right.  During the class

10      periods, though, that are involved in this

11      case, you made money during those periods

12      in trading Sigma, correct?

13           A.    I cannot -- I cannot say.

14           Q.    You cannot say because you

15      haven't added up -- added up the trades?

16           A.    I cannot say because I haven't --

17      I haven't looked at that in several years.

18           Q.    Okay.

19           A.    This is not a particularly --

20      something I -- I -- I like to dwell on.

21           Q.    I understand.

22                 During the -- the period that you

23      were trading shares, approximately how many

24      different securities did you trade?

25           A.    At different companies, different
```

```
1                   Tauber - Confidential              51

2       stocks?

3              Q.    Yes.

4              A.    It would -- it would certainly be

5       less than 50, more than 20.

6              Q.    At any given time?

7              A.    Now I'm talking over -- over the

8       period.

9              Q.    All right.  So just take, for

10      example, the -- the class periods in this

11      action, right, which go back to 2007 and

12      part of 2008.

13             A.    Yeah.

14             Q.    During that timeframe,

15      approximately how many securities would you

16      be trading at -- at the same time?  How

17      many positions would you hold?

18             A.    I would say less --

19                   MR. BROWER:  Objection to form.

20             A.    I'm sorry?

21             Q.    I'll rephrase the question.

22                   During the -- during the class

23      periods --

24             A.    Yeah.

25             Q.    -- involved in this case --
```

```
 1                  Tauber - Confidential           52

 2          A.      Yeah.

 3          Q.      -- which go from, I think,

 4    approximately the middle of 2007 to the

 5    first quarter of 2008 --

 6          A.      Yeah.

 7          Q.      -- at any given time,

 8    approximately how many different securities

 9    would you own?

10          A.      Less than ten.

11          Q.      Okay.  Do you recall what any of

12    them were back during the time of the class

13    period involved here?

14          A.      I can recall -- one of them was

15    called LNOP, I think, which was an Israeli

16    company, tech company.

17          Q.      Were they all tech companies?

18          A.      I don't think they were all tech

19    companies, no.

20          Q.      Aside from the tech companies,

21    what -- what industries were they involved

22    in?

23          A.      Let's see.  I think I had -- I

24    had some shares in -- in some drug

25    companies.  Now, if we're talking about the
```

```
 1                 Tauber - Confidential              53

 2          period -- I have a hard time remembering

 3          whether it's within that period.  I

 4          think --

 5               Q.    Okay.

 6               A.    But I did have some -- some

 7          medical or -- or medical devices, drug

 8          companies -- that's all I can think of at

 9          the moment.

10               Q.    Okay.  And at the time that you

11          started trading securities for your own

12          account, approximately how many did you

13          start out with?

14               A.    I'm not clear on the question.

15               Q.    Okay.  Fair enough.

16                     When -- when did you first start

17          trading securities for your own account?

18          About 2004?

19               A.    2004, 2005, somewhere in there.

20               Q.    Okay.  When you started doing

21          that, how many -- how many positions of

22          different companies did you have at one

23          point?

24                     MR. BROWER:  Objection to the

25               form.
```

```
1                 Tauber - Confidential          54
2          A.    At one point, I'm not sure -- I'm
3     not sure I could answer that.
4          Q.    All right.  When you opened it
5     up, did you -- were you -- was it -- were
6     you only trading one company?  Was it more
7     than one?
8          A.    I wasn't trading companies at
9     first.  I was -- I was trading funds.
10         Q.    When is the first time that you
11    started trading companies?
12         A.    Probably six months to a year
13    after I was -- after I had opened my
14    account at Fidelity.
15         Q.    All right.  And when you started
16    trading your own securities, you making the
17    investment decisions on what to buy and
18    what to sell --
19         A.    Right.
20         Q.    -- approximately how many
21    positions did you have at one time?
22              MR. BROWER:  At any one time?
23              MR. HYLAND:  At the -- at the
24         time he -- at the time he started.
25              MR. BROWER:  When they opened the
```

```
 1                  Tauber - Confidential            55

 2          account?

 3                  MR. HYLAND:  When they opened the

 4          account, the first few months, call it.

 5          A.    Well, as I said, I didn't -- I

 6     didn't trade in individual companies

 7     immediately.

 8          Q.    Right.

 9          A.    It would have been six months to

10     a year, and I probably started out with two

11     or three initially.

12          Q.    All right.  When is the first

13     time that you purchased or sold a security

14     issued by Sigma?

15          A.    Oh, wow.  Well, I guess it must

16     have been 2006, I think.

17          Q.    Okay.  Why were you interested in

18     Sigma?

19          A.    I -- I was really looking for,

20     you know, the best investment

21     opportunities.  I would read tech

22     magazines.  I'd read -- I became

23     involved -- not involved, but I followed

24     what's called, I think, George Gilder's

25     newsletter.  I would go to the Yahoo.  You
```

1               Tauber - Confidential          56

2          know, I would -- I would read everything I

3          could.  I would try to be knowledgeable.

4          And Sigma came to my attention through some

5          of the people that were investing through

6          George Gilder, or not through him, but --

7          but were discussing him or this particular

8          stock on -- on the Gilder website.

9               Q.    And did you speak to anyone about

10         possibly investing in Sigma?

11              A.    I don't think I ever spoke to

12         anyone.  I think -- if we're talking about

13         before I began to -- to invest, I would

14         follow it -- follow the conversation.  And

15         mostly, I would follow conversations.  I

16         wasn't a very active participant.  I didn't

17         think I really -- at least at that point, I

18         wanted to learn.  I wasn't -- didn't think

19         that I necessarily had -- had information

20         that was especially useful to others.

21              So I listened, and I watched, and

22         I read what people were saying about it.

23         And it was -- I think, initially, it was

24         less than $10 a share when I first heard

25         about it.  And that -- that might have been

```
 1                  Tauber - Confidential              57

 2         in the fall or the summer of 2006.  I'm not

 3         sure.

 4              Q.    Did you consult any financial

 5         professional about investing?

 6              A.    Not really.

 7              Q.    Okay.  Did you read any books?

 8              A.    Yeah.

 9              Q.    Can you identify any of them?

10              A.    There were one or two books that

11         I -- that I got, I think on -- on trading

12         in the stock market that a picked up,

13         general books on -- on trading and

14         investment strategies.  And there was at

15         least one Motley Fool book for the same

16         purpose.  And there were -- you know, I'd

17         follow Yahoo and read what I could on -- on

18         stocks and -- and the tech field because

19         it's not something that I know a great deal

20         about.  And I did my best to educate

21         myself.

22              Q.    When you say you read -- you read

23         Yahoo, are you referring to the Yahoo blogs

24         on certain securities?

25              A.    Well, I also was reading Market
```

1                   Tauber - Confidential              58

2        Watch -- is it called Market Watch?

3              Q.    Okay.  Okay.

4              A.    Very -- very carefully, I was,

5        you know, once again, trying to -- to

6        become somewhat knowledgeable.  And -- and

7        I would read -- I would certainly read the

8        blogs of any stocks that I was -- and I

9        don't mean -- by blogs, I guess we're both

10       talking about a chat -- more or less, a

11       chat room.

12             Q.    Okay, right.  Yeah.

13             A.    I mean, there would occasionally

14       be -- be information that was from the

15       company or -- or they would reference

16       articles in other places, which I would go

17       to consistent with.

18             Q.    Right.  Okay.

19                   Can you describe mechanically the

20       process that you followed when you placed

21       an order to purchase or sell a security.

22             A.    Well --

23                   MR. BROWER:  Objection.

24       Foundation.

25             Q.    Well, I'll rephrase.

1                    Tauber - Confidential              59

2          A.     Okay.

3          Q.     Did you make -- was it your

4     practice to make investment decisions

5     yourself in buying and selling Sigma?

6          A.     Yeah.

7          Q.     Same question with respect to

8     other securities.

9          A.     Yeah.

10         Q.     And when you made a decision to

11    buy or sell, for example, Sigma, how did

12    you go about effectuating the transaction?

13         A.     Well, I would use the Fidelity

14    online stock-trading mechanism, which I

15    imagine is like -- like most of them.  They

16    basically give you an opportunity to -- to

17    purchase stocks in realtime, and -- and I

18    would -- I can't think of -- of any stocks

19    that I purchased other than through

20    Fidelity.

21         Q.     All right.  So you did it

22    entirely online?

23         A.     I think there were some trades

24    where I actually called Fidelity to -- to

25    make the trades --

```
 1                  Tauber - Confidential              60
 2          Q.     Okay.
 3          A.     -- in a few instances.  But other
 4     than that, it was -- it was almost all
 5     online.
 6          Q.     All right.  So you would input
 7     the transaction on your computer?
 8          A.     Yeah.
 9          Q.     Correct?
10          A.     Yeah.
11          Q.     You'd log into your Fidelity
12     account.
13          A.     Yeah.
14          Q.     And you would --
15              MR. BROWER:  Let him finish the
16     question.
17          Q.     You -- and you would place the
18     order online, correct?
19          A.     Correct.
20          Q.     And then what happened after you
21     did that?
22          A.     I'm not sure what you mean by
23     "what happened."  I would get a -- I would
24     get a letter confirming.
25          Q.     All right.
```

```
1                    Tauber - Confidential          61

2              A.    I would also -- there would also

3         be an online confirmation of -- of some

4         sort.  And it would be reflected in -- in

5         my shares and also my account.

6              Q.    Right.  And did you keep -- did

7         you keep those records?

8              A.    You know, I -- I've moved twice.

9         I -- I really haven't kept any of those

10        records.

11             Q.    All right.  At the time, did you

12        keep the records?

13             A.    Well, I did -- I did at that

14        time.

15             Q.    All right.  And did you reconcile

16        your -- did you get a monthly statement

17        from Fidelity?

18             A.    Yeah.

19             Q.    And did you check the monthly

20        statement?

21             A.    Yeah.

22             Q.    Did you ever have any disputes as

23        to the accuracy of the information

24        contained on the statements that you

25        received?
```

```
 1                  Tauber - Confidential            62

 2           A.     No.

 3           Q.     Okay.  How did you compute your

 4      -- your gains and losses on your securities

 5      trading?

 6           A.     I'm not sure -- I'm not sure

 7      about your question.

 8           Q.     Okay.  So you were trading -- you

 9      might have been trading maybe ten

10      securities at any given time during the

11      class period, correct?

12           A.     I think that's fair.

13           Q.     All right.  So that means you're

14      buying securities and you're selling

15      securities?

16           A.     Yeah.

17           Q.     How did you calculate your amount

18      of losses and your amount of gains for

19      income tax purposes?

20           A.     Well, I basically turned over my

21      Fidelity account information to my

22      accountant, and he would make those

23      calculations.

24           Q.     Okay.  And did he make those

25      calculations with respect to each security
```

```
1                Tauber - Confidential              63
2        that you traded?
3             A.    This goes back a number of years.
4        I don't -- I don't have a specific
5        recollection.
6             Q.    All right.  And did your
7        accountant provide you with documents
8        showing your profits and losses?
9             A.    I received a -- my tax document
10       or tax return that -- that would be the --
11       the sum total of it.
12            Q.    All right.  And who was your
13       accountant back in 2006 through 2008?
14            A.    David Kobe.
15                  THE WITNESS:  I'm sorry?
16                  MR. BROWER:  Nothing.
17            Q.    I'm sorry?
18            A.    David Kobe, K-O-B-E.
19            Q.    Okay.  Is he still your
20       accountant?
21            A.    Yes, he is.
22            Q.    Okay.  And where is he located?
23            A.    In San Francisco.
24            Q.    All right.  And do you know
25       whether -- what method that was utilized in
```

```
1                  Tauber - Confidential              64

2        computing profits and losses on your

3        trades, like a first in/first out, last

4        in/first out?  Do you know what was -- what

5        kind of methodology was -- was used?

6            A.    No.

7            Q.    Okay.  Aside from your Fidelity

8        account, have you ever had any other

9        account through which you purchased or sold

10       securities, aside from that fund that you

11       identified before?

12           A.    Right.

13               MR. BROWER:  And not including

14           the 401k or the IRA.

15           Q.    I -- I am including that, because

16       that was held at Fidelity, right?

17               MR. BROWER:  Oh, I'm sorry.  You

18           said account.

19               MR. HYLAND:  I'm sorry.

20               MR. BROWER:  Private accounts.

21               MR. HYLAND:  Thank you.

22               MR. BROWER:  I thought you were

23           referring to the individual account.

24               MR. HYLAND:  I appreciate it.

25               Yes, okay.
```

1                    Tauber - Confidential            65

2            Q.    Aside from the three accounts

3       that you've identified at Fidelity, have

4       you had any other accounts through which

5       you purchased or sold securities?

6            A.    No.

7            Q.    All right.  And when is the last

8       time that you purchased or sold a security

9       in your -- one of your Fidelity accounts?

10           A.    Like I -- as I mentioned, I think

11      there were a few thousand dollars remaining

12      in my account -- one of my accounts a few

13      years ago, and I withdrew that.

14           Q.    All right.  And aside from the

15      two retirement accounts that you had at --

16      at Fidelity, do you have any other

17      retirement accounts?

18           A.    No.  Well, I don't know what you

19      mean by "retirement accounts."

20           Q.    Any other 401k or Keogh or any

21      other IRAs other than the --

22           A.    No.

23           Q.    -- ones that were represented in

24      the Fidelity accounts?

25           A.    No.

```
1                Tauber - Confidential              66

2          Q.     Okay.  Now, what was it about

3     Sigma that got you interested?

4          A.     As I've indicated, there was a

5     good deal of talk on -- on the -- on the --

6     in the -- in the Gilder chat room, if you

7     want to call it that.  And that got my

8     interest, and I started to do some

9     research.

10         Q.     What did you like about Sigma?

11         A.     Well, what they were doing was

12    they were creating an interface that

13    allowed people who -- or allowed companies

14    to bring digital information into the home

15    to be distributed through the home.  And at

16    the time, they were the only company that

17    had a device or device -- device

18    sophisticated enough to do that.  And, so,

19    there was a lot of chatter about them.

20              There was a lot of -- I mean, not

21    just on Gilder, but -- but I believe

22    I've -- I read a number of articles, some

23    of which might have been in Market Watch,

24    and others, which suggested this was --

25    this was a real comer.  I think even Motley
```

```
1                    Tauber - Confidential              67

2        Fool did several articles on it.  And I

3        started to -- to follow it closely.

4              Q.    What did Sigma manufacture?

5              A.    It was -- it's -- it's an

6        interface device which allows different

7        streams in the home to -- to divide and to

8        provide data to any number of devices --

9        TVs, computers.  And, I mean, that's --

10       that was -- as I recall, that was their

11       main product.  And it was a small company,

12       and it had a very -- at the time, it had

13       almost a monopoly, as I understood it, on

14       such a device.

15             Q.    All right.  Were you aware of its

16       competition?

17             A.    I was aware that there were other

18       companies that were far larger that could

19       be competition.

20             Q.    Who were they?

21             A.    I don't remember.

22             Q.    Okay.  And during the time that

23       you -- I may have asked it.  I just want to

24       make sure.

25                   During the time that you traded,
```

1                Tauber - Confidential              68

2          purchased, and sold Sigma, was there any

3          person from whom you personally sought

4          advice, either formally or informally?

5               A.    Well, I -- I -- I -- you know, as

6          I said, I -- I tried to -- to find or to

7          locate information as best I could, which

8          meant -- meant I went to a few

9          informational conferences, where, not just

10         Sigma, but a number of companies would have

11         an opportunity to talk about their products

12         and about their company and give

13         information.

14               So I -- I went to more than one,

15         perhaps two or three such -- such

16         gatherings.  I had an opportunity to speak

17         briefly to their spokespersons during

18         question periods and briefly afterwards.

19         So I -- I became somewhat more acquainted

20         with this particular stock than -- than any

21         other.

22               Q.    Okay.  And what were the total --

23         back in 2007/2008, what were the total

24         assets in your three Fidelity accounts?

25               A.    You have to tell me when we're

```
 1                 Tauber - Confidential              69

 2          talking about.

 3                 Q.    Yeah, I did.  2007/2008.

 4                 A.    I understand, but -- but the

 5          amount -- are we talking amounts, or are we

 6          talking --

 7                 Q.    Yeah.  The value.

 8                 What was the total value of your

 9          three Fidelity -- Fidelity accounts?

10                 A.    Well, I mean, it -- it

11          fluctuated.

12                 Q.    Approximately what's the range?

13                 A.    At some point, it might have

14          been -- I don't know -- something over --

15          or in the neighborhood of $2 million.

16                 Q.    2 million?  Yes?

17                 MR. HYLAND:  Should we take a

18          break?

19                 MR. BROWER:  Sure.

20                 THE VIDEOGRAPHER:  Stand by,

21          please.

22                 The time is 11:02.  This is the

23          end of Tape No. 1.  We are off the

24          record.

25                 (Recess)
```

1                    Tauber - Confidential            70

2                    (Mr. Kerr exited the conference

3          room.)

4                    THE VIDEOGRAPHER:  The time is

5          11:12 a.m.  This is the beginning of

6          Tape No. 2.  We are back on the record.

7     EXAMINATION CONTINUED

8     BY MR. HYLAND:

9          Q.    Mr. Tauber, what was the source

10    of the money that was used in your three

11    accounts to trade securities?  By "three

12    accounts," I'm referring to the Fidelity

13    accounts.

14         A.    The IRA and the 401k were from my

15    -- my employers.  And the individual

16    account was money that I had saved over the

17    years.

18                    (Mr. Kerr entered the conference

19         room.)

20         Q.    Was any portion in inheritance?

21         A.    Yes.

22         Q.    How much?

23         A.    I believe -- I believe

24    approximately $200,000.

25         Q.    200?

```
 1                  Tauber - Confidential            71

 2          A.     I believe.

 3          Q.     Okay.  And do you recall, back in

 4    2007/2008, how much -- what the total

 5    assets were in your individual account?

 6          A.     You know, I think it was pretty

 7    much half was in individual.

 8          Q.     Okay.

 9          A.     Half was in the IRA and the 401k.

10          Q.     Okay.  All right.

11                 MR. HYLAND:  And if I could mark

12          as an exhibit some -- 2 -- 2 and 3.

13                 This is 2.

14                 MR. KERR:  That's 2 and 3?

15                 MR. HYLAND:  No, that's just 2.

16          That's your copy.  I have a copy for

17          each of you.

18                 MR. KERR:  Thank you.

19                 (A set of interrogatories was

20          marked as Tauber 2 for identification.)

21                 MR. HYLAND:  And this is 3.

22                 (First amended interrogatories

23          were marked as Tauber 3 for

24          identification.)

25          Q.     Just looking at Exhibit 2, do you
```

```
 1                    Tauber - Confidential            72

 2         recognize this document, Mr. Tauber?  It's

 3         entitled "Defendants Sonar Capital

 4         Management's, Neil Druker's, Sonar Partners

 5         LP's, Sonar Institutional Fund LP's, and

 6         Sonar Overseas Fund LTD's first amended

 7         interrogatories."

 8                    (Pause)

 9                    MR. BROWER:  Mr. Hyland, you

10            asked him if he sees the document?

11                    MR. HYLAND:  If he recognizes it.

12                    MR. BROWER:  Oh, okay.

13         Q.    Have you seen it before?

14         A.    I'd like to -- I'd like to read a

15         document before I -- before I answer.

16                    (Pause)

17         A.    Yes, I believe I have.

18         Q.    Okay.  And did you provide

19         answers to those interrogatories?

20         A.    Yes, sir, I believe I did.

21         Q.    All right.  And if I could also

22         direct your attention to Exhibit 3.  I

23         think those are document responses.

24                    Have you seen those before?

25                    MR. BROWER:  Object to the form,
```

```
1                    Tauber - Confidential                73

2           but go ahead.

3           A.      If I may.

4           Q.      Yes, sure.

5                   (Pause)

6           A.      I believe I have seen this.

7           Q.      Okay.  And are those the

8    responses that the plaintiffs submitted in

9    response to the defendants' request for

10   production of documents?

11          A.      You know, I -- I -- I recall

12   reviewing this and discussing this with

13   counsel.  As to whether or not this was, in

14   fact, the document that was returned, I

15   couldn't -- I couldn't answer at this

16   point.

17          Q.      When you say "document returned,"

18   do you mean returned to the defendants?

19          A.      Correct.

20          Q.      Okay.  But do you recall

21   reviewing a draft of the responses prior to

22   the document being put in -- into final and

23   served on the defendants?

24          A.      I consulted with and reviewed the

25   documents.  And upon completion of that
```

```
 1                     Tauber - Confidential              74

 2        review and consultation, my attorney

 3        returned the document, as I recall.

 4             Q.    And did you approve what is

 5        marked as Exhibit 3, the responses to

 6        Sonar's document requests?

 7             A.    I believe so.

 8             Q.    Okay.

 9                  MR. HYLAND:  If I could mark as

10        Tauber Exhibit 4.  That's the next

11        document.

12                  (Objections and responses to

13        defendants' first amended

14        interrogatories were marked as Tauber 4

15        for identification.)

16                  (Pause)

17             Q.    And this is entitled "Plaintiff

18        Jeffrey Tauber's objections and responses

19        to Defendants Sonar Capital Management

20        LLC's, Neil Druker's, Sonar Partners LP's,

21        Sonar Institutional Fund LP's, and Sonar

22        Overseas Fund LTD's first amended

23        interrogatories."

24                  I'd like to direct your attention

25        to the last page of the document.
```

```
 1                 Tauber - Confidential            75

 2         A.     The verification.

 3         Q.     There's a verification, right?

 4         A.     Yeah.

 5         Q.     And that's your verification?

 6         A.     That's my hand -- that's my

 7   signature.

 8         Q.     All right.  And that is your

 9   signature verifying the accuracy of the

10   answers to the interrogatories set forth in

11   Exhibit 4?

12         A.     I believe that's what a

13   verification is, and that's correct.

14         Q.     All right.  And when you received

15   the interrogatories -- you received the

16   interrogatories from counsel, which are

17   Exhibit 2, I believe, before you answered?

18         A.     That's correct.

19         Q.     Okay.  And you provided the

20   answers in consultation with counsel to

21   these interrogatories?

22         A.     That's correct.

23         Q.     And after doing so, then you

24   signed the verification, and that's on the

25   last page?
```

```
 1                 Tauber - Confidential          76

 2          A.     That's correct.

 3          Q.     All right.

 4                 MR. HYLAND:  The next document.

 5                 (A summons and complaint filed

 6          February 23, 2006, was marked as Tauber

 7          5 for identification.)

 8          Q.     Do you recognize what's been

 9    marked as Tauber Exhibit 5?

10          A.     I need a moment.

11          Q.     Okay.

12                 (Pause)

13          A.     Yes.

14          Q.     Okay.  What is the document?

15          A.     It's a suit that was brought in

16    the California court, and it was for my --

17    my fee for work done for the State Bar

18    Association.

19          Q.     Okay.  And you brought a suit

20    against the State Bar Association for a

21    breach of contract?

22          A.     That's correct.

23          Q.     Okay.  And it's entitled -- the

24    first or the second page says "Summons."

25    And then there are several pages thereafter
```

1                    Tauber - Confidential              77

2          with questions and answers in which you

3          would check a box.

4                    Do you see that?

5          A.      Mm-hmm.

6          Q.      Yes?

7          A.      Yes.

8          Q.      And did you check those boxes?

9          A.      I believe -- I believe I -- I

10         did.

11         Q.      All right.  And you caused this

12         suit to be filed against the State Bar

13         Association?

14         A.      I believe -- I believe so.

15         Q.      Okay.  And then if you take a

16         look towards the -- the back, we see a --

17         an exhibit dated August 11, 2002, and

18         that's a letter from you to Mr. Scott

19         Drexel.

20                    Do you see that?

21         A.      Yes, sir.

22         Q.      And is that your letter to him?

23         A.      I believe it is.

24         Q.      And then after that, we see

25         another letter dated November 28, 2005, a

```
1                    Tauber - Confidential            78
2           two-page letter.
3                      Do you see that?
4           A.     I do.
5           Q.     And that's a letter from you,
6      again, to Mr. Drexel?
7           A.     That's correct.
8           Q.     All right.  And is it fair to say
9      that in this letter, you describe your
10     complaint against the Bar Association?
11          A.     I believe that's correct.
12          Q.     Okay.  And did you prepare this
13     letter yourself?
14          A.     I did.
15          Q.     I'm talking about the
16     November 28, 2005, letter.
17          A.     Yeah, I did.
18          Q.     Okay.  And you remember this
19     suit?
20          A.     I certainly do.
21          Q.     Okay.  Did the suit get any
22     publicity?
23          A.     The suit was settled -- was
24     resolved, and it was done so with an
25     agreement that the results were to be
```

1                  Tauber - Confidential               79

2          private.

3                  Q.    Okay.  All right.

4                  Did you consider it to be a

5          rather serious matter to sue the Bar

6          Association of the State of California?

7                  A.    I believe I indicate in here that

8          it's a relatively minor matter.

9                  Q.    Okay.  But it was your decision

10         to bring the suit, right?

11                 A.    Yeah.

12                 Q.    If I could direct your attention

13         to Exhibit 2.

14                 A.    Okay.

15                 Q.    Excuse me.  Exhibit 4.

16                 A.    Four?

17                 Q.    Yeah.

18                 A.    I'm sorry.

19                 (Pause)

20                 Q.    And these are your objections and

21         responses to the defendants'

22         interrogatories that were served on you?

23                 A.    I believe so.

24                 Q.    Where you had your verification

25         on the last page?

```
 1                 Tauber - Confidential          80

 2          A.     Yep.

 3          Q.     And if I could direct your

 4     attention to Interrogatory No. 10, which is

 5     on page 12 of Exhibit 4.

 6                 Interrogatory 10 states,

 7     "Identify all instances during the last ten

 8     years where either of plaintiffs has been

 9     involved as a named party or class

10     representative in a litigation or

11     arbitration in any jurisdiction or before

12     any tribunal or administrative agency and

13     for each such instance: (a) identify the

14     name or caption of such action; (b),

15     identify the court or tribunal in which it

16     was pending; (c), provide a brief

17     description of the nature of the action and

18     the relief sought; and (d), state the

19     outcome of such action or, if still

20     pending, provide a description of the

21     status of such action."

22          A.     Okay.

23          Q.     And then you gave an objection

24     and a response to Interrogatory No. 10,

25     correct?
```

```
 1                  Tauber - Confidential          81
 2          A.      Yep.
 3          Q.      And then if you look at your
 4     response, it says, "Subject to and without
 5     waiving the foregoing objections, Tauber
 6     states as follows:  Other than the present
 7     litigation, Tauber has not, during the last
 8     ten years, been involved as a named party
 9     or class representative in a litigation or
10     arbitration in any jurisdiction or before
11     any tribunal or administrative agency."
12                  That was your answer, correct?
13          A.      Correct.
14          Q.      That answer is not truthful, is
15     it?
16          A.      It is truthful, if truth -- if
17     truth means that one is doing one's best to
18     tell the truth.  If it's factual, I would
19     say no, it is not factual.
20          Q.      So you'd say it's inaccurate.
21          A.      I think that's appropriate.
22          Q.      Because your complaint against
23     the State Bar of the State of California
24     was filed February 23, 2006, correct?
25          A.      Yes.
```

                    Tauber - Confidential            82

1        Q.     And your verification is dated

2    January 22, 2014, correct?

3        A.     I believe so.

4        Q.     All right.  And, so, your suit

5    against the State Bar of California should

6    have been identified when you answered

7    Interrogatory No. 10, correct?

8        A.     That is correct.

9        Q.     Okay.  And in your verification,

10   you declare that your answers, under the

11   penalty of perjury, are true and correct,

12   correct?

13       A.     To the best of my knowledge.  I

14   mean, there's always the requirement that

15   one be -- be truthful.  But this was a

16   minor -- a relatively minor case, and one

17   that occurred eight years prior, and simply

18   did not come to mind.

19       Q.     Okay.  At the -- at the time that

20   you submitted the verification --

21       A.     Yeah.

22       Q.     -- were you or were you not aware

23   that you had filed an action against the

24   State Bar of California in 2006?

```
1                    Tauber - Confidential            83

2            A.     I was not aware because I did

3       not -- it did not come to mind.

4            Q.     If it had come to mind, would you

5       agree with me that it should have been

6       disclosed in your answer --

7            A.     Of course.

8            Q.     -- to Interrogatory No. 10?

9                   Is that right?

10           A.     Of course.

11           Q.     Are there any other actions or

12      proceedings that should have been disclosed

13      in your response to Interrogatory No. 10,

14      which is Exhibit 4?

15                  MR. BROWER:  What he recalls now

16           that he didn't recall then?

17                  MR. HYLAND:  Let the question

18           as --

19                  MR. BROWER:  Object to the form.

20                  MR. HYLAND:  -- as stated.

21                  MR. BROWER:  Go ahead.  Answer.

22           A.     I actually have -- have given --

23      when I think about it, there was a lawsuit

24      that was filed, I think, about ten years

25      ago.  It might have been -- it might have
```

```
1                   Tauber - Confidential          84

2        been within ten years.  I have a summer

3        home on the Russian River, and there's

4        damage to the banks of that river and to my

5        dwelling that had been attributed by

6        experts to the damming of water by the

7        PG&E, which is the electric company in

8        California, and I filed a lawsuit against

9        them.  It would have probably been in

10       2004/2005.  And that matter was resolved as

11       well.

12            Q.    You were the plaintiff in that

13       case?

14            A.    That's correct.

15            Q.    Where -- in what court was the

16       lawsuit filed?

17            A.    Mendocino County.

18            Q.    Who was the defendant?

19            A.    Pacific Gas and Electric Company.

20            Q.    And what was the outcome of that?

21            A.    The outcome is a matter of

22       settlement and, I believe, is not open to

23       the public.

24            Q.    Did you receive a monetary

25       payment?
```

```
1                Tauber - Confidential              85
2           A.    The outcome of that is not open
3      to the public, to my knowledge.
4           Q.    All right.  Was there a
5      settlement agreement?
6           A.    There was an agreement.
7           Q.    And the settlement agreement had
8      a confidentiality provision?
9           A.    I believe it did.
10          Q.    And the confidentiality provision
11     stated that it couldn't be disclosed except
12     as required by legal process?
13          A.    I'd have to return to the -- to
14     that agreement.  I have not looked at it in
15     -- in ten years.
16          Q.    Okay.
17               MR. HYLAND:  I want it on the
18          record asking that that happen and that
19          we receive a copy of it.
20               MR. BROWER:  Well, if the
21          agreement says -- it doesn't say under
22          compulsion by a Court order or
23          something, we'll take it under
24          consideration.  If it does, the answer
25          is no.
```

```
 1                Tauber - Confidential           86
 2           MR. HYLAND:  Well --
 3           MR. BROWER:  If it doesn't have
 4      the exception --
 5           MR. HYLAND:  All right.
 6           MR. BROWER -- you're suggesting,
 7      the answer is no.
 8           MR. HYLAND:  I would say that
 9      whether it does or it doesn't, I think
10      that it would have to be -- have to be
11      produced because of -- it's clearly --
12      clearly an exception to that.  But we
13      can talk about that.
14           MR. BROWER:  We can talk about
15      that.
16           MR. HYLAND:  I'm not going to
17      debate about it now.
18           Exhibit 6.
19           (A document entitled
20      United States Tax Court Docket Entries
21      was marked as Tauber 6 for
22      identification.)
23      Q.    Do you recognize Exhibit 6?
24      A.    No.
25      Q.    This at the top says,
```

**REDACTED**

1          Tauber - Confidential          87

2     "United States Tax Court Docket Entries,"

3     and it says -- on the left, there's a

4     docket number, and it says, "Jeffrey Tauber

5     versus Commissioner of Internal Revenue."

6               Do you see that?

7        A.    I do.



**REDACTED**

Tauber - Confidential          88



REDACTED

Tauber - Confidential                89



Tauber - Confidential                    90



**REDACTED**

Tauber - Confidential                    91





REDACTED

Tauber - Confidential                    92

Q.    All right.  And how do you know
Mr. Steven Katz?

A.    He's my tax attorney.

Q.    How long has he been your tax
attorney?

A.    Probably 2000 -- perhaps 2008.

Q.    All right.  And he's still your
tax attorney?

A.    He's still my attorney.

Q.    Is he a friend?

A.    No.

Q.    Okay.  Do you find him to be
competent?

A.    I believe so.

REDACTED

Tauber - Confidential          93



Tauber - Confidential          94



Tauber - Confidential                95



**REDACTED**

Tauber - Confidential                96



**REDACTED**

Tauber - Confidential                 97



REDACTED

Tauber - Confidential                98



Tauber - Confidential                    99



REDACTED

Tauber - Confidential                100

Q.    Okay.  Are you currently insolvent?

A.    No.

Q.    Are you paying debts as they become due?

A.    I am at this time.

Q.    Do you have credit card debt?

A.    No.

Q.    Have you had any credit cards canceled?

A.    No.

Q.    How many credit cards do you have?

A.    Three.

Q.    And you use all of them?

A.    Yes.

Q.    Do you have outstanding balances on any of them?

A.    No.  Well, I mean, within -- within 3 to $500 or something.

```
 1                  Tauber - Confidential        101
 2          Q.     Okay.  Have you -- you identified
 3     some properties.  I think you identified a
 4     vacation property and a Cragmont Avenue
 5     property?
 6          A.     Yeah.
 7          Q.     All right.  Do you still own the
 8     Cragmont Avenue property?
 9          A.     No, I do not.
10          Q.     You sold that?
11          A.     I did.
12          Q.     When did you sell that?
13          A.     It would have been in 2008.
14          Q.     Okay.  When -- when did you
15     purchase that property?
16          A.     2005.
17          Q.     And did you make or lose money on
18     the sale?
19          A.     I lost money.
20          Q.     How much did you buy it for and
21     how much did you -- did you sell it for?
22          A.     I purchased it for, I believe,
23     $750,000, and it was sold through the bank,
24     and I'm not sure what the selling price
25     was.  I think it was somewhere in the
```

```
1                    Tauber - Confidential              102

2          neighborhood of $600,000.

3                    Q.     So it was a foreclosure?

4                    A.     No.

5                    Q.     You said you sold it through the

6          bank.

7                           What does that mean?

8                    A.     Well, there are different ways

9          that one deals with -- with property sales,

10         and one of them is to -- to sell it to or

11         through your bank.  And that is the

12         procedure that -- that I -- I used.

13                   Q.     Did you sell it to the bank or

14         through the bank?

15                   A.     You know, I'm not -- I'm not sure

16         what the appropriate nomenclature is.  I

17         think there was a buyer, and the bank

18         assumed the property, and it was sold to

19         that buyer through the bank, as I

20         understood it.

21                   Q.     And at the time of the sale, was

22         there an outstanding mortgage on that

23         property, the Cragmont Avenue property?

24                   A.     There was.

25                   Q.     What was the amount of the
```

```
 1                   Tauber - Confidential              103
 2        mortgage?
 3              A.    I'm not sure.  I think it
 4        probably was somewhere between 450 and
 5        $500,000.
 6              Q.    So you think you have maybe
 7        around 100 or $150 in equity?
 8              A.    I have no equity.
 9              Q.    No equity?
10              A.    No equity.
11              Q.    Well, if you sold it for 600,000,
12        and your outstanding mortgage was 450 or
13        500, that would have left about 100 left
14        over in equity, right?
15              A.    I had no equity.
16              Q.    Okay.
17              A.    Which means that it -- that I
18        probably owed more than that.
19              Q.    Okay.  And what about your
20        vacation -- I think you mentioned a
21        vacation property?
22              A.    I own a property -- a cabin in
23        the -- on the Russian River.
24              Q.    And where is that located?
25              A.    That's located on the -- on --
```

1                   Tauber - Confidential          104

2          well, it's -- it's located in Mendocino

3          County.  And the address is 8001 Potter

4          Valley Road.

5                  Q.    Have you ever lived there?

6                  A.    For -- from time to time, yeah.

7                  Q.    All right.  And when did you

8          acquire that property?

9                  A.    It was 2002.

10                 Q.    And you still own that?

11                 A.    I still do.

12                 Q.    Is there a mortgage on that

13         property?

14                 A.    There is.

15                 Q.    What's the amount of the

16         mortgage?

17                 A.    There's a first and a second.  So

18         it's probably somewhere in the neighborhood

19         of $230,000.

20                 Q.    Total, the first and the second?

21                 A.    Total, yeah.

22                 Q.    Do you rent that property?

23                 A.    I do.

24                 Q.    Are you current on the mortgage

25         payments on that property?

1                     Tauber - Confidential        105

2          A.     Yeah.

3          Q.     Do you own any other personal --

4     real estate?

5          A.     No.

6          Q.     During -- during the year

7     2007/2008, am I correct that you were

8     getting paid on a per-diem basis as -- as

9     needed?

10         A.     Yeah.

11         Q.     And you weren't getting a regular

12    salary.

13         A.     No.

14         Q.     Okay.  For 2007 and 2008, can you

15    give a range of how much you made on your

16    per-diem payments for your services as a

17    judge?

18         A.     Not really.  It was -- it -- it

19    varied pretty -- pretty significantly.

20    Sometimes, some years, it was as little as

21    $30,000, and some years, it was over

22    $100,000.

23         Q.     Okay.  And do you have a

24    recollection back in 2007 and 2008 what the

25    amount was?

```
 1                   Tauber - Confidential        106
 2            A.    I think 2007 was probably in the
 3       neighborhood of -- well, I really don't
 4       know.  It would -- it would -- 50 to 75,000
 5       perhaps.
 6            Q.    Okay.  And back in 2007, in your
 7       mind, were you relying on your trading to
 8       help you make ends meet?
 9            A.    I never took any money out.  I
10       left it all in.  And therefore, I lost it
11       all.
12            Q.    Do you gamble at all?
13            A.    No.
14            Q.    Ever go to Vegas?
15            A.    Very rarely, and -- and I don't
16       gamble.
17            Q.    All right.  And how did you learn
18       about this lawsuit?
19            A.    My brother-in-law told me about
20       it.  He follows -- he follows financial
21       matters.  He's a former economist with one
22       of the large banks.  And so he, as a
23       pastime -- because he's retired -- he
24       follows the stock market.  And in this
25       particular instance, he knew that I had a
```

```
1                 Tauber - Confidential          107

2       large sum in Sigma and -- and saw the

3       notice and called me and told me about it.

4              Q.    Has he served as a class

5       representative before that you're aware of?

6              A.    No.

7              Q.    Okay.  And you said he's your

8       brother-in-law.

9                    How is he your brother-in-law?

10             A.    He's married to my sister.

11             Q.    Okay.  And what's his name?

12             A.    Michael Raffleson.

13             Q.    How do you spell that?

14             A.    R-A-F-F-L-E-S-O-N.

15             Q.    Okay.  And where does he reside?

16             A.    It's -- it's -- it's in Long

17      Beach.  I don't know the address.

18             Q.    Okay.  And he's still married to

19      your sister?

20             A.    Yeah.

21             Q.    And how is he aware that you had

22      invested in Sigma?

23             A.    Because we used to talk about

24      investments in general.

25             Q.    Did he ever provide you advice?
```

```
 1                    Tauber - Confidential          108
 2          A.      Not really.
 3          Q.      Okay.  And did he understand that
 4     you had lost a lot of money in Sigma at
 5     that time?
 6          A.      At what time, sir?
 7          Q.      At the time that he told you
 8     about this lawsuit.
 9          A.      Oh, I -- I believe so, yeah.
10          Q.      At the time that you learned
11     about this lawsuit, were you still invested
12     in Sigma, or were you out of Sigma?
13          A.      I might have had a few thousand
14     dollars in it.  I don't think I did, but
15     it -- at most, it would have been probably
16     2 or $3,000.
17          Q.      Okay.  And what -- what kinds of
18     trades did you engage in with -- with
19     Sigma?
20                  You purchased and sold stock,
21     correct?
22          A.      Yeah.
23          Q.      Did you utilize options?
24          A.      Yep.
25          Q.      What kind of options?
```

1                    Tauber - Confidential          109

2           A.     What kind are there?

3           Q.     I'm asking you.

4                  What kind of options are you

5      aware of?

6           A.     Well, I can -- I can tell you

7      that they were -- as I understood it, they

8      were options that Sigma stock would go up.

9      And they had a time -- they had a period of

10     time in which Sigma would have to reach a

11     certain level for this -- for the option to

12     -- to pay off.

13          Q.     Well, how did the option work,

14     though?

15          A.     I don't know if I could explain.

16          Q.     What's a call option?  You ever

17     hear of a call option?

18          A.     You know, I did understand a good

19     deal at the time.  It's something that I've

20     kind of put out of my mind.

21          Q.     What is a put option?

22          A.     I could not tell you.  It's

23     something I haven't dealt with in some

24     time.

25          Q.     Well, when you traded in options,

```
 1                    Tauber - Confidential          110

 2        how did you understand those options worked

 3        mechanically?

 4                    MR. BROWER:  Asked and answered.

 5             Go ahead.

 6             Q.    What would you -- what were you

 7        buying and what were you selling?

 8             A.    I was basically buying a -- I was

 9        buying a -- an agreement that -- that if

10        the stock was at a certain level at the end

11        of the -- the option period, then one would

12        receive the stock where you would have --

13        you would -- you would gain a profit on the

14        -- on the option.

15             Q.    How did you learn about options?

16             A.    Through reading and through

17        following, you know, various discussions.

18        They came to my attention; I followed them;

19        I saw how other people were doing on Gilder

20        and decided that it was something that I

21        wanted to know more about.

22             Q.    Did you buy and sell options?

23             A.    I -- my recollection is that I

24        bought options.

25             Q.    And, so, if you bought an option,
```

1     Tauber - Confidential   111

2   what would happen thereafter to the option?

3   What were the -- what -- what were the

4   possible outcomes?

5     A.  Well, if the stock reached the

6   level that you had -- that you had applied

7   for, then you would -- the return -- you

8   would -- you would have a return on that

9   option.

10     Q.  And what if it didn't?

11     A.  Then you would lose whatever

12   monies you put in that option.

13     Q.  Could you sell an option?

14     A.  I believe you could, yes, sir.

15     Q.  Did you ever sell options?

16     A.  I don't recall doing that.

17     Q.  Did you lose money on these

18   options that you traded in regarding Sigma?

19     A.  I did.

20     Q.  Have you ever heard the term

21   "short sale"?

22     A.  Yeah.

23     Q.  What is a short sale?

24     A.  I'm trying to remember.  I had --

25   I had much more facility than I do right

```
 1                  Tauber - Confidential            112

 2        now.  As I -- as I recall, a short sale

 3        is -- is where one has an expectation that

 4        the stock will go down.

 5               Q.     And then what happens?

 6               A.     Quite frankly, I don't recall.

 7               Q.     Did you ever engage in short

 8        sales?

 9               A.     I don't believe I did.

10               Q.     And when you learned from

11        Mr. Raffleson about the existence of the

12        suit, what did you do?

13               A.     I contacted the law firm that was

14        mentioned in the -- in the article.

15               Q.     Which law firm was that?

16               A.     I believe Mr. -- is it Pivens?

17        Law firm.

18               Q.     And what did you do?

19               A.     I spoke to Mr. Pivens.

20               Q.     And what did he say to you, and

21        what did you say to him?

22                      MR. BROWER:  Nice try.  I direct

23               him not to answer.  Move on.  I'm

24               directing him not to answer.

25               Attorney-client privilege.
```

1                   Tauber - Confidential           113

2                   MR. HYLAND:  Well, I'm marking

3              not asking for any legal advice.

4                   MR. BROWER:  You're asking him

5              what his lawyer said to him and what he

6              said to his lawyer in contemplation of

7              retaining counsel?  Nice try.  Is that

8              what Mr. Druker does?

9                   MR. HYLAND:  No.  He's not a

10             class representative.

11                  MR. BROWER:  No, he's not.

12             Q.    And you thereafter retained

13        Mr. Piven's firm?

14             A.    That's correct.

15             Q.    Okay.

16                  (A draft of a class action

17             complaint was marked as Tauber 7 for

18             identification.)

19             Q.    Do you recognize Exhibit 7?

20                  (Pause)

21             A.    Not specifically, no.  I remember

22        signing an agreement, but I couldn't -- I

23        couldn't swear that this is the agreement.

24             Q.    Is it -- it's addressed to "Dear

25        shareholder," right?  It doesn't --

```
1                  Tauber - Confidential              114

2          A.      Yeah, correct.

3          Q.      It doesn't contain your name.

4          A.      That's correct.

5          Q.      At the bottom, it says, "Tauber

6     504."

7                  Does that indicate that you

8     produced this document?

9          A.      Personally?

10         Q.      At the bottom, there's a --

11         A.      I know.  I know what you're

12    saying.

13         Q.      Yes.

14         A.      I just --

15         Q.      Yes.

16         A.      Is the question did I produce

17    this document?

18         Q.      Yes.

19         A.      And by "produce," you mean did

20    I -- did I draw it up?

21         Q.      No.

22                 MR. BROWER:  No.

23         Q.      Did you produce this document in

24    the litigation?  Did this come from your

25    files, and did you produce it?
```

```
 1                 Tauber - Confidential         115
 2          A.    I have no files.
 3          Q.    Okay.  So you don't know one way
 4      or the other whether you produced this
 5      document?
 6          A.    I assume that it -- that it's my
 7      document, but I couldn't -- I couldn't
 8      swear to it.
 9          Q.    All right.
10              MR. BROWER:  For the record, we
11              produced the document.  Is there
12              some --
13              MR. HYLAND:  I understand that.
14              MR. BROWER:  -- issue?  Okay.
15              MR. HYLAND:  Yeah.  There's an
16              issue.  You produced it, but I don't
17              know if Mr. Tauber produced it to you.
18              That's why I asked the question.
19              MR. BROWER:  Okay.
20              MR. HYLAND:  Exhibit 8.
21              (A document entitled Plaintiff's
22              Certification was marked as Tauber 8
23              for identification.)
24          Q.    Do you recognize Exhibit 8, which
25      is entitled "Plaintiff's Certification"?
```

```
 1                    Tauber - Confidential          116
 2          A.     May I read it?
 3                 (Pause)
 4          A.     Yes, I believe this is a document
 5     that I signed.
 6          Q.     And who prepared this document?
 7          A.     Are you referring to both sides
 8     of this document?
 9          Q.     Let's stick with the first page,
10     which is plaintiff's certification.
11                 It says, "Jeffrey Tauber declares
12     that," right?
13          A.     That was created, or, rather, a
14     draft was provided to me and discussed, and
15     I signed it.
16          Q.     Was a draft provided to you?
17          A.     Yeah.
18          Q.     And did you have any changes to
19     it?
20          A.     I don't recall.
21                 MR. BROWER:  We're still on the
22          first page, right?
23                 MR. HYLAND:  Yes.
24                 MR. BROWER:  Okay.
25          Q.     And that's your signature at the
```

```
1                  Tauber - Confidential              117

2         bottom?

3              A.    That's correct.

4              Q.    That's dated March 2, 2012?

5              A.    That's correct.

6              Q.    Okay.  Now, if you go back to

7         Exhibit 7 for a moment.

8              A.    Yes.

9              Q.    In the second paragraph, the

10        paragraph that starts with the word "Also,"

11        do you see that?

12             A.    Yeah.

13             Q.    If you could just read that to

14        yourself.  This asks you to provide

15        information concerning your trading,

16        correct, in Sigma?

17             A.    That's correct.

18             Q.    Okay.  And about halfway down, it

19        asks that you identify the trade date for

20        each transaction during the class period,

21        correct?

22             A.    Correct.

23             Q.    And the word "trade" is all in

24        capital letters, correct?

25             A.    Correct.
```

```
 1                  Tauber - Confidential          118

 2           Q.    And did you undertake and perform

 3      that exercise to assemble all of your

 4      trading information concerning Sigma --

 5           A.    I --

 6           Q.    -- during the class period?

 7           A.    When -- when that request was

 8      made, I contacted Fidelity --

 9           Q.    Yes.

10           A.    -- and asked them for that

11      information.  They sent me a -- quite a

12      voluminous package.  I'm trying to remember

13      now.  It probably was at least two to three

14      inches thick.  And I reviewed the

15      information, and I provided that

16      information to Mr. Pivens.

17           Q.    When you say you provided that

18      information, you -- you sent the documents

19      that Fidelity sent to you on to Mr. Piven?

20           A.    Well, I reviewed them first

21      because they wanted me to -- to note

22      whether or not --

23                 MR. BROWER:  Be careful not to

24           disclose conversations between you and

25           your counsel.
```

1               Tauber - Confidential          119

2               THE WITNESS:  Okay.

3          A.    I did review them, and I then --

4     I then provided them to my attorney.

5          Q.    All right.  If you turn it over

6     where it says "Attachment to

7     certification."

8          A.    Yeah.

9          Q.    And this document on the left

10    says, "Name:  Jeffrey Tauber," and then it

11    has a number of columns, starting with

12    number of shares, and then followed by

13    purchased/sold, and then trade date, price

14    per share, number of shares.

15         A.    Right.

16         Q.    Purchase, sale, trade date,

17    right, and price per share?

18         A.    Mm-hmm.

19         Q.    Yes?

20         A.    Yeah, I see it.

21         Q.    And who populated this chart?

22         A.    The chart was -- as I understood

23    it, reflected the information that was

24    delivered to me by Fidelity.  And the chart

25    itself was not drawn up by me.

```
1                  Tauber - Confidential         120

2          Q.     Who drew it up?  Who prepared the

3    chart?

4          A.     Well, I prepared it with my

5    attorney, through discussions with my

6    attorney.

7          Q.     And were those telephone

8    discussions or in-person discussions?

9          A.     Those were telephone discussions.

10         Q.     All right.  And while you were

11   having those discussions, did you have a

12   copy of all of the pertinent Fidelity

13   information and your attorneys have a copy

14   of all of that information?

15         A.     My recollection is that my

16   attorneys had that information, and I had

17   that information as well.

18         Q.     All right.  And did you go over

19   it line by line with your counsel?

20         A.     That I cannot say.  I -- I -- my

21   recollection is -- is that I relied on the

22   information and on the consultations to

23   come up with the -- with the numbers.

24         Q.     When you discussed this chart

25   with counsel, was it already completed and
```

```
 1                  Tauber - Confidential          121

 2          then you discussed it, or was it blank and

 3          you were discussing with your counsel how

 4          it should be completed?

 5               A.    My recollection is that there

 6          were discussions about specific dates and

 7          numbers, and -- and I provided information

 8          or -- or attempted to provide information.

 9               Q.    All right.  But the information

10          that you attempted to provide already had

11          been provided to your counsel at the time,

12          correct --

13               A.    Yeah.

14               Q.    -- in the form of the documents

15          sent to you by Fidelity, right?

16               A.    Mm-hmm.

17               Q.    Okay.  And who -- who physically

18          prepared the chart?

19               A.    I did not.

20               Q.    Do you know who did?

21               A.    It ultimately was provided to me

22          for review by my attorneys.

23               Q.    Are you aware of which of your

24          attorneys or their employees prepared the

25          chart?
```

```
 1              Tauber - Confidential          122

 2         A.    I do not have that information.

 3         Q.    And who did you discuss the chart

 4    with?

 5         A.    I believe that I spoke to

 6    Mr. Pivens about the chart.

 7         Q.    Anyone else?

 8         A.    Not at that time.  I -- it

 9    depends what we're -- when we're talking.

10    This is -- this would be March 2, 2012.

11    And -- so I may have also discussed this

12    with Mr. Kerr.  I'm not sure that that

13    occurred.

14         Q.    Okay.  Is the chart accurate?

15         A.    I cannot -- I cannot certify that

16    Fidelity is correct in all matters.  These

17    are numbers that were provided to me, and I

18    relied on the accuracy of Fidelity's

19    accounting and -- and their presentation of

20    -- of information.

21         Q.    To your knowledge, is any of the

22    information on the chart on Exhibit A

23    inaccurate?

24         A.    Well, the only thing I -- I -- I

25    understand may be inaccurate is the trade
```

1                  Tauber - Confidential        123

2      dates.  As I understand it, there was some

3      confusion, certainly on my part.  As you no

4      doubt noted, I am not an experienced

5      trader.  And I wasn't even certain what the

6      significance of a trade date is opposed to

7      a settlement date.

8          Q.    Okay.  But you had -- as of this

9      time in March of 2012, you had been

10     personally trading in securities for about

11     eight years, correct?

12         A.    No, no.  I probably started in

13     2005 trading individual stocks, maybe

14     2000 -- late -- I don't know when in 2005.

15     And this was 2012.  So it would have been

16     something like six, perhaps seven years.

17         Q.    All right.  And during that time,

18     you had engaged in perhaps thousands of

19     transactions, correct?

20              MR. BROWER:  Objection.

21         A.    I couldn't tell you whether there

22     were a thousand transactions.

23         Q.    Well, in Sigma alone, you had

24     hundreds of transactions, correct?

25         A.    Probably.

1              Tauber - Confidential        124

2          Q.    All right.  And that each time

3     you entered --

4          A.    You know, if I may answer that

5     question slightly differently.  I noted,

6     when I was looking at the -- at the

7     complaint, that when I would make a

8     purchase of stock, and a large purchase --

9     could be 5, 10,000 shares -- that would be

10    broken down sometimes into 20 sales.

11         Q.    Okay.

12         A.    So if we're talking about

13    hundreds of sales, I don't know that there

14    were hundreds of sales.  I know that --

15    that there were certainly dozens, if not --

16    and -- and I wouldn't -- I would guess at

17    least close to 100 maybe -- and maybe

18    substantially more.  But a lot of those

19    sales were -- were multiple parts of a

20    single sale.

21         Q.    All right.

22         A.    Okay?

23         Q.    And -- and when you say "multiple

24    parts," am I correct that you might decide,

25    for example -- take a hypothetical -- to

```
 1              Tauber - Confidential        125
 2       sell -- to purchase a thousand shares --
 3            A.    Right.
 4            Q.    -- but you decide to do it in
 5       increments?
 6            A.    No.
 7            Q.    No?
 8            A.    No.  Sigma is not a large enough
 9       company necessarily to -- for -- for
10       Fidelity to -- to -- as I understand it,
11       which is very limited -- to -- to sell
12       5,000 shares just like that.
13            Q.    Right.
14            A.    So they will break it down into
15       sometimes 15, 20 --
16            Q.    Okay.
17            A.    -- 30 separate sales.  And -- but
18       I've only made one purchase.
19            Q.    And -- and when Fidelity did
20       that, in implementing your instructions,
21       you would get confirmations from Fidelity.
22            A.    Yeah.
23            Q.    Correct?
24            A.    Yeah.
25            Q.    And those -- and you received
```

```
 1                Tauber - Confidential          126

 2        hundreds of those, correct?

 3             A.     Yeah, yeah.

 4             Q.     And those confirmations identify

 5        trade date, correct?

 6             A.     I don't recall.

 7             Q.     All right.

 8                    MR. BROWER:  Is it time for

 9        another break?

10                    MR. HYLAND:  Sure.  Yeah.  We

11        could do that.

12                    THE VIDEOGRAPHER:  Stand by,

13        please.  The time is 12:30.  We are now

14        off the record.  This is the end of

15        Tape No. 2.

16                    (Luncheon recess: 12:30 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                   Tauber - Confidential          127

 2                   AFTERNOON SESSION

 3                        1:40 p.m.

 4              THE VIDEOGRAPHER:  Stand by,

 5         please.

 6              The time is 1:40 p.m.  This is

 7         the beginning of Tape No. 3.  We are

 8         back on the record.

 9    EXAMINATION CONTINUED

10    BY MR. HYLAND:

11         Q.   Good afternoon, Mr. Tauber.

12         A.   Good afternoon.

13         Q.   I'm going to show you the next

14    exhibit, which will be Exhibit 9.

15              (Trading records were marked as

16         Tauber 9 for identification.)

17         Q.   I'm going to ask you if you can

18    identify Exhibit 9 as trading records

19    reflecting your trades in Sigma.

20         A.   That's what it appears to be,

21    yes, sir.

22         Q.   Okay.  And were these -- and

23    these records were sent to you by Fidelity?

24         A.   I received envelopes regularly

25    from Fidelity, and I assume that they're
```

1                Tauber - Confidential          128

2         all -- they -- they were all received, yes,

3         sir.

4              Q.    Okay.  And were these records

5         shown in Exhibit 9 -- were they used to

6         assist in the compilation of the trading

7         chart that appears as part of Exhibit 8?

8              A.    I don't believe it was -- I'm not

9         certain.  But I don't believe it was -- it

10        was these documents.

11             Q.    Okay.  All right.

12                   But when Exhibit 8 was prepared,

13        though, you did testify that there were

14        trading records that had been provided by

15        Fidelity that led you or your attorneys to

16        be able to complete the schedule.

17             A.    Yes.  Let me just say this.  They

18        no longer had the records online is my

19        recollection.  And, so, they -- they sent

20        me records that were -- that were different

21        than -- my recollection is that they were

22        set up in a -- in a different fashion than

23        this.

24             Q.    Okay.  All right, fine.

25                   And just taking a look at the

```
 1                Tauber - Confidential        129
 2        first page up top, it identifies brokerage
 3        account and number, which is blacked out.
 4        And then it says your name, Jeffrey Tauber.
 5             A.    Right.
 6             Q.    This represents, then, your
 7        individual account at Fidelity?
 8             A.    I believe so.
 9             Q.    All right.  And did anybody else
10        have an interest at any time in that
11        account?
12             A.    No.
13             Q.    All right.  And then if you go,
14        just, for example, to page 548.
15             A.    548.
16                  MR. BROWER:  Using the bottom
17             number.
18                  THE WITNESS:  Okay.
19             A.    Yes, sir.
20             Q.    Up top it, says, "Brokerage
21        account number," and it says, "IRA
22        rollover, Jeffrey Tauber."
23             A.    Right.
24             Q.    You see that, right?
25             A.    Yes.
```

```
1                 Tauber - Confidential          130

2          Q.    And that's a separate account

3     from your individual account, right?

4          A.    That's correct.

5          Q.    Okay.  And did anyone else ever

6     have any ownership or beneficial interest

7     in that account?

8          A.    No, sir.

9          Q.    Okay.  And it says "IRA

10    rollover."

11                What was it a rollover from?  Do

12    you remember?

13         A.    The only thing I can think of is

14    that I -- I had a -- I had a retirement

15    plan with the organization that I headed,

16    National Association of Drug Court

17    Professionals, and I no doubt had a pension

18    or an IRA, and that might be the case that

19    it might be from that -- from that -- from

20    that purpose.

21         Q.    Is that your best recollection

22    that that was rolled into this IRA?

23         A.    I wouldn't want to say that.  I

24    would want to say that -- that that's what

25    I can think it likely to be.
```

```
 1                Tauber - Confidential          131

 2          Q.    And do you know when the IRA

 3     rollover account was formed?

 4          A.    All three accounts were formed at

 5     the same time.

 6          Q.    All right.

 7          A.    Same day.

 8          Q.    So your IRA rollover, am I

 9     correct, came -- came directly from some

10     other employer-sponsored plan directly into

11     the Fidelity?

12          A.    I had -- I had -- I had a -- I

13     had a -- an account with Edwards and

14     Company.

15          Q.    AG Edwards?

16          A.    AG Edwards.  And it was -- and I

17     believe I had both the IRA and the -- and

18     the 401k.  I believe they were both with

19     them.  And it was a very -- I knew -- I

20     knew the people, and -- and they handled

21     for several years prior to Fidelity.  So, I

22     mean, I did have -- I did have a

23     representative who was handling my -- my

24     monies rather than myself prior to that

25     date.
```

```
1                   Tauber - Confidential          132
2         Q.    Prior to transferring the money
3    into Fidelity?
4         A.    Exactly.
5         Q.    So at Edwards, you had a
6    professional that was assisting you?
7         A.    Yeah.
8         Q.    Did that professional make any
9    investment decisions for you?
10         A.    Yeah.
11         Q.    So that was what you would
12    call -- do you understand that that was a
13    discretionary account?
14         A.    I believe so.  Yeah.
15         Q.    So you decided -- so Edwards was
16    trading -- so a representative from Edwards
17    was trading your money, both your
18    retirement accounts and your personal
19    account?
20         A.    I'm not sure about the personal
21    account.
22         Q.    Okay.
23         A.    I may have had -- just had that
24    in the bank.  I -- I really don't recall.
25         Q.    Okay.
```

Tauber - Confidential                133

1
2          A.     Yeah.
3          Q.     And, so, AG Edwards would make
4     the trading decisions for you.
5          A.     Prior to Fidelity, yeah.
6          Q.     Right.  And, so, they wouldn't
7     even check with you; they would just make
8     the trades, and then you would see what was
9     happening?
10         A.     Well, I mean, I consulted with
11    them on a regular basis.
12         Q.     Right.  But they had the
13    authority to actually make a decision to
14    buy or sell a security?
15         A.     Yeah.
16         Q.     Yes?
17         A.     Yeah.
18         Q.     Okay.  And then you changed that
19    relationship and moved the accounts over to
20    Fidelity?
21         A.     Yep.
22         Q.     Where only you would be the one
23    making the trading decisions, correct?
24         A.     Correct, sir.
25         Q.     Why did you do it that way?

```
 1                Tauber - Confidential        134
 2         A.    Well, I thought that I was a
 3    capable person.  I thought that I wanted
 4    more personal accountability for the
 5    decisions that were being made.  And I
 6    thought that I could, once again,
 7    competently represent myself in that
 8    regard.
 9         Q.    You thought you could get better
10    results doing it yourself than doing it
11    with AG Edwards.
12         A.    It's another way of saying it.
13         Q.    Okay.  And then I'll just get you
14    to identify the third account, if you -- if
15    you just move over to page 552.  I'm just
16    directing your attention to the title of
17    the account.
18         A.    Yeah.
19               MR. BROWER:  Are you sure -- oh,
20         552.  I'm sorry.
21               MR. HYLAND:  Yeah.
22         A.    Okay.
23         Q.    And up there, it says, "IRA
24    simplified employee pension plan," right?
25         A.    Right.
```

```
 1                  Tauber - Confidential        135

 2           Q.     So that's the third account?

 3           A.     That's the third account.

 4           Q.     And what did this account derive

 5      from?

 6           A.     Well, that's a good question.  I

 7      -- quite frankly, I'm not sure if this

 8      related to National Association of Drug

 9      Court Professionals or to a prior -- I -- I

10      previously had a -- an IRA, or maybe it was

11      a 401k, and -- and I had it for many, many

12      years.  And I think that that would have

13      been -- just trying to -- I'm only trying

14      to make some sense of this because it's

15      something that I haven't really thought of

16      in a long time.

17                  I think the 401k is something I

18      probably had for 20 or 30 years, and it was

19      just something that would build and build.

20      It -- it was with a -- a major company such

21      as fiduciary -- Fidelity, but it wasn't

22      Fidelity.  And -- and I think the other

23      one, I think -- I think the IRA pension

24      probably was from NAD -- NADCP, National

25      Association of Drug Court Professionals.
```

```
 1                Tauber - Confidential        136
 2        Q.    Okay.  The 401k, though, was that
 3     an employer-sponsored plan, and if so, who
 4     was the employer?
 5        A.    It probably was before I became
 6     the judge.  So I had a number of employers.
 7     I was a public defender.  I was a private
 8     attorney.  So there were a number of
 9     opportunities to put money in.
10        Q.    All right.  When you were a
11     private attorney, it was your firm, right?
12        A.    Yeah.
13        Q.    And do you remember having a 401k
14     plan?
15        A.    Yeah.
16        Q.    Okay.  All right.
17              And apart from the -- the two
18     IRAs identified in these documents, that
19     is, your rollover IRA -- that's what it's
20     called -- and the simplified employee
21     pension plan IRA, did you ever have any
22     other IRAs?
23        A.    No.
24        Q.    Okay.
25              MR. BROWER:  Other than what he's
```

1                    Tauber - Confidential            137
2            already testified to.
3                    MR. HYLAND:  Well --
4                    MR. BROWER:  He already testified
5            he had an IRA years before that was
6            with a mutual fund company like
7            Fidelity, but not Fidelity.  He
8            testified he had this 401k plan from
9            some prior employer.  Your question had
10           the word "ever" in it --
11                   MR. HYLAND:  Yeah.
12                   MR. BROWER:  -- other than these
13           two, and that would be misleading
14           because he's already testified that's
15           not correct.
16                   MR. HYLAND:  Well, I'm not sure.
17           Okay.  We'll straighten that out.
18           A.    Okay.
19           Q.    So you've got the simplified
20      employee pension plan IRA, right?
21           A.    Right.
22           Q.    Am I correct that you think that
23      that is a rollover of sorts from a prior
24      401k?
25                   A.    I understood -- I understood that

```
 1              Tauber - Confidential        138

 2       one was an IRA, and one was a 401k.

 3            Q.    Okay.

 4            MR. HYLAND:  Mr. Brower --

 5            A.    And -- And maybe --

 6            MR. HYLAND:  Mr. Brower --

 7            A.    -- other language --

 8            MR. HYLAND:  -- you're been

 9       giving some certain body signals

10       to him, I think.

11            MR. BROWER:  That's bullshit.

12            MR. HYLAND:  Perhaps -- perhaps

13       inadvertent --

14            MR. BROWER:  That's not true.

15            MR. HYLAND:  Perhaps

16       inadvertently.

17            MR. BROWER:  That's not true.

18            MR. HYLAND:  Perhaps

19       inadvertently.  No --

20            MR. BROWER:  And you're smirking

21       half the day.

22            MR. HYLAND:  No, I'm not.

23            MR. BROWER:  So I'm happy to have

24       him get two more cameras.

25            MR. HYLAND:  Okay.
```

```
 1                 Tauber - Confidential          139
 2              MR. BROWER:  And we could do a
 3         three-way.
 4              MR. HYLAND:  We might -- we may
 5         do that, okay?
 6              MR. BROWER:  Okay.  Then why
 7         don't we do that.
 8              MR. HYLAND:  We may do that, but
 9         not right now.  But -- but, you have
10         and I've got --
11              MR. BROWER:  It's not true, and
12         I'm not going to listen to it.
13              MR. HYLAND:  Okay.  All right.
14         Fine.  I'm just stating it for the
15         record.
16              MR. BROWER:  And half the day
17         I've been spending looking in the other
18         direction away from the witness.
19              MR. HYLAND:  Okay.
20              MR. BROWER:  So why don't you put
21         that on the record.
22              MR. HYLAND:  You've been
23         shrugging and nodding your head up and
24         -- nodding your head and shaking your
25         head and shrugging your shoulders.
```

```
 1                  Tauber - Confidential        140

 2                  MR. BROWER:  That's just my

 3           reaction to --

 4                  MR. HYLAND:  After --

 5                  MR. BROWER:  -- your question,

 6           not the answer.

 7                  MR. HYLAND:  After there's a

 8           question and before an answer, okay?

 9           All right.

10           A.    Can I just add this much?  I've

11      been staring at you virtually --

12           Q.    Okay.

13           A.    -- the entire time.

14           Q.    Thank you.

15                  Okay.  Other than the IRA

16      simplified employee pension plan --

17           A.    Right.

18           Q.    -- and the rollover IRA --

19           A.    Right.

20           Q.    -- okay, are you aware of any

21      other retirement plans or IRAs separate and

22      apart from those two?

23           A.    Not at the time that I started

24      my -- my plan with Fidelity.

25           Q.    Okay.
```

```
 1                  Tauber - Confidential         141
 2            A.     And quite frankly, I don't -- I
 3       don't know of any that I can think of.  I
 4       mean, it's conceivable that I had other
 5       plans earlier in my career, but it's just
 6       not --
 7            Q.     That's fine.
 8            A.     -- not coming to mind.
 9            Q.     Thank you.
10                   All right.  And if you go back to
11       Exhibit 8, I'm looking at the chart here
12       that shows a summary of your purchases and
13       sales of Sigma during the class periods,
14       correct?
15            A.     No. 8?
16            Q.     Certain of them, yes.
17                   MR. BROWER:  Stay in front of it.
18            A.     All right.
19            Q.     The chart on the back.
20                   Now, when you list these
21       securities, am I correct -- and identify
22       these transactions -- am I correct that all
23       of these transactions consist of
24       transactions in your individual account,
25       your rollover IRA account, and your
```

```
1                Tauber - Confidential        142

2       simplified employee pension plan account?

3            A.    I couldn't tell you that at this

4       time.

5            Q.    All right.  Well, what -- what

6       did you intend to capture when you were

7       summarizing your trading?

8            A.    My understanding was that there

9       was -- there was data that was relevant to

10      the lawsuit, and I was made privy to that

11      data and reviewed it with counsel.  And it

12      appeared to me to be -- to be accurate, and

13      I so certified.

14           Q.    Okay.  And just going back to

15      Exhibit 9, okay?  I see that -- that which

16      is your trading records.

17           A.    Okay.

18           Q.    I see they start in January 2006.

19           A.    Okay.

20           Q.    Okay?  But I'm going to direct

21      you forward in the document on -- to July

22      of 2007.

23           A.    Okay.

24           Q.    And in particular, if we can go

25      to -- start on page 609.
```

1                    Tauber - Confidential              143

2          A.     Okay.

3          Q.     And if you flip through the

4     subsequent pages --

5                    MR. BROWER:  I'm sorry,

6            Mr. Hyland, what's the page again?

7                    THE WITNESS:  609.

8                    MR. HYLAND:  609, Tauber 609.

9                    MR. BROWER:  Thank you.

10         Q.     And if you -- if you -- if you

11    flip through from 609, and we -- if we go

12    to 610 --

13         A.     Okay.

14         Q.     -- just for example, we see a

15    purchase of, it appears, Sigma call --

16    calls.

17                  Do you see that?

18         A.     Mm-hmm.

19         Q.     Yes?

20         A.     Yeah.

21         Q.     And that's in your simplified

22    employee pension plan?

23         A.     Okay.

24         Q.     And if you go, like, to the -- to

25    the next page --

```
 1                    Tauber - Confidential            144
 2          A.     Okay.
 3          Q.     -- do you see there there's a --
 4     which is 611?
 5          A.     Right.
 6          Q.     There -- that reflects purchases
 7     in your individual account?
 8          A.     Okay.
 9          Q.     Okay.  And was it your intention
10     to make part of this lawsuit your purchases
11     in all three accounts?
12          A.     Yeah.
13          Q.     Yes, right?
14                 Okay.  And in your chart, though,
15     you didn't designate which account,
16     purchased or sold, which Sigma security --
17     Sigma security, correct?
18          A.     I'm going to go back to it.  Does
19     not appear to be so designated.
20          Q.     Okay.  Now, the first trade
21     that's identified on your trading -- on
22     your chart --
23          A.     You're talking about page --
24                 MR. BROWER:  Back -- to the back
25          of 8.
```

```
1                 Tauber - Confidential          145
2         Q.      To the back of 8.
3         A.      Back of page 8?
4         Q.      No, Exhibit 8.
5         A.      Exhibit 8, okay.
6         Q.      Yeah, the chart there.
7         A.      Thank you.
8         Q.      For example, that shows an
9    initial purchase of -- of -- during the
10   class period of 9,000 shares of Sigma,
11   correct?
12        A.      That's correct.
13        Q.      All right.  And is it your
14   understanding that the trade date that's
15   listed there, that's not correct?
16        A.      That's my understanding at this
17   time.
18        Q.      Okay.  And that it's your
19   understanding at this time that the dates
20   identified under the columns trade dates
21   are not accurate?
22        A.      That's -- that's the information
23   I've been given, yeah.
24        Q.      Okay.  Did you ever engage in any
25   trading after hours?
```

```
 1                  Tauber - Confidential          146
 2          A.    You know, I think I did from time
 3     to time, but it wasn't something I did
 4     regularly.
 5          Q.    And is it something that you did
 6     back in the summer of 2007?
 7          A.    I couldn't tell you.
 8          Q.    Okay.  All right.
 9                So your initial purchase of 9,000
10     shares --
11          A.    Okay.
12          Q.    -- there --
13                MR. BROWER:  Listed on Exhibit 8.
14                MR. HYLAND:  I'm sorry?
15                MR. BROWER:  Listed on Exhibit 8.
16                MR. HYLAND:  On Exhibit 8, yes.
17                MR. BROWER:  I think he answered
18     before.  You said "there."
19                MR. HYLAND:  Yeah, yeah.
20          Q.    -- that was a purchase.  And then
21     on July 30th, we see a -- a large sale,
22     right?  We see a sale of about 9,000 -- the
23     same 9,000 shares, correct?
24          A.    I see 9,000 and 8,000.
25          Q.    Right.  But if you take a look
```

1                  Tauber - Confidential           147

2          over on the right --

3          A.    Oh, I see it.  Then there's --

4     there were smaller sales within that one.

5     Yeah.  Yeah.  So it was the same 9,000,

6     yeah.

7          Q.    And so you purchased 9,000

8     shares.  And it says 719, but that might be

9     the settlement date, right, instead of the

10    trade date?

11         A.    That is probably the settlement

12    date, yes, sir.

13         Q.    Okay.  And then you -- then you

14    sold 9,000 shares about ten days later or

15    so, right?

16         A.    Ten days later or so, yeah,

17    absolutely.

18         Q.    Why did you do that?

19         A.    I can tell you what -- what I was

20    doing at the time.  At the time, I was -- I

21    was beginning to learn more about Sigma

22    from -- from all the -- the sources that

23    I've described.  I had reason to believe

24    that it -- I knew that it had climbed quite

25    extraordinarily from approximately $8 a

```
 1                 Tauber - Confidential          148

 2         share, when I think I first was introduced

 3         to it, and I was buying larger shares --

 4         numbers of shares of Sigma.  And

 5         occasionally, I would also sell large

 6         numbers of shares of Sigma.  I'm not sure

 7         if it was, in fact, the best strategy, but

 8         it was a strategy that I was employing.

 9              Q.    So was it your intention to be

10         more or less a short-term trader during

11         this period?

12              A.    No.  I never thought of myself as

13         a short-term trader.

14              Q.    All right.  Because I'm just

15         trying to get at your -- your -- if you

16         could possibly articulate for me the reason

17         you would buy 9,000 shares of Sigma, and

18         then 11 days later, sell 9,000 shares.

19              A.    Right, and -- and at a lesser

20         price.  So the answer to that is I cannot

21         place these sales in any context except to

22         suggest that I was doing my best to manage

23         my account, and that was part of that

24         process.

25              Q.    Were you relying on any
```

```
1                  Tauber - Confidential            149

2           investor -- any -- any type of analyst

3           reports at this time?

4                A.     You know, I -- I would do the

5           things that I understood were appropriate.

6           I would listen in to the conference calls,

7           I would read everything that was written, I

8           would go to -- Fidelity had various

9           companies that were analyzed in-house, and

10          some of them out of house.  And I would

11          review all the information I had and -- and

12          make decisions based on that.

13               Q.     All right.  And I see -- if you

14          take a look on August 16th --

15               A.     Yeah.

16               Q.     -- it appears that, in the same

17          day, you purchased 18,000 shares and sold

18          18,000 shares?

19               A.     Apparently, I lost.  I -- I

20          really don't have any -- any explanation

21          except that it wasn't a very good day.  I

22          think -- I think it's also appropriate to

23          say that these are -- these are -- these

24          sales are, you know, two, three weeks

25          apart.
```

```
 1                Tauber - Confidential        150
 2          Q.    No.  I'm talking about the -- on
 3     August 16th.
 4          A.    I understand.  I understand.
 5          Q.    You bought 18,000 shares and sold
 6     18,000 shares in the same day.
 7          A.    Yeah, yeah.
 8          Q.    And that would have meant that
 9     when you bought the shares, you were laying
10     out, you know, approximately close to
11     $600,000, correct?
12          A.    Mm-hmm.  Mm-hmm.
13          Q.    Yes?
14          A.    I -- I'll -- I'll accept your
15     math.
16          Q.    What percentage of your overall
17     Fidelity account did that --
18          A.    -- reflect?
19          Q.    -- reflect?
20          A.    I don't know.  I know that --
21     that I had great expectations for -- for --
22     for Sigma, and that I was investing large
23     amounts in Sigma.  And I had the impression
24     that I was making the right choice or the
25     right decisions.
```

```
1                   Tauber - Confidential        151
2            Q.    But as you sit here today, can
3       you have -- do you have any explanation why
4       you would spend almost $600,000 on Sigma
5       stock and then sell it the same day?
6            A.    At a -- at a lesser price?
7       Without -- without being able to go back in
8       time, I can't answer that.
9            Q.    Did you have any sort of a file
10      on your Sigma transactions?
11           A.    I did, yeah, of course.
12           Q.    Did you have any research that
13      was in there?
14           A.    I did.
15           Q.    And did you produce that in this
16      case?
17           A.    That's been gone for five years
18      or more.
19           Q.    Okay.  Had you ever purchased
20      stock for anything around this amount of
21      money and sold it in the same day before?
22           A.    Not that I can think of.
23           Q.    And, I mean, during this time --
24      I'm talking about while these trades were
25      being made -- I'm talking about July/August
```

```
 1                  Tauber - Confidential          152
 2        2007 -- were you taking any medication at
 3        all that could have affected -- could have
 4        affected your judgment?
 5             A.    No, no.
 6             Q.    Okay.  And am I correct that you
 7        never added up your purchases and sales for
 8        the three class periods to see whether you
 9        made or lost money on Sigma?
10             A.    Oh, at the time, I'm sure I did.
11             Q.    But in connection with this suit,
12        you haven't done that?
13             A.    If I did it, I did it at the very
14        beginning.  I don't -- I don't recall what
15        I determined.  I mean, it was clear to me
16        that I was -- I was, at the time, making
17        money in the sense that -- I mean, I didn't
18        see any of the money.  I never saw any of
19        the money.  But the stock had risen
20        substantially since my initial purchases.
21             Q.    And would you be surprised to
22        learn that you -- that you made money
23        during the class periods by trading Sigma?
24             A.    No, I wouldn't be surprised.
25             Q.    Okay.  With respect to the first
```

1                 Tauber - Confidential              153

2          class period, which, I think, is July 13th

3          to sometime in August --

4               A.    Okay.

5               Q.    -- how do you claim you were

6          damaged, if at all?

7               A.    I feel that if I had accurate

8          information that was available to everyone,

9          that I would have made better decisions.

10         If I knew that the price was being affected

11         in some way by insider trading, I would

12         have not put the money that I did into the

13         stock.  I feel like -- I feel like I was

14         literally abused.  I feel like this class

15         has been abused by your client.

16              Q.    How?

17              A.    They have -- as I understand

18         it -- I haven't talked to anybody who's --

19         who's a participant.  But there was a

20         scheme to provide information to an

21         outsider, who then bought stocks that drove

22         the price up and then drove it down.  And I

23         felt that this was a legitimate market in

24         this particular stock.

25                    And as it turns out, to some

1                  Tauber - Confidential          154

2        extent, it was being driven or manipulated

3        by persons who presented me with a

4        inappropriate, inaccurate, and un-factual

5        description of the stock.  And I think that

6        that is not only wrong, but I think that it

7        created an impression that was -- was

8        probably not warranted for -- for that

9        whole class of -- of purchasers.

10            Q.    Who gave you an inaccurate

11       description of the -- of the stock?

12            A.    I'm describing what I noted when

13       I looked at the stock and -- and its

14       movements.  And as I understand it, there

15       was an enormous amount of money --

16       millions, tens of millions of dollars, if

17       I'm not mistaken -- that were pumped into

18       the stock and then pulled out of the stock

19       that, in fact, changed -- excuse me --

20       that, in fact, changed the perception of

21       that stock by the honest -- by the small

22       stockholder.

23                  And perhaps I wasn't a small

24       stockholder, but I certainly was a diligent

25       one, and I think I -- I did my best to

1                  Tauber - Confidential              155

2          understand what the facts were.  And I

3          wasn't -- I didn't have real facts.  I had

4          facts that were, at least, to some extent,

5          manipulated unfairly and illegally.

6              Q.    Who manipulated the facts?

7              A.    As I understand it, there was an

8          insider who provided information to Sonar,

9          the Sonar company.  And there was a

10         gentleman by the name of Freeman who

11         received that information and made it

12         available to a Mr. Druker.  And the two of

13         them distributed that money among a series

14         and a number of investment firms.  And in

15         so doing, tens of millions of dollars were

16         siphoned off ultimately from this stock.

17             Q.    So is it your contention that

18         Sonar is buying the stock, somehow

19         improperly pushed the stock higher?  Is

20         that what you testified to?

21             A.    I don't know that it pushed it

22         higher, but it presented an inaccurate,

23         unfair picture to the stockholders.

24             Q.    But how -- how did that hurt --

25         how did that hurt you, Mr. Tauber?

Tauber - Confidential          156

1

2          A.     Okay.  Well, let me tell you how.

3          Q.     During the selling period, right?

4     How did that hurt you?

5          A.     During the selling period or

6     during the buying period?

7          Q.     Selling period.

8                 How were you hurt?

9          A.     All right.  During the selling

10    period, the -- the Sonar company was

11    supporting the price, and perhaps even

12    pushing it up, creating an inappropriate

13    and an unfair and an illegal impression of

14    the strength of the stock.  And persons

15    like myself, who believed that this was an

16    important stock, that this was a stock with

17    great opportunity, and -- and -- and the

18    ability to move up very substantially, was

19    a part of creating that impression.  In a

20    sense, it created a -- a feeling or an

21    understanding of great enthusiasm.

22                Watching the stock go from -- I

23    don't know -- from -- when I got into it,

24    perhaps it was at 15 to 20.  But to go up

25    to -- to $70 a share, and to know that

1                    Tauber - Confidential          157

2          someone has that information prior to me,

3          and then once it reaches that height,

4          pulling out, pulling their money out while

5          I still am under the impression that the

6          stock is strong while they know it isn't,

7          is -- is irreparable harm.  It's harmed my

8          life, it's harmed my family, it's harmed me

9          in the most extraordinary and substantial

10         ways.  And that's all I've got to say.

11              Q.    Well, if you take a look at the

12         period on your chart here from the first

13         date, September 19th, and if you go up to

14         August 16th.

15              A.    September --

16                    MR. BROWER:  You mean July 19th?

17              Q.    July 19th.

18              A.    July 19th.

19              Q.    I'm looking at your trades.

20              A.    Yeah.

21              Q.    Through August 16th, right?

22              A.    Right.

23              Q.    Those are your transactions --

24              A.    Yeah.

25              Q.    -- during a seller class period,

```
 1                Tauber - Confidential              158
 2      right?
 3           A.     Right.
 4           Q.     Okay.  And if -- if -- so you are
 5      representing people who sold during that
 6      period, correct?
 7           A.     Okay.
 8           Q.     Are you?  Is that true?
 9           A.     I believe so.
10           Q.     Okay.  And if Sonar was buying,
11      and it was pushing the price of the stock
12      up, that would mean that you would be
13      selling at a higher price than you
14      otherwise would, right?
15           A.     That's only part of the picture.
16      Yeah.  You're right.
17           Q.     Right?  Correct?
18           A.     Yeah.
19           Q.     Okay.  Okay.
20                  So let's just assume that Sonar
21      didn't trade during its first selling
22      period; it neither bought nor sold, right?
23           A.     Mm-hmm.
24           Q.     Is it your testimony that,
25      without Sonar buying during the first class
```

```
 1                    Tauber - Confidential          159

 2          period, the price actually would have been

 3          lower during that timeframe?

 4               A.     And would more accurately reflect

 5          the strength of the stock as opposed to the

 6          information that's been obtained by an

 7          organization illegally and distorting the

 8          strength of the stock.

 9                    So I would agree with you that,

10          as a purchaser or as a seller, there's --

11          there's more money to be made, but in terms

12          of -- of understanding and evaluating the

13          stock, there's a great deal that is lost to

14          the honest stock --

15               Q.     Well, during that first class

16          period, just looking at you, how -- how was

17          anything lost?

18                    If you look at your transactions

19          from July 19th to August 16th, we see an

20          increase in price there, don't we?

21               A.     We do see -- see -- in fact, it

22          goes all the way -- if I'm not mistaken,

23          all the way to $70.

24               Q.     I'm talking about the first class

25          period.
```

Tauber - Confidential          160

1

2          A.     All right.  We're talking about

3     the first class period.

4          Q.     Right.

5          A.     And -- and what I'm telling you

6     is that on a strictly technical basis, and

7     if we -- if you were to work out the math

8     and tell me that I made money during that

9     period, I wouldn't disagree with you.  But

10    I would also tell you that the

11    manipulation, the illegal manipulation of

12    the stock by your client, had a deleterious

13    and a serious negative impact on the market

14    and on the stock buyers --

15         Q.     How did Sonar's --

16         A.     -- and sellers.

17         Q.     How did Sonar's trading during

18    the first class period have a deleterious

19    impact on the stock?

20         A.     Well, if one were to assume that

21    the stock market is a fair, an unbiased,

22    and a -- a just mechanism, then -- then one

23    acts with that in mind, as I did.  But if

24    instead, the prices are being driven up,

25    then there's great -- there's a great loss

Tauber - Confidential                161

1

2      in terms of not only the -- the -- the

3      reputation, I think, of the stock and the

4      stock market, but in terms of the

5      perceptions of the people that are -- that

6      are selling the stock.  So I -- I -- I

7      grant you -- if you tell me that -- that I

8      made -- that I made money in that first

9      period, that may be true.  But clearly, the

10     sellers are -- are victims even if they did

11     make money during that period.

12          Q.    And tell me how they are victims.

13               How would you -- you have been

14     any different during the first class period

15     if Sonar had neither purchased nor sold

16     stock?

17          A.    Well, for one thing, I would be

18     operating what I would assume would be in a

19     -- in an honest and fair auction of shares

20     of stock, as I understand the stock market

21     is supposed to be.  But that wasn't the

22     case.  And I think that's -- that's a very

23     substantial loss to the -- to the

24     community.  It certainly was a huge loss to

25     me.

1                    Tauber - Confidential          162

2          Q.    It was not a monetary loss in any

3     respect, was it, during the first class

4     period?

5          A.    If you tell me that I -- that I

6     made money in the first class period, I'm

7     not going to disagree with you, because I

8     haven't added up those numbers.  But what

9     I've told you is that it has an enormous

10    impact on both the system and the

11    individual sellers.

12         Q.    Is it your contention that you

13    would be economically in a different

14    position if Sonar had neither purchased nor

15    sold during the first class period?

16         A.    Could very well be.  I mean, I --

17    I could not -- I cannot, you know -- and I

18    could not at the time certainly tell the

19    future.  But I could see that my enthusiasm

20    for the stock would certainly have been

21    different than it was if that manipulation

22    had not occurred.  I don't know.  There's

23    no way for me to know.

24         Q.    Now, are you alleging

25    manipulation in this case?

```
 1                 Tauber - Confidential          163

 2          A.     Yes.

 3          Q.     Okay.  And please describe

 4      exactly how manipulation occurred.

 5          A.     Once again, I -- I haven't spoken

 6      to your client.  I don't know any of the

 7      parties that are involved.  I just know

 8      what has been presented to me in the form

 9      of a complaint, in the form of a

10      memorandum, and in discussions with my

11      attorneys.  And as I understand it,

12      information was being presented illegally

13      to your client, and your client was using

14      it to benefit themselves at the expense of

15      legitimate buyers and sellers and

16      distorting the market in a way that was

17      deleterious to everyone.

18          Q.     And that's your manipulation

19      claim?

20          A.     They made $30 million.  To me,

21      that's manipulation.

22          Q.     Who told you that they made

23      $30 million?

24          A.     That's in the complaint.

25          Q.     Right.  Did you check the
```

1            Tauber - Confidential            164

2        accuracy of that number?

3            A.    That is the number that I have

4        heard from a number of -- in a number of

5        documents.  I have no reason to disbelieve

6        it.  If it's off, then perhaps it's less

7        than that.  Perhaps it's more than that.

8        That's the round figure that I've been

9        given.

10           Q.    When you make that allegation in

11       a complaint, do you, as a class

12       representative, believe you have an

13       obligation to verify the truth of that

14       statement?

15           A.    I believe that I have the

16       responsibility with my attorney to review

17       the information that we have and to make

18       the very best factual allegation that we

19       can based upon the information that we

20       have.

21           Q.    What records did you look at to

22       lead you to conclude that Sonar made

23       $30 million in trading Sigma?

24           A.    My information is that I believe

25       on the selling end, if I'm not mistaken,

1                Tauber - Confidential          165

2           there was some $20 million, and on the

3           buying end, there was $10 million.  That is

4           in the complaint.  That is in, as I

5           understand it, documents that have been

6           produced in discussions with Mr. Freeman,

7           who, I believe -- is it Furman or Freeman?

8           I can't remember -- who has reached an

9           agreement, as I understand it, to provide

10          accurate information.  And based upon the

11          information that he provided as well as

12          other parties, that was the number that I

13          discussed with my attorneys, and that is

14          the number that I present to you after

15          those discussions.

16               Q.    Are you aware that Sonar has

17          produced its trading records in respect of

18          trading in Sigma during the class periods?

19               A.    I'm sorry.  I couldn't

20          understand.

21               Q.    Are you aware that Sonar has

22          produced its trading records for Sigma

23          purchases and sales?

24               A.    I believe --

25                    MR. BROWER:  Object to the form.

1
2          Go ahead.

3                    THE WITNESS:  I'm sorry?  Go

4          ahead?

5                    MR. BROWER:  Go ahead.

6          A.     I believe that -- that after some

7          very serious foot-dragging, that did occur,

8          yes, sir.

9          Q.     All right.  And are you aware of

10         whether any steps were taken to verify the

11         allegation that Sonar made $30 million in

12         profits on Sigma during the class period?

13         A.     I am not -- I wish -- I wish I

14         could be more of an expert, but I'm not.  I

15         have been given information that I -- I

16         rely on by my attorneys, that I have been

17         informed have been provided by a

18         participant of the manipulation and the

19         insider trading.  And that is -- as I

20         understand it, is the most accurate number

21         that they have been able to -- to come up

22         with.  As I understand it, it's taken over

23         a year or a year and a half just to get

24         that information from Sonar, and perhaps

25         longer to get the names of the persons and

1              Tauber - Confidential          167

2         organizations and institutions that were

3         paid off with that -- with those monies,

4         however much they were.

5              Q.    Actually, you just fairly

6         recently just produced your trading

7         records; isn't that right?

8              A.    The confusion that we had, and

9         certainly I had, were recently produced and

10        should have been -- if I had been a little

11        bit -- a little bit sharper and a little

12        bit more experienced, would have been

13        produced immediately.  It was -- my

14        understanding is that, actually, the

15        numbers and the dates that come -- that

16        actually exist for the trade are far better

17        for the plaintiff than the settlement dates

18        that were provided previously.  So there

19        was no advantage to provide the wrong

20        dates.  As a matter of fact, it's -- it's

21        -- it's against the -- the interest of the

22        class.

23             Q.    Wrong dates were provided for

24        approximately 20 months before those dates

25        were corrected, correct?

Tauber - Confidential          168

1

2          A.    I don't know how long it took.  I

3     know that -- that the information that was

4     provided was -- was not for -- for what was

5     requested, at least I know that at this

6     time.

7          Q.    Well, you represented trades as

8     having a particular trade date when that

9     was not accurate, correct?

10          A.    I was unaware -- you know, I --

11     I've been looking at -- at the Fidelity

12     dates, and I'm still not really sure what

13     the -- what the difference is, because in

14     some instances, the trade -- the settlement

15     date is the next day, and other times, it's

16     four days later, and sometimes it's three

17     days later.  So I don't -- I assume the

18     trade date is the date that you -- you --

19     you push the button, and you -- and you

20     purchase or sell -- or you sell new stock.

21     As to whether the settlement date is a

22     certain number of days later, I really

23     don't know.  I really can't say any more

24     than that.

25          Q.    But you always knew, though, that

Tauber - Confidential                169

2      there -- there was a concept of a trade

3      date and a settlement date, correct?

4           A.    I knew that they were both

5      concepts.  I didn't know that they weren't

6      the same date.

7           Q.    You never knew that until

8      recently?

9           A.    I knew that they were -- that

10     they -- they sometimes were the same date

11     and sometimes were a day later and

12     sometimes were two days or three or four

13     days later.  And I never understood what

14     the difference was.

15          Q.    But you know that early on, the

16     defendants, in certain motion papers, had

17     brought to the Court's attention that the

18     prices of the stocks on the -- on the dates

19     that you represented you traded --

20          A.    Yeah.

21          Q.    -- were different from the market

22     prices that day, correct?

23          A.    I understand that now, and I

24     understand from reading transcripts that --

25     that that has been an issue.  And -- and I

Tauber - Confidential                170

1

2      am truly sorry for that -- for that error.

3      But once again, my understanding is that

4      the error was in favor of the defendants.

5      So I'm not sure what -- what the point or

6      relevance of -- of this is.

7           Q.    Well, let me explain it to you.

8      You provided information where you

9      certified under oath to the Court that --

10     that securities were purchased and sold on

11     a particular date, correct?

12          A.    Correct.

13          Q.    Right?

14                And that information was provided

15     to the defendants, correct?

16          A.    I assume so.

17          Q.    Well, it was filed with the

18     Court, right?  Makes sense the defendants

19     would get that information, right?

20          A.    In my experience, yeah.

21          Q.    And wouldn't it make sense that a

22     responsible defendant would look at that

23     information and compare it to the market

24     prices --

25                MR. BROWER:  Objection.

```
1                  Tauber - Confidential          171
2          Q.      -- of those days?
3                  MR. BROWER:  Objection.
4          Speculation.
5          Q.      Wouldn't that be fair to do?
6          A.      Counsel, I'll have to accept
7      your -- your analysis.  I am not --
8          Q.      I'm not asking you --
9          A.      -- a financial --
10         Q.      -- to --
11         A.      I'm not white collar or a
12     financial attorney, so I couldn't -- I
13     couldn't speak to that.
14         Q.      Well, when you gave a trade date
15     -- when you represented information as
16     being trade date information, right --
17         A.      Yeah.
18         Q.      -- and you identified the number
19     of shares purchased that day and the price
20     of the stock, that was because it was
21     pertinent to your case, right?
22         A.      I understood it was necessary,
23     yes, sir.
24         Q.      And that's something that the
25     defendants would be entitled to have.
```

```
1                  Tauber - Confidential           172

2              MR. BROWER:  Objection.

3         Q.    Right?

4         A.    I'll -- I'll -- I'll accede to

5    the fact that -- that this is information

6    you had a right to, yeah, absolutely.

7         Q.    Right.  And that the defendants

8    -- wouldn't it make sense to you, as a

9    judge, the defendants would look at the

10   date that you swore you purchased or sold

11   securities and verified the accuracy of the

12   information?

13        A.    You know -- you know what --

14   what's strange to me is that if -- if --

15        Q.    Just answer the question.

16        A.    I am answering the question,

17   Counsel.

18             MR. BROWER:  Stop arguing with

19        him, Mark.

20             MR. HYLAND:  I'm not.

21             MR. BROWER:  Ask the question,

22        and he's going to answer.  Stop arguing

23        with him.  You don't get to play this

24        game.  There's no jury here.  He's

25        going to answer the question --
```

```
 1                  Tauber - Confidential          173
 2                  MR. HYLAND:  I'm looking forward
 3            to the jury.
 4                  MR. BROWER:  -- the way he's
 5            going to answer it.
 6                  MR. HYLAND:  This is going to be
 7            pretty.
 8                  MR. BROWER:  I'm sure you are.
 9                  Go ahead.  Answer.
10                  THE WITNESS:  I need the question
11            again, please.
12                  (Question read)
13            A.    It would, but I would also expect
14      them to find -- not finding them to be
15      accurate, to -- to go back and to -- to
16      inquire as to whether or not they had the
17      correct dates.  And as someone who's been
18      in the legal field for 35 years, but in a
19      very different area of the legal field,
20      it's my feeling that that's exactly what
21      competent counsel does.
22            Q.    And do you have an understanding
23      that the defendants did not do that?
24            A.    My understanding is that the
25      defendants did do that, but they never
```

1                   Tauber - Confidential          174

2       attempted to inquire as to whether or not

3       they had the right date as opposed -- of

4       the trade as opposed to settlement.

5                   My understanding is that

6       Mr. Druker, just a few days ago, indicated

7       that he didn't know the difference in

8       depositions.  So I'm -- I'm not sure why

9       you expect me to have a greater

10      understanding than a man who has been in a

11      financial position for many decades.

12          Q.    Is it your testimony that you

13      understand that Mr. Druker didn't know the

14      difference?  Did somebody tell you that?

15          A.    I understand that -- in a

16      deposition, that he did indicate so.

17          Q.    Who told you that?

18          A.    I -- I can -- I can indicate that

19      I had a -- I had a brief discussion with my

20      attorneys.

21          Q.    Okay.  You didn't see the

22      testimony, did you?

23          A.    No.

24                  MR. HYLAND:  Next exhibit.

25                  MR. BROWER:  You're up to 10?

```
 1                  Tauber - Confidential           175
 2              MR. HYLAND:  Yes.
 3                 (A memorandum of law dated
 4          May 15, 2012, was marked as Tauber 10
 5          for identification.)
 6              MR. BROWER:  Two documents.
 7              MR. HYLAND:  Right.
 8              MR. BROWER:  You want to mark
 9          them 10 and 11?
10              MR. HYLAND:  Mark them 10 and 11,
11          sure.
12              MR. BROWER:  You have two
13          documents.  Take the paper clip off.
14          Take the paper clip off.
15              THE WITNESS:  Of this one?
16              MR. BROWER:  Yeah.  Take the
17          paper clip off.  Give her the second
18          piece of paper.
19              THE WITNESS:  All right.  Is that
20          the one you want underneath?
21              MR. BROWER:  She marked them.
22                 (An affidavit of Mark J. Hyland
23          was marked as Tauber 11 for
24          identification.)
25              THE WITNESS:  10, 11?
```

```
1                    Tauber - Confidential          176

2                    MR. BROWER:  Yes.

3          Q.    Okay.  If I could direct your

4     attention to Exhibit 10.  This is

5     Defendants Sonar Capital Management's and

6     Neil Druker's memorandum of law in support

7     of their motion to dismiss the amended

8     class action complaint, and it's -- it was

9     filed on May 15, 2012.

10                And I'd like to direct your

11    attention to page 3 of the document.

12         A.    Yes, sir.

13         Q.    And if you go about halfway down

14    -- and this is covered elsewhere -- but you

15    see the sentence starting with, "Not only

16    did Tauber close out his position in

17    Sigma"?

18         A.    Yeah.

19         Q.    It said, "But his certification

20    to the Court evidences that on all but one

21    of his 114 trades, the price he paid or

22    received for his Sigma shares was

23    significantly outside of the trading range

24    of Sigma stock for those days.  Not only

25    does Tauber fail to allege a loss, because
```

```
 1                Tauber - Confidential        177
 2        he sold shares at below-market prices (and
 3        bought at above-market prices), he could
 4        not plausibly have been relying on the
 5        integrity of the market."
 6                Now, there, defendants are
 7        bringing to your attention and the Court's
 8        attention that based on the certification
 9        that you gave, your prices were
10        significantly outside of the trading range,
11        correct?
12             A.    Correct.
13             Q.    Okay.  And are you aware that
14        there was a -- an oral argument --
15             A.    I am.
16             Q.    -- on -- on defendants' motion?
17             A.    I am.
18             Q.    And are you aware -- have you
19        seen a transcript of that?
20             A.    I have.
21             Q.    And are you aware that your
22        counsel suggested that the reason for that
23        might have been because you were trading
24        after hours?
25                Are you aware of that?
```

1                    Tauber - Confidential           178

2            A.      I read that.

3            Q.      Okay.  And also, did you read

4       that in the judge's opinion when he granted

5       defendants' motion to dismiss the first

6       complaint?

7            A.      I don't recall reading that.

8            Q.      Okay.

9                    MR. BROWER:  I'm not exactly sure

10           what the judge said.

11           Q.      That the judge said that the

12      explanation given was perhaps you were

13      trading --

14                   MR. BROWER:  Perhaps.

15           Q.      -- outside of market hours,

16      correct?

17                   MR. BROWER:  Perhaps.  Okay.

18           Q.      Right?

19                   So at the time that the

20      defendants served their motion and made the

21      allegation about you trading outside of the

22      market, at that point, nobody went back and

23      checked to see if that was correct, right?

24           A.      From what I've read, I'm not

25      sure.  I don't know.  I -- I personally was

Tauber - Confidential         179

1   not present, and so I can't really speak to

2   that.

3        Q.    Not whether you were present or

4   not, but that after the explanation was

5   provided by counsel, and after the Court

6   referred to the fact that the discrepancy

7   could have been due to the fact that you

8   were trading outside of market hours,

9   nobody on your side went back and made the

10  correction of the trade date versus

11  settlement date.

12       A.    Counsel, I --

13             MR. BROWER:  Objection to the

14       form.  Go ahead.

15       A.    I -- I understand that -- that

16  it's a document that -- that -- that I -- I

17  certified.  But I -- and I understand that

18  -- that I had -- I have a duty and

19  obligation for it to be correct.

20  Unfortunately, I -- I didn't have the

21  experience or expertise to recognize the

22  error.  And quite frankly, I'm not sure of

23  its relevance beyond that.

24       Q.    Well, do you think it was unfair

```
 1                  Tauber - Confidential        180
 2         that the defendants had been led to
 3         believe, for some 20 months, that the
 4         trading information that you had provided
 5         was not accurate?
 6              A.    I -- I think it's unfortunate.  I
 7         don't -- I don't know about unfair.
 8              Q.    Okay.  And if I could direct your
 9         attention to Exhibit 11.
10                   MR. BROWER:  Your declaration?
11                   MR. HYLAND:  Yes.
12                   MR. BROWER:  Okay.
13              Q.    You've seen this before, haven't
14         you?
15              A.    I may have.  I cannot say that
16         I -- that I definitely have seen it before.
17              Q.    If you take a look at the chart
18         on page 3, you don't remember ever looking
19         at that?
20                   MR. BROWER:  Object to the form.
21              A.    I don't have any recollection.
22              Q.    But you see that the chart
23         reflects work that was done by the
24         defendants to point out the discrepancies
25         in price based on the information that you
```

```
 1                Tauber - Confidential            181

 2         had provided regarding trade dates,

 3         correct?

 4              A.    Well, if you give me a moment.

 5              Q.    Sure.

 6                    (Pause)

 7              A.    All right.  I've read it.

 8                    MR. HYLAND:  Can you read the

 9         question back.

10                    (Question read)

11              A.    I -- I understand that it does

12         that.

13              Q.    And that was based on the

14         defendants' understanding that the

15         materials that you provided concerning

16         trade dates were accurate, right?

17                    MR. BROWER:  Tell me if there's

18              some merit to your argument.

19              Q.    You can answer.

20              A.    Yeah, I -- I understand.  Yeah, I

21         -- certainly, the work that was done was

22         based on inaccurate data.

23              Q.    Okay.

24                    MR. HYLAND:  This is the next

25              exhibit.
```

```
 1                Tauber - Confidential          182
 2                   (A deposition transcript was
 3              marked as Tauber 12 for
 4              identification.)
 5              Q.    This is a transcript, Exhibit 12,
 6         of an argument that took place on
 7         September -- excuse me --
 8              MR. BROWER:  June 19th.
 9              Q.    -- June 19th.
10              MR. HYLAND:  Thank you.
11              Q.    2012.
12              A.    Okay.
13              Q.    And you've seen this before?
14              A.    I'm not sure.  Do you want to
15         direct me to a specific place?
16              Q.    Well, I -- I think you testified
17         earlier that you had seen a transcript of
18         -- of the argument.
19              A.    You know, I did.  I just don't
20         recall the appearances as being -- I didn't
21         know that Mr. --  Mr. Kerr was the
22         attorney.  I thought -- I thought it was
23         Mr. Brower.
24              Q.    Well, if we go to -- if you go to
25         page 28, I'm going to take you over to 29.
```

```
 1                  Tauber - Confidential           183

 2        A.      Okay.

 3        Q.      Up at the top --

 4                MR. BROWER:  Of 29 or --

 5                MR. HYLAND:  Of 29.

 6        A.      Okay.

 7        Q.      And this is the colloquy by

 8     Mr. Haber and the Court, the Court asking

 9     him.

10                "QUESTION:  Just like, you know,

11           millions of people in this country.  He

12           lives in California.  He is often doing

13           that after the markets would be closed

14           in the east.  So maybe those -- and

15           this is just true surmise, all right --

16           maybe those trades were being executed

17           on after hours trading; that the high

18           and the lows for Bloomberg don't

19           reflect what, you know, highs and lows

20           for the after hours trading."

21        A.      This is Mr. Haber.

22        Q.      Yeah.

23                MR. BROWER:  Yeah.

24        Q.      Correct.

25                MR. BROWER:  Yes.
```

```
 1                Tauber - Confidential        184
 2          A.    Who I -- I've -- I've seen in
 3     court once.
 4          Q.    Right.  All right.
 5                Okay.  And following the argument
 6     that day, you -- I'm not asking you for
 7     substance, but you --
 8                MR. BROWER:  You don't want to
 9          finish where he says, "We honestly
10          don't know"?
11                MR. HYLAND:  Yeah.  We honestly
12          don't know.  That's correct.  Yeah.
13          Right.
14          Q.    And you heard a -- a report on
15     the -- how the argument went, correct?
16          A.    Yeah.
17          Q.    And that after that argument,
18     there was no effort at that time made to
19     figure out why the trading records, right,
20     did or didn't reflect a discrepancy in
21     terms of prices.
22          A.    Right.
23          Q.    Nothing happened, correct?
24          A.    I think it went to the judge for
25     a decision.  He said he would reach a
```

```
 1                  Tauber - Confidential          185
 2        decision by Halloween, if I'm not mistaken.
 3             Q.    Right.
 4             MR. HYLAND:  Next exhibit.
 5             (An opinion and order was marked
 6        as Tauber 13 for identification.)
 7             Q.    And you've seen the judge's
 8        decision on the motion to dismiss?
 9             A.    I have.
10             Q.    The first motion to dismiss?
11             A.    I have.
12             Q.    And if I could direct your
13        attention to page 10 and 11.
14             A.    Okay.
15             Q.    And if you go over to 11, about
16        halfway down the first carryover paragraph,
17        there's a sentence --
18             A.    Okay.
19             Q.    -- starting with "Moreover."
20             MR. BROWER:  I'm sorry.  Where?
21             MR. HYLAND:  On page 11.
22             A.    "Moreover"?  I don't see
23        "moreover."
24             Q.    This is -- make sure we got the
25        right decision.  This is opinion and order.
```

```
 1                    Tauber - Confidential          186

 2           A.    Opinion and order.

 3           Q.    Right.

 4           A.    11 civic 9665.

 5           Q.    Page 1 of 16.  This is a

 6      16-page --

 7                 MR. BROWER:  This is 11 of 16.

 8           A.    Yeah.

 9           Q.    Page 11, yes.

10           A.    Okay.

11           Q.    If you go down --

12                 MR. KERR:  About ten lines down

13      on the first paragraph.

14           Q.    Nine lines down.

15           A.    Nine lines down.

16           Q.    Over on the right.

17           A.    Oh, okay.  All right.

18                 MR. BROWER:  That says we'll

19      revisit the issue after --

20           Q.    And this is the --

21                 MR. HYLAND:  Excuse -- excuse me.

22           Q.    This is -- this is the judge's

23      decision, correct?

24           A.    I believe so.

25           Q.    But do you have any doubt?
```

```
1                     Tauber - Confidential          187
2                     Take a look at the last page.
3           A.    It appears to have his signature
4      on it.  It appears to be an official
5      document with a seal and a file, and, so, I
6      would assume that it is, in fact, his
7      decision.
8           Q.    Do you think you would need to do
9      anything else to --
10          A.    No, I think that -- that -- that
11     satisfies me.
12                    May I read this -- the
13     paragraph --
14          Q.    Sure.
15          A.    -- you're referencing?
16                    MR. BROWER:  Be sure to start on
17          the entire page where the paragraph
18          begins.
19          A.    May I do that?
20          Q.    Sure.
21          A.    Okay.
22                    (Pause)
23          A.    It seems to reflect --
24                    MR. BROWER:  All right.  There's
25          no question pending.
```

```
 1                  Tauber - Confidential          188

 2          A.      All right.  Thank you, sir.

 3          Q.      He's directing you to where the

 4     -- it says "Moreover."

 5                  It says, "Moreover, the factual

 6     context in which Tauber traded is unclear:

 7     In addition to the defendants' assertion

 8     that Tauber may have been a day-trader or a

 9     short-seller, plaintiffs' counsel suggests

10     that Tauber regularly traded after hours,

11     so the prices at which he traded might, in

12     fact, be within the market price range if

13     after hours prices were included."

14                  Do you see that?

15          A.      I read it.

16          Q.      Okay.  And where the judge

17     recites, "Plaintiffs' counsel suggests that

18     Tauber regularly traded after hours, so

19     that the prices at which he traded might,

20     in fact, be within the market range if

21     after hours prices were included," right,

22     is not the case, was not the case at the

23     time, correct?

24                  MR. BROWER:  Objection.

25          A.      You're -- you're -- from what I
```

```
 1                   Tauber - Confidential        189
 2       understand, the attorney, who is not my
 3       attorney, suggested that I might have been
 4       trading at night, and he was wrong.  And
 5       the judge indicated that if it was an
 6       issue, it would have to be revisited in an
 7       amended complaint, which I understand it
 8       was.
 9            Q.    And you read this opinion and
10       order when it came out, correct?
11            A.    I believe so.
12            Q.    All right.  And when you read it,
13       did you do any sort of -- make any inquiry
14       to make sure that what the judge was saying
15       was true or was not true concerning your --
16       concerning your after hours trading?
17                 MR. BROWER:  Objection.  Witness
18            has testified he did after hours
19            trading.  So what are you --
20                 MR. HYLAND:  Hold on a second.
21            Q.    Is it your testimony that your
22       after hours trading was the cause of the
23       discrepancy and prices that are reflected
24       on the certification that you put in to
25       the Court?
```

```
 1                    Tauber - Confidential         190

 2           A.     No, I'm not -- I'm not suggesting

 3      that.

 4                  MR. BROWER:   That wasn't a

 5      question.

 6           Q.     Okay.  When was it that you

 7      finally decided to check to see if the

 8      information that you put in your trading

 9      chart, which is Exhibit A, was correct?

10           A.     It was in -- it was last year,

11      and counsel brought to my attention that

12      there may have been a mistake made and that

13      I should correct it if that were the case.

14      So I contacted Fidelity and -- immediately

15      and made inquiries, and they provided me

16      with additional information and data that

17      corrected the -- the issue.

18           Q.     Up to that point when your

19      client -- your -- your counsel brought that

20      to your attention, did you think that after

21      hours trading was the cause in the

22      discrepancy between the price that you had

23      represented on Exhibit 8 and the market

24      price difference?

25           A.     I don't remember reading that.  I
```

Tauber - Confidential                191

1
2     mean, I -- I had the document.  I read it.
3     But I don't remember that as -- as -- as
4     something that kind of stuck out.
5          Q.    You knew that the defendants were
6     featuring an -- an argument that your
7     trading prices didn't match the market,
8     correct?
9               MR. BROWER:  Objection.
10         A.    That's -- well, that's not true.
11    I didn't know that that was an issue until
12    much later.
13         Q.    Well, it was in the defendants'
14    initial motion to dismiss, correct?
15         A.    It was in -- you will have to
16    reference the -- the document.
17         Q.    All right.
18              MR. BROWER:  I think it's 10.
19         Q.    If you go to Exhibit 10, this is
20    defendants' motion, the brief in support of
21    their motion to dismiss the complaint.
22         A.    I'm not sure that I've ever seen
23    this.  I don't -- I don't believe I
24    testified -- I've testified today that I
25    actually received it.

```
 1                  Tauber - Confidential            192
 2          Q.     Okay.  Do you have a best
 3     recollection whether you saw Sonar's brief
 4     in support of its motion to dismiss?
 5                  MR. BROWER:  Object to the form.
 6          Asked and answered twice.
 7          Q.     Do you think you received it or
 8     not?
 9          A.     I don't recognize it.
10          Q.     Okay.
11                  MR. HYLAND:  Next Exhibit,
12          Exhibit 14.
13                  (A memorandum dated August 30,
14          2013, was marked as Tauber 14 for
15          identification.)
16          Q.     Exhibit 14 is Defendants' Sonar
17     Capital Management's and Neil Druker's
18     memorandum in support of their motion to
19     dismiss the second amended class action
20     complaint, filed August 30, 2013.
21          A.     Yes, sir.
22          Q.     Have you seen this document
23     before?
24          A.     I believe I did receive this
25     document.
```

1                    Tauber - Confidential              193

2          Q.     Believe you did not?

3          A.     I believe I did.

4          Q.     You did.

5                 When?

6          A.     It would have been in the summer

7     or -- or the fall of 2013.

8          Q.     Did you read it?

9          A.     Well, it's not easy reading.  I

10    did read it.  I couldn't tell you what it

11    says without reading it again.

12                (Pause)

13                (Defendants' reply memorandum of

14         law dated September 20, 2013, was

15         marked as Tauber 15 for

16         identification.)

17         Q.     Do you recognize Exhibit 15?

18         A.     I believe I have seen this, yes,

19    sir.

20         Q.     And this was filed -- up top, you

21    see it was filed on September 20, 2013?

22         A.     Yep.

23         Q.     If I could direct your attention

24    to the first page under "Preliminary

25    Statement."

```
 1              Tauber - Confidential        194

 2              The first sentence says,

 3     "Twenty months after the amended complaint

 4     was filed, plaintiffs now state that the

 5     trade data they represent -- and which

 6     Tauber certified as accurate in his lead

 7     plaintiff motion -- is wrong."

 8              Do you see that?

 9     A.    I see that.

10     Q.    And that's a true statement,

11     correct?

12     A.    That's correct.

13              MR. HYLAND:  Let's take a break.

14              THE VIDEOGRAPHER:  Stand by,

15     please.

16              The time is 3:07 p.m.  This is

17     the end of DVD 3.  We are off the

18     record.

19              (Recess)

20              THE VIDEOGRAPHER:  Stand by,

21     please.

22              The time is 3:19 p.m.  This is

23     the beginning of DVD No. 4.  We are

24     back on the record.

25     EXAMINATION CONTINUED
```

```
 1                  Tauber - Confidential          195
 2       BY MR. HYLAND:
 3            Q.    If I could direct your attention
 4       back to Exhibit 13, which is the opinion
 5       and order filed June 13, 2013.
 6            A.    Which exhibit again?
 7            Q.    13.
 8            A.    15, 14 -- yes, sir.
 9            Q.    Yeah.  I'd like to direct your
10       attention again to page 11.
11                  Again, starting at the same
12       language we looked at earlier, about
13       halfway down, starting with the word
14       "Moreover," do you see that?
15            A.    Mm-hmm.
16            Q.    Just read that sentence to
17       yourself.
18                  And the way the paragraph ends,
19       it says, "Accordingly, this issue may be
20       revisited once any amended pleading is
21       filed," right?
22            A.    Yes, sir.
23            Q.    And after this decision came
24       down, an amended complaint was filed,
25       right?
```

```
 1                Tauber - Confidential         196
 2        A.    I understand that's correct, yes.
 3        Q.    Okay.
 4              THE WITNESS:  That would be the
 5        second amended complaint?
 6              MR. KERR:  It's right there.
 7              THE WITNESS:  Okay.
 8              (A second amended class action
 9        complaint was marked as Tauber 16 for
10        identification.)
11        A.    Yes, sir.
12        Q.    And this is the second amended
13   class action complaint that was filed after
14   the Court's opinion and order reflected in
15   Exhibit 13, correct?
16        A.    I believe so, yes, sir.
17        Q.    And in Exhibit 13, a Judge Rakoff
18   had said, "Accordingly, this issue may be
19   revisited once any amended pleading is
20   filed."
21              And the issue he was referring to
22   was that -- was -- was the issue of the
23   discrepancy in the trade date prices versus
24   the market prices that had been reflected
25   on your certification, correct?
```

Tauber - Confidential          197

1

2          A.    I understand that to be the case.

3          Q.    But the second amended class

4     action complaint that was filed,

5     Exhibit 16, a month later, five weeks

6     later, does not address, again, the issue

7     of trade date, settlement date, or the

8     market prices that apparently were outside

9     of the range, correct?

10         A.    I wouldn't know that unless I

11    read the document.

12         Q.    Did you review the second amended

13    complaint before it was filed?

14         A.    I believe I did have an

15    opportunity to read it.

16         Q.    Did you comment on it in any way?

17         A.    That I could not say.

18         Q.    Do you remember making any

19    comments on it?

20         A.    I do not recall making any

21    comments on it.

22         Q.    If you go to the back, the

23    exhibits, what is reflected on these

24    exhibits to your complaint?

25         A.    Which exhibit were you

```
 1                   Tauber - Confidential              198

 2        referencing?

 3                   MR. BROWER:  Exhibit A.

 4             Q.    Start with A.

 5             A.    It's a comparison of price and

 6        number of shares sold by Sonar compared to

 7        those or the similar -- well, let me just

 8        -- let me just back up one moment.

 9                   It shows Sigma -- Sonar's

10        purchase and -- and share price as compared

11        to the shares that I sold.  And, so, it's

12        -- it's a comparison chart.

13             Q.    Who prepared it?

14             A.    I did not prepare it.

15             Q.    Did you check it?

16             A.    I had an opportunity to review

17        it, which I did.

18             Q.    You did?

19             A.    Yes, sir.

20             Q.    What did you compare it with?

21             A.    I compared it with the document.

22        I checked it for any -- any obvious errors.

23        I did not have with me at that time the

24        actual Fidelity documents.  So I didn't go

25        through each one.
```

```
 1                Tauber - Confidential         199
 2         Q.    Okay.  But isn't it the case that
 3     where shares are represented as having been
 4     purchased or sold by you, that you took the
 5     very same information that was in the chart
 6     that you and your attorney completed and
 7     which is reflected in Exhibit 8?
 8         A.    I'd have to go over that at this
 9     time.  I'm -- I -- I don't know.
10         Q.    Well, you represent in the second
11     amended complaint that you sold 9,000
12     shares on July 30, 2007, correct?
13              MR. BROWER:  I can't read your
14         handwriting.
15         A.    That -- that appears to be
16     correct.
17         Q.    Why do you say it appears to be
18     correct?
19         A.    Because that's what I'm -- what I
20     -- when I'm looking at it, that's what I
21     see.
22              MR. BROWER:  Are -- are you --
23         Q.    I'm looking at --
24         A.    I'm looking at the certification.
25     Isn't that what you asked me to do?
```

```
 1                Tauber - Confidential          200

 2         Q.    I'm looking at the exhibit to the

 3    second amended complaint.

 4         A.    And I'm looking at the

 5    certification.  I thought you asked me if I

 6    had gone to the certification to compare it

 7    and what I would -- what I would see.

 8         Q.    Here's what I'm asking you.

 9         MR. BROWER:  Let him restart.

10         Q.    I'll start over again.

11         A.    Okay.

12         Q.    Were you aware that you are

13    required, when you file a class action

14    complaint alleging violation to the

15    securities laws, that you must identify

16    your trades in the securities during the

17    relevant period about which you're

18    complaining?

19         A.    I believe I -- I am aware of

20    that.

21         MR. BROWER:  Objection.  You want

22      to show him a copy of the PSLRA?

23         MR. HYLAND:  No.

24         MR. BROWER:  Then your

25      characterization is incorrect.
```

1

2          MR. HYLAND:  Okay.

3          Q.    What -- what was the purpose of

4    Exhibit A?

5               MR. BROWER:  Are you talking

6          about that Exhibit A?

7               MR. HYLAND:  I'm talking about

8          the Exhibit A.

9               MR. BROWER:  Okay.  Okay.

10               MR. HYLAND:  Exhibit A to the

11          second amended complaint.

12               MR. BROWER:  Okay.  This is

13          different.

14          Q.    Okay.  What is the purpose of

15    attaching this chart?

16          A.    I -- I believe it's to show the

17    -- the change in value and the loss to a

18    named complaint.

19          Q.    Where does it show that for you?

20          A.    Let me -- let me restate that.

21    It appears to show shares, share prices,

22    and dates that Sigma shares were purchased

23    by Sonar.  It also shows dates in which

24    Sigma shares were purchased by myself.

25          Q.    Right.  And I'm going to focus on

```
1                  Tauber - Confidential            202

2        the dates.

3                   You said purchased by yourself?

4                   MR. BROWER:  No.

5                   MR. HYLAND:  Please, Mr. Brower.

6          A.     I'm sorry.  Did I say purchased?

7                   Thank you.

8          Q.     You meant sales?

9          A.     I meant sales.

10         Q.     All right.

11         A.     I'm looking at --

12                  MR. BROWER:  He's reading.

13         A.     -- the document, and I'm reading

14       the titles.

15         Q.     And so, in the last paragraph, it

16       says, "Sigma shares sold by named

17       plaintiffs," correct?

18         A.     Right.

19         Q.     And under that, it says, "Monday,

20       July 30, 2007, 9,000 Tauber."

21                  So you're representing to the

22       Court you sold 9,000 shares of Sigma on

23       Monday, July 30th, correct?

24         A.     That's what that represents.

25         Q.     Okay.  But, again, that is not
```

1                 Tauber - Confidential          203

2          the actual trade date, is it?

3               A.    From what I understand, it is

4          not.

5               Q.    And similarly, with respect to

6          the sales on August 16, 2007, where it says

7          you sold 18,000 shares of Sigma, that also

8          does not represent the trade date, does it?

9               A.    I understand that that's

10         incorrect.

11              Q.    Okay.  Now, in the second amended

12         complaint, did you change the class periods

13         about which you were complaining?

14              A.    I don't recall.

15              Q.    Do you remember at any point

16         whether the class periods changed in any

17         respect?

18              A.    I believe I did discuss that with

19         Mr. Kerr, yes, sir.

20              Q.    And why did the class periods

21         change?

22              A.    My recollection is that they were

23         changed because new information had been

24         discovered that reflected different dates.

25              Q.    What new information?

```
 1                  Tauber - Confidential        204
 2          A.     I'm not exactly certain, but I
 3       think that it was a confluence of
 4       information that -- that made its way to
 5       counsel through Mr. Freeman through
 6       discovery.  And on that basis, I was told
 7       that it was appropriate to change the
 8       dates.  And we discussed that and agreed to
 9       do it.
10          Q.     Well, when you initially became a
11       plaintiff, you purported to represent a
12       class of sellers from July 13, 2007, to
13       November 27, 2007, right?
14          A.     That sounds correct.
15          Q.     And in your second amended
16       complaint, if you look at Exhibit A here,
17       okay, the one that we were just looking at,
18       Exhibit A to Exhibit 16, we see
19       transactions from July 13, 2007, to
20       August 21, 2007, correct?
21          A.     Correct.
22          Q.     Do you see that?
23                 And then if you go to Exhibit B
24       of the same exhibit, the next block, the
25       next period runs from September 11, 2007,
```

```
 1                Tauber - Confidential          205

 2       to November 27, 2011, correct?

 3              A.     That appears to be correct.

 4              Q.     And, so, this is your second

 5       class period now, correct?

 6              A.     Yes, sir.

 7              Q.     So you see that there's a gap,

 8       don't you, between August 22nd and

 9       September 20, 2007, where you're not

10       representing anybody?

11                     MR. BROWER:  Objection.

12              Q.     Do you see that?

13              A.     I see that, yes, sir.

14              Q.     Why did that happen?

15              A.     Well, the best of my

16       recollection, this -- the two class periods

17       that were established were periods that the

18       data supported in the complaint.

19              Q.     What data?

20              A.     The data that exists in these

21       complaints, meaning the dates reflect new

22       information that had been discovered as I

23       understood it through counsel.

24              Q.     What new information?

25              A.     That -- that I could not say at
```

```
 1                 Tauber - Confidential          206
 2      this time.  It has been probably two years.
 3           Q.    Well, you have these very same
 4      class periods in your third amended
 5      complaint, correct?
 6           A.    As in the second?
 7           Q.    Yes.
 8           A.    I'd have to look at that, sir.
 9           Q.    When was the third amended
10      complaint filed?
11           A.    If I saw the document, I could
12      tell you.  I believe it -- it was within
13      the last several months, if I'm not
14      mistaken.
15           Q.    What's your best recollection?
16           A.    This past fall.
17           Q.    All right.  Did you review it?
18           A.    I did.
19           Q.    How does it differ from the
20      second amended complaint?
21           A.    You're asking me about a document
22      that I have not -- that I don't have in
23      front of me, and I cannot tell you the
24      difference, especially since the third
25      complaint has perhaps 200 pages or
```

```
1                  Tauber - Confidential         207

2         something close to it, including exhibits.

3              Q.    What's the -- can you describe

4         any differences between the third amended

5         complaint and the second amended complaint?

6              A.    No.  Well, I could tell you one,

7         certainly.  I understand that among the

8         more recent discovery were the names

9         that -- of defendants who had benefitted

10        directly from the illegal activity.  And

11        that information was only recently

12        discovered, at least to my knowledge.

13             Q.    And who are such persons?

14             A.    You're asking me to tell you from

15        memory the names?  I could tell you one.  I

16        believe Mrs. Druker was one of the

17        defendants, if I'm not mistaken.

18             Q.    Anyone else?

19             A.    No.  I'd have to -- once again,

20        I'd have to take a look at it.  I did -- I

21        looked -- I looked at it very recently.  I

22        looked at it sometime ago.  But names, as I

23        indicated earlier, are difficult for me.

24             Q.    And what -- looking at the second

25        class period, and that runs from
```

1                   Tauber - Confidential          208

2       September 11, 2007, to November 27, 2007?

3             A.     Which document, sir?

4             Q.     Yeah.  Just the --

5                    MR. BROWER:  Second amended

6       complaint.

7             Q.     -- second amended complaint.

8       It's Exhibit 16.  And why don't you go to

9       Exhibit B.

10            A.     Yes, sir.

11            Q.     All right.  Can you describe your

12      allegations, your theory of the case

13      regarding the second class period.

14            A.     I believe that this is the same

15      theory as found on page 59 in Exhibit A.

16      There are the shares of Sigma purchased by

17      Sonar, the dates of those -- of those

18      purchases, the share price, and the value,

19      total value of the shares purchased by

20      Sonar.  And then there are the dates of

21      shares sold by both Mr. Gordon and myself.

22            Q.     And what are the alleged acts of

23      wrongdoing during this particular class

24      period?

25            A.     Well, I think the harm alleged,

1                    Tauber - Confidential          209

2          as exists in -- in A, is that both myself

3          and Mr. Gordon certainly might have acted

4          differently if we were aware of the

5          information that had been illegally

6          obtained by Sonar, meaning that instead of

7          selling, we might have retained the stock

8          and achieved the remuneration or at least

9          the percentage of remuneration that Sonar

10         was able to achieve illegally.

11              Q.    Are you alleging that the

12         information that Sonar allegedly had should

13         have been shared with the market, or are

14         you alleging that Sonar simply should not

15         have traded in the security?

16              A.    I --

17                    MR. BROWER:  Object to the form.

18         Go ahead.

19              A.    I think that inside trading is

20         immoral and illegal act that undermines the

21         credibility of the stock market.  It

22         certainly has kept me away from the stock

23         market, although there are other

24         circumstances that do as well.

25              Q.    Okay.  But specifically, what

```
 1                    Tauber - Confidential        210

 2        acts of wrongdoing do you allege Sonar

 3        engaged in?

 4              A.    I think we've gone -- we've

 5        gone --

 6              Q.    No, during the second class

 7        period.

 8              A.    Oh, specifically?

 9                    All right.  They had information,

10        and on the basis of that information, they

11        purchased large quantities, enormous

12        quantities, in one instance, $10 million of

13        -- of Sigma stock that, if we, Mr. Gordon

14        and myself and other members of the class

15        were aware of, might have meant that we

16        would not have sold the stock at the price

17        we did, and we would have gained the

18        advantage that Sonar obtained illegally.

19              Q.    How did -- how did Sonar's

20        alleged acts hurt you?

21              A.    I think I just explained it.

22              Q.    No.  You say that -- as I

23        understand --

24                    MR. BROWER:  Objection.  You're

25              arguing with the witness.
```

```
 1                  Tauber - Confidential        211
 2          Q.     Your allegation is that Sonar --
 3     your allegation is that Sonar engaged in
 4     illegal insider trading, correct?
 5          A.     That's my understanding, yeah.
 6          Q.     Okay.  And, so, you're saying
 7     that Sonar should not have done that.
 8                 And you know that Sonar has
 9     denied this, of course, right?  I'm just
10     speaking hypothetically.
11                 And you're saying that Sonar
12     should not have done that.
13          A.     Correct.
14          Q.     Right?
15                 Okay.  So you're saying by Sonar
16     doing that, Sonar made money that it should
17     not have made, correct?
18          A.     Right.
19          Q.     All right.  How did that hurt
20     you?
21          A.     Well, specifically, if that
22     information had been made available, as you
23     suggested as one of the possibilities to
24     the market, we might have -- and I
25     certainly would not have sold, but made
```

```
 1              Tauber - Confidential        212

 2        purchases.  And in doing so, I think I

 3        would have profited very substantially.

 4        And, you know, that's -- that's really all

 5        I have to say.

 6            Q.    You did make purchases during

 7        this period, correct?

 8            A.    I made purchases and I also made

 9        sales.

10            Q.    You -- you purchased more than

11        you sold, didn't you?

12            A.    I would have to review that --

13        that data.  I'm not -- I'm not certain

14        about that.

15            Q.    Okay.  You've never reviewed

16        that?

17            A.    At one point, I did, yes, sir.

18            Q.    All right.  Are you alleging for

19        the second class period that Sonar somehow

20        pushed the price of the Sigma securities

21        up?

22            A.    I think that's part of it.  As I

23        look at -- I'm just surmising, just -- just

24        looking at the numbers.  It looks to me

25        like there's something like 30 to
```

```
 1                 Tauber - Confidential          213

 2       $40 million worth of Sigma stock that was

 3       purchased in -- in about six weeks.  And I

 4       think that could have substantially

 5       affected the market and, certainly, my

 6       behavior.

 7                 So, yes, I think it could have

 8       manipulated the price.  But, once again, I

 9       think that the second part of that is that

10       information that was illegally gained was

11       denied to a -- to an honest shareholder or

12       purchaser who sold -- who might sell rather

13       than -- than either retain stock or

14       purchase stock.

15            Q.    If -- if Sonar had obtained that

16       information, which you contend was

17       illegally obtained, and not traded, but

18       obtained it, and not traded, would you have

19       any claim?

20                 MR. BROWER:  Objection.

21            A.    Isn't that an illegal conclusion?

22            Q.    No.

23                 MR. BROWER:  Yes, it is.

24            A.    I -- I -- I'm not prepared to

25       answer that.  I don't have the expertise or
```

1

2        the knowledge to answer that.

3            Q.    If Sonar's purchases during the

4        second class period pushed the price of

5        Sigma up, correct --

6            A.    Yeah, yeah.

7            Q.    -- that would have meant that

8        your sales were at a higher price than they

9        otherwise would have been, correct?

10           A.    If I sold it all.

11           Q.    Well, you're representing a class

12       to sellers, aren't you?

13           A.    I am, but that class could very

14       well have retained their shares rather than

15       sold them if they were privy to the

16       information that -- that Sonar was.

17           Q.    But they would have gotten a

18       higher -- they would have received a higher

19       price had Sonar not purchased to begin

20       with, right?

21           A.    Well, if you're suggesting that

22       Sonar is pushing -- could be pushing the

23       price up, I think that's -- that's probably

24       accurate.  I mean, I have no idea whether

25       that's the case or not.  I believe that --

1                    Tauber - Confidential        215

2          that it certainly appears to be.

3                    I mean, once again, I'm not an

4          expert, but I believe that -- that pumping

5          $40 million or so into a relatively small

6          stock probably is pushing the price up.

7          And I suppose that sellers would get more

8          money.  But at the same time, they might,

9          in fact, become buyers, and they might, in

10         fact, retain rather than sell their stock.

11              Q.    And if that had become -- the

12         information that you contend Sonar obtained

13         illegally had become public before Sonar

14         purchased, what would have happened?

15              A.    Once again, you're asking me to

16         -- to speculate, and we don't do that in

17         California.

18              Q.    If the information had become

19         public, everybody would have access to it,

20         then, correct?

21              A.    I would think so, yeah.

22              Q.    And would that have moved the

23         stock up or down under your theory?

24              A.    I think that it would -- it --

25         you know, I -- quite frankly, I'm -- I'm

1                    Tauber - Confidential          216

2         just not savvy enough to -- to give you any

3         kind of definitive answer.  The best I can

4         do is to say that -- that if there's good

5         information out there, that more people

6         would obviously be looking at Sigma to buy.

7         But that -- I'm not sure that necessarily

8         is the same thing as where a company takes

9         advantage of information and denies it to

10        the remainder of the market.

11             Q.     And then you have a third class

12        period, correct?

13             A.     Yes, sir.

14             Q.     And what are you -- who do you

15        purport to represent during this third

16        period?

17             A.     These would be the buyers and

18        those persons who bought in the period from

19        December 20th through March 12th.

20             Q.     All right.  And what is your

21        theory of wrongdoing alleged against Sonar

22        during this period, the buyer period?

23             A.     I think it's actually clearer in

24        this particular segment because they have,

25        in essence, driven the price up.  And in

Tauber - Confidential          217

doing so, they've created an expectation
among stockholders.  And when they withdrew
their money because they had insider
information that was detrimental, buyers
were still under the impression that the
stock was -- that it had legs, that it was
substantial, that it was going to continue
to grow, whereas the only player on the
block who knew it was -- was not so was
getting out of the market as quickly as
possible.

Q.   And what did Sonar know that you
contend was constituted material nonpublic
information?

A.   My recollection from the
complaint and from discussions with counsel
and other information that was relayed to
me is that -- I don't want to get the wrong
company, but I believe it was Panasonic.
I'm not sure.  There was -- it may have
been Motorola.

There was a major company that
had purchased a large quantity of product
in the third quarter, previous third

```
 1                Tauber - Confidential        218
 2       quarter, that had pulled out.  And that was
 3       enormously detrimental to -- to Sigma.  And
 4       having that information and using it to
 5       sell 112,000 shares at 62.84, 156,000
 6       shares at 49.15, I think, was very
 7       detrimental.  I was purchasing at the time
 8       they were selling as well as, I'm sure,
 9       thousands of others.
10            Q.    You were selling also, weren't
11       you?
12            A.    I believe so, yes, sir.
13            Q.    Okay.  Now, in these exhibits to
14       the second amended complaint, for the
15       two -- what I call -- selling class
16       periods, you just identify the shares that
17       you sold, correct?
18            A.    I'm sorry.  I don't understand
19       the question.
20            Q.    Yes.  Go to Exhibit 16.
21            MR. BROWER:  Mr. Hyland, I'm
22       going to object.  Why don't you go to
23       paragraph 97 of the complaint.
24            Q.    Exhibit 16.
25            MR. BROWER:  Why don't you go to
```

```
1                  Tauber - Confidential           219
2            paragraph 97 of the complaint first,
3            since that's a misleading question.
4            You're going through exhibits that the
5            exhibits themselves are described in
6            the body of the complaint as to what
7            they are.
8                  MR. HYLAND:  Yeah.
9                  MR. BROWER:  It's paragraph 97,
10           paragraph 111.
11                 MR. HYLAND:  Got it.  Yeah.
12           Fine.
13                 MR. BROWER:  Okay.
14           Q.    Same question.  If you go to
15       Exhibit A, B, and C.
16           A.    Okay.
17           Q.    During -- on this chart on
18       Exhibit A, this reflects -- this reflects
19       the first selling class period, right?
20           A.    Just give me a moment.  It's like
21       a very long day in court.
22                 All right.  Yes, sir.  A, B, and
23       C.
24           Q.    Yeah.  Exhibit A, okay?
25           A.    Yes, sir.
```

```
 1                  Tauber - Confidential         220
 2           Q.     This is a selling class period
 3      where you purport to represent sellers,
 4      right?
 5           A.     Yes, sir.
 6           Q.     And you identify your sales,
 7      correct?
 8           A.     Yes, sir.
 9           Q.     You don't identify your buys,
10      correct?
11           A.     I do not see it here, no, sir.
12           Q.     Okay.  Exhibit B.  You are
13      representing again a separate period,
14      during a separate period, a class of
15      sellers, correct?
16           A.     Correct.
17           Q.     And you identify your sales but
18      not your purchases, correct?
19           A.     Correct, yeah.
20           Q.     And in Exhibit C, the third class
21      period, you're representing -- this time,
22      you're representing a class of buyers,
23      correct?
24           A.     Correct.
25           Q.     And you're representing your
```

```
1                Tauber - Confidential              221

2         sales that you purchased but not sold,

3         right?

4              A.    That's correct.

5                   MR. BROWER:  For the record, the

6              third paragraph as found in Exhibit C

7              is paragraph 120 of the complaint, and

8              all three of those paragraphs describe

9              that's exactly what's on the chart,

10             contemporaneous --

11                  MR. HYLAND:  They also don't

12             disclose --

13                  MR. BROWER:  -- sales.

14                  MR. HYLAND:  They also don't

15             disclose the opposite trading.

16                  MR. BROWER:  Whatever that means.

17                  (Pause)

18             A.    Is this -- is this a reasonable

19         time to take a short break, maybe just

20         about ten minutes?

21             Q.    That's okay.

22             A.    Five minutes?  Ten minutes?

23             Q.    Yes.

24             A.    Something like that?

25             Q.    Let's go for five.
```

```
 1                     Tauber - Confidential        222

 2                     THE VIDEOGRAPHER:  Stand by,

 3              please.

 4                     The time is 3:56 p.m.  We are off

 5              the record.

 6                     (Recess)

 7                     THE VIDEOGRAPHER:  Stand by,

 8              please.

 9                     The time is 4:06 p.m.  We are

10              back on the record.

11         EXAMINATION CONTINUED

12         BY MR. HYLAND:

13                     MR. HYLAND:  17.

14                     (A third amended class action

15              complaint was marked as Tauber 17 for

16              identification.)

17              Q.    Do you recognize Exhibit 17?

18              A.    I do.

19              Q.    And what is it?

20              A.    Third amended class action

21         complaint.

22              Q.    It was filed on December 30,

23         2014?

24              A.    Just one moment.

25                     Filed December 30th, yes, sir.
```

```
1                    Tauber - Confidential            223

2            Q.    Did you receive a draft of this

3       complaint before it was filed?

4            A.    I did.

5            Q.    Were you asked to comment on it?

6            A.    I was.

7            Q.    Did you have any comments on it?

8            A.    We had a conversation, I recall,

9       about what had taken place in terms of the

10      negotiated plea and discovery that had been

11      made and -- and the potential for clawing

12      back against the named defendants.

13           Q.    Did you have any comments on the

14      complaint, on the draft complaint?

15           A.    I don't recall anything

16      specifically, no, sir.

17           Q.    Anything general?

18           A.    No.  It seemed to me to be -- to

19      be good work.

20           Q.    On any of the complaints, did you

21      ever have a comment that you, in fact,

22      wrote on the document and sent back to

23      counsel?

24           A.    Virtually all the comments

25      were -- were conveyed by telephone.
```

1                    Tauber - Confidential          224

2           Q.     Can you remember what any of the

3     comments were?

4           A.     I remember I wanted to know what

5     "clawed back" meant.

6           Q.     Okay.

7           A.     And I wanted to know what the

8     process was and the procedures.

9           Q.     Okay.  Have you ever met Noah

10    Freeman?

11          A.     No.

12          Q.     Have you researched his

13    background at all?

14          A.     No, just what I've read in the --

15    in the complaint.

16          Q.     Do you have any other information

17    about Noah Freeman other than what you've

18    read in the complaint?

19          A.     From discussions with my counsel.

20          Q.     Okay.  Are you aware that he's an

21    admitted drug user?

22          A.     I think -- I'm trying to

23    remember, but I -- it is -- there's a -- I

24    have some vague recollection in the

25    complaint.  But perhaps -- I quite honestly

1                Tauber - Confidential          225

2          couldn't say.

3               Q.    Are you aware that he -- he

4          testified at the trial of Winnie Jiau?

5               A.    No.  I may have read it, but I

6          don't recall it.

7               Q.    You didn't read any of the

8          transcripts of the testimony at the Winnie

9          Jiau trial?

10              A.    I don't recall reading that.

11              Q.    Okay.  Did you ever hear that --

12         that Freeman admitted to hallucinating on

13         mushrooms, drug-laced mushrooms, and

14         running around the streets of San Francisco

15         in his underwear?

16              A.    You know, this stuff is vaguely

17         familiar.  I can't recall whether it was in

18         something I've read that you submitted.  I

19         kind of think it was, and I can't recall in

20         what document.  I'm -- I'm just trying to

21         be as straight as I can.  I -- I've heard

22         the allegation somewhere, and I think it

23         was in one of your documents.

24              Q.    Do you want to think again about

25         that last allegation?

1                     Tauber - Confidential          226

2          A.      I'm not -- I'm not --

3          Q.      Have you heard that last

4     allegation before?

5          A.      I've heard the last -- the

6     allegation before.

7          Q.      All right.

8          A.      Whether -- whether -- and as to

9     whether it's in one of your documents or

10    not, I -- I couldn't say.

11         Q.      All right.  Have you heard that

12    Noah Freeman actively participated in

13    triathlons?

14         A.      I don't remember that part.

15         Q.      Okay.  You didn't hear that he

16    used performance-enhancing drugs to improve

17    his performance in those?

18         A.      I don't recall anything about

19    marathons or running.

20         Q.      Did you hear anything about him

21    receiving illegal prescription drugs?

22         A.      The part about being a drug

23    addict is -- it's kind of -- rings a bell,

24    but the other stuff doesn't.

25         Q.      Did you hear any allegations that

```
 1                Tauber - Confidential            227
 2       he assisted in the purchase of -- of
 3       supplying prostitutes to contacts?
 4            A.    No.
 5            Q.    Okay.  If those -- if -- if those
 6       things were true, if they were true, in
 7       your mind, as a judge, would they affect
 8       his credibility?
 9                 MR. BROWER:  Objection.
10            Q.    Based on your experience.
11                 MR. BROWER:  Objection.
12            A.    Counsel, I -- I -- I'm a trial
13       judge, not a jury.  I don't -- I don't make
14       those kinds of determinations.  I leave
15       that to the jury.
16            Q.    You've had bench trials before,
17       haven't you?
18            A.    I certainly do.
19            Q.    You know the difference between a
20       bench trial and a jury trial?
21            A.    I certainly do, Counsel.
22            Q.    And in a bench trial, you are the
23       finder of facts?
24            A.    And credibility.
25            Q.    Correct.
```

```
 1                 Tauber - Confidential        228
 2         A.    Yeah.  It -- it depends on so
 3    many things.  You know --
 4         Q.    Okay.
 5         A.    -- it's -- to say that it would
 6    have no impact would not be true, but to
 7    say that it would have a substantial impact
 8    would be probably overstating the case.  It
 9    would be one of the factors that I would
10    consider.  If you're a judge or if you're a
11    juror, you're expected to take in all the
12    information that you can and to use it and
13    weigh it in an unbiased fashion.
14              So in California, at least, there
15    are certain things we can consider and
16    certain things we can't.  For example,
17    being a drug addict or being charged with
18    -- being under the influence is not one of
19    the things you can charge or prove as a
20    prior or use his character for impeachment.
21    So it really depends where you are.
22         Q.    And you do give standard jury
23    instructions that if a -- if a juror
24    concludes that a witness has lied on the
25    witness stand, the jury -- the juror is
```

```
 1                  Tauber - Confidential          229
 2          entitled to, but not required to, disregard
 3          the witness' testimony in its entirety,
 4          correct?
 5                  A.    Not entitled, but may.
 6                  Q.    What did I say?
 7                  A.    They may consider it, but are not
 8          to use it.  I'm not sure I could -- I could
 9          repeat it exactly, but basically what you
10          said is correct.
11                  Q.    All right.  And in your
12          experience, you have -- you -- you -- you
13          have had the occasion to deal with
14          defendants who have pleaded guilty and
15          become cooperators, correct?
16                  A.    It's -- it's certainly happened
17          in -- in my court, yeah, yeah.
18                  Q.    Okay.  And one of the reasons
19          that -- a primary reason that a defendant
20          will cooperate is the hopes of receiving a
21          lesser sentence, correct?
22                  A.    Yeah, of course.
23                  Q.    And generally, the more people
24          that a cooperating defendant can implicate,
25          the better the chance for a lighter
```

```
 1                 Tauber - Confidential            230

 2        sentence.

 3                     MR. BROWER:   Objection.

 4             Q.      Right?

 5             A.      You know, that's really the --

 6        maybe that's in federal court.  But in --

 7        in -- in state court, if -- if there's a

 8        cooperative witness and the prosecution

 9        makes a request, the Court will consider

10        it.  But I'm not one that automatically

11        sentences on the basis of -- of a

12        recommendation from the prosecution.

13             Q.      But a cooperating defendant has

14        that hope that, by the cooperation, they

15        would get a reduced sentence, correct?

16             A.      And -- and it does happen.

17             Q.      Okay.  Are you aware that Noah

18        Freeman wore a wire in conversations with

19        his -- his best friend?

20             A.      Vaguely familiar.  I'm sorry.

21        That's -- that's the best I can do.  I may

22        have read it in the complaint or in some

23        other document.

24             Q.      You think it's in the complaint?

25             A.      You know, I don't know.  It just
```

```
 1                  Tauber - Confidential          231

 2         seems to me like I've -- I've -- I've read

 3         that, and it may have been in a memorandum

 4         or some other document.

 5              Q.    Okay.  Have you ever heard of

 6         Don Longueuil?

 7              A.    No.

 8              Q.    All right.  Have you ever heard

 9         of Thai Nuan?

10              A.    No.

11              Q.    No?

12              A.    Like I said, I'm not great on

13         names.

14              Q.    Okay.  Have you ever heard of

15         Abaxis?

16              A.    Yeah.  I have heard of that.

17         Were they a defendant or -- or one of the

18         defendants?  I -- I'm -- I'm trying to put

19         it back together.  I've heard the name, if

20         that's your question, yeah.

21              Q.    Okay.  And you reached a

22         settlement with Noah Freeman, correct?

23              A.    Yes, sir.

24              Q.    And what factors did you weigh in

25         determining whether the settlement was
```

```
 1                Tauber - Confidential          232
 2      reasonable?
 3           A.    Well, I'm a little bit
 4      uncomfortable answering that, and I'm going
 5      to defer to my counsel.  It just seems like
 6      it's something that -- that -- that ought
 7      to be covered by lawyer-client privilege.
 8                THE WITNESS:  But -- but you tell
 9           me.
10                MR. BROWER:  Try it another way.
11           Q.    You -- you approved the
12      settlement, correct?
13           A.    Correct.
14           Q.    Okay.  And did you consider any
15      factors in determining whether or not you
16      should agree to what Noah Freeman was
17      proposing and what you ultimately agreed
18      to?
19                MR. BROWER:  You can go ahead.
20                THE WITNESS:  Thank you.
21           A.    My recollection is that he had
22      agreed to provide the names of defendant or
23      corporations that -- or institutions that
24      had been -- that had benefitted from
25      illegality.  My understanding that -- is
```

1

2      that he is to be sentenced, if I'm not

3      mistaken.  My understanding is that he has

4      opted to engage in a financial settlement,

5      as -- as -- as being a partial settlement

6      of this case.  And, I believe, if I'm not

7      mistaken -- and this -- some of this stuff

8      I'm trying to remember from six months or a

9      year ago, but it was about a half million

10     dollars, if I'm not mistaken.

11          Q.    Half a million dollars what --

12     that he's paying?

13          A.    That he's paying.  That may be

14     news to you.

15          Q.    Did he -- did -- did you -- did

16     you consider his personal financial

17     situation and ability to pay?

18          A.    I don't recall.  I think there

19     was some discussion about that, and that he

20     had -- he had limited ability to pay.

21          Q.    But you've never met Mr. Freeman.

22          A.    No.

23          Q.    Do you have any desire to?

24          A.    Not really.  In fact, this whole

25     week could disappear, and that would be

```
 1                  Tauber - Confidential           234
 2        just fine.
 3             Q.    When you were making investment
 4        decisions back in -- you know, generally,
 5        back in 2000 -- 2006, 2007, 2008 --
 6             A.    Sure.
 7             Q.    -- was it your intention -- was
 8        it your general thesis to -- to buy and
 9        hold securities?
10             A.    You know, it was, and with the
11        idea of obviously making a lot of money and
12        -- and leaving the market.  So I had a
13        long-range goal to do that.  I wasn't -- my
14        plan wasn't a ten-year plan.  It was more
15        like, I would say, three to five years.
16             Q.    And with respect to your
17        transactions in Sigma, though, each month,
18        you were -- you were -- during the three
19        class periods or each -- during each class
20        periods, you were buying and selling,
21        correct?
22             A.    I was.  And -- and some of it --
23        some of it actually surprises me.  And when
24        I think back to it, it was a -- a very --
25        it was a difficult time.
```

```
 1                 Tauber - Confidential        235
 2          Q.    Was that -- was that pattern of
 3     -- of buying and selling Sigma -- was --
 4     was that consistent with the way you were
 5     buying and selling other securities?
 6               MR. BROWER:  Objection.  You can
 7          answer.
 8          A.    I -- no, it wasn't.  It -- it
 9     was -- it was a stock that I -- I saw rise
10     from a relatively modest cost, and -- and,
11     so, it was my intention to benefit from it
12     if I could.  And, certainly, there was a
13     possibility that I could attain my goals
14     and -- and leave the market in -- in a --
15     in a beneficial position.
16          Q.    Now, ultimately, ultimately, you
17     -- you lost a lot of money trading Sigma,
18     correct?
19          A.    Yes, sir.
20          Q.    But during the three class
21     periods that are at issue here, you made
22     money, correct?
23               MR. BROWER:  Objection.
24          A.    Once again, I -- I haven't done
25     the addition, so I couldn't tell you.
```

```
 1                 Tauber - Confidential          236
 2          Q.     All right.  And, so, when did you
 3     incur your substantial losses in Sigma?
 4          A.     I incurred losses starting
 5     probably in November.  I think it topped
 6     out -- I was just looking at a document --
 7     at 68 or something in that -- that
 8     vicinity, if I'm not mistaken.  And it
 9     started down from there.  And -- and I held
10     on.  And it was -- they say that -- that
11     it's much easier to -- to buy stocks than
12     sell them.  And, certainly, that was, I
13     think, the case for most stockowners.
14          Q.     Well, your third class period
15     ended, in this case, in -- in March of
16     2008, correct?
17          A.     Right, right.
18          Q.     And, so, you -- you had
19     substantial losses after that?  Is that
20     what your --
21          A.     I had --
22          Q.     -- testimony is?
23          A.     I had losses after that, but most
24     of -- I mean, this is -- this is what I
25     recall.
```

1                    Tauber - Confidential          237

2          Q.     Yeah.

3          A.     Most of my losses occurred before

4     then, if I'm not mistaken.

5          Q.     How much did you -- how much did

6     you end up losing in Sigma after the -- the

7     third class period?

8          A.     Third class period ends --

9          Q.     It ended in March of 2008.

10         A.     Beginning of March?  End of

11    March?

12         Q.     Yes.

13                MR. BROWER:  March 12th.

14         Q.     March 12th.

15         A.     You know, I just don't know.  I

16    think that by that time, I was down to

17    perhaps -- I'm thinking maybe perhaps

18    10,000 shares from 40 or 50, something like

19    that, if that.

20         Q.     Do you -- do you contend that

21    your losses after the class periods

22    involved in this case were a result of any

23    illegal activity?

24         A.     I'm going to -- to stick with --

25    with the complaint as is, I'm not making

1                    Tauber - Confidential          238

2          any allegations beyond that.  I think that

3          decisions I made after that were certainly

4          set in place in some ways, or at least were

5          a -- a factor in my retaining Sigma.

6               Q.    Now, you experienced losses in

7          your other trading beside Sigma also?

8               A.    Relatively minor compared to

9          Sigma.

10              Q.    Okay.  Well, during this time, I

11         think that you testified you think you had

12         about $2 million of assets that you were

13         trading?

14              A.    I thought it was more than that.

15         I was thinking that I had about two and a

16         half million dollars.  But I --

17              Q.    Okay.

18              A.    In November, probably, at the end

19         of November, it would have been something

20         like that.

21              Q.    Okay.  And what happened to the

22         two and a half million?

23              A.    It -- well, Sigma went away,

24         basically.  It returned to the basement.

25         I'm not sure when it did.  I think it was

```
 1                  Tauber - Confidential           239
 2        probably maybe by May.  It was back down to
 3        about 10 or $15.
 4             Q.    What's left of the two and a half
 5        million dollars today?
 6             A.    The answer is nothing.
 7             Q.    Was it all lost in the market?
 8             A.    Yeah.
 9             Q.    All right.  Did you trade on
10        margin at all?
11             A.    I did.
12             Q.    And did you trade on margin
13        during the class periods?
14             A.    I would think so, yeah.
15             Q.    That's your recollection?
16             A.    Yes.
17             Q.    Do your trading records identify
18        margin trades, do you know?
19             A.    I wouldn't know.
20             Q.    I'm looking at Exhibit 9.
21                   Can you tell the amount of
22        margin, if any, that was utilized in making
23        these trades from these records?
24             A.    Well, I couldn't tell you from
25        the records.  I -- I used margin a fair --
```

1
2      fair amount, but -- and, of course, that

3      had to be -- had to be paid back.  I

4      think -- when I said two and a half

5      million, I meant with margin, two and a

6      half million.  So it was probably -- it

7      could have very easily been closer to 2

8      million or less in terms of real money as

9      opposed to what's -- what I owed in terms

10     of margin.

11          Q.    Do you think you understood the

12     margin rules adequately when you were

13     engaging in this trading --

14          A.    Yeah.

15          Q.    -- backed in the class periods?

16          A.    Yeah, I did.

17          Q.    And expect it to be very risky?

18          MR. BROWER:  Object to the form.

19          A.    You know what?  I don't think

20     margin got me in trouble.  I didn't -- I

21     didn't sell, and I didn't lose the money

22     because I -- because of the margin -- any

23     margin problems.

24          Q.    When did -- when did you first

25     start utilizing margin in trading for your

```
1                 Tauber - Confidential           241

2        own account?

3             A.     Probably 2006 sometime,

4        maybe 2000 -- late 2000 -- that's hard for

5        me to say.

6             Q.     That's okay.

7             A.     I didn't use it a lot, and --

8        and, of course, depending on the stock, how

9        much you could actually trade on margin is

10       -- is -- is substantially different for

11       each company.

12            Q.     Right.

13            A.     And -- and I don't think Sigma

14       had a particularly high rating for that, so

15       I think -- I think you were -- you were

16       limited to 10 or 20 percent, something like

17       that.

18            Q.     What did you do to educate

19       yourself about the risks of trading on

20       margin?

21            A.     Well, like I said, I -- I -- I

22       read everything I could, and I -- I would

23       call up Fidelity, and I would talk -- talk

24       to a consultant.  Obviously, generally, we

25       -- we wouldn't talk about Sigma, but we --
```

```
 1                  Tauber - Confidential          242

 2         we discussed the issues.

 3              Q.    And when is the first time that

 4         you traded in options?

 5              A.    Probably summer of 2007.

 6              Q.    2007?

 7              A.    I think.

 8              Q.    Was Sigma the first time you

 9         utilized options?

10              A.    I think.

11              MR. HYLAND:  Let's just take a

12         couple of minutes.  I'm just about

13         done.

14              A.    Sure.

15              THE VIDEOGRAPHER:  Stand by,

16         please.

17              The time is 4:33.  This is the

18         end of DVD 4.  We are now off the

19         record.

20              (Recess)

21              (Plaintiffs' memorandum to

22         dismiss the second amended class action

23         complaint was marked as Tauber 18 for

24         identification.)

25              THE VIDEOGRAPHER:  Stand by,
```

1
2          please.
3                  The time is 4:38 p.m.  This is
4          the beginning of DVD No. 5.  We are
5          back on the record.
6   EXAMINATION CONTINUED
7   BY MR. HYLAND:
8          Q.     Looking at Exhibit 18, have you
9   seen -- which is Plaintiffs' memorandum of
10  law and opposition to Defendants' Sonar
11  Capital Management's, Neil Druker's motion
12  to dismiss the second amended class action
13  complaint -- have you seen this before?
14         A.     If I may have a moment.
15                (Pause)
16         A.     I believe I have, yes, sir.
17         Q.     And did you review it before it
18  was put into final?
19         A.     I believe I did, sir.
20         Q.     And you see some -- if you go to
21  the back, the last page of the brief is
22  page 26, and then there's an Exhibit A.
23                Do you see that?
24         A.     Yeah.
25         Q.     Just go to Exhibit A there.  And

Tauber - Confidential          244

1       this Exhibit A is entitled "Plaintiff

2       Jeffrey Tauber Trades In Sigma Designs,

3       Inc. Stock," right?

4            A.    Right.

5            Q.    Okay.  Again, I touched on this

6       earlier.  But if you take a look under the

7       first column, number of shares, it says

8       "9,000," right?

9            A.    Right.

10           Q.    Purchased.

11                 Trade date:  7/16/2007.

12           A.    Right.

13           Q.    You were generally positive on

14      Sigma at this time?

15           A.    On that date specifically?

16           Q.    Around this time.  I'm talking

17      during -- during the selling period, during

18      the seller class period, the first seller

19      class period.

20           A.    Yeah.  I -- I had seen it rise

21      from approximately 10 -- $10 to $30.

22           Q.    And, so, you purchased 9,000

23      shares, and then sell the 9,000 shares

24      shortly thereafter.

REDACTED

1               Tauber - Confidential            245

2          A.     Yeah.

3          Q.     Correct?

4          A.     Right.

5          Q.     What -- what made you do that?

6     Do you know?

7          A.     I think you've asked me this

8     before.  And I don't mind going back to it.

9     I don't really know.  I know that I had --

10    I've taken a look at -- at my -- the number

11    of shares I had over the period -- the

12    class period, and they were fairly

13    consistent.  They stayed fairly consistent,

14    for the most part, at about 40,000, I

15    believe.

16              As to why I sold it, there were

17    times when I just got cold feet.  There

18    were times when I just got really nervous.

19    ██████████████████████████

20    ████████████████████████████

21    ███████████████████████████

22    ████████████████████████████

23    ████████████

24              And I just -- you know, there

25    were times when it was -- it was difficult

1                    Tauber - Confidential          246

2          to be completely rational.  And I feel like

3          I was rational almost all the time.  There

4          were some times when the -- the work I was

5          doing was -- was very challenging.

6               Q.    Your drug court work?

7               A.    No, I'm talking about -- I'm

8          talking about this.

9               Q.    Oh, okay.

10              A.    I mean, this is, you know -- it's

11         -- it's dealing with a lot of money.  And

12         -- and it can be -- it can be difficult.

13         And, you know, I wish -- I wish I could

14         always be as rational as -- as I am on the

15         bench.

16              Q.    Just for example, if you go to a

17         page in your trading records, Exhibit 9,

18         page 612.

19              A.    We're still on 14 -- 16?

20         Exhibit 16?

21              Q.    No.  If you go to Exhibit 9 --

22              A.    I'm sorry.

23              Q.    -- which is your trading records.

24              MR. BROWER:  Your trading

25         records.

```
 1                    Tauber - Confidential          247
 2            A.    Yeah.  Right.  Go ahead.  Oh,
 3       there it is.  Yeah.  Right.
 4                 MR. BROWER:  Mark, I'm sorry,
 5            what page again?
 6                 MR. HYLAND:  Oh, if you go to
 7            612.
 8            A.    612, yes, sir.
 9            Q.    All right.  This is -- this is
10       the trade date July -- trade date
11       July 20th.
12            A.    Yeah.
13            Q.    Okay?
14            A.    Yeah.
15            Q.    And also keep Exhibit 18 out,
16       would you?
17            A.    18?
18            Q.    Right.  You know, the --
19            A.    Right.  The one you just gave us?
20            Q.    Yeah.  And I'm going to be -- you
21       may be looking at the chart on the back.
22            A.    All right.
23                 MR. BROWER:  Does this come from
24            a call option?
25                 MR. HYLAND:  Yeah.  I'm looking
```

Tauber - Confidential                248

1  
2          at -- yes, it is a call option.  Yes.
3          Yes.  And that's my -- that's my
4          question.
5                  MR. BROWER:  This?  It says
6          "stock."
7                  MR. HYLAND:  Huh?
8                  MR. BROWER:  It says "stock" on
9          the chart.
10                 MR. HYLAND:  Yes, it does.
11                 MR. BROWER:  Oh, okay.
12                 MR. HYLAND:  I understand.  No,
13         But I'm asking here.
14         Q.    In -- in this lawsuit, are you
15     purporting to represent people who held
16     options in the stock?
17         A.    I don't believe that -- that
18     was -- that it's part of the complaint, as
19     I understand it.
20         Q.    Why not?
21         A.    From my understanding, that is
22     not part of the class.
23         Q.    Why not?
24         A.    From my understanding, the law
25     that's not part of the class, and that's

```
 1                 Tauber - Confidential           249

 2       something that was discussed.

 3            Q.    Okay.  It was discussed and was

 4       decided that you weren't making the calls

 5       part of the class or any options.

 6                 MR. BROWER:  Were not.

 7                 MR. HYLAND:  Were not.  Yeah.

 8                 MR. BROWER:  Okay.

 9            Q.    All right.  But I see here this

10       reflects that on July 20, 2007 --

11            A.    Yeah.

12            Q.    -- you're selling 59 call

13       options, correct?

14            A.    Right.

15            Q.    And why would you be selling call

16       options that day but not selling shares?

17            A.    I -- there's -- there's -- you

18       know, there's more profit to be made in

19       options than in shares.  But there --

20       there's an understanding or there's -- that

21       you reach a certain number by a certain

22       day.  I don't know -- I don't know how

23       else -- how else to say it.

24            Q.    Okay.  But sitting here today,

25       you can't explain why you were selling
```

```
1                  Tauber - Confidential         250

2       options, selling calls on that day; is that

3       correct?

4                  MR. BROWER:  I'm going to object,

5            but you can answer.

6            A.    I -- I was in the stock market to

7       make money, and I thought that Sigma was --

8       had shown itself to be a very reliable

9       stock, and I believe that it was

10      appropriate and reasonable to do at the

11      time.

12           Q.    Well, but what -- what is the --

13      what is the investment bias of selling

14      calls?

15                 MR. BROWER:  Object to the form.

16           Q.    I mean, what are you hoping to

17      accomplish by selling a call?

18           A.    I don't know -- I don't know -- I

19      thought I just said it -- I mean, I may

20      be -- that the purpose is to make -- to

21      make money.

22           Q.    How would you make money by

23      selling calls?

24           A.    As I understand it, if the -- the

25      call was for -- for July 30th, and I was
```

```
1                    Tauber - Confidential          251

2         attempting to profit by the stocks reaching

3         the required level.

4              Q.    How would you profit by selling a

5         call?

6              A.    The -- the call was for

7         July 30th, and the trade date was

8         July 20th.  If the stock was at the

9         required level, I would -- I would benefit

10        from it.

11             Q.    How?  Wouldn't you benefit by it

12        if you bought and exercised a call if the

13        stock was at the required level as opposed

14        to selling a call?

15                   MR. BROWER:  Object.

16             A.    Yeah.  I -- I simply -- I --

17        I've -- quite frankly, I -- I -- I

18        cannot -- I can answer -- I cannot answer

19        that --

20             Q.    Okay.

21             A.    -- at this time.

22             Q.    Okay.  If you go to 618 of

23        Exhibit 9.

24                   And this shows a purchase on

25        August 13, 2007, of some 19,345 shares of
```

```
 1                 Tauber - Confidential            252
 2        Sigma, correct?
 3              A.      We're talking about August 13th?
 4              Q.      Yes.
 5              A.      All right.
 6              Q.      Page 618.
 7              A.      Okay.  All right.
 8              Q.      And you see a lot of purchasing
 9        activity on that page, over the next three
10        pages, from 618 to 621 --
11              A.      You know, I --
12              Q.      -- correct?
13              A.      -- I believe, although I can't
14        say it for sure, my -- my guess is that
15        it's the same transactions.  Is that
16        incorrect?
17              Q.      Oh, I don't know.  It could be.
18        But my point is that -- that from records
19        618 to 621, it looks like you've purchased
20        almost 20,000 shares of Sigma for about
21        $645,000.
22              A.      Yeah.
23              Q.      Okay?
24              A.      Yeah.
25              Q.      Now, for you, isn't that a huge
```

```
1                    Tauber - Confidential              253

2          purchase?

3                A.     That -- that is a huge purchase,

4          yeah.

5                Q.     Had you ever made one that big up

6          to that point, do you know?

7                A.     Doesn't look like I did.

8                Q.     Okay.  Now, as you're sitting

9          here today, can you identify any reason

10         that caused you to make a purchase of that

11         size?

12               A.     Well, you know, there were so

13         many -- so many ways that I received input.

14         And just going back and reviewing the

15         Gilder hotline, the various existing

16         analyses that Fidelity did, and the fact

17         that it appeared to me that it was

18         reasonable to do so.  But if you're asking

19         me was there any specific reason, I simply

20         couldn't tell you at this point.

21               Q.     Well, you -- okay.

22                      On August 13th, you're -- you're

23         -- you're buying 19,345 shares for

24         $645,000.  And then the same day, you sold

25         18,000 shares.
```

```
1                Tauber - Confidential        254

2                What happened?

3          A.    You know, probably the best --

4     best way to describe -- I mean, just

5     looking at it and knowing myself, I -- I

6     probably got cold feet.

7          Q.    Okay.  If you go to 626 --

8          A.    All right.

9          Q.    -- which shows -- if you go to

10    6 -- starting at 626 all the way to 645.

11         A.    Okay.

12         Q.    I think that shows all of your

13    trading on October 22, 2007.

14         A.    Yeah, yeah.

15         Q.    Right?  That's that it looks

16    like?

17         A.    Yeah.  That was a single trade.

18         Q.    A what?

19         A.    It was a single trade that was

20    broken down --

21         Q.    Okay.

22         A.    -- by Fidelity.

23         Q.    So you're selling 17,800 shares

24    for about $940,000, correct?

25         A.    I don't remember the exact
```

**REDACTED**

1           Tauber - Confidential              255

2     numbers, but it was a lot of money.

3           Q.    Do you know why you sold that

4     much?

5           A.    Yeah.  Holding on is -- is

6     really -- is really hard to do sometimes.

7     Black Monday had just occurred, and -- or

8     at least the celebration or the

9     anniversary.  And there were some -- there

10    were just some reasons why I felt that

11    maybe I should get out, which, I suppose

12    that you can call it cold feet.

13

14

15

16

17

18

19

20

21

22

23           Q.    Okay.  Now, if you go to

24    page 646, and if you go from 646 to 650.

25           A.    Okay.

1                    Tauber - Confidential              256

2          Q.     This shows transactions on

3     November -- November 8th.

4          A.     Yes, sir.

5          Q.     And it looks like you purchased

6     19,545 shares on November 8, 2007, for

7     $1,070,476.

8                 Do you see that?

9          A.     All right.  Starting on page 646

10    through page --

11         Q.     Right.  646 to 650, I think it

12    is.

13         A.     Okay.

14         Q.     Yes.

15         A.     Yeah.  Okay.

16         Q.     And, again, it looks like -- and

17    it looks like, from these records and from

18    your chart on Exhibit 18, that on

19    November 8th, you purchased over a -- more

20    than 19,000 shares, right?

21         A.     Yeah.

22         Q.     And this is after you had, just

23    two weeks before, sold approximately the

24    same amount, right?

25         A.     Okay.

1                    Tauber - Confidential          257

2          Q.    Now, so you got out of the stock

3    pretty substantially on October 22nd and

4    then got back into it on November 8th.

5          A.    Right.

6          Q.    And so you purchased there.

7                Any explanation -- do you have

8    any -- any reason why you did that?

9          A.    The only thing I could tell you

10   is that I was still -- I still believed

11   that this stock had great promise and

12   decided that I wanted to remain active in

13   it.  And as to specifics, I was very

14   diligent in collecting information and

15   doing my best to follow its rise.

16         Q.    Because on the next day, you

17   purchased another 24,845 shares.  So you

18   purchased about a million 350 in the course

19   of two days, right, on 11/8 and -- well,

20   11/8 and 12, I guess.

21         A.    Yes, sir.

22         Q.    And then if you look at 654, you

23   sold 5300 shares.

24         A.    Right.

25         Q.    So after buying a million 350,

Tauber - Confidential                258

1
2    you then quickly sold 5,300 shares.
3              Do you have any -- any
4    explanation why you would, you know, a
5    couple weeks before, sell about a million
6    dollars' worth, and then two weeks later,
7    buy back a million 350's worth, and then
8    the next day after completing that, sell
9    5300 shares?
10        A.    I think I've given you the best
11   answer I can, which is that I was trying to
12   optimize my profit, and using the
13   information I had, I was making decisions.
14   What those -- what that information was --
15   what -- seven years ago or eight years
16   ago -- is -- is so -- so difficult to -- to
17   reconstruct.
18        Q.    I'm just -- I fully understand
19   that.
20              But what I'm trying to get at is,
21   we see these purchases and sales coming in
22   such a fashion as the way we do.
23              Does that jog your recollection
24   as to why you were doing it?
25        A.    It -- it -- it jogs my

```
 1                  Tauber - Confidential          259

 2          recollection as to how much money I've

 3          lost, yes, it certainly does that.

 4               Q.    Because after that sale, on

 5          November 12th of 5300, a week later, you

 6          purchased on the 19th and the 20th,

 7          respectively, 5,000 shares on each day,

 8          correct?

 9               A.    The 15th and the 20th?

10               Q.    No, on the -- on the 19th and the

11          20th.

12               A.    Okay.

13               Q.    And that's on 661 and 662, I

14          think.

15               A.    All right.  651 and 652?  I'm

16          sorry.

17               Q.    Yes.  Yes.

18                     And if you look at your chart

19          also attached as Exhibit 18, it will also

20          show you the transactions.

21               A.    All right.

22               Q.    So on the -- on the 11th and

23          12th, you -- on the -- excuse me -- on

24          the -- on the -- on the 11th -- on

25          November 12th, we see a purchase of 5,000,
```

```
 1                  Tauber - Confidential           260
 2        and then we also see a sale of 5300.
 3              A.    On the 11th?
 4              Q.    No, on -- I'm sorry.  We went
 5        over the purchases on -- on November 8th.
 6              A.    Okay.
 7              Q.    We've gone over those --
 8              A.    Yeah.
 9              Q.    -- which was, like, a million 350
10        --
11              A.    Okay.
12              Q.    -- and approximately 19,000-plus
13        shares.
14                    And then we have a sale of 50 --
15        another purchase of 5,000 shares on
16        November 12th, correct?
17              A.    5600 -- excuse me -- 5300, yeah.
18              Q.    Yes?  On the 12th.
19              A.    Right.
20              Q.    And then a sale on the 12th of
21        5300.
22              A.    Right.
23              Q.    So you bought 5300 on the 12th,
24        and then you sold 5300 on the 12th.
25              A.    At virtually the same price.
```

```
 1                 Tauber - Confidential        261
 2         Q.    Yes.
 3               MR. BROWER:  Are we on 11/12 now?
 4               MR. HYLAND:  The date 11/12?
 5               MR. BROWER:  Yeah.
 6               MR. HYLAND:  Yes.
 7               MR. BROWER:  Okay.  That's not
 8         the same price.
 9         Q.    Again, so you buy and sell 5300
10    on the same day.
11         A.    That apparently is what happened.
12         Q.    And did -- I mean, do you think
13    you -- you bought and then you sold because
14    you got cold feet?
15         A.    I think that's certainly one --
16    one possibility.
17         Q.    You don't think there was any
18    news that came down, do you, that would
19    make you do that?
20         A.    I have no recollection of that.
21         Q.    Okay.  And then after that, you
22    purchased, on November 19th and 20th,
23    another 5,000 shares each day for 10,000
24    shares.
25         A.    Right.
```

```
 1                Tauber - Confidential        262
 2          Q.    If you look at 672, Exhibit 9.
 3          A.    Okay.
 4          Q.    Yeah.  You see over on the right,
 5     it says -- in three spots there, it says,
 6     "Not an execution"?
 7          A.    Mm-hmm.
 8          Q.    Yes?
 9          A.    Yeah.
10          Q.    What does that mean?  Do you know
11     what that refers to?  Was that a canceled
12     order?
13          A.    I really don't know.
14          Q.    Okay.  And if you go to --
15          A.    It says, "canceled orders," sir,
16     in the last -- the last phrase in each --
17     in each one.
18          Q.    Yes, yes.  The bold says, "Not an
19     execution."  You're correct.  "Canceled
20     orders," right.
21                Do you remember why you would
22     have canceled an order?
23          A.    No, sir.
24          Q.    Because on December 26, 2007, it
25     looks like you purchased 20,000 shares
```

```
 1                    Tauber - Confidential              263
 2        exactly, I think.
 3                    No, maybe it was more than that.
 4                    Yeah, 20,000 shares exactly for a
 5        1,109,000 shares.  And --
 6                    MR. BROWER:  Shares?
 7                    MR. HYLAND:  No, dollars, I'm
 8            sorry.  20,000 shares for a purchase
 9            price of $1,109,982.
10            Q.    All right.  So, again, sitting
11        here today, do you have any explanation for
12        your trading decision?
13            A.    Well, it looks like they're
14        both -- December 26th -- just one moment.
15                    It looks like I bought it and
16        sold it almost -- almost immediately,
17        because there's no change at all.
18            Q.    It looks -- it looks like you
19        purchased 20,000 shares on the 26th, and
20        then you sold 20,655 shares on the same
21        day, right?
22            A.    I couldn't tell you the number of
23        shares, sir.
24            Q.    Okay.
25            A.    But approximately.
```

```
 1                  Tauber - Confidential            264
 2           Q.    That's what -- I mean,
 3     approximately.  Because you have -- you
 4     have extensive -- from your chart, you have
 5     extensive -- your chart indicates a
 6     purchase of 19,300 shares, then a separate
 7     purchase of 400, then a separate purchase
 8     of 300 for a total of 20,000 shares on
 9     December 26, 2007, and then sales that
10     appear to add up to slightly more than
11     that.
12           A.    At the same price.
13           Q.    About the same price.
14           A.    Right.
15           Q.    Right.  So aside from giving
16     Fidelity commission dollars, what -- what
17     were you doing?
18           A.    I think -- I think the best way
19     to describe it is that I was changing my
20     mind.  Now, specifically why I did in that
21     particular fashion, I could not tell you
22     today.
23           Q.    And -- and if you just -- rather
24     than go through it all, if you -- if you
25     just take a look, you know, at your
```

```
 1                Tauber - Confidential          265

 2      activities in January, it looks like you

 3      finished the month of December with some

 4      sales on the 27th, correct?

 5           A.    I'd have to look at that again.

 6           Q.    Okay.  Yeah.  It's Exhibit 18, if

 7      you want to look at that chart.

 8           A.    Yeah.  There were some sales on

 9      the 27th.

10           Q.    And then you had transactions in

11      January, up to the 16th, and then no

12      transactions until March 4th?

13           A.    That's -- that's correct.

14           Q.    And, so, you have -- you're

15      representing buyers from December 20th

16      to -- into March, correct?

17           A.    I thought there was only one

18      buyer; is that correct?  And that was

19      December --

20           Q.    You're -- you're --

21                MR. BROWER:  He meant through

22      March.

23           A.    Through March.

24           Q.    Through March 4th.

25           A.    Right, right, okay.
```

```
 1                    Tauber - Confidential          266

 2          Q.    But the -- the third class period

 3     starts on December 20th, correct?

 4          A.    Right.

 5          Q.    And all of your activity during

 6     that period on and after December 27th

 7     consists of selling activity, correct?

 8          A.    After the 27th, apparently so,

 9     yes, sir.

10          Q.    All right.  And, so, during the

11     buyer class period, where you were

12     representing buyers, you -- you were --

13     again, you were a net seller, correct?

14                MR. BROWER:  Object to the form.

15          A.    I couldn't -- once again, I

16     couldn't tell you.  I haven't -- I haven't

17     tracked that.  Or at least I haven't

18     tracked that recently, so I couldn't tell

19     you, sir.

20          Q.    Okay.  And do you have in mind,

21     as you you sit here today, again -- the

22     same question for the buyer class period --

23     any further enlightenment on your

24     investment thesis during that period other

25     than what you've testified to?
```

```
1                  Tauber - Confidential          267
2                  MR. BROWER:  Objection.  Go
3          ahead.
4          A.     Not really.
5          Q.     Okay.  I have no further
6     questions.
7                  MR. BROWER:  I don't have much.
8     EXAMINATION
9     BY MR. BROWER:
10         Q.     Could you go to Tauber Exhibit 8.
11    That's the certification.
12                 Okay.  Look at the chart.
13    Mr. Hyland pointed out that none of your
14    options transactions were listed on this
15    chart.
16                 Do you remember that?
17         A.     Yeah.
18         Q.     Okay.  And that was correct;
19    they're not listed?
20         A.     That was my understanding.
21         Q.     Okay.  Could you look at
22    paragraph -- turning over and look at
23    paragraph 4, and read that into the record.
24         A.     "Plaintiff's transactions in
25    Sigma Designs, Inc. Common stock during the
```

1                      Tauber - Confidential          268

2          class period are attached hereto."

3               Q.     Okay.  So notwithstanding the

4          date that we've spent a lot of time on

5          today, that was, in fact, the correct types

6          of transactions listed on the attachments?

7               A.     Common stock.

8               Q.     All right.  Okay.

9                      Can you go to Exhibit 9.  That's

10         the trading records, these trading records.

11                     Okay.  Were the documents --

12         let's be clear.  Exhibit 9 are confirmation

13         statements or individual confirmation

14         statements?

15              A.     Apparently so.

16              Q.     Okay.  There's a large collection

17         of them it's about.

18              A.     Yeah.

19              Q.     Were these documents available to

20         you online at the time you contacted

21         counsel and/or prepared the PSLRA

22         certification?

23              A.     No.  My recollection is that they

24         had to go, what they described, into the

25         back room to get them.

```
 1                  Tauber - Confidential          269
 2          Q.     Okay.  And do you recall what --
 3   what --
 4          A.     They were archived, but -- but
 5   not -- not online.
 6          Q.     Okay.  And were -- and -- and how
 7   long do you recall after you contacted --
 8   and you've testified you contacted someone
 9   at Fidelity to get these Exhibit 9.
10                  How long did it take them to --
11   to get these to you after you contacted
12   them about Exhibit 9?  And that is, asked
13   them for confirmation statements or
14   something showing actual trade dates.
15          A.     I guess I -- I need to know what
16   date these were received.
17          Q.     Well, do you recall generally
18   just how long it took Fidelity to comply
19   with this request?  Best estimate based on
20   your recollection.  If you have no
21   recollection, you have no recollection.
22          A.     I know it took some time, some --
23   some weeks, I believe.
24          Q.     Okay.  All right.
25                  Let's look at that trade -- let's
```

```
 1                 Tauber - Confidential        270
 2        look at -- I'm going to use this just for
 3        simplicity -- the chart that's attached to
 4        Exhibit 18, just for simplicity.
 5                    Is this the right one?  I may
 6        have the wrong one.  I'm sorry.  Where's
 7        the one I marked up?  This is the one I
 8        marked up.
 9                    Okay.  Anyway, all right.
10                    First question:  At the end -- at
11        -- the class period, as you know, ends
12        around March 12, 2008.
13            A.    Okay.
14            Q.    We've -- we've covered that
15        today.
16                    Did you own any Sigma stock
17        before July of 2007?
18            A.    Yes.
19            Q.    Do you recall approximately how
20        much -- the documents will speak for
21        themselves.
22                    But do you recall approximately
23        how much?
24            A.    I would -- I would guess probably
25        20 or 30,000 shares.
```

```
 1                Tauber - Confidential          271
 2          Q.     Okay.  Did you own any Sigma
 3     stock after March 12, 2008?
 4          A.     Yes.
 5          Q.     Do you recall about how much?
 6          A.     You know --
 7          Q.     Approximately.
 8          A.     -- I -- I couldn't say.
 9          Q.     Okay.  Do you know or recall
10     whether shares you purchased before -- of
11     Sigma -- that you purchased before July of
12     2007 were at a price more or less than the
13     prices at which you sold those shares
14     during the -- any of the three class
15     periods?
16          A.     I think they had all gone up.
17          Q.     Okay.  So when you sold shares,
18     for instance, in December of 2007, do you
19     know whether those were shares you
20     purchased before the class period at prices
21     below the prices you received on those
22     sales, or were those shares you actually
23     purchased during a class period?
24          A.     I mean, that's just -- that's
25     very difficult to say.  I -- I did a lot of
```

```
 1                Tauber - Confidential            272

 2     trading, and I know I started out in July

 3     with, as I said, probably 20 to 30,000

 4     shares.  Over the next several months, I --

 5     I think I may have added 10,000 shares

 6     through December.

 7          Q.    Okay.  My question -- my -- I

 8     guess my question --

 9          A.    I'm not sure if I'm answering

10     your question.

11          Q.    Okay.  My question is, is it

12     possible that you were selling pre-class

13     period shares that had a lower basis during

14     the class period rather than selling shares

15     you bought perhaps a week or two before you

16     sold those same shares?

17          A.    I see what you're saying.

18                Yeah, certainly.  I mean, I

19     was -- I was aware of -- of -- I had some

20     awareness of when I bought what packages of

21     stock.  That was -- that was something that

22     I think Fidelity had on its -- on its

23     online service.

24          Q.    Okay.  So when Mr. Hyland would

25     ask you why did you buy shares on 12/21 and
```

1                    Tauber - Confidential                273

2          then sell those same shares on 12/26, and

3          questions of that type --

4               A.    Yeah.

5               Q.    -- are you sure you were actually

6          selling the shares you bought on 12/21, or

7          were you buying shares that you had paid

8          much less money for before the class period

9          on 12/26?

10              A.    The answer to that is I'm not

11         sure.  I don't know.

12              Q.    Okay.  Fair enough.

13                    Could you look at that chart

14         that's attached to Exhibit 18.  This is

15         just the transaction --

16                    You're on the wrong document.

17                    MR. BROWER:  Thank you.

18              Q.    The 11/12 transaction, the wash

19         transaction --

20              A.    Yeah.

21              Q.    -- do you know whether that

22         represented the exercise of an option and

23         sale of the shares pursuant to the option

24         or options?

25              A.    11/12?

Q. Yeah.
A. What about it, sir?
Q. Do you know whether the purchase and sale on that day, which you'll see is identical, at identical prices --
A. Yeah.
Q. -- which is hard to do, was the exercise and sale of an option simultaneously?
A. I couldn't say.
Q. Okay. Would that be what would occur in terms of price if you, in fact, sold options on 5,300 shares of the stock -- I'm sorry -- if you exercised call options of 5,300 shares and ordered them to be immediately sold simultaneously?
A. I -- I assume that that's -- that's one possibility, yeah.
Q. Okay. By the way, what happens -- you noted before, I believe -- I'm not going to go back to the page number -- the option that Mr. Hyland pointed had an expiration date of July 20th.
A. July 30th, I think it was.

1                    Tauber - Confidential          275

2          Q.    It was July 30th.  Thank you.

3     You're correct.

4                And it was sold on July 2nd --

5     20.

6          A.    20th.

7          Q.    Right.

8                What happens if you don't either

9     sell the option at a profit or exercise the

10    option before the expiration date?  And

11    that's a call option.

12         A.    On the expiration date, you

13    can -- you can purchase it at the level

14    that you've -- you've -- you bought it for.

15    So if it's a $20 option, you can buy that

16    option on that date for $20.

17         Q.    You can buy the stock.

18         A.    You can buy the stock for $20.

19         Q.    Okay.

20         A.    That's -- that's what I meant to

21    say.

22         Q.    I know.  What if the stock was

23    trading at $18 on that day?

24         A.    You can just leave it alone.

25         Q.    And what happens to the option?

```
1                  Tauber - Confidential          276
2           A.    Then you lost -- you lost the
3     option.
4           Q.    Okay.  That option goes away.
5           A.    The cost, what you paid for the
6     option.
7           Q.    Right, is lost.
8           A.    Yeah.
9           Q.    Okay.  Could you take a look at
10    Exhibit 7.  That was the redacted retainer
11    agreement.  Excuse me.
12          A.    Yes, sir.
13          Q.    Okay.  Could you read the last
14    paragraph on the first page.
15          A.    You want me to read it out loud?
16          Q.    Yeah.
17          A.    "We agree to represent" --
18          Q.    Better you than me.  Trust me.
19          A.    All right.  "We agree to
20    represent you and other class members in
21    this litigation on a fully contingent
22    basis.  This means that if, and only if,
23    the lawsuit generates a fund and/or benefit
24    for the class, will we seek payment of our
25    fees.  The payment of our fees and the
```

1                    Tauber - Confidential          277

2          reimbursement of our expenses in this case

3          are subject to Court approval.  Absent an

4          order from the Court to the contrary, fees

5          will be calculated as a percentage of the

6          gross amount of the fund and/or benefit.

7          If there is no reason" -- rather -- "if

8          there is no recovery for the class, this

9          firm will ordinarily recover no fees.  You

10         will not have to pay any fees or advanced

11         expenses yourself."

12             Q.    Is that your understanding of

13         your agreement with your counsel

14         representing you in the case on behalf of

15         the class?

16             A.    It is.

17             Q.    Okay.  Could you take a look at

18         the next paragraph on the next page.

19             A.    The very next paragraph?

20             Q.    Yeah.

21             A.    Okay.  Do you want me to read it

22         again, or just read it --

23             Q.    No, read the first paragraph on

24         top of page 2 to yourself.  You don't have

25         to read it into the record.

```
 1                Tauber - Confidential        278
 2         A.    All right.
 3         Q.    Just tell me when you're done.
 4               (Pause)
 5         A.    Okay.
 6         Q.    Okay.  Is that your understanding
 7    of your arrangement with your counsel
 8    representing you in the class in this
 9    action with respect to out-of-pocket
10    expenses?
11         A.    Yes.
12         Q.    Okay.  And you agreed to that at
13    the time you became involved in this
14    litigation?
15         A.    Yes, sir.
16         Q.    Okay.  When was the last time you
17    sat as a superior court judge?
18         A.    On November -- last day of
19    November, which, I think it was the 28th,
20    if I'm not mistaken.  I'm not sure.
21         Q.    Okay.  And that would be
22    November 2014.
23         A.    Yeah.
24         Q.    And are you still, so to speak,
25    on call?
```

```
1                    Tauber - Confidential          279
2              A.    Well, I've been -- I've been in
3         the Caribbean for the last six weeks.  So I
4         took my vacation and came back --
5         basically, I came back early to -- to be
6         here in this proceeding.  When I get back
7         to California, I imagine I will be asked to
8         accept another assignment.
9              Q.    Okay.  And by "asked to accept
10        another assignment," what -- what does that
11        mean?
12             A.    I'll call -- when I'm ready, I'll
13        call the Administrative Office of the
14        Courts, I'll tell them that I'm interested
15        in an assignment, and they typically will
16        let me know what's available and ask me if
17        I'm interested in working in specific
18        courts.
19                   The other possibility is that
20        there are courts that I've worked for on
21        behalf previously, for example, Marin
22        County.  I just spent a year -- almost a
23        year and a half working there.  If I
24        contact them, I might just go back to work
25        for them.  The downside for that is that
```

**REDACTED**

1                  Tauber - Confidential                280

2       they would probably want me full time, and

3       I'm reluctant to do that.

4            Q.    Okay.  And that would be sitting

5       full time as a superior court judge in

6       Marin County, California.

7            A.    Yeah.

8            Q.    Without disclosing what the terms

9       of the agreement was, the settlement that

10      was reached with PG&E, were -- were you

11      happy with the settlement?

12           A.    Oh, yes.

13

14

15

16

17

18           Q.    And with respect to the action

19      regarding payment of fees to you by the

20      California Bar Association for services

21      provided, were you happy with the result

22      or -- and/or settlement that occurred

23      there?

24           A.    It was satisfactory.

25           Q.    Okay.  Is there any reason you

```
 1                  Tauber - Confidential          281
 2       could not perform the duties of a class
 3       representative in this action that you know
 4       of?
 5            A.     I don't believe so.
 6            Q.     I have no further questions.  I'm
 7       done.
 8                  MR. HYLAND:  One question.
 9       RE-EXAMINATION
10       BY MR. HYLAND:
11            Q.     Other than the litigations
12       that -- or the -- or the disputes that we
13       identified, which included against the
14       State Bar of California, the IRS, and the
15       separate action, were there any others?
16            A.     No.
17                  MR. BROWER:  Within the time
18       period.
19            Q.     Within -- within the time period.
20            A.     The ten years.
21            Q.     Ten years from the time the
22       interrogatory was propounded.
23            A.     No, no.
24            Q.     Thank you.
25            A.     Thank you, sir.
```

1                   Tauber - Confidential          282

2               THE VIDEOGRAPHER:  Stand by,

3         please.

4               The time is 5:34 p.m.  This is

5         the end of DVD 5 and today's deposition

6         of Jeffrey Tauber.  We are off the

7         record.

8               MR. BROWER:  The witness will

9         read and sign.

10              (Time noted: 5:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Tauber - Confidential              283

2        January 22, 2015

3

4                    ERRATA

5

6     PAGE/LINE      CHANGE/REASON

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

Tauber - Confidential                    284

_____

JEFFREY TAUBER

Subscribed and sworn to

before me this    day

of            2015

_____

1                                                            285

2                          CERTIFICATE

3

4        STATE OF NEW YORK )

5                         ) ss.

6        COUNTY OF NASSAU  )

7

8            I, Sharon Lengel, a Registered

9        Professional Reporter and Notary Public

10       within and for the State of New York, do

11       hereby certify:

12           That JEFFREY TAUBER, the witness whose

13       deposition is hereinbefore set forth, was

14       duly sworn by me and that such deposition is

15       a true record of the testimony given by such

16       witness.

17           I further certify that I am not

18       related to any of the parties to this action

19       by blood or marriage and that I am in no way

20       interested in the outcome of this matter.

21

22

23           _____

24                 SHARON LENGEL, RPR

25

286

January 22, 2015

INDEX

| WITNESS | | EXAMINATION BY | PAGE |
|---------|---|----------------|------|
| Jeffrey Tauber | | Mr. Hyland | 5 |
| | | Mr. Brower | 267 |
| | | Mr. Hyland | 281 |

| TAUBER | PAGE | |
|--------|------|---|
| 1 | 14 | A notice of deposition |
| 2 | 71 | A set of interrogatories |
| 3 | 71 | First amended interrogatories |
| 4 | 74 | Objections and responses to defendants' first amended interrogatories |
| 5 | 76 | A summons and complaint filed February 23, 2006 |
| 6 | 86 | A document entitled United States Tax Court Docket Entries |
| 7 | 113 | A draft of a class action complaint |
| 8 | 115 | A document entitled Plaintiff's Certification |
| 9 | 127 | Trading records |
| 10 | 175 | A memorandum of law dated May 15, 2012 |

287

January 22, 2015

INDEX(Continued)

TAUBER  PAGE

11    175      An affidavit of Mark J.
               Hyland

12    182      A deposition transcript

13    185      An opinion and order

14    192      A memorandum dated
               August 30, 2013

15    193      Defendants' reply
               memorandum of law dated
               September 20, 2013

16    196      A second amended class
               action complaint

17    222      A third amended class
               action complaint

18    242      Plaintiffs' memorandum to
               dismiss the second amended
               class action complaint


      REQUEST:      86

## $

**$1,070,476** [1] - 256:7
**$1,109,982** [1] - 263:9
**$10** [4] - 56:24, 165:3, 210:12, 244:22
**$100,000** [2] - 97:8, 105:22
**$15** [1] - 239:3
**$150** [2] - 44:6, 103:7
**$170,000** [1] - 94:21
**$18** [1] - 275:23
**$20** [4] - 165:2, 275:15, 275:16, 275:18
**$20,000** [1] - 50:4
**$200,000** [2] - 70:24, 245:21
**$230,000** [1] - 104:19
**$25,000** [1] - 28:20
**$3,000** [1] - 108:16
**$30** [5] - 163:20, 163:23, 164:23, 166:11, 244:22
**$30,000** [2] - 97:4, 105:21
**$40** [2] - 213:2, 215:5
**$500** [1] - 100:25
**$500,000** [1] - 103:5
**$600,000** [3] - 102:2, 150:11, 151:4
**$645,000** [2] - 252:21, 253:24
**$70** [2] - 156:25, 159:23
**$700** [3] - 40:3, 40:4, 40:5
**$750,000** [1] - 101:23
**$940,000** [1] - 254:24

### '

**'68** [1] - 21:23
**'72** [2] - 22:16, 22:17
**'88** [1] - 25:16
**'91** [2] - 41:12, 41:19
**'96** [1] - 29:23
**'97** [1] - 29:24
**'98** [1] - 41:12
**'99** [3] - 41:12, 41:19

## 1

**1** [9] - 1:9, 4:5, 14:4, 14:6, 14:9, 69:23, 89:8, 186:5, 286:10
**1,109,000** [1] - 263:5
**10** [24] - 25:10, 80:4, 80:6, 80:24, 82:8, 83:8, 83:13, 87:25, 90:17, 174:25, 175:4, 175:9, 175:10, 175:25, 176:4, 185:13, 191:18, 191:19, 239:3, 241:16, 244:22, 286:23
**10,000** [4] - 124:9, 237:18,

261:23, 272:5
**100** [5] - 1:9, 28:6, 103:7, 103:13, 124:17
**10004** [2] - 1:20, 2:20
**10016** [1] - 2:8
**11** [17] - 77:17, 148:18, 175:9, 175:10, 175:23, 175:25, 180:9, 185:13, 185:15, 185:21, 186:4, 186:7, 186:9, 195:10, 204:25, 208:2, 287:6
**11-cv-09665(JSR** [1] - 1:6
**11/12** [4] - 261:3, 261:4, 273:18, 273:25
**11/8** [2] - 257:19, 257:20
**111** [1] - 219:10
**112,000** [1] - 218:5
**113** [1] - 286:19
**114** [1] - 176:21
**115** [1] - 286:21
**11:02** [1] - 69:22
**11:12** [1] - 70:5
**11th** [3] - 259:22, 259:24, 260:3
**12** [13] - 25:10, 29:10, 31:10, 38:7, 38:9, 80:5, 90:18, 182:3, 182:5, 257:20, 270:12, 271:3, 287:7
**12/21** [2] - 272:25, 273:6
**12/26** [2] - 273:2, 273:9
**120** [1] - 221:7
**127** [1] - 286:22
**12:30** [2] - 126:13, 126:16
**12th** [11] - 216:19, 237:13, 237:14, 259:5, 259:23, 259:25, 260:16, 260:18, 260:20, 260:23, 260:24
**13** [14] - 29:7, 31:10, 38:8, 89:22, 185:6, 195:4, 195:5, 195:7, 196:15, 196:17, 204:12, 204:19, 251:25, 287:8
**130** [1] - 94:25
**1357** [1] - 42:22
**13th** [3] - 153:2, 252:3, 253:22
**14** [7] - 192:12, 192:14, 192:16, 195:8, 246:19, 286:10, 287:9
**15** [9] - 125:15, 156:24, 175:4, 176:9, 193:15, 193:17, 195:8, 286:24, 287:11
**156,000** [1] - 218:5
**15th** [1] - 259:9
**16** [12] - 186:5, 186:7, 196:9, 197:5, 203:6, 204:18, 208:8, 218:20, 218:24, 246:19, 246:20, 287:13
**16-page** [1] - 186:6
**16th** [6] - 149:14, 150:3,

157:14, 157:21, 159:19, 265:11
**17** [4] - 222:13, 222:15, 222:17, 287:14
**17,800** [1] - 254:23
**170** [1] - 94:22
**175** [2] - 286:23, 287:6
**18** [10] - 242:23, 243:8, 247:15, 247:17, 256:18, 259:19, 265:6, 270:4, 273:14, 287:16
**18,000** [7] - 149:17, 149:18, 150:5, 150:6, 203:7, 245:19, 253:25
**182** [1] - 287:7
**185** [1] - 287:8
**188** [1] - 20:20
**19** [3] - 29:13, 43:19, 43:20
**19,000** [1] - 256:20
**19,000-plus** [1] - 260:12
**19,300** [1] - 264:6
**19,345** [2] - 251:25, 253:23
**19,545** [1] - 256:6
**192** [1] - 287:9
**193** [1] - 287:11
**196** [1] - 287:13
**1971** [3] - 21:4, 22:4, 22:15
**1974** [1] - 23:4
**1985** [1] - 25:11
**1995** [1] - 29:14
**1997** [1] - 28:22
**19th** [10] - 157:13, 157:16, 157:17, 157:18, 159:19, 182:8, 182:9, 259:6, 259:10, 261:22
**1:40** [2] - 127:3, 127:6

## 2

**2** [21] - 13:11, 69:15, 69:16, 70:6, 71:12, 71:13, 71:14, 71:15, 71:20, 71:25, 75:17, 79:13, 108:16, 117:4, 122:10, 126:15, 238:12, 240:7, 277:24, 286:11
**20** [18] - 21:18, 38:9, 51:5, 124:10, 125:15, 135:18, 156:24, 167:24, 180:3, 193:14, 193:21, 205:9, 241:16, 249:10, 270:25, 272:3, 275:5, 287:12
**20,000** [7] - 245:20, 252:20, 262:25, 263:4, 263:8, 263:19, 264:8
**20,655** [1] - 263:20
**20/20** [1] - 48:15
**200** [2] - 70:25, 206:25
**2000** [5] - 92:15, 123:14, 234:5, 241:4
**2001** [5] - 30:8, 34:4, 38:24,

38:25, 39:3
**2002** [3] - 30:8, 77:17, 104:9
**2004** [2] - 53:18, 53:19
**2004/2005** [3] - 47:15, 47:17, 84:10
**2005** [6] - 53:19, 77:25, 78:16, 101:16, 123:13, 123:14
**2006** [11] - 32:21, 55:16, 57:2, 63:13, 76:6, 81:24, 82:25, 142:18, 234:5, 241:3, 286:16
**2007** [37] - 10:15, 32:23, 33:13, 40:7, 51:11, 52:4, 93:13, 105:14, 105:24, 106:2, 106:6, 142:22, 146:6, 152:2, 199:12, 202:20, 203:6, 204:12, 204:13, 204:19, 204:20, 204:25, 205:9, 208:2, 234:5, 242:5, 242:6, 249:10, 251:25, 254:13, 256:6, 262:24, 264:9, 270:17, 271:12, 271:18
**2007/2008** [4] - 68:23, 69:3, 71:4, 105:7
**2008** [17] - 10:23, 32:8, 43:20, 49:21, 51:12, 52:5, 63:13, 92:15, 97:14, 101:13, 105:14, 105:24, 234:5, 236:16, 237:9, 270:12, 271:3
**2010** [1] - 89:23
**2011** [3] - 32:9, 205:2
**2012** [9] - 8:5, 117:4, 122:10, 123:9, 123:15, 175:4, 176:9, 182:11, 286:24
**2013** [8] - 192:14, 192:20, 193:7, 193:14, 193:21, 195:5, 287:10, 287:12
**2014** [3] - 82:3, 222:23, 278:22
**2015** [6] - 1:12, 4:7, 283:2, 284:12, 286:2, 287:2
**209** [1] - 20:22
**20th** [11] - 216:19, 247:11, 251:8, 259:6, 259:9, 259:11, 261:22, 265:15, 266:3, 274:24, 275:6
**21** [1] - 204:20
**22** [7] - 1:12, 4:7, 82:3, 254:13, 283:2, 286:2, 287:2
**222** [1] - 287:14
**22nd** [2] - 205:8, 257:3
**23** [3] - 76:6, 81:24, 286:16
**24,845** [1] - 257:17
**242** [1] - 287:16
**26** [3] - 243:22, 262:24, 264:9
**267** [1] - 286:7
**26th** [2] - 263:14, 263:19

**27** [3] - 204:13, 205:2, 208:2
**27th** [4] - 265:4, 265:9, 266:6, 266:8
**28** [3] - 77:25, 78:16, 182:25
**281** [1] - 286:8
**28th** [1] - 278:19
**29** [3] - 182:25, 183:4, 183:5
**2nd** [1] - 275:4

## 3

**3** [14] - 13:21, 71:12, 71:14, 71:21, 71:23, 72:22, 74:5, 89:22, 100:25, 127:7, 176:11, 180:18, 194:17, 286:12
**3,000** [1] - 30:20
**30** [10] - 23:13, 125:17, 135:18, 192:13, 192:20, 199:12, 202:20, 212:25, 222:22, 287:10
**30,000** [2] - 270:25, 272:3
**300** [1] - 264:8
**30th** [7] - 146:21, 202:23, 222:25, 250:25, 251:7, 274:25, 275:2
**33rd** [1] - 2:7
**35** [1] - 173:18
**350** [3] - 257:18, 257:25, 260:9
**350's** [1] - 258:7
**3:07** [1] - 194:16
**3:19** [1] - 194:22
**3:56** [1] - 222:4

## 4

**4** [14] - 74:10, 74:14, 75:11, 79:15, 80:5, 83:14, 88:2, 90:13, 90:17, 91:21, 194:23, 242:18, 267:23, 286:14
**40** [3] - 23:2, 26:3, 237:18
**40,000** [1] - 245:14
**400** [1] - 264:7
**401k** [13] - 46:10, 64:14, 65:20, 70:14, 71:9, 131:18, 135:11, 135:17, 136:2, 136:13, 137:8, 137:24, 138:2
**450** [2] - 103:4, 103:12
**475** [1] - 2:7
**49.15** [1] - 218:6
**4:06** [1] - 222:9
**4:33** [1] - 242:17
**4:38** [1] - 243:3
**4th** [2] - 265:12, 265:24

## 5

**5** [7] - 76:7, 76:9, 124:9, 243:4, 282:5, 286:6, 286:16
**5,000** [5] - 125:12, 259:7, 259:25, 260:15, 261:23
**5,300** [5] - 258:2, 274:14, 274:16
**50** [9] - 26:3, 29:9, 30:6, 31:9, 33:25, 51:5, 106:4, 237:18, 260:14
**500** [1] - 103:13
**504** [1] - 114:6
**50s** [1] - 34:6
**51** [2] - 33:22, 34:3
**5300** [9] - 257:23, 258:9, 259:5, 260:2, 260:17, 260:21, 260:23, 260:24, 261:9
**548** [2] - 129:14, 129:15
**552** [2] - 134:15, 134:20
**5600** [1] - 260:17
**59** [2] - 208:15, 249:12
**5:34** [1] - 282:4
**5:35** [1] - 282:10

## 6

**6** [5] - 86:18, 86:21, 86:23, 254:10, 286:17
**60** [2] - 31:11, 33:19
**600,000** [1] - 103:11
**609** [5] - 142:25, 143:7, 143:8, 143:11
**610** [1] - 143:12
**611** [1] - 144:4
**612** [3] - 246:18, 247:7, 247:8
**618** [4] - 251:22, 252:6, 252:10, 252:19
**62.84** [1] - 218:5
**621** [2] - 252:10, 252:19
**626** [2] - 254:7, 254:10
**645** [1] - 254:10
**646** [4] - 255:24, 256:9, 256:11
**650** [2] - 255:24, 256:11
**651** [1] - 259:15
**652** [1] - 259:15
**654** [1] - 257:22
**661** [1] - 259:13
**662** [1] - 259:13
**67** [1] - 33:10
**672** [1] - 262:2
**68** [2] - 26:12, 236:7

## 7

**7** [5] - 113:17, 113:19,

117:7, 276:10, 286:19
**7/16/2007** [1] - 244:12
**70** [2] - 25:25, 31:11
**70,000** [1] - 245:21
**71** [2] - 286:11, 286:12
**719** [1] - 147:8
**74** [1] - 286:14
**75,000** [1] - 106:4
**76** [1] - 286:16

## 8

**8** [21] - 115:20, 115:22, 115:24, 128:7, 128:12, 141:11, 141:15, 144:25, 145:2, 145:3, 145:4, 145:5, 146:13, 146:15, 146:16, 147:25, 190:23, 199:7, 256:6, 267:10, 286:21
**8,000** [1] - 146:24
**8001** [1] - 104:3
**843** [2] - 40:18, 40:19
**86** [2] - 286:17, 287:19
**8th** [4] - 256:3, 256:19, 257:4, 260:5

## 9

**9** [15] - 127:14, 127:16, 127:18, 128:5, 142:15, 239:20, 246:17, 246:21, 251:23, 262:2, 268:9, 268:12, 269:9, 269:12, 286:22
**9,000** [16] - 145:10, 146:9, 146:22, 146:23, 146:24, 147:5, 147:7, 147:14, 148:17, 148:18, 199:11, 202:20, 202:22, 244:9, 244:23, 244:24
**9665** [1] - 186:4
**97** [3] - 218:23, 219:2, 219:9
**9:40** [2] - 1:12, 4:6

## A

**a.m** [3] - 1:12, 4:6, 70:5
**A.P** [1] - 2:9
**Abaxis** [1] - 231:15
**ability** [4] - 20:5, 156:18, 233:17, 233:20
**able** [7] - 7:22, 36:14, 99:16, 128:16, 151:7, 166:21, 209:10
**above-market** [1] - 177:3
**Abraham** [1] - 20:23
**absence** [2] - 29:15, 35:11, 35:17, 35:22, 36:14, 36:20

**absent** [1] - 277:3
**absolutely** [2] - 147:17, 172:6
**abuse** [1] - 42:18
**abused** [2] - 153:14, 153:15
**accede** [1] - 172:4
**accept** [4] - 150:14, 171:6, 279:8, 279:9
**accepted** [3] - 24:18, 33:2, 88:16
**access** [1] - 215:19
**accomplish** [1] - 250:17
**accordingly** [1] - 195:19
**Accordingly** [1] - 196:18
**account** [54] - 44:20, 44:23, 45:3, 45:13, 45:16, 45:21, 46:8, 46:16, 47:5, 47:14, 49:3, 49:5, 49:15, 50:7, 53:12, 53:17, 54:14, 55:2, 55:4, 60:12, 61:5, 62:21, 64:8, 64:9, 64:18, 64:23, 65:12, 70:16, 71:5, 129:3, 129:7, 129:11, 129:21, 130:2, 130:3, 130:7, 131:3, 131:13, 132:13, 132:19, 132:21, 134:14, 134:17, 135:2, 135:3, 135:4, 141:24, 141:25, 142:2, 144:7, 144:15, 148:23, 150:17, 241:2
**accountability** [1] - 134:4
**accountant** [4] - 62:22, 63:7, 63:13, 63:20
**accounting** [1] - 122:19
**accounts** [28] - 44:3, 46:3, 46:13, 47:6, 47:9, 48:25, 49:2, 49:13, 49:14, 49:19, 64:20, 65:2, 65:4, 65:9, 65:12, 65:15, 65:17, 65:19, 65:24, 68:24, 69:9, 70:11, 70:12, 70:13, 131:4, 132:18, 133:19, 144:11
**accuracy** [5] - 61:23, 75:9, 122:18, 164:2, 172:11
**accurate** [12] - 122:14, 142:12, 145:21, 153:7, 165:10, 166:20, 168:9, 173:15, 180:5, 181:16, 194:6, 214:24
**accurately** [1] - 159:4
**achieve** [1] - 209:10
**achieved** [1] - 209:8
**acquainted** [1] - 68:19
**acquire** [1] - 104:8
**act** [1] - 209:20
**acted** [1] - 209:3
**action** [34] - 6:24, 8:23, 8:25, 12:13, 12:22, 51:11, 80:14, 80:17, 80:19, 80:21, 82:24, 87:12, 87:17, 91:7, 113:16, 176:8, 192:19,

196:8, 196:13, 197:4,
200:13, 222:14, 222:20,
242:22, 243:12, 278:9,
280:18, 281:3, 281:15,
285:18, 286:19, 287:13,
287:15, 287:17

**Action** [1] - 22:9

**actions** [1] - 83:11

**active** [3] - 44:5, 56:16,
257:12

**actively** [2] - 21:17, 226:12

**activities** [1] - 265:2

**activity** [5] - 207:10,
237:23, 252:9, 266:5, 266:7

**acts** [4] - 160:23, 208:22,
210:2, 210:20

**actual** [3] - 198:24, 203:2,
269:14

**add** [2] - 140:10, 264:10

**added** [7] - 12:5, 24:23,
50:15, 152:7, 162:8, 272:5

**addict** [2] - 226:23, 228:17

**addicts** [1] - 21:13

**addition** [2] - 188:7, 235:25

**additional** [1] - 190:16

**address** [5] - 40:17, 43:12,
104:3, 107:17, 197:6

**addressed** [1] - 113:24

**adequately** [1] - 240:12

**administer** [1] - 3:12

**Administrative** [3] - 27:24,
34:13, 279:13

**administrative** [4] - 80:12,
81:11, 91:2, 91:8

**admitted** [2] - 224:21,
225:12

**advanced** [1] - 277:10

**advantage** [3] - 167:19,
210:18, 216:9

**adverse** [1] - 9:21

**adversely** [1] - 9:3

**advice** [3] - 68:4, 107:25,
113:3

**affect** [4] - 9:19, 20:5, 20:8,
227:7

**affected** [5] - 9:3, 152:3,
152:4, 153:10, 213:5

**affidavit** [2] - 175:22, 287:6

**AFTERNOON** [1] - 127:2

**afternoon** [2] - 127:11,
127:12

**afterwards** [1] - 68:18

**AG** [4] - 131:15, 131:16,
133:3, 134:11

**age** [3] - 25:25, 31:21, 33:9

**agency** [4] - 80:12, 81:11,
91:2, 91:8

**ago** [9] - 7:12, 49:7, 65:13,
83:25, 174:6, 207:22, 233:9,
258:15, 258:16

**agree** [5] - 83:5, 159:9,

232:16, 276:17, 276:19

**agreed** [4] - 204:8, 232:17,
232:22, 278:12

**AGREED** [3] - 3:4, 3:9, 3:13

**agreement** [19] - 78:25,
85:5, 85:6, 85:7, 85:14,
85:21, 87:21, 90:10, 91:17,
92:8, 92:9, 96:10, 110:9,
113:22, 113:23, 165:9,
276:11, 277:13, 280:9

**ahead** [15] - 73:2, 83:21,
95:15, 98:19, 110:5, 166:2,
166:4, 166:5, 173:9, 179:15,
209:18, 232:19, 247:2, 267:3

**al** [1] - 4:10

**Alameda** [3] - 24:13, 24:14,
24:19

**Albany** [2] - 40:14, 42:22

**alcohol** [1] - 29:20

**allegation** [11] - 8:25,
164:10, 164:18, 166:11,
178:21, 211:2, 211:3,
225:22, 225:25, 226:4, 226:6

**allegations** [4] - 8:22,
208:12, 226:25, 238:2

**allege** [2] - 176:25, 210:2

**alleged** [6] - 9:6, 12:20,
208:22, 208:25, 210:20,
216:21

**allegedly** [1] - 209:12

**alleging** [5] - 162:24,
200:14, 209:11, 209:14,
212:18

**allowed** [2] - 66:13

**allowing** [1] - 27:21

**allows** [1] - 67:6

**almost** [13] - 25:4, 25:7,
43:7, 60:4, 67:13, 90:8, 94:3,
151:4, 246:3, 252:20,
263:16, 279:22

**alone** [2] - 123:23, 275:24

**alternative** [2] - 21:12,
29:21

**amended** [38] - 71:22, 72:6,
74:13, 74:22, 176:7, 189:7,
192:19, 194:3, 195:20,
195:24, 196:5, 196:8,
196:12, 196:19, 197:3,
197:12, 199:11, 200:3,
201:11, 203:11, 204:15,
206:4, 206:9, 206:20, 207:4,
207:5, 208:5, 208:7, 218:14,
222:14, 222:20, 242:22,
243:12, 286:12, 286:15,
287:13, 287:14, 287:16

**amount** [14] - 62:17, 62:18,
69:5, 93:15, 94:15, 102:25,
104:15, 105:25, 151:20,
154:15, 239:21, 240:2,
256:24, 277:6

**amounts** [3] - 69:5, 100:3,

150:23

**analyses** [1] - 253:16

**analysis** [1] - 171:7

**analyst** [1] - 149:2

**analyzed** [1] - 149:9

**AND** [4] - 1:9, 3:4, 3:9, 3:13

**anecdote** [1] - 23:7

**anniversary** [1] - 255:9

**Answer** [1] - 89:22

**answer** [43] - 8:11, 11:25,
13:10, 13:18, 13:25, 20:6,
54:3, 72:15, 73:15, 81:12,
81:14, 83:6, 83:21, 85:24,
86:7, 88:12, 90:4, 97:22,
97:24, 98:19, 112:23,
112:24, 124:4, 140:6, 140:8,
148:20, 151:8, 172:15,
172:22, 172:25, 173:5,
173:9, 181:19, 213:25,
214:2, 216:3, 235:7, 239:6,
250:5, 251:18, 258:11,
273:10

**answered** [8] - 8:10, 75:17,
82:7, 87:14, 87:24, 110:4,
146:17, 192:6

**answering** [4] - 6:8,
172:16, 232:4, 272:9

**answers** [7] - 6:11, 72:19,
75:10, 75:20, 77:2, 82:11,
90:14

**anyway** [2] - 26:7, 270:9

**AOC** [1] - 34:18

**apart** [3] - 136:17, 140:22,
149:25

**appear** [2] - 144:19, 264:10

**APPEARANCES** [1] - 2:2

**appearances** [1] - 182:20

**appeared** [2] - 142:12,
253:17

**appearing** [1] - 14:17

**applied** [4] - 23:16, 24:13,
24:17, 111:6

**appreciate** [1] - 64:24

**appropriate** [8] - 6:14, 23:7,
81:21, 102:16, 149:5,
149:22, 204:7, 250:10

**approval** [1] - 277:3

**approve** [1] - 74:4

**approved** [1] - 232:11

**arbitration** [3] - 80:11,
81:10, 90:24

**archived** [1] - 269:4

**area** [8] - 17:7, 17:8, 21:11,
23:17, 25:7, 46:23, 91:10,
173:19

**arguing** [3] - 172:18,
172:22, 210:25

**argument** [8] - 177:14,
181:18, 182:6, 182:18,
184:5, 184:15, 184:17, 191:6

**arrangement** [2] - 278:7,

280:13

**article** [1] - 112:14

**articles** [3] - 58:16, 66:22,
67:2

**articulate** [1] - 148:16

**aside** [6] - 52:20, 64:7,
64:10, 65:2, 65:14, 264:15

**assemble** [1] - 118:3

**assertion** [1] - 188:7

**assets** [4] - 45:16, 68:24,
71:5, 238:12

**Assigned** [1] - 37:24

**assigned** [4] - 31:3, 31:19,
31:22, 37:24

**assignment** [3] - 279:8,
279:10, 279:15

**assist** [2] - 39:18, 128:6

**assisted** [1] - 227:2

**assisting** [1] - 132:6

**Association** [11] - 30:17,
38:22, 76:18, 76:20, 77:13,
78:10, 79:6, 130:16, 135:8,
135:25, 280:20

**association** [1] - 32:3

**assume** [10] - 95:9, 115:6,
127:25, 158:20, 160:20,
161:18, 168:17, 170:16,
187:6, 274:18

**assumed** [1] - 102:18

**assumes** [1] - 88:10

**assuming** [1] - 23:20

**attached** [4] - 199:19,
268:2, 270:3, 273:14

**attaching** [1] - 201:15

**Attachment** [1] - 119:6

**attachments** [1] - 268:6

**attain** [1] - 235:13

**attempted** [3] - 121:8,
121:10, 174:2

**attempting** [1] - 251:2

**attempts** [1] - 7:21

**attention** [20] - 56:4, 72:22,
74:24, 79:12, 80:4, 90:12,
110:18, 134:16, 169:17,
176:4, 176:11, 177:7, 177:8,
180:9, 185:13, 190:11,
190:20, 193:23, 195:3,
195:10

**attorney** [27] - 24:24, 28:3,
74:2, 87:19, 91:9, 92:12,
92:14, 92:17, 92:18, 93:22,
94:4, 94:8, 95:6, 95:8, 98:24,
112:25, 119:4, 120:5, 120:6,
136:8, 136:11, 164:16,
171:12, 182:22, 189:2,
189:3, 199:6

**attorney's** [1] - 95:13

**attorney-client** [1] - 112:25

**Attorneys** [2] - 2:5, 2:13

**attorneys** [11] - 5:22, 9:9,
120:13, 120:16, 121:22,

121:24, 128:15, 163:11, 165:13, 166:16, 174:20
**attributed** [1] - 84:5
**auction** [1] - 161:19
**August** [16] - 77:17, 149:14, 150:3, 153:3, 157:14, 157:21, 159:19, 192:13, 192:20, 203:6, 204:20, 205:8, 251:25, 252:3, 253:22, 287:10
**authority** [1] - 133:13
**authorized** [1] - 3:11
**automatically** [1] - 230:10
**available** [8] - 18:14, 31:5, 39:12, 153:8, 155:12, 211:22, 268:19, 279:16
**Avenue** [9] - 2:7, 40:18, 40:19, 42:22, 43:11, 96:7, 101:4, 101:8, 102:23
**aware** [31] - 18:3, 18:7, 19:16, 19:19, 19:22, 67:15, 67:17, 82:23, 83:2, 87:22, 93:20, 107:5, 107:21, 109:5, 121:23, 140:20, 165:16, 165:21, 166:9, 177:13, 177:18, 177:21, 177:25, 200:12, 200:19, 209:4, 210:15, 224:20, 225:3, 230:17, 272:19
**awareness** [1] - 272:20

**B**

**backed** [1] - 240:15
**background** [5] - 17:6, 20:18, 25:5, 25:22, 224:13
**balances** [1] - 100:22
**Bancroft** [1] - 89:5
**bank** [9] - 99:24, 101:23, 102:6, 102:11, 102:13, 102:14, 102:17, 102:19, 132:24
**banks** [2] - 84:4, 106:22
**bar** [2] - 22:22
**Bar** [10] - 76:17, 76:20, 77:12, 78:10, 79:5, 81:23, 82:6, 82:25, 280:20, 281:14
**based** [10] - 10:4, 149:12, 164:19, 165:10, 177:8, 180:25, 181:13, 181:22, 227:10, 269:19
**basement** [1] - 238:24
**basis** [3] - 27:23, 34:18, 38:20, 39:5, 39:21, 105:8, 133:11, 160:6, 204:6, 210:10, 230:11, 272:13, 276:22
**Battery** [3] - 1:20, 2:19, 4:13
**Bay** [3] - 23:17, 40:15, 40:16

**Beach** [1] - 107:17
**became** [11] - 24:10, 26:13, 28:24, 29:4, 30:24, 55:22, 68:19, 94:15, 136:5, 204:10, 278:13
**become** [11] - 27:2, 29:2, 31:2, 58:6, 93:20, 100:10, 215:9, 215:11, 215:13, 215:18, 229:15
**becomes** [1] - 39:10
**began** [1] - 56:13
**begin** [1] - 214:19
**beginning** [10] - 4:4, 16:9, 35:5, 70:5, 127:7, 147:21, 152:14, 194:23, 237:10, 243:4
**begins** [1] - 187:18
**behalf** [6] - 8:22, 33:5, 89:9, 89:18, 277:14, 279:21
**behavior** [1] - 213:6
**bell** [1] - 226:23
**below** [2] - 177:2, 217:21
**below-market** [1] - 177:2
**bench** [5] - 29:25, 227:16, 227:20, 227:22, 246:15
**beneficial** [2] - 130:6, 235:15
**benefit** [6] - 163:14, 235:11, 251:9, 251:11, 276:23, 277:6
**benefitted** [2] - 207:9, 232:24
**Berkeley** [3] - 40:14, 43:9, 96:6
**beside** [1] - 238:7
**best** [27] - 6:12, 8:2, 21:15, 38:2, 49:11, 55:20, 57:20, 68:7, 81:17, 82:14, 130:21, 148:7, 148:22, 154:25, 164:18, 192:2, 205:15, 206:15, 216:3, 230:19, 230:21, 254:3, 254:4, 257:15, 258:10, 264:18, 269:19
**better** [5] - 134:9, 153:9, 167:16, 229:25, 276:18
**between** [8] - 3:5, 90:10, 103:4, 118:24, 190:22, 205:8, 207:4, 227:19
**beyond** [3] - 18:12, 179:24, 238:2
**bias** [1] - 250:13
**big** [1] - 253:5
**bit** [6] - 6:22, 29:11, 167:11, 167:12, 232:3
**black** [1] - 255:7
**blacked** [1] - 129:3
**blank** [1] - 121:2
**blessed** [1] - 30:12
**block** [2] - 204:24, 217:10
**blogs** [3] - 57:23, 58:8, 58:9
**blood** [1] - 285:12

**Bloomberg** [1] - 183:18
**board** [1] - 36:3
**body** [2] - 138:9, 219:6
**bold** [1] - 262:18
**book** [2] - 22:10, 57:15
**books** [3] - 57:7, 57:10, 57:13
**Boston** [2] - 21:2, 22:4
**bottom** [4] - 114:5, 114:10, 117:2, 129:16
**bought** [16] - 110:24, 110:25, 150:5, 150:9, 153:21, 158:22, 177:3, 216:18, 251:12, 260:23, 261:13, 263:15, 272:15, 272:20, 273:6, 275:14
**box** [1] - 77:3
**boxes** [1] - 77:8
**breach** [1] - 76:21
**break** [5] - 69:18, 125:14, 126:9, 194:13, 221:19
**Brian** [1] - 5:3
**BRIAN** [1] - 2:10
**brief** [5] - 80:16, 174:19, 191:20, 192:3, 243:21
**briefly** [4] - 23:24, 68:17, 68:18, 93:18
**bring** [2] - 66:14, 79:10
**bringing** [1] - 177:7
**broken** [2] - 124:10, 254:20
**Brokerage** [1] - 129:20
**brokerage** [2] - 44:2, 129:2
**Brooklyn** [4] - 20:24, 20:25, 21:19, 21:20
**brother** [3] - 106:19, 107:8, 107:9
**brother-in-law** [3] - 106:19, 107:8, 107:9
**brought** [6] - 12:22, 76:15, 76:19, 169:17, 190:11, 190:19
**BROWER** [182] - 2:4, 2:9, 4:24, 6:6, 6:21, 8:10, 11:8, 19:6, 26:23, 39:25, 51:19, 53:24, 54:22, 54:25, 58:23, 60:15, 63:16, 64:13, 64:17, 64:20, 64:22, 69:19, 72:9, 72:12, 72:25, 83:15, 83:19, 83:21, 85:20, 86:3, 86:6, 86:14, 88:4, 88:7, 89:10, 89:19, 91:25, 93:3, 95:21, 96:18, 96:23, 97:17, 97:21, 97:25, 98:3, 98:11, 98:16, 98:19, 110:4, 112:22, 113:4, 113:11, 114:22, 115:10, 115:14, 115:19, 116:21, 116:24, 118:23, 123:20, 126:8, 129:16, 134:19, 136:25, 137:4, 137:12, 138:11, 138:14, 138:17, 138:20, 138:23, 139:2,

139:6, 139:11, 139:16, 139:20, 140:2, 140:5, 141:17, 143:5, 143:9, 144:24, 146:13, 146:15, 146:17, 157:16, 165:25, 166:5, 170:25, 171:3, 172:2, 172:18, 172:21, 173:4, 173:8, 174:25, 175:6, 175:8, 175:12, 175:16, 175:21, 176:2, 178:9, 178:14, 178:17, 179:14, 180:10, 180:12, 180:20, 181:17, 182:8, 183:4, 183:23, 183:25, 184:8, 185:20, 186:7, 186:18, 187:16, 187:24, 188:24, 189:17, 190:4, 191:9, 191:18, 192:5, 198:3, 199:13, 199:22, 200:9, 200:21, 200:24, 201:5, 201:9, 201:12, 202:4, 202:12, 205:11, 208:5, 209:17, 210:24, 213:20, 213:23, 218:21, 218:25, 219:9, 219:13, 221:5, 221:13, 221:16, 227:9, 227:11, 230:3, 232:10, 232:19, 235:6, 235:23, 237:13, 240:18, 246:24, 247:4, 247:23, 248:5, 248:8, 248:11, 249:6, 249:8, 250:4, 250:15, 251:15, 261:3, 261:5, 261:7, 263:6, 265:21, 266:14, 267:2, 267:7, 267:9, 273:17, 281:17, 282:8
**Brower** [14] - 4:24, 6:6, 6:7, 8:9, 14:21, 15:6, 15:21, 138:4, 138:6, 182:23, 202:5, 286:7
**BROZ** [3] - 2:21, 5:5, 98:7
**Broz** [1] - 5:5
**build** [2] - 135:19
**bullshit** [1] - 138:11
**business** [1] - 48:8
**button** [1] - 168:19
**buy** [17] - 45:20, 47:25, 54:17, 59:11, 101:20, 110:22, 133:14, 148:17, 216:6, 234:8, 236:11, 258:7, 261:9, 272:25, 275:15, 275:17, 275:18
**buyer** [7] - 12:8, 102:17, 102:19, 216:22, 265:18, 266:11, 266:22
**buyers** [11] - 9:25, 10:16, 11:3, 160:14, 163:15, 215:9, 216:17, 217:5, 220:22, 265:15, 266:12
**buying** [24] - 9:20, 10:8, 11:10, 11:19, 11:22, 11:23, 12:19, 59:5, 62:14, 110:7, 110:8, 110:9, 148:3, 155:18, 156:6, 158:10, 158:25,

165:3, 234:20, 235:3, 235:5,
253:23, 257:25, 273:7
**buys** [1] - 220:9
**BY** [11] - 2:9, 2:21, 5:13,
70:8, 127:10, 195:2, 222:12,
243:7, 267:9, 281:10, 286:5

# C

**cabin** [1] - 103:22
**calculate** [1] - 62:17
**calculated** [1] - 277:5
**calculations** [2] - 62:23,
62:25
**California** [23] - 21:7,
22:23, 25:8, 25:24, 28:23,
29:16, 31:2, 38:10, 40:15,
76:16, 79:6, 81:23, 82:6,
82:25, 84:8, 183:12, 215:17,
228:14, 245:22, 279:7,
280:6, 280:20, 281:14
**Californian** [1] - 15:14
**cameras** [1] - 138:24
**canceled** [5] - 100:15,
262:11, 262:15, 262:19,
262:22
**cannot** [15] - 13:10, 18:25,
50:13, 50:14, 50:16, 120:20,
122:15, 148:20, 162:17,
180:15, 206:23, 251:18
**capable** [1] - 134:3
**CAPITAL** [1] - 1:7
**capital** [1] - 117:24
**Capital** [7] - 2:14, 4:10,
72:3, 74:19, 176:5, 192:17,
243:11
**caption** [1] - 80:14
**capture** [1] - 142:6
**card** [1] - 100:12
**cards** [2] - 100:14, 100:17
**care** [1] - 45:4
**career** [3] - 44:15, 48:16,
141:5
**careful** [1] - 118:23
**carefully** [1] - 58:4
**Caribbean** [1] - 279:3
**carryover** [1] - 185:16
**case** [35] - 12:10, 16:10,
16:22, 17:13, 17:17, 19:18,
26:7, 27:23, 38:13, 39:6,
39:7, 50:11, 51:25, 82:17,
84:13, 130:18, 151:16,
161:22, 162:25, 171:21,
188:22, 190:13, 197:2,
199:2, 208:12, 214:25,
228:8, 233:6, 236:13,
236:15, 237:22, 277:2,
277:14
**Case** [1] - 1:5
**case-by-case** [1] - 27:23
**cases** [6] - 27:16, 28:11,

28:12, 28:14, 28:15, 28:16
**caused** [3] - 77:11, 245:20,
253:10
**celebration** [1] - 255:8
**center** [1] - 22:8
**Center** [1] - 22:9
**certain** [15] - 57:24, 109:11,
110:10, 123:5, 128:9, 138:9,
141:16, 168:22, 169:16,
204:2, 212:13, 228:15,
228:16, 249:21
**certainly** [29] - 16:11, 17:8,
22:13, 51:4, 58:7, 78:20,
123:3, 124:15, 154:24,
161:24, 162:18, 162:20,
167:9, 181:21, 207:7, 209:3,
209:22, 211:25, 213:5,
215:2, 227:18, 227:21,
229:16, 235:12, 236:12,
238:3, 259:3, 261:15, 272:18
**CERTIFICATE** [1] - 285:2
**Certification** [3] - 115:22,
115:25, 286:21
**certification** [11] - 116:10,
119:7, 176:19, 177:8,
189:24, 196:25, 199:24,
200:5, 200:6, 267:11, 268:22
**certified** [4] - 142:13,
170:9, 179:18, 194:6
**certify** [3] - 122:15, 285:11,
285:17
**chair** [1] - 37:4
**chairman** [1] - 36:3
**challenging** [1] - 246:5
**chambers** [1] - 36:7
**chance** [1] - 229:25
**change** [6] - 16:23, 201:17,
203:12, 203:21, 204:7,
263:17
**CHANGE/REASON** [1] -
283:6
**changed** [7] - 26:5, 32:3,
133:18, 154:19, 154:20,
203:16, 203:23
**changes** [1] - 116:18
**changing** [1] - 264:19
**character** [1] - 228:20
**characterization** [1] -
200:25
**charge** [1] - 228:19
**charged** [3] - 42:11, 42:14,
228:17
**chart** [37] - 119:21, 119:22,
119:24, 120:3, 120:24,
121:18, 121:25, 122:3,
122:6, 122:14, 122:22,
128:7, 141:11, 141:19,
144:14, 144:22, 145:6,
157:12, 180:17, 180:22,
190:9, 198:12, 199:5,
201:15, 219:17, 221:9,

247:21, 248:9, 256:18,
259:18, 264:4, 264:5, 265:7,
267:12, 267:15, 270:3,
273:13
**chat** [3] - 58:10, 58:11, 66:6
**chatter** [1] - 66:19
**check** [7] - 61:19, 77:3,
77:8, 133:7, 163:25, 190:7,
198:15
**checked** [2] - 178:23,
198:22
**chief** [2] - 29:14, 35:18
**children** [1] - 42:2
**choice** [1] - 150:24
**choose** [2] - 87:16, 88:5
**chose** [1] - 30:2
**chronology** [1] - 24:6
**circumstances** [2] - 16:24,
209:24
**civic** [1] - 186:4
**civil** [6] - 17:7, 25:6, 28:12,
28:14, 28:16, 32:2
**claim** [3] - 153:5, 163:19,
213:19
**claims** [1] - 28:13
**Clara** [2] - 23:19, 24:11
**Clark** [1] - 7:3
**class** [16] - 5:2, 8:23, 9:3,
10:8, 10:10, 10:11, 11:2,
11:3, 11:15, 11:18, 11:21,
12:6, 50:9, 51:10, 51:22,
52:12, 62:11, 80:9, 81:9,
90:23, 98:14, 107:4, 113:10,
113:16, 117:20, 118:6,
141:13, 145:10, 152:8,
152:23, 153:2, 153:14,
154:9, 157:25, 158:25,
159:15, 159:24, 160:3,
160:18, 161:14, 162:3,
162:6, 162:15, 164:11,
165:18, 166:12, 167:22,
176:8, 192:19, 196:8,
196:13, 197:3, 200:13,
203:12, 203:16, 203:20,
204:12, 205:5, 205:16,
206:4, 207:25, 208:13,
208:23, 210:6, 210:14,
212:19, 214:4, 214:11,
214:13, 216:11, 218:15,
219:19, 220:2, 220:14,
220:20, 220:22, 222:14,
222:20, 234:19, 235:20,
236:14, 237:7, 237:8,
237:21, 239:13, 240:15,
242:22, 243:12, 244:19,
244:20, 245:12, 248:22,
248:25, 249:5, 266:2,
266:11, 266:22, 268:2,
270:11, 271:14, 271:20,
271:23, 272:12, 272:14,
273:8, 276:20, 276:24,

277:8, 277:15, 278:8, 281:2,
286:19, 287:13, 287:14,
287:17
**classes** [5] - 9:4, 9:22,
9:23, 12:23, 12:25
**clawed** [1] - 224:5
**clawing** [1] - 223:11
**clear** [5] - 8:3, 36:8, 53:14,
152:15, 268:12
**clearer** [1] - 216:23
**clearly** [3] - 86:11, 86:12,
161:9
**client** [8] - 112:25, 153:15,
160:12, 163:6, 163:13,
190:19, 232:7
**climb** [2] - 23:8, 23:9
**climbed** [1] - 147:24
**clip** [3] - 175:13, 175:14,
175:17
**close** [4] - 124:17, 150:10,
176:16, 207:2
**closed** [2] - 49:6, 183:13
**closely** [1] - 67:3
**closer** [2] - 31:11, 240:7
**Coast** [2] - 37:14, 37:15
**cold** [4] - 245:17, 254:6,
255:12, 261:14
**collar** [1] - 171:11
**colleagues** [1] - 37:2
**collecting** [1] - 257:14
**collection** [1] - 268:16
**College** [3] - 20:25, 21:19,
21:20
**college** [4] - 21:7, 21:8,
21:10, 21:24
**colloquy** [1] - 183:7
**column** [1] - 244:8
**columns** [2] - 119:11,
145:20
**comer** [1] - 66:25
**coming** [2] - 141:8, 258:21
**commendation** [1] - 33:3
**comment** [4] - 17:20,
197:16, 223:5, 223:21
**comments** [6] - 197:19,
197:21, 223:7, 223:13,
223:24, 224:3
**commission** [1] - 264:16
**commissioner** [2] - 25:12,
92:25
**Commissioner** [2] - 87:5,
87:9
**common** [2] - 267:25,
268:7
**communicate** [2] - 15:9,
94:6
**communicated** [1] - 94:3
**community** [1] - 161:24
**commute** [1] - 24:16
**companies** [15] - 22:13,
50:25, 52:17, 52:19, 52:20,

52:25, 53:8, 53:22, 54:8, 54:11, 55:6, 66:13, 67:18, 68:10, 149:9

**Company** [2] - 84:19, 131:14

**company** [18] - 22:14, 52:16, 54:6, 58:15, 66:16, 67:11, 68:12, 84:7, 125:9, 135:20, 137:6, 155:9, 156:10, 216:8, 217:20, 217:23, 241:11

**compare** [3] - 170:23, 198:20, 200:6

**compared** [4] - 198:6, 198:10, 198:21, 238:8

**comparison** [2] - 198:5, 198:12

**competent** [2] - 92:22, 173:21

**competently** [1] - 134:7

**competition** [2] - 67:16, 67:19

**compilation** [1] - 128:6

**complainant** [1] - 92:5

**complaining** [2] - 200:18, 203:13

**complaint** [66] - 76:5, 78:10, 81:22, 91:24, 92:3, 92:4, 113:17, 124:7, 163:9, 163:24, 164:11, 165:4, 176:8, 178:6, 189:7, 191:21, 192:20, 194:3, 195:24, 196:5, 196:9, 196:13, 197:4, 197:13, 197:24, 199:11, 200:3, 200:14, 201:11, 201:18, 203:12, 204:16, 205:18, 206:5, 206:10, 206:20, 206:25, 207:5, 208:6, 208:7, 217:17, 218:14, 218:23, 219:2, 219:6, 221:7, 222:15, 222:21, 223:3, 223:14, 224:15, 224:18, 224:25, 230:22, 230:24, 237:25, 242:23, 243:13, 248:18, 286:16, 286:20, 287:13, 287:15, 287:17

**complaints** [2] - 205:21, 223:20

**complete** [1] - 128:16

**completed** [3] - 120:25, 121:4, 199:6

**completely** [1] - 246:2

**completing** [1] - 258:8

**completion** [1] - 73:25

**comply** [1] - 269:18

**compulsion** [1] - 85:22

**compute** [1] - 62:3

**computer** [1] - 60:7

**computers** [1] - 67:9

**computing** [1] - 64:2

**conceivable** [1] - 141:4

**concept** [3] - 31:5, 37:6, 169:2

**concepts** [1] - 169:5

**concerning** [6] - 94:19, 117:15, 118:4, 181:15, 189:15, 189:16

**conclude** [1] - 164:22

**concludes** [1] - 228:24

**conclusion** [1] - 213:21

**Coney** [1] - 20:20

**conference** [3] - 70:2, 70:18, 149:6

**conferences** [1] - 68:9

**CONFIDENTIAL** [1] - 1:15

**confidential** [1] - 95:23

**confidentiality** [2] - 85:8, 85:10

**confirmation** [4] - 61:3, 268:12, 268:13, 269:13

**confirmations** [1] - 125:21, 126:4

**confirming** [1] - 60:24

**confluence** [1] - 204:3

**confusion** [2] - 123:3, 167:8

**connection** [1] - 152:11

**consider** [9] - 26:9, 79:4, 91:22, 228:10, 228:15, 229:7, 230:9, 232:14, 233:16

**consideration** [1] - 85:24

**consist** [1] - 141:23

**consistent** [4] - 58:17, 235:4, 245:13

**consists** [1] - 266:7

**constituted** [1] - 217:14

**constitutional** [3] - 29:24, 32:14, 34:9

**consult** [2] - 17:12, 57:4

**consultant** [1] - 241:24

**consultation** [2] - 74:2, 75:20

**consultations** [1] - 120:22

**consulted** [1] - 73:24, 133:10

**contact** [4] - 7:22, 15:25, 17:3, 279:24

**contacted** [9] - 16:18, 95:11, 112:13, 118:8, 190:14, 268:20, 269:7, 269:8, 269:11

**contacts** [1] - 227:3

**contain** [1] - 114:3

**contained** [1] - 61:24

**contemplation** [1] - 113:6

**contemporaneous** [1] - 221:10

**contemporaries** [1] - 36:24

**contend** [5] - 94:18, 213:16, 215:12, 217:14, 237:20

**contention** [2] - 155:17, 162:12

**context** [2] - 148:21, 188:6

**contingent** [1] - 276:21

**continue** [3] - 23:21, 30:3, 217:8

**CONTINUED** [5] - 70:7, 127:9, 194:25, 222:11, 243:6

**contract** [1] - 76:21

**contrary** [1] - 277:4

**controlled** [1] - 44:17

**controlling** [1] - 27:25

**controls** [1] - 18:15

**conversation** [2] - 56:14, 223:8

**conversations** [4] - 16:10, 56:15, 118:24, 230:18

**conveyed** [1] - 223:25

**convicted** [1] - 42:5

**cooperate** [1] - 229:20

**cooperating** [2] - 229:24, 230:13

**cooperation** [1] - 230:14

**cooperative** [1] - 230:8

**cooperators** [1] - 229:15

**coplaintiff** [2] - 7:18, 8:13

**copy** [8] - 71:16, 85:19, 89:17, 90:3, 120:12, 120:13, 200:22

**Corporation** [1] - 9:12

**corporations** [1] - 232:23

**correct** [182] - 10:24, 11:4, 11:9, 11:16, 11:17, 12:24, 21:21, 22:2, 27:15, 39:22, 45:13, 45:17, 45:18, 45:22, 50:12, 60:9, 60:18, 60:19, 62:11, 73:19, 75:13, 75:18, 75:22, 76:2, 76:22, 78:7, 78:11, 80:25, 81:12, 81:13, 81:24, 82:3, 82:8, 82:9, 82:12, 82:13, 84:14, 88:23, 88:24, 89:2, 89:3, 89:9, 89:20, 93:8, 93:15, 93:16, 93:18, 99:25, 100:5, 105:7, 108:21, 113:14, 114:2, 114:4, 117:3, 117:5, 117:16, 117:17, 117:21, 117:22, 117:24, 117:25, 121:12, 122:16, 123:11, 123:19, 123:24, 124:24, 125:23, 126:2, 126:5, 130:4, 131:9, 133:23, 133:24, 137:15, 137:22, 141:14, 141:21, 141:22, 144:17, 145:11, 145:12, 145:15, 146:23, 150:11, 152:6, 158:6, 158:17, 167:25, 168:9, 169:3, 169:22, 170:11, 170:12, 170:15, 173:17, 177:11, 177:12, 178:16, 178:23, 179:20, 181:3, 183:24, 184:12, 184:15, 184:23, 186:23, 188:23, 189:10, 190:9, 190:13, 191:8, 191:14, 194:11, 194:12, 196:2, 196:15, 196:25, 197:9, 199:12, 199:16, 199:18, 202:17, 202:23, 204:14, 204:20, 204:21, 205:2, 205:3, 205:5, 206:5, 211:4, 211:13, 211:17, 212:7, 214:5, 214:9, 215:20, 216:12, 218:17, 220:7, 220:10, 220:15, 220:16, 220:18, 220:19, 220:23, 220:24, 221:4, 227:25, 229:4, 229:10, 229:15, 229:21, 230:15, 231:22, 232:12, 232:13, 234:21, 235:18, 235:22, 236:16, 245:3, 249:13, 250:3, 252:2, 252:12, 254:24, 259:8, 260:16, 262:19, 265:4, 265:13, 265:16, 265:18, 266:3, 266:7, 266:13, 267:18, 268:5, 275:3

**corrected** [2] - 167:25, 190:17

**correction** [1] - 179:11

**cost** [2] - 235:10, 276:5

**Council** [1] - 22:12

**counsel** [34] - 3:5, 4:19, 8:14, 73:13, 75:16, 75:20, 88:21, 88:25, 113:7, 118:25, 120:19, 120:25, 121:3, 121:11, 142:11, 171:6, 173:21, 177:22, 179:6, 179:13, 188:9, 188:17, 190:11, 190:19, 204:5, 205:23, 217:17, 223:23, 224:19, 227:12, 232:5, 268:21, 277:13, 278:7

**Counsel** [2] - 172:17, 227:21

**counties** [1] - 38:9

**countries** [1] - 23:2

**country** [1] - 183:11

**county** [2] - 27:23

**County** [10] - 23:19, 24:11, 24:13, 24:15, 24:19, 31:24, 84:17, 104:3, 279:22, 280:6

**COUNTY** [1] - 285:6

**county-by-county** [1] - 27:23

**couple** [2] - 242:12, 258:5

**course** [11] - 15:4, 28:14, 83:7, 83:10, 95:4, 151:11, 211:9, 229:22, 240:2, 241:8, 257:18

**court** [40] - 4:15, 5:7, 26:25, 27:14, 27:17, 27:22, 28:11, 28:17, 28:22, 28:24, 28:25,

29:3, 29:4, 29:6, 29:7, 30:25,
31:8, 31:13, 31:15, 31:16,
34:18, 35:8, 39:12, 76:16,
80:15, 84:15, 87:12, 87:23,
88:14, 88:18, 90:11, 184:3,
219:21, 229:17, 230:6,
230:7, 246:6, 278:17, 280:5
  **Court** [25] - 15:17, 18:15,
30:17, 32:6, 34:13, 38:23,
85:22, 86:20, 87:2, 130:16,
135:9, 135:25, 170:9,
170:18, 176:20, 179:6,
183:8, 189:25, 202:22,
230:9, 277:3, 277:4, 286:18
  **COURT** [1] - 1:2
  **Court's** [3] - 169:17, 177:7,
196:14
  **courtroom** [2] - 36:6
  **courtrooms** [1] - 38:9
  **courts** [10] - 27:21, 30:7,
30:19, 30:20, 32:4, 37:7,
39:13, 279:18, 279:20
  **Courts** [2] - 27:24, 279:14
  **covered** [3] - 176:14, 232:7,
270:14
  **Cragmont** [5] - 43:10, 96:7,
101:4, 101:8, 102:23
  **create** [1] - 35:6
  **created** [4] - 116:13, 154:7,
156:20, 217:2
  **creating** [3] - 66:12,
156:12, 156:19
  **credibility** [3] - 209:21,
227:8, 227:24
  **credit** [3] - 100:12, 100:14,
100:17
  **crime** [2] - 42:5, 42:9
  **criminal** [9] - 23:5, 23:14,
24:9, 25:4, 25:7, 28:11,
29:19, 31:25, 35:3
  **curious** [1] - 17:9
  **current** [2] - 42:21, 104:24

**D**

  **D.C** [2] - 30:3, 33:4
  **damage** [1] - 84:4
  **damaged** [1] - 153:6
  **damming** [1] - 84:6
  **data** [10] - 67:8, 142:9,
142:11, 181:22, 190:16,
194:5, 205:18, 205:19,
205:20, 212:13
  **date** [46] - 4:6, 117:19,
119:13, 119:16, 123:6,
123:7, 126:5, 131:25,
145:14, 147:9, 147:10,
147:12, 157:13, 168:8,
168:15, 168:18, 168:21,
169:3, 169:6, 169:10,
170:11, 171:14, 171:16,

172:10, 174:3, 179:11,
179:12, 196:23, 197:7,
203:2, 203:8, 244:12,
244:16, 247:10, 251:7,
261:4, 268:4, 269:16,
274:24, 275:10, 275:12,
275:16
  **dated** [10] - 77:17, 77:25,
82:2, 117:4, 175:3, 192:13,
193:14, 286:23, 287:9,
287:11
  **dates** [5] - 10:18, 20:15,
121:6, 123:2, 145:19,
145:20, 167:15, 167:17,
167:20, 167:23, 167:24,
168:12, 169:18, 173:17,
181:2, 181:16, 201:22,
201:23, 202:2, 203:24,
204:8, 205:21, 208:17,
208:20, 269:14
  **Dave** [1] - 6:4
  **DAVID** [1] - 2:9
  **David** [3] - 4:24, 63:14,
63:18
  **day-trader** [1] - 188:8
  **days** [13] - 23:13, 147:14,
147:16, 148:18, 168:16,
168:17, 168:22, 169:12,
169:13, 171:2, 174:6,
176:24, 257:19
  **deal** [10] - 39:13, 39:16,
48:21, 48:22, 49:4, 57:19,
66:5, 109:19, 159:13, 229:13
  **dealing** [3] - 29:20, 93:23,
246:11
  **dealings** [1] - 90:7
  **deals** [1] - 102:9
  **dealt** [2] - 21:15, 109:23
  **Dear** [1] - 113:24
  **debate** [1] - 86:17
  **debt** [1] - 100:12
  **debts** [1] - 100:9
  **decades** [1] - 174:11
  **December** [13] - 216:19,
222:22, 222:25, 262:24,
263:14, 264:9, 265:3,
265:15, 265:19, 266:3,
266:6, 271:18, 272:6
  **decide** [2] - 124:24, 125:4
  **decided** [7] - 23:14, 26:9,
110:20, 132:15, 190:7,
249:4, 257:12
  **deciding** [1] - 15:18
  **decision** [12] - 45:20,
59:10, 79:9, 133:13, 184:25,
185:2, 185:8, 185:25,
186:23, 187:7, 195:23,
263:12
  **decisions** [14] - 17:13,
45:15, 54:17, 59:4, 132:9,
133:4, 133:23, 134:5,

149:12, 150:25, 153:9,
234:4, 238:3, 258:13
  **declaration** [1] - 180:10
  **declare** [1] - 82:11
  **declares** [1] - 116:11
  **Defendant** [1] - 4:23
  **defendant** [7] - 84:18,
170:22, 229:19, 229:24,
230:13, 231:17, 232:22
  **Defendants** [4] - 1:10, 72:3,
74:19, 176:5
  **defendants** [28] - 1:18,
2:13, 4:23, 5:6, 17:17, 19:5,
19:13, 73:18, 73:23, 169:16,
170:4, 170:15, 170:18,
171:25, 172:7, 172:9,
173:23, 173:25, 177:6,
178:20, 180:2, 180:24,
191:5, 207:9, 207:17,
223:12, 229:14, 231:18
  **Defendants'** [4] - 192:16,
193:13, 243:10, 287:11
  **defendants'** [10] - 73:9,
74:13, 79:21, 177:16, 178:5,
181:14, 188:7, 191:13,
191:20, 286:14
  **defender** [4] - 23:11, 24:11,
24:18, 136:7
  **defense** [1] - 28:3
  **Defense** [1] - 22:11
  **defer** [1] - 232:5
  **deficient** [1] - 93:25
  **definitely** [1] - 180:16
  **definition** [1] - 88:9
  **definitive** [1] - 216:3
  **deleterious** [3] - 160:12,
160:18, 163:17
  **delighted** [1] - 20:19
  **delivered** [1] - 119:24
  **Democratic** [1] - 22:9
  **denied** [2] - 211:9, 213:11
  **denies** [1] - 216:9
  **depleted** [1] - 49:15
  **deposition** [16] - 1:17, 3:10,
3:15, 4:8, 4:11, 8:9, 14:5,
14:18, 14:22, 174:16, 182:2,
282:5, 285:13, 285:14,
286:10, 287:7
  **depositions** [3] - 19:17,
19:23, 174:8
  **derive** [1] - 135:4
  **describe** [11] - 9:23, 20:17,
49:11, 58:19, 78:9, 163:3,
207:3, 208:11, 221:8, 254:4,
264:19
  **described** [3] - 147:23,
219:5, 268:24
  **describing** [1] - 154:12
  **description** [5] - 45:7,
80:17, 80:20, 154:5, 154:11
  **designate** [1] - 144:15

  **designated** [2] - 7:14,
144:19
  **designating** [1] - 95:22
  **designation** [1] - 29:5
  **Designs** [2] - 244:3, 267:25
  **desire** [1] - 233:23
  **detail** [1] - 24:3
  **detainers** [1] - 28:15
  **determinations** [1] - 227:14
  **determined** [1] - 152:15
  **determining** [1] - 231:25,
232:15
  **detriment** [1] - 10:10
  **detrimental** [3] - 217:5,
218:3, 218:7
  **device** [5] - 66:17, 67:6,
67:14
  **devices** [2] - 53:7, 67:8
  **diem** [6] - 38:15, 39:5,
39:20, 39:23, 105:8, 105:16
  **dies** [1] - 39:11
  **differ** [2] - 47:4, 206:19
  **difference** [7] - 168:13,
169:14, 174:7, 174:14,
190:24, 206:24, 227:19
  **differences** [1] - 207:4
  **different** [17] - 50:24,
50:25, 52:8, 53:22, 67:6,
102:8, 128:20, 128:22,
161:14, 162:13, 162:21,
169:21, 173:19, 201:13,
203:24, 241:10
  **differently** [2] - 124:5,
209:4
  **difficult** [8] - 20:16, 48:20,
207:23, 234:25, 245:25,
246:12, 258:16, 271:25
  **digital** [1] - 66:14
  **diligent** [3] - 48:17, 154:24,
257:14
  **diminished** [1] - 49:9
  **dipped** [1] - 255:15
  **direct** [15] - 72:22, 74:24,
79:12, 80:3, 90:12, 112:22,
142:20, 176:3, 176:10,
180:8, 182:15, 185:12,
193:23, 195:3, 195:9
  **directing** [3] - 97:21, 97:23,
112:24, 134:16, 188:3
  **direction** [1] - 139:18
  **directly** [8] - 21:24, 93:23,
94:6, 95:12, 98:7, 131:9,
131:10, 207:10
  **disabilities** [1] - 21:13
  **disagree** [2] - 160:9, 162:7
  **disappear** [1] - 233:25
  **disbelieve** [1] - 164:5
  **disclose** [6] - 87:16, 88:5,
91:23, 118:24, 221:12,
221:15
  **disclosed** [3] - 83:6, 83:12,

85:11

**disclosing** [1] - 280:8

**discovered** [3] - 203:24, 205:22, 207:12

**discovery** [6] - 18:4, 18:8, 18:12, 204:6, 207:8, 223:10

**discrepancies** [1] - 180:24

**discrepancy** [5] - 179:7, 184:20, 189:23, 190:22, 196:23

**discretionary** [3] - 44:20, 44:23, 132:13

**discuss** [5] - 16:22, 19:25, 95:13, 122:3, 203:18

**discussed** [9] - 116:14, 120:24, 121:2, 122:11, 165:13, 204:8, 242:2, 249:2, 249:3

**discussing** [3] - 56:7, 73:12, 121:3

**discussion** [2] - 174:19, 233:19

**discussions** [14] - 9:9, 16:19, 110:17, 120:5, 120:8, 120:9, 120:11, 121:6, 163:10, 165:6, 165:15, 217:17, 224:19

**dismiss** [11] - 176:7, 178:5, 185:8, 185:10, 191:14, 191:21, 192:4, 192:19, 242:22, 243:12, 287:16

**dispute** [3] - 88:22, 91:6, 280:15

**disputes** [2] - 61:22, 281:12

**disregard** [1] - 229:2

**distorting** [2] - 159:7, 163:16

**distributed** [2] - 66:15, 155:13

**DISTRICT** [2] - 1:2, 1:2

**district** [4] - 26:14, 27:11, 27:17, 28:10

**District** [1] - 27:4

**divide** [1] - 67:7

**Docket** [4] - 86:20, 87:2, 89:8, 286:18

**docket** [1] - 87:4

**document** [57] - 14:10, 14:13, 17:23, 18:2, 19:3, 63:9, 72:2, 72:10, 72:15, 72:23, 73:14, 73:17, 73:22, 74:3, 74:6, 74:11, 74:25, 76:4, 76:14, 86:19, 89:15, 89:21, 90:6, 92:6, 114:8, 114:17, 114:23, 115:5, 115:7, 115:11, 115:21, 116:4, 116:6, 116:8, 119:9, 142:21, 176:11, 179:17, 187:5, 191:2, 191:16, 192:22, 192:25, 197:11, 198:21, 202:13, 206:11,

206:21, 208:3, 223:22, 225:20, 230:23, 231:4, 236:6, 273:16, 286:17, 286:21

**documents** [25] - 9:8, 16:8, 17:4, 17:6, 17:16, 18:17, 18:19, 63:7, 73:10, 73:25, 89:10, 118:18, 121:14, 128:10, 136:18, 164:5, 165:5, 175:6, 175:13, 198:24, 225:23, 226:9, 268:11, 268:19, 270:20

**DOES** [1] - 1:9

**dollars** [11] - 49:8, 65:11, 108:14, 154:16, 155:15, 233:10, 233:11, 238:16, 239:5, 263:7, 264:16

**dollars'** [1] - 258:6

**Don** [1] - 231:6

**done** [12] - 9:21, 25:6, 27:22, 33:4, 76:17, 78:24, 152:12, 180:23, 181:21, 211:7, 211:12, 235:24, 242:13, 278:3, 281:7

**doubt** [4] - 32:23, 123:4, 130:17, 186:25

**down** [21] - 96:11, 96:14, 112:4, 117:18, 124:10, 125:14, 153:22, 176:13, 185:16, 186:11, 186:12, 186:14, 186:15, 195:13, 195:24, 215:23, 236:9, 237:16, 239:2, 254:20, 261:18

**downside** [1] - 279:25

**dozens** [1] - 124:15

**draft** [7] - 73:21, 113:16, 116:14, 116:16, 223:2, 223:14, 286:19

**drafts** [3] - 17:15, 18:16, 18:23

**dragging** [1] - 166:7

**draw** [1] - 114:20

**drawn** [1] - 119:25

**drew** [1] - 120:2

**Drexel** [2] - 77:19, 78:6

**driven** [3] - 154:2, 160:24, 216:25

**drove** [2] - 153:21, 153:22

**Drug** [5] - 30:17, 38:23, 130:16, 135:8, 135:25

**drug** [12] - 21:12, 29:20, 33:6, 35:12, 37:6, 52:24, 53:7, 224:21, 225:13, 226:22, 228:17, 246:6

**drug-laced** [1] - 225:13

**drugs** [2] - 226:16, 226:21

**DRUKER** [1] - 1:7

**Druker** [10] - 2:18, 4:23, 5:6, 9:18, 19:21, 113:8, 155:12, 174:6, 174:13,

207:16

**Druker's** [5] - 72:4, 74:20, 176:6, 192:17, 243:11

**due** [2] - 100:10, 179:8

**duly** [2] - 5:10, 285:14

**during** [85] - 10:2, 11:5, 11:12, 11:14, 11:18, 11:21, 12:6, 12:16, 12:17, 12:18, 13:4, 13:24, 18:7, 31:12, 41:10, 44:12, 44:14, 48:9, 50:9, 50:11, 50:22, 51:14, 51:22, 52:12, 62:10, 67:22, 67:25, 68:17, 80:7, 81:7, 90:21, 105:6, 117:20, 118:6, 123:17, 141:13, 145:9, 148:10, 151:23, 152:23, 156:3, 156:5, 156:6, 156:9, 157:25, 158:5, 158:21, 158:25, 159:3, 159:15, 160:8, 160:17, 161:11, 161:14, 162:3, 162:15, 165:18, 166:12, 200:16, 208:23, 210:6, 212:6, 214:3, 216:15, 216:22, 219:17, 220:14, 234:18, 234:19, 235:20, 238:10, 239:13, 244:18, 266:5, 266:10, 266:24, 267:25, 271:14, 271:23, 272:13

**duties** [1] - 281:2

**duty** [1] - 179:19

**DVD** [5] - 194:17, 194:23, 242:18, 243:4, 282:5

**dwell** [1] - 50:20

**dwelling** [1] - 84:5

**DWI** [1] - 42:15

### E

**early** [5] - 22:16, 34:6, 169:15, 279:5

**earned** [1] - 98:9

**easier** [1] - 236:11

**easily** [2] - 38:8, 240:7

**east** [1] - 183:14

**East** [2] - 37:15, 40:15

**easy** [1] - 193:9

**economically** [1] - 162:13

**economist** [1] - 106:21

**edict** [3] - 29:24, 32:14, 34:9

**educate** [2] - 57:20, 241:18

**education** [4] - 21:5, 23:23, 29:18, 38:5

**educational** [1] - 20:18

**Edwards** [8] - 131:13, 131:15, 131:16, 132:5, 132:15, 132:16, 133:3, 134:11

**effect** [2] - 34:22, 97:12

**effectuating** [1] - 59:12

**effort** [1] - 184:18

**eight** [5] - 26:7, 26:8, 82:18, 123:11, 258:15

**eight-month** [1] - 26:8

**either** [8] - 15:21, 29:24, 34:14, 68:4, 80:8, 90:22, 213:13, 275:8

**elected** [3] - 27:5, 27:12, 29:13

**election** [2] - 26:11, 26:16

**electric** [1] - 84:7

**Electric** [1] - 84:19

**electronically** [1] - 16:2

**elevated** [1] - 39:11

**eligible** [1] - 38:6

**eliminated** [1] - 28:23

**Ellis** [2] - 24:22

**elsewhere** [1] - 176:14

**eludes** [1] - 24:24

**Emeryville** [1] - 27:4

**employed** [1] - 37:22

**employee** [6] - 134:24, 136:20, 137:20, 140:16, 142:2, 143:22

**employees** [1] - 121:24

**employer** [4] - 131:10, 136:3, 136:4, 137:9

**employer-sponsored** [2] - 131:10, 136:3

**employers** [2] - 70:15, 136:6

**employing** [1] - 148:8

**employment** [1] - 37:20

**end** [15] - 10:21, 25:21, 32:9, 69:23, 110:10, 126:14, 164:25, 165:3, 194:17, 237:6, 237:10, 238:18, 242:18, 270:10, 282:5

**ended** [3] - 32:10, 236:15, 237:9

**ends** [4] - 106:8, 195:18, 237:8, 270:11

**engage** [4] - 108:18, 112:7, 145:24, 233:4

**engaged** [2] - 123:18, 210:3, 211:3

**engaging** [1] - 240:13

**enhancing** [1] - 226:16

**enlightenment** [1] - 266:23

**enormous** [3] - 154:15, 162:9, 210:11

**enormously** [1] - 218:3

**entered** [2] - 70:18, 124:3

**enthusiasm** [2] - 156:21, 162:19

**entire** [3] - 95:22, 140:13, 187:17

**entirely** [2] - 25:7, 59:22

**entirety** [1] - 229:3

**entitled** [13] - 72:3, 74:17, 76:23, 86:19, 89:22, 115:21,

115:25, 171:25, 229:2, 229:5, 244:2, 286:17, 286:21
**Entries** [3] - 86:20, 87:2, 286:18
**envelopes** [1] - 127:24
**equity** [6] - 103:7, 103:8, 103:9, 103:10, 103:14, 103:15
**ERRATA** [1] - 283:4
**error** [3] - 170:2, 170:4, 179:23
**errors** [1] - 198:22
**especially** [4] - 16:9, 49:5, 56:20, 206:24
**essence** [1] - 216:25
**establish** [1] - 91:18
**established** [1] - 205:17
**estate** [1] - 105:4
**estimate** [1] - 269:19
**et** [1] - 4:10
**evaluating** [1] - 159:12
**evidence** [1] - 88:11
**evidences** [1] - 176:20
**exact** [2] - 10:18, 254:25
**exactly** [11] - 97:3, 99:9, 132:4, 163:4, 173:20, 178:9, 204:2, 221:9, 229:9, 263:2, 263:4
**exam** [2] - 22:22
**EXAMINATION** [9] - 5:12, 70:7, 127:9, 194:25, 222:11, 243:6, 267:8, 281:9, 286:5
**example** [11] - 17:23, 19:3, 51:10, 59:11, 124:25, 129:14, 143:14, 145:8, 228:16, 246:16, 279:21
**except** [5] - 3:6, 27:19, 85:11, 148:21, 149:21
**exception** [2] - 86:4, 86:12
**excuse** [10] - 43:19, 79:15, 94:25, 154:19, 182:7, 186:21, 259:23, 260:17, 276:11
**executed** [1] - 183:16
**execution** [2] - 262:6, 262:19
**exercise** [4] - 118:3, 273:22, 274:9, 275:9
**exercised** [2] - 251:12, 274:15
**Exhibit** [94] - 14:4, 14:9, 71:25, 72:22, 74:5, 74:10, 75:11, 75:17, 76:9, 79:13, 79:15, 80:5, 83:14, 86:18, 86:23, 88:2, 90:13, 90:17, 91:21, 113:19, 115:20, 115:24, 117:7, 122:22, 127:14, 127:18, 128:5, 128:7, 128:12, 141:11, 142:15, 145:4, 145:5, 146:13, 146:15, 146:16,

176:4, 180:9, 182:5, 190:9, 190:23, 191:19, 192:11, 192:12, 192:16, 193:17, 195:4, 196:15, 196:17, 197:5, 198:3, 199:7, 201:4, 201:6, 201:8, 201:10, 204:16, 204:18, 204:23, 208:8, 208:9, 208:15, 218:20, 218:24, 219:15, 219:18, 219:24, 220:12, 220:20, 221:6, 222:17, 239:20, 243:8, 243:22, 243:25, 244:2, 246:17, 246:20, 246:21, 247:15, 251:23, 256:18, 259:19, 262:2, 265:6, 267:10, 268:9, 268:12, 269:9, 269:12, 270:4, 273:14, 276:10
**exhibit** [10] - 71:12, 77:17, 127:14, 174:24, 181:25, 185:4, 195:6, 197:25, 200:2, 204:24
**exhibits** [6] - 197:23, 197:24, 207:2, 218:13, 219:4, 219:5
**exist** [1] - 167:16
**existence** [2] - 91:23, 112:11
**existing** [1] - 253:15
**exists** [2] - 205:20, 209:2
**exited** [1] - 70:2
**expect** [3] - 173:13, 174:9, 240:17
**expectation** [2] - 112:3, 217:2
**expectations** [1] - 150:21
**expected** [1] - 228:11
**expense** [1] - 163:14
**expenses** [3] - 277:2, 277:11, 278:10
**experience** [5] - 26:22, 170:20, 179:22, 227:10, 229:12
**experienced** [1] - 123:4, 167:12, 238:6
**expert** [2] - 166:14, 215:4
**expertise** [1] - 179:22, 213:25
**experts** [1] - 84:6
**expiration** [3] - 274:24, 275:10, 275:12
**explain** [3] - 109:15, 170:7, 249:25
**explained** [1] - 210:21
**explanation** [8] - 98:5, 149:20, 151:3, 178:12, 179:5, 257:7, 258:4, 263:11
**expunged** [1] - 42:9
**extensive** [2] - 264:4, 264:5
**extent** [5] - 26:5, 34:23, 154:2, 155:4

**extraordinarily** [2] - 37:11, 147:25
**extraordinary** [3] - 30:10, 34:22, 157:9
**extremely** [1] - 30:15

# F

**facility** [1] - 111:25
**fact** [21] - 18:13, 34:20, 73:14, 148:7, 154:19, 154:20, 159:21, 167:20, 172:5, 179:7, 179:8, 187:6, 188:12, 188:20, 215:9, 215:10, 223:21, 233:24, 253:16, 268:5, 274:13
**factor** [2] - 238:5
**factors** [3] - 228:9, 231:24, 232:15
**facts** [6] - 88:11, 155:2, 155:3, 155:4, 155:6, 227:23
**factual** [5] - 81:18, 81:19, 154:4, 164:18, 188:5
**fail** [1] - 176:25
**fair** [12] - 19:9, 39:3, 49:12, 53:15, 62:12, 78:8, 160:21, 161:19, 171:5, 239:25, 240:2, 273:12
**fairly** [4] - 33:8, 167:5, 245:12, 245:13
**fall** [4] - 57:2, 91:7, 193:7, 206:16
**familiar** [4] - 18:11, 31:4, 225:17, 230:20
**family** [2] - 25:6, 157:8
**far** [7] - 24:15, 24:16, 42:23, 44:7, 67:18, 98:3, 167:16
**fashion** [1] - 128:22, 228:13, 258:22, 264:21
**favor** [1] - 170:4
**featuring** [1] - 191:6
**February** [3] - 76:6, 81:24, 286:16
**federal** [5] - 18:10, 18:11, 18:12, 25:13, 230:6
**Federal** [1] - 15:17
**fee** [1] - 76:17
**fees** [6] - 276:25, 277:4, 277:9, 277:10, 280:19
**feet** [4] - 245:17, 254:6, 255:12, 261:14
**fell** [1] - 88:9
**felony** [3] - 27:19, 28:2
**felt** [4] - 30:11, 153:23, 255:10
**few** [9] - 16:12, 49:7, 55:4, 60:3, 65:11, 65:12, 68:8, 108:13, 174:6
**Fidelity** [60] - 44:6, 45:13, 45:25, 46:3, 47:14, 48:5,

48:25, 49:13, 54:14, 59:13, 59:20, 59:24, 60:11, 61:17, 62:21, 64:7, 64:16, 65:3, 65:9, 65:16, 65:24, 68:24, 69:9, 70:12, 118:8, 118:19, 119:24, 120:12, 121:15, 122:16, 125:10, 125:19, 125:21, 127:23, 127:25, 128:15, 129:7, 131:11, 131:21, 132:3, 133:5, 133:20, 135:21, 135:22, 137:7, 140:24, 149:8, 150:17, 168:11, 190:14, 198:24, 241:23, 253:16, 254:22, 264:16, 269:9, 269:18, 272:22
**Fidelity's** [1] - 122:18
**fiduciary** [1] - 135:21
**field** [5] - 35:3, 46:22, 57:18, 173:18, 173:19
**fifth** [1] - 20:21
**figure** [3] - 12:7, 164:8, 184:19
**file** [4] - 96:2, 151:9, 187:5, 200:13
**filed** [28] - 76:5, 77:12, 81:24, 82:24, 83:24, 84:8, 84:16, 89:9, 89:18, 96:8, 170:17, 176:9, 192:20, 193:20, 193:21, 194:4, 195:5, 195:21, 195:24, 196:13, 196:20, 197:4, 197:13, 206:10, 222:22, 222:25, 223:3, 286:16
**files** [2] - 114:25, 115:2
**filing** [2] - 3:14, 91:14
**final** [2] - 73:22, 243:18
**finally** [1] - 190:7
**finances** [1] - 98:5
**financial** [8] - 17:8, 57:4, 106:20, 171:9, 171:12, 174:11, 233:4, 233:16
**finder** [1] - 227:23
**fine** [6] - 8:6, 128:24, 139:14, 141:7, 219:12, 234:2
**finish** [2] - 60:15, 184:9
**finished** [1] - 265:3
**firm** [8] - 24:22, 89:4, 112:13, 112:15, 112:17, 113:13, 136:11, 277:9
**firms** [1] - 155:14
**First** [2] - 71:22, 286:12
**first** [59] - 10:22, 15:11, 16:12, 24:24, 33:16, 33:18, 33:25, 34:2, 52:5, 53:16, 54:9, 54:10, 55:4, 55:12, 56:24, 64:3, 72:6, 74:13, 74:22, 76:24, 104:17, 104:20, 116:9, 116:22, 118:20, 129:2, 144:20, 148:2, 152:25, 157:12,

158:21, 158:25, 159:15, 159:24, 160:3, 160:18, 161:8, 161:14, 162:3, 162:6, 162:15, 178:5, 185:10, 185:16, 186:13, 193:24, 194:2, 219:2, 219:19, 240:24, 242:3, 242:8, 244:8, 244:19, 270:10, 276:14, 277:23, 286:14

**five** [6] - 43:7, 151:17, 197:5, 221:22, 221:25, 234:15

**fledgling** [1] - 36:4
**flip** [2] - 143:3, 143:11
**Floor** [1] - 2:7
**fluctuated** [1] - 69:11
**focus** [1] - 201:25
**follow** [7] - 6:15, 56:14, 56:15, 57:17, 67:3, 257:15
**followed** [8] - 46:20, 55:23, 58:20, 97:15, 98:23, 99:5, 110:18, 119:12
**following** [3] - 97:10, 110:17, 184:5
**follows** [5] - 5:11, 81:6, 106:20, 106:24
**Fool** [2] - 57:15, 67:2
**foot** [1] - 166:7
**foot-dragging** [1] - 166:7
**foreclosure** [1] - 102:3
**foregoing** [1] - 81:5
**forgot** [1] - 44:19
**form** [21] - 3:7, 11:8, 51:19, 53:25, 72:25, 83:19, 89:19, 93:3, 96:18, 96:23, 121:14, 163:8, 163:9, 165:25, 179:15, 180:20, 192:5, 209:17, 240:18, 250:15, 266:14
**formal** [1] - 91:13
**formally** [1] - 68:4
**formed** [2] - 131:3, 131:4
**former** [1] - 106:21
**forth** [3] - 38:5, 75:10, 285:13
**forward** [2] - 142:21, 173:2
**foundation** [1] - 58:24
**foundational** [1] - 6:13
**four** [6] - 21:2, 23:3, 32:6, 79:16, 168:16, 169:12
**Francisco** [4] - 32:5, 40:16, 63:23, 225:14
**frankly** [7] - 45:2, 112:6, 135:7, 141:2, 179:23, 215:25, 251:17
**Frederick** [1] - 24:25
**Freeman** [13] - 9:16, 155:10, 165:6, 165:7, 204:5, 224:10, 224:17, 225:12, 226:12, 230:18, 231:22, 232:16, 233:21

**FREEMAN** [1] - 1:7
**frequency** [1] - 16:5
**frequent** [1] - 17:3
**friend** [2] - 92:19, 230:19
**front** [4] - 15:17, 89:13, 141:17, 206:23
**fulfilled** [1] - 38:4
**full** [2] - 280:2, 280:5
**fully** [2] - 258:18, 276:21
**FUND** [2] - 1:9
**Fund** [6] - 2:16, 2:17, 72:5, 72:6, 74:21, 74:22
**fund** [10] - 45:10, 45:11, 47:21, 47:23, 47:24, 47:25, 64:10, 137:6, 276:23, 277:6
**funds** [5] - 48:8, 54:9, 99:18, 99:19, 99:23
**Furman** [2] - 9:16, 165:7
**FURTHER** [2] - 3:9, 3:13
**future** [1] - 162:19

## G

**gain** [1] - 110:13
**gained** [2] - 210:17, 213:10
**gains** [3] - 62:4, 62:18, 93:17
**gamble** [2] - 106:12, 106:16
**game** [1] - 172:24
**gap** [1] - 205:7
**Gas** [1] - 84:19
**gatherings** [1] - 68:16
**general** [5] - 24:6, 57:13, 107:24, 223:17, 234:8
**generally** [5] - 229:23, 234:4, 241:24, 244:14, 269:17
**generates** [1] - 276:23
**gentleman** [3] - 9:15, 9:18, 155:10
**gentlemen** [2] - 5:24, 19:25
**George** [4] - 35:20, 36:16, 55:24, 56:6
**Gilder** [6] - 56:6, 56:8, 66:6, 66:21, 110:19, 253:15
**Gilder's** [1] - 55:24
**girlfriend** [1] - 41:4
**given** [14] - 9:17, 29:22, 32:20, 34:16, 51:6, 52:7, 62:10, 83:22, 145:23, 164:9, 166:15, 178:12, 258:10, 285:15
**gladly** [1] - 34:15
**GLOBAL** [1] - 1:8
**goal** [1] - 234:13
**goals** [1] - 235:13
**Gordon** [4] - 4:9, 208:21, 209:3, 210:13
**GORDON** [1] - 1:4
**grade** [2] - 20:21, 20:23

**graduated** [2] - 21:3, 21:20
**graduating** [1] - 22:3
**grant** [1] - 161:7
**granted** [2] - 29:14, 29:16, 35:10, 35:16, 36:20, 178:4
**grassroots** [1] - 36:10
**great** [13] - 24:3, 26:18, 39:13, 49:4, 57:19, 150:21, 156:17, 156:21, 159:13, 160:25, 231:12, 257:11
**greater** [2] - 12:12, 174:9
**greatly** [1] - 49:9
**gross** [1] - 277:6
**grow** [1] - 217:9
**guess** [8] - 55:15, 58:9, 124:16, 252:14, 257:20, 269:15, 270:24, 272:8
**guesstimate** [1] - 8:3
**guilty** [1] - 229:14

## H

**Haber** [3] - 8:17, 183:8, 183:21
**half** [15] - 24:12, 25:17, 71:7, 71:9, 138:21, 139:16, 166:23, 233:9, 233:11, 238:16, 238:22, 239:4, 240:4, 240:6, 279:23
**halfway** [4] - 117:18, 176:13, 185:16, 195:13
**Halloween** [1] - 185:2
**hallucinating** [1] - 225:12
**hand** [1] - 75:6
**handled** [1] - 131:20
**handling** [1] - 131:23
**handwriting** [1] - 199:14
**happy** [4] - 3:8, 138:23, 280:11, 280:21
**hard** [4] - 53:2, 241:4, 255:6, 274:8
**harm** [2] - 157:7, 208:25
**harmed** [3] - 157:7, 157:8
**head** [3] - 139:23, 139:24, 139:25
**headed** [1] - 130:15
**health** [1] - 29:21
**hear** [8] - 27:17, 28:11, 28:12, 109:17, 225:11, 226:15, 226:20, 226:25
**heard** [17] - 16:17, 19:24, 28:13, 28:14, 56:24, 111:20, 164:4, 184:14, 225:21, 226:3, 226:5, 226:11, 231:5, 231:8, 231:14, 231:16, 231:19
**hearing** [1] - 7:21
**height** [1] - 157:3
**held** [5] - 4:11, 45:21, 64:16, 236:9, 248:15

**help** [1] - 106:8
**helpful** [1] - 25:23
**helping** [1] - 35:5
**HEREBY** [1] - 3:4
**hereby** [1] - 285:11
**hereinbefore** [1] - 285:13
**hereto** [2] - 3:6, 268:2
**High** [1] - 20:24
**high** [3] - 20:25, 183:17, 241:14
**higher** [6] - 155:19, 155:22, 158:13, 214:8, 214:18
**highs** [1] - 183:19
**Hillman** [2] - 4:16, 4:18
**Hills** [2] - 43:9, 96:7
**Himalayas** [1] - 23:10
**hindsight** [1] - 48:14
**history** [2] - 23:23, 24:7
**hmm** [9] - 77:5, 119:18, 121:16, 143:18, 150:12, 158:23, 195:15, 262:7
**hold** [3] - 51:17, 189:20, 234:9
**holding** [1] - 255:5
**home** [7] - 37:19, 43:10, 66:14, 66:15, 67:7, 84:3, 96:8
**honest** [4] - 154:21, 159:14, 161:19, 213:11
**honestly** [3] - 184:9, 184:11, 224:25
**hope** [1] - 230:14
**hopes** [1] - 229:20
**hoping** [1] - 250:16
**hotline** [1] - 253:15
**hours** [15] - 14:25, 145:25, 177:24, 178:15, 179:9, 183:17, 183:20, 188:10, 188:13, 188:18, 188:21, 189:16, 189:18, 189:22, 190:21
**house** [2] - 149:9, 149:10
**Huber** [1] - 8:17
**huge** [3] - 161:24, 252:25, 253:3
**hundreds** [5] - 21:11, 123:24, 124:13, 124:14, 126:2
**hurt** [6] - 155:24, 155:25, 156:4, 156:8, 210:20, 211:19
**Hyland** [11] - 4:21, 72:9, 143:6, 175:22, 218:21, 267:13, 272:24, 274:23, 286:6, 286:8, 287:6
**HYLAND** [107] - 2:22, 4:21, 5:13, 14:3, 19:7, 19:9, 54:23, 55:3, 64:19, 64:21, 64:24, 69:17, 70:8, 71:11, 71:15, 71:21, 72:11, 74:9, 76:4, 83:17, 83:20, 85:17, 86:2, 86:5, 86:8, 86:16, 95:25,

97:19, 97:23, 98:2, 98:13, 98:17, 113:2, 113:9, 115:13, 115:15, 115:20, 116:23, 126:10, 127:10, 134:21, 137:3, 137:11, 137:16, 138:4, 138:6, 138:8, 138:12, 138:15, 138:18, 138:22, 138:25, 139:4, 139:8, 139:13, 139:19, 139:22, 140:4, 140:7, 143:8, 146:14, 146:16, 146:19, 172:20, 173:2, 173:6, 174:24, 175:2, 175:7, 175:10, 180:11, 181:8, 181:24, 182:10, 183:5, 184:11, 185:4, 185:21, 186:21, 189:20, 192:11, 194:13, 195:2, 200:23, 201:2, 201:7, 201:10, 202:5, 219:8, 219:11, 221:11, 221:14, 222:12, 222:13, 242:11, 243:7, 247:6, 247:25, 248:7, 248:10, 248:12, 249:7, 261:4, 261:6, 263:7, 281:8, 281:10

**hypothetical** [1] - 124:25
**hypothetically** [1] - 211:10

**I**

**idea** [2] - 214:24, 234:11
**identical** [2] - 274:6
**identification** [18] - 14:6, 71:20, 71:24, 74:15, 76:7, 86:22, 113:18, 115:23, 127:16, 175:5, 175:24, 182:4, 185:6, 192:15, 193:16, 196:10, 222:16, 242:24
**identified** [11] - 64:11, 65:3, 82:7, 100:3, 101:2, 101:3, 136:18, 144:21, 145:20, 171:18, 281:13
**identifies** [2] - 89:8, 129:2
**identify** [16] - 57:9, 80:7, 80:13, 80:15, 117:19, 126:4, 127:18, 134:14, 141:21, 200:15, 218:16, 220:6, 220:9, 220:17, 239:17, 253:9
**Identify** [1] - 90:20
**ignorance** [1] - 88:19
**ill** [1] - 39:10
**illegal** [8] - 156:13, 160:11, 207:10, 209:20, 211:4, 213:21, 226:21, 237:23
**illegality** [1] - 232:25
**illegally** [9] - 155:5, 159:7, 163:12, 209:5, 209:10, 210:18, 213:10, 213:17, 215:13
**imagine** [3] - 50:3, 59:15,

279:7
**immediately** [5] - 55:7, 167:13, 190:14, 263:16, 274:17
**immoral** [1] - 209:20
**impact** [5] - 160:13, 160:19, 162:10, 228:6, 228:7
**impeachment** [1] - 228:20
**implementing** [1] - 125:20
**implicate** [1] - 229:24
**important** [3] - 35:7, 37:11, 156:16
**impression** [7] - 90:9, 150:23, 154:7, 156:13, 156:19, 157:5, 217:6
**improperly** [1] - 155:19
**improve** [1] - 226:16
**in-house** [1] - 149:9
**in-person** [1] - 120:8
**in/first** [2] - 64:3, 64:4
**inaccurate** [7] - 81:20, 122:23, 122:25, 154:4, 154:10, 155:22, 181:22
**inadvertent** [1] - 138:13
**inadvertently** [2] - 138:16, 138:19
**inappropriate** [2] - 154:4, 156:12
**Inc** [2] - 244:4, 267:25
**inches** [1] - 118:14
**include** [1] - 42:6
**included** [3] - 188:13, 188:21, 281:13
**including** [3] - 64:13, 64:15, 207:2
**income** [1] - 62:19
**incorrect** [3] - 200:25, 203:10, 252:16
**increase** [1] - 159:20
**increments** [1] - 125:5
**incur** [1] - 236:3
**incurred** [1] - 236:4
**INDEX** [1] - 286:3
**INDEX(Continued** [1] - 287:3
**indicate** [4] - 79:7, 114:7, 174:16, 174:18
**indicated** [7] - 16:20, 31:24, 47:20, 66:4, 174:6, 189:5, 207:23
**indicates** [1] - 264:5
**individual** [18] - 9:17, 34:17, 46:8, 46:15, 49:3, 49:14, 55:6, 64:23, 70:15, 71:5, 71:7, 123:13, 129:7, 130:3, 141:24, 144:7, 162:11, 268:13
**individuals** [6] - 9:13, 9:14, 10:3, 10:7, 21:14, 33:6
**industries** [1] - 52:21
**influence** [1] - 228:18

**influential** [1] - 35:3
**informally** [1] - 68:4
**information** [96] - 6:10, 9:2, 9:6, 9:13, 9:17, 9:19, 10:4, 10:9, 12:4, 13:8, 13:17, 34:16, 56:19, 58:14, 61:23, 62:21, 66:14, 68:7, 68:13, 91:15, 91:16, 117:15, 118:4, 118:11, 118:15, 118:16, 118:18, 119:23, 120:13, 120:14, 120:16, 120:17, 120:22, 121:7, 121:8, 121:9, 122:2, 122:20, 122:22, 145:22, 149:11, 153:8, 153:20, 155:8, 155:11, 157:2, 159:6, 163:12, 164:17, 164:19, 164:24, 165:10, 165:11, 166:15, 166:24, 168:3, 170:8, 170:14, 170:19, 170:23, 171:15, 171:16, 172:5, 172:12, 180:4, 180:25, 190:8, 190:16, 199:5, 203:23, 203:25, 204:4, 205:22, 205:24, 207:11, 209:5, 209:12, 210:9, 210:10, 211:22, 213:10, 213:16, 214:16, 215:12, 215:18, 216:5, 216:9, 217:5, 217:15, 217:18, 218:4, 224:16, 228:12, 257:14, 258:13, 258:14
**informational** [1] - 68:9
**informed** [1] - 166:17
**inheritance** [1] - 70:20
**initial** [4] - 145:9, 146:9, 152:20, 191:14
**input** [2] - 60:6, 253:13
**inquire** [2] - 173:16, 174:2
**inquiries** [1] - 190:15
**inquiry** [2] - 17:10, 189:13
**inside** [1] - 209:19
**insider** [11] - 9:2, 9:6, 10:2, 10:3, 10:7, 153:11, 155:8, 166:19, 211:4, 217:4
**insofar** [1] - 98:24
**insolvent** [1] - 100:7
**instance** [4] - 80:13, 106:25, 210:12, 271:18
**instances** [4] - 60:3, 80:7, 90:21, 168:14
**instead** [3] - 147:9, 160:24, 209:6
**institute** [1] - 29:18
**INSTITUTIONAL** [1] - 1:8
**Institutional** [3] - 2:16, 72:5, 74:21
**institutions** [2] - 167:2, 232:23
**instructed** [1] - 98:24
**instruction** [1] - 6:15

**instructions** [2] - 125:20, 228:23
**integrity** [1] - 177:5
**intend** [1] - 142:6
**intention** [4] - 144:9, 148:9, 234:7, 235:11
**interest** [5] - 9:21, 66:8, 129:10, 130:6, 167:21
**interested** [9] - 17:9, 23:15, 37:9, 46:21, 55:17, 66:3, 279:14, 279:17, 285:20
**interesting** [1] - 26:21
**interface** [2] - 66:12, 67:6
**interference** [1] - 45:5
**Internal** [4] - 87:5, 87:9, 88:22, 93:2
**interrogatories** [16] - 18:24, 19:12, 71:19, 71:22, 72:7, 72:19, 74:14, 74:23, 75:10, 75:15, 75:16, 75:21, 79:22, 286:11, 286:13, 286:15
**Interrogatory** [7] - 80:4, 80:6, 80:24, 82:8, 83:8, 83:13, 90:17
**interrogatory** [6] - 18:21, 87:15, 87:25, 88:10, 90:14, 281:22
**introduce** [1] - 4:19
**introduced** [1] - 148:2
**invest** [1] - 56:13
**invested** [2] - 107:22, 108:11
**investing** [4] - 56:5, 56:10, 57:5, 150:22
**investment** [13] - 45:15, 46:20, 46:24, 47:3, 54:17, 55:20, 57:14, 59:4, 132:9, 155:14, 234:3, 250:13, 266:24
**investments** [1] - 107:24
**investor** [1] - 149:2
**involve** [1] - 10:16
**involved** [16] - 10:12, 24:9, 30:13, 37:13, 50:10, 51:25, 52:13, 52:21, 55:23, 80:9, 81:8, 90:22, 163:7, 237:22, 278:13
**involves** [1] - 10:14
**IRA** [24] - 44:7, 44:14, 46:9, 64:14, 70:14, 71:9, 129:21, 130:9, 130:18, 130:22, 131:2, 131:8, 131:17, 134:23, 135:10, 135:23, 136:19, 136:21, 137:5, 137:20, 138:2, 140:15, 140:18, 141:25
**IRAs** [4] - 65:21, 136:18, 136:22, 140:21
**irreparable** [1] - 157:7
**IRS** [23] - 91:7, 91:24, 92:5,

93:8, 93:20, 93:24, 94:3, 94:6, 94:13, 94:18, 95:8, 95:10, 95:12, 95:20, 96:2, 96:15, 96:22, 97:2, 97:7, 98:12, 100:2, 280:14, 281:14
**IRS** [1] - 95:17
**IS** [3] - 3:4, 3:9, 3:13
**Island** [1] - 20:21
**Israeli** [1] - 52:15
**issue** [16] - 31:21, 93:20, 95:15, 115:14, 115:16, 169:25, 186:19, 189:6, 190:17, 191:11, 195:19, 196:18, 196:21, 196:22, 197:6, 235:21
**issued** [2] - 11:19, 55:14
**issues** [2] - 35:13, 242:2
**IT** [3] - 3:4, 3:9, 3:13
**itself** [3] - 35:2, 119:25, 250:8

## J

**JANE** [1] - 1:9
**January** [13] - 1:12, 4:7, 32:18, 32:19, 32:21, 32:23, 82:3, 142:18, 265:2, 265:11, 283:2, 286:2, 287:2
**Jeffrey** [11] - 2:6, 4:8, 74:18, 87:4, 116:11, 119:10, 129:4, 129:22, 244:3, 282:6, 286:6
**JEFFREY** [5] - 1:4, 1:17, 5:9, 284:8, 285:12
**Jiau** [2] - 225:4, 225:9
**job** [4] - 23:4, 23:18, 24:13, 26:23
**jobs** [1] - 23:17
**jog** [1] - 258:23
**jogs** [1] - 258:25
**JOHN** [1] - 1:9
**judge** [43] - 21:8, 25:21, 25:25, 26:13, 27:2, 27:11, 28:4, 29:3, 29:4, 29:6, 29:8, 30:22, 31:3, 31:6, 31:13, 31:15, 31:17, 31:19, 31:20, 31:22, 32:2, 32:13, 33:13, 34:10, 35:8, 35:9, 37:24, 39:10, 105:17, 136:6, 172:9, 178:10, 178:11, 184:24, 188:16, 189:5, 189:14, 227:7, 227:13, 228:10, 278:17, 280:5
**Judge** [1] - 196:17
**judge's** [3] - 178:4, 185:7, 186:22
**Judges** [1] - 37:25
**judges** [8] - 21:11, 25:15, 28:23, 28:24, 29:18, 30:24, 30:25, 35:25
**judgeship** [1] - 25:19

**judgment** [1] - 152:4
**judicial** [2] - 21:6, 21:10
**July** [25] - 142:21, 146:21, 153:2, 157:16, 157:17, 157:18, 159:19, 199:12, 202:20, 202:23, 204:12, 204:19, 247:10, 247:11, 249:10, 250:25, 251:7, 251:8, 270:17, 271:11, 272:2, 274:24, 274:25, 275:2, 275:4
**July/August** [1] - 151:25
**June** [2] - 182:8, 182:9, 195:5
**jurisdiction** [5] - 28:16, 38:6, 80:11, 81:10, 90:25
**juror** [3] - 228:11, 228:23, 228:25
**jury** [8] - 27:19, 172:24, 173:3, 227:13, 227:15, 227:20, 228:22, 228:25
**justice** [4] - 29:14, 29:19, 35:3, 35:18

## K

**K-O-B-E** [1] - 63:18
**Katz** [4] - 89:2, 89:17, 90:7, 92:11
**keep** [4] - 61:6, 61:7, 61:12, 247:15
**Keogh** [1] - 65:20
**kept** [2] - 61:9, 209:22
**Kerr** [13] - 5:3, 6:3, 8:9, 14:21, 15:6, 15:22, 16:11, 16:18, 70:2, 70:18, 122:12, 182:21, 203:19
**KERR** [6] - 2:10, 5:3, 71:14, 71:18, 186:12, 196:6
**kind** [13] - 31:15, 42:5, 42:12, 42:18, 64:5, 108:25, 109:2, 109:4, 109:20, 191:4, 216:3, 225:19, 226:23
**kinds** [2] - 108:17, 227:14
**Kissel** [2] - 4:12, 4:22
**KISSEL** [2] - 1:19, 2:12
**knowing** [2] - 17:10, 254:5
**knowledge** [7] - 8:20, 82:14, 85:3, 89:15, 122:21, 207:12, 214:2
**knowledgeable** [3] - 48:19, 56:3, 58:6
**known** [1] - 18:4
**Kobe** [2] - 63:14, 63:18

## L

**laced** [1] - 225:13
**lack** [2] - 99:17, 99:19
**language** [2] - 138:7,

195:12
**large** [13] - 48:8, 49:22, 49:24, 106:22, 107:2, 124:8, 125:8, 146:21, 148:5, 150:22, 210:11, 217:24, 268:16
**larger** [3] - 45:10, 67:18, 148:3
**last** [35] - 6:5, 7:4, 7:8, 7:18, 7:24, 8:18, 15:5, 15:20, 16:14, 24:25, 29:10, 38:7, 38:17, 64:3, 65:7, 74:25, 75:25, 79:25, 80:7, 81:7, 90:21, 187:2, 190:10, 202:15, 206:13, 225:25, 226:3, 226:5, 243:21, 262:16, 276:13, 278:16, 278:18, 279:3
**late** [2] - 123:14, 241:4
**Law** [1] - 21:3
**law** [24] - 4:12, 18:9, 21:25, 22:10, 23:5, 23:14, 24:9, 24:22, 25:5, 25:6, 88:20, 106:19, 107:8, 107:9, 112:13, 112:15, 112:17, 175:3, 176:6, 193:14, 243:10, 248:24, 286:23, 287:11
**laws** [1] - 200:15
**lawsuit** [10] - 83:23, 84:8, 84:16, 106:18, 108:8, 108:11, 142:10, 144:10, 248:14, 276:23
**lawyer** [4] - 25:8, 113:5, 113:6, 232:7
**lawyer-client** [1] - 232:7
**laying** [1] - 150:9
**lead** [4] - 7:15, 15:19, 164:22, 194:6
**learn** [5] - 56:18, 106:17, 110:15, 147:21, 152:22
**learned** [2] - 9:8, 108:10, 112:10
**least** [10] - 9:9, 29:9, 31:9, 56:17, 57:15, 91:15, 118:13, 124:17, 155:4, 168:5, 207:12, 209:8, 228:14, 238:4, 255:8, 266:17
**leave** [11] - 29:14, 29:23, 32:21, 35:11, 35:16, 35:21, 36:14, 36:20, 227:14, 235:14, 275:24
**leaving** [4] - 37:14, 37:19, 234:12
**led** [3] - 88:13, 128:15, 180:2
**left** [10] - 29:23, 30:7, 32:20, 49:8, 87:3, 103:13, 106:10, 119:9, 239:4
**legal** [7] - 4:17, 17:6, 85:12, 87:12, 113:3, 173:18, 173:19

**legitimate** [2] - 153:23, 163:15
**legs** [1] - 217:7
**LENGEL** [1] - 285:24
**Lengel** [3] - 1:21, 4:16, 285:8
**length** [1] - 26:18
**less** [12] - 24:20, 28:6, 51:5, 51:18, 52:10, 56:24, 58:10, 148:10, 164:6, 240:8, 271:12, 273:8
**lesser** [3] - 148:19, 151:6, 229:21
**letter** [9] - 60:24, 77:18, 77:22, 77:25, 78:2, 78:5, 78:9, 78:13, 78:16
**letters** [1] - 117:24
**level** [7] - 109:11, 110:10, 111:6, 251:3, 251:9, 251:13, 275:13
**lied** [1] - 228:24
**lien** [8] - 87:20, 88:16, 90:9, 91:18, 96:2, 96:7, 96:11, 96:14
**liens** [1] - 96:15
**life** [1] - 157:8
**lighter** [1] - 229:25
**likely** [1] - 130:25
**limited** [3] - 125:11, 233:20, 241:16
**Lincoln** [1] - 20:24
**line** [2] - 120:19
**lines** [3] - 186:12, 186:14, 186:15
**list** [1] - 141:20
**listed** [6] - 145:15, 146:13, 146:15, 267:14, 267:19, 268:6
**listen** [2] - 139:12, 149:6
**listened** [1] - 56:21
**literally** [1] - 153:14
**litigation** [7] - 80:10, 81:7, 81:9, 90:24, 114:24, 276:21, 278:14
**litigations** [1] - 281:11
**live** [6] - 40:12, 40:13, 41:4, 42:21, 42:23, 43:6
**lived** [5] - 40:22, 42:20, 43:9, 43:14, 104:5
**lives** [1] - 183:12
**living** [3] - 23:12, 23:18, 24:14
**LLC** [4] - 1:7, 1:8, 2:14, 4:10
**LLC's** [1] - 74:20
**LLP** [2] - 1:20, 2:12
**LNOP** [1] - 52:15
**locate** [1] - 68:7
**located** [4] - 63:22, 103:24, 103:25, 104:2
**log** [1] - 60:11

**long-range** [1] - 234:13
**Longueuil** [1] - 231:6
**look** [33] - 77:16, 81:3, 128:25, 146:25, 149:14, 157:11, 159:18, 164:21, 170:22, 172:9, 180:17, 187:2, 204:16, 206:8, 207:20, 212:23, 244:7, 245:10, 253:7, 257:22, 259:18, 262:2, 264:25, 265:5, 265:7, 267:12, 267:21, 267:22, 269:25, 270:2, 273:13, 276:9, 277:17
**looked** [8] - 23:4, 50:17, 85:14, 154:13, 195:12, 207:21, 207:22
**looking** [28] - 14:16, 48:15, 55:19, 71:25, 124:6, 139:17, 141:11, 157:19, 159:16, 168:11, 173:2, 180:18, 199:20, 199:23, 199:24, 200:2, 200:4, 202:11, 204:17, 207:24, 212:24, 216:6, 236:6, 239:20, 243:8, 247:21, 247:25, 254:5
**looks** [12] - 212:24, 252:19, 254:15, 256:5, 256:16, 256:17, 262:25, 263:13, 263:15, 263:18, 265:2
**lose** [6] - 26:2, 48:21, 101:17, 111:11, 111:17, 240:21
**losing** [1] - 237:6
**loss** [6] - 160:25, 161:23, 161:24, 162:2, 176:25, 201:17
**losses** [12] - 49:16, 62:4, 62:18, 63:8, 64:2, 236:3, 236:4, 236:19, 236:23, 237:3, 237:21, 238:6
**lost** [16] - 49:4, 50:6, 94:14, 101:19, 106:10, 108:4, 149:19, 152:9, 159:13, 159:17, 235:17, 239:7, 259:3, 276:2, 276:7
**loud** [1] - 276:15
**lower** [2] - 159:3, 272:13
**lows** [2] - 183:18, 183:19
**LP** [4] - 1:8, 1:9, 2:15, 2:16
**LP's** [4] - 72:5, 74:20, 74:21
**Ltd** [1] - 2:17
**LTD** [1] - 1:9
**LTD's** [2] - 72:6, 74:22
**Luke** [1] - 24:22
**Luncheon** [1] - 126:16


**M**


**magazines** [1] - 55:22
**magistrate** [1] - 25:13
**main** [1] - 67:11

**Maiorano** [1] - 4:17
**MAIORANO** [1] - 2:25
**major** [2] - 135:20, 217:23
**man** [1] - 174:10
**manage** [1] - 148:22
**MANAGEMENT** [1] - 1:7
**Management** [3] - 2:14, 4:10, 74:19
**Management's** [4] - 72:4, 176:5, 192:17, 243:11
**manipulated** [4] - 154:2, 155:5, 155:6, 213:8
**manipulation** [8] - 160:11, 162:21, 162:25, 163:4, 163:18, 163:21, 166:18
**manufacture** [1] - 67:4
**marathons** [1] - 226:19
**March** [17] - 117:4, 122:10, 123:9, 216:19, 236:15, 237:9, 237:10, 237:11, 237:13, 237:14, 265:12, 265:16, 265:22, 265:23, 265:24, 270:12, 271:3
**margin** [14] - 239:10, 239:12, 239:18, 239:22, 239:25, 240:5, 240:10, 240:12, 240:20, 240:22, 240:23, 240:25, 241:9, 241:20
**Marin** [4] - 31:23, 42:22, 279:21, 280:6
**MARK** [1] - 2:22
**Mark** [4] - 172:19, 175:22, 247:4, 287:6
**mark** [5] - 4:21, 71:11, 74:9, 175:8, 175:10
**marked** [23] - 14:6, 71:20, 71:23, 74:5, 74:14, 76:6, 76:9, 86:21, 113:17, 115:22, 127:15, 175:4, 175:21, 175:23, 182:3, 185:5, 192:14, 193:15, 196:9, 222:15, 242:23, 270:7, 270:8
**Market** [3] - 57:25, 58:2, 66:23
**market** [35] - 43:22, 48:20, 57:12, 106:24, 153:23, 160:13, 160:21, 161:4, 161:20, 163:16, 169:21, 170:23, 177:2, 177:3, 177:5, 178:15, 178:22, 179:9, 188:12, 188:20, 190:23, 191:7, 196:24, 197:8, 209:13, 209:21, 209:23, 211:24, 213:5, 216:10, 217:11, 234:12, 235:14, 239:7, 250:6
**markets** [1] - 183:13
**marking** [1] - 113:2
**marriage** [1] - 285:19
**married** [7] - 41:6, 41:8,

41:14, 41:19, 41:24, 107:10, 107:18
**match** [1] - 191:7
**material** [1] - 217:14
**materials** [1] - 181:15
**math** [2] - 150:15, 160:7
**Matt** [1] - 4:17
**matter** [11] - 4:9, 15:19, 79:5, 79:8, 84:10, 84:21, 91:12, 91:17, 94:7, 167:20, 285:20
**matters** [2] - 106:21, 122:16
**MATTHEW** [1] - 2:25
**mean** [40] - 15:8, 17:25, 28:2, 33:25, 58:9, 58:13, 60:22, 65:19, 66:20, 67:9, 69:10, 73:18, 82:15, 96:14, 100:24, 102:7, 114:19, 131:22, 133:10, 141:4, 151:23, 152:15, 152:17, 157:16, 158:12, 162:16, 191:2, 214:24, 215:3, 236:24, 246:10, 250:16, 250:19, 254:4, 261:12, 262:10, 264:2, 271:24, 272:18, 279:11
**meaning** [3] - 45:19, 205:21, 209:6
**means** [7] - 25:14, 37:25, 62:13, 81:17, 103:17, 221:16, 276:22
**meant** [1] - 68:8, 150:8, 202:8, 202:9, 210:15, 214:7, 224:5, 240:5, 265:21, 275:20
**mechanically** [2] - 58:19, 110:3
**mechanism** [3] - 48:20, 59:14, 160:22
**mechanisms** [1] - 18:6
**medical** [2] - 53:7
**medication** [3] - 20:4, 20:7, 152:2
**meet** [6] - 5:18, 5:21, 8:8, 14:20, 15:10, 106:8
**meeting** [2] - 6:18, 15:11
**member** [1] - 37:24
**members** [4] - 10:8, 37:3, 210:14, 276:20
**membership** [1] - 30:18
**memorandum** [13] - 163:10, 175:3, 176:6, 192:13, 192:18, 193:13, 231:3, 242:21, 243:9, 286:23, 287:9, 287:11, 287:16
**memory** [1] - 207:15
**Mendocino** [2] - 84:17, 104:2
**mental** [2] - 21:13, 29:21
**mention** [1] - 255:17

**mentioned** [4] - 31:8, 65:10, 103:20, 112:14
**merit** [1] - 181:18
**met** [6] - 5:22, 15:2, 15:5, 15:21, 224:9, 233:21
**method** [1] - 63:25
**methodology** [1] - 64:5
**MICHAEL** [1] - 2:21
**Michael** [2] - 5:5, 107:12
**middle** [1] - 52:4
**might** [27] - 26:9, 30:6, 56:25, 62:9, 66:23, 69:13, 83:25, 91:22, 108:13, 124:24, 130:18, 130:19, 139:4, 147:8, 177:23, 188:11, 188:19, 189:3, 209:3, 209:7, 210:15, 211:24, 213:12, 215:8, 215:9, 279:24
**million** [25] - 69:15, 69:16, 163:20, 163:23, 164:23, 165:2, 165:3, 166:11, 210:12, 213:2, 215:5, 233:9, 233:11, 238:12, 238:16, 238:22, 239:5, 240:5, 240:6, 240:8, 257:18, 257:25, 258:5, 258:7, 260:9
**millions** [4] - 154:16, 155:15, 183:11
**mind** [14] - 37:17, 82:19, 83:3, 83:4, 87:16, 88:3, 106:7, 109:20, 141:8, 160:23, 227:7, 245:8, 264:20, 266:20
**minor** [4] - 79:8, 82:17, 238:8
**minutes** [4] - 221:20, 221:22, 242:12
**misdemeanor** [2] - 28:5, 42:6
**misleading** [2] - 137:13, 219:3
**mistake** [1] - 190:12
**mistaken** [15] - 10:15, 32:11, 46:11, 154:17, 159:22, 164:25, 185:2, 206:14, 207:17, 233:3, 233:7, 233:10, 236:8, 237:4, 278:20
**modest** [1] - 235:10
**moment** [10] - 25:2, 53:9, 76:10, 117:7, 181:4, 198:8, 219:20, 222:24, 243:14, 263:14
**Monday** [3] - 202:19, 202:23, 255:7
**monetary** [2] - 84:24, 162:2
**money** [52] - 45:2, 45:3, 48:21, 48:22, 48:23, 49:5, 50:11, 70:10, 70:16, 93:12, 94:15, 96:17, 96:19, 96:22,

101:17, 101:19, 106:9,
108:4, 111:17, 132:2,
132:17, 136:9, 151:21,
152:9, 152:17, 152:18,
152:19, 152:22, 153:12,
154:15, 155:13, 157:4,
159:11, 160:8, 161:8,
161:11, 162:6, 211:16,
215:8, 217:4, 234:11,
235:17, 235:22, 240:8,
240:21, 246:11, 250:7,
250:21, 250:22, 255:2,
259:2, 273:8
  **monies** [3] - 111:12,
131:24, 167:3
  **monopoly** [1] - 67:13
  **month** [5] - 10:22, 26:8,
197:5, 234:17, 265:3
  **monthly** [7] - 16:16, 61:16,
61:19, 99:12, 99:13, 99:14,
100:3
  **months** [14] - 7:20, 16:12,
17:2, 23:3, 26:8, 54:12, 55:4,
55:9, 167:24, 180:3, 194:3,
206:13, 233:8, 272:4
  **Moreover** [4] - 185:19,
188:4, 188:5, 195:14
  **moreover** [2] - 185:22,
185:23
  **morning** [2] - 5:16, 5:17
  **mortgage** [6] - 102:22,
103:2, 103:12, 104:12,
104:16, 104:24
  **most** [13] - 30:6, 31:22,
32:3, 35:2, 37:18, 59:15,
108:15, 157:9, 166:20,
236:13, 236:23, 237:3,
245:14
  **mostly** [2] - 16:11, 56:15
  **motion** [15] - 7:14, 169:16,
176:7, 177:16, 178:5,
178:20, 185:8, 185:10,
191:14, 191:20, 191:21,
192:4, 192:18, 194:7, 243:11
  **Motley** [2] - 57:15, 66:25
  **Motorola** [1] - 217:22
  **move** [3] - 112:23, 134:15,
156:18
  **moved** [3] - 61:8, 133:19,
215:22
  **movements** [1] - 154:14
  **MR** [293] - 4:21, 4:24, 5:3,
5:5, 5:13, 6:6, 6:21, 8:10,
11:8, 14:3, 19:6, 19:7, 19:9,
26:23, 39:25, 51:19, 53:24,
54:22, 54:23, 54:25, 55:3,
58:23, 60:15, 63:16, 64:13,
64:17, 64:19, 64:20, 64:21,
64:22, 64:24, 69:17, 69:19,
70:8, 71:11, 71:14, 71:15,
71:18, 71:21, 72:9, 72:11,

72:12, 72:25, 74:9, 76:4,
83:15, 83:17, 83:19, 83:20,
83:21, 85:17, 85:20, 86:2,
86:3, 86:5, 86:6, 86:8, 86:14,
86:16, 88:4, 88:7, 89:10,
89:19, 91:25, 93:3, 95:21,
95:25, 96:18, 96:23, 97:17,
97:19, 97:21, 97:23, 97:25,
98:2, 98:3, 98:7, 98:11,
98:13, 98:16, 98:17, 98:19,
110:4, 112:22, 113:2, 113:4,
113:9, 113:11, 114:22,
115:10, 115:13, 115:14,
115:15, 115:19, 115:20,
116:21, 116:23, 116:24,
118:23, 123:20, 126:8,
126:10, 127:10, 129:16,
134:19, 134:21, 136:25,
137:3, 137:4, 137:11,
137:12, 137:16, 138:4,
138:6, 138:8, 138:11,
138:12, 138:14, 138:15,
138:17, 138:18, 138:20,
138:22, 138:23, 138:25,
139:2, 139:4, 139:6, 139:8,
139:11, 139:13, 139:16,
139:19, 139:20, 139:22,
140:2, 140:4, 140:5, 140:7,
141:17, 143:5, 143:8, 143:9,
144:24, 146:13, 146:14,
146:15, 146:16, 146:17,
146:19, 157:16, 165:25,
166:5, 170:25, 171:3, 172:2,
172:18, 172:20, 172:21,
173:2, 173:4, 173:6, 173:8,
174:24, 174:25, 175:2,
175:6, 175:7, 175:8, 175:10,
175:12, 175:16, 175:21,
176:2, 178:9, 178:14,
178:17, 179:14, 180:10,
180:11, 180:12, 180:20,
181:8, 181:17, 181:24,
182:8, 182:10, 183:4, 183:5,
183:23, 183:25, 184:8,
184:11, 185:4, 185:20,
185:21, 186:7, 186:12,
186:18, 186:21, 187:16,
187:24, 188:24, 189:17,
189:20, 190:4, 191:9,
191:18, 192:5, 192:11,
194:13, 195:2, 196:6, 198:3,
199:13, 199:22, 200:9,
200:21, 200:23, 200:24,
201:2, 201:5, 201:7, 201:9,
201:10, 201:12, 202:4,
202:5, 202:12, 205:11,
208:5, 209:17, 210:24,
213:20, 213:23, 218:21,
218:25, 219:8, 219:9,
219:11, 219:13, 221:5,
221:11, 221:13, 221:14,
221:16, 222:12, 222:13,

227:9, 227:11, 230:3,
232:10, 232:19, 235:6,
235:23, 237:13, 240:18,
242:11, 243:7, 246:24,
247:4, 247:6, 247:23,
247:25, 248:5, 248:7, 248:8,
248:10, 248:11, 248:12,
249:6, 249:7, 249:8, 250:4,
250:15, 251:15, 261:3,
261:4, 261:5, 261:6, 261:7,
263:6, 263:7, 265:21,
266:14, 267:2, 267:7, 267:9,
273:17, 281:8, 281:10,
281:17, 282:8
  **multiple** [2] - 124:19,
124:23
  **Municipal** [1] - 27:4
  **municipal** [9] - 27:10,
27:17, 27:21, 28:10, 28:17,
28:22, 28:25, 29:6, 35:8
  **mushrooms** [2] - 225:13
  **must** [2] - 55:15, 200:15
  **mutual** [1] - 137:6


### N

  **NAD** [1] - 135:24
  **NADCP** [1] - 135:24
  **Nader** [2] - 22:7, 22:13
  **name** [15] - 6:2, 6:5, 7:4,
8:18, 9:16, 9:18, 24:24,
24:25, 41:15, 80:14, 107:11,
114:3, 129:4, 155:10, 231:19
  **Name** [1] - 119:10
  **named** [6] - 80:9, 81:8,
90:23, 201:18, 202:16,
223:12
  **names** [7] - 20:13, 166:25,
207:8, 207:15, 207:22,
231:13, 232:22
  **NASSAU** [1] - 285:6
  **national** [1] - 36:9
  **National** [6] - 22:11, 30:17,
38:22, 130:16, 135:8, 135:24
  **nature** [4] - 8:24, 9:5,
18:19, 80:17
  **necessarily** [4] - 56:19,
88:8, 125:9, 216:7
  **necessary** [1] - 171:22
  **need** [5] - 31:6, 76:10,
173:10, 187:8, 269:15
  **needed** [3] - 17:13, 31:25,
105:9
  **needs** [1] - 21:8
  **negative** [1] - 160:13
  **negotiated** [1] - 223:10
  **neighborhood** [5] - 69:15,
94:21, 102:2, 104:18, 106:3
  **Neil** [8] - 2:18, 4:23, 5:6,
72:4, 74:20, 176:6, 192:17,
243:11

  **NEIL** [1] - 1:7
  **Nepal** [1] - 23:8
  **nervous** [1] - 245:18
  **net** [3] - 12:7, 12:8, 266:13
  **never** [21] - 34:11, 34:12,
42:14, 47:18, 47:19, 89:17,
90:3, 92:2, 92:3, 92:4, 92:5,
106:9, 148:12, 152:7,
152:18, 169:7, 169:13,
173:25, 212:15, 233:21,
255:15
  **NEW** [2] - 1:2, 285:4
  **new** [5] - 168:20, 203:23,
203:25, 205:21, 205:24
  **New** [8] - 1:20, 1:23, 2:8,
2:20, 4:13, 15:14, 285:10
  **news** [2] - 233:14, 261:18
  **newsletter** [1] - 55:25
  **next** [21] - 23:12, 31:10,
74:10, 76:4, 97:22, 127:13,
143:25, 168:15, 174:24,
181:24, 185:4, 192:11,
204:24, 204:25, 252:9,
257:16, 258:8, 272:4,
277:18, 277:19
  **nice** [3] - 26:23, 112:22,
113:7
  **night** [1] - 189:4
  **nine** [2] - 186:14, 186:15
  **ninth** [1] - 20:23
  **Noah** [6] - 224:9, 224:17,
226:12, 230:17, 231:22,
232:16
  **NOAH** [1] - 1:7
  **nobody** [2] - 178:22,
179:10
  **nomenclature** [1] - 102:16
  **non** [1] - 22:15
  **non-profits** [1] - 22:15
  **noncustodial** [1] - 21:15
  **none** [1] - 267:13
  **nonpublic** [1] - 217:14
  **Northern** [1] - 38:9
  **Notary** [2] - 1:22, 285:9
  **note** [1] - 118:21
  **noted** [5] - 123:4, 124:5,
154:12, 274:21, 282:10
  **nothing** [4] - 16:21, 63:16,
184:23, 239:6
  **notice** [6] - 1:19, 14:5,
14:18, 93:24, 107:3, 286:10
  **notification** [1] - 94:13
  **notwithstanding** [1] -
268:3
  **November** [23] - 31:24,
32:10, 77:25, 78:16, 204:13,
205:2, 208:2, 236:5, 238:18,
238:19, 256:3, 256:6,
256:19, 257:4, 259:5,
259:25, 260:5, 260:16,
261:22, 278:18, 278:19,

278:22
**Nuan** [1] - 231:9
**number** [35] - 23:16, 26:10, 27:20, 30:19, 35:25, 49:25, 63:3, 66:22, 67:8, 68:10, 87:4, 119:11, 119:12, 119:14, 129:3, 129:17, 129:21, 136:6, 136:8, 155:14, 164:2, 164:3, 164:4, 165:12, 165:14, 166:20, 168:22, 171:18, 198:6, 244:8, 245:10, 249:21, 263:22, 274:22
**numbers** [9] - 120:23, 121:7, 122:17, 148:4, 148:6, 162:8, 167:15, 212:24, 255:2
**numerous** [2] - 16:10, 16:15
**NY** [3] - 1:20, 2:8, 2:20

# O

**Oakland** [3] - 23:11, 24:15, 27:3
**oath** [3] - 3:12, 6:9, 170:9
**object** [19] - 11:8, 72:25, 83:19, 88:4, 88:7, 89:19, 93:3, 96:18, 96:23, 165:25, 180:20, 192:5, 209:17, 218:22, 240:18, 250:4, 250:15, 251:15, 266:14
**objection** [25] - 39:25, 51:19, 53:24, 58:23, 80:23, 91:25, 97:17, 123:20, 170:25, 171:3, 172:2, 179:14, 188:24, 189:17, 191:9, 200:21, 205:11, 210:24, 213:20, 227:9, 227:11, 230:3, 235:6, 235:23, 267:2
**objections** [4] - 3:6, 74:18, 79:20, 81:5
**Objections** [2] - 74:12, 286:14
**obligation** [4] - 16:7, 16:18, 164:13, 179:20
**obligations** [2] - 38:4, 255:14
**obtained** [7] - 159:6, 209:6, 210:18, 213:15, 213:17, 213:18, 215:12
**obvious** [2] - 37:18, 198:22
**obviously** [6] - 30:13, 32:25, 93:10, 216:6, 234:11, 241:24
**occasion** [1] - 229:13
**occasionally** [2] - 58:13, 148:5
**occasions** [4] - 7:20, 7:23, 16:15, 16:20
**occur** [2] - 166:7, 274:13

**occurred** [7] - 82:18, 122:13, 162:22, 163:4, 237:3, 255:7, 280:22
**October** [4] - 32:10, 245:19, 254:13, 257:3
**OF** [3] - 1:2, 285:4, 285:6
**offenders** [1] - 33:6
**offense** [1] - 42:12
**Office** [3] - 27:24, 34:13, 279:13
**officer** [1] - 3:11
**offices** [2] - 1:19, 4:12
**official** [1] - 187:4
**often** [4] - 16:4, 17:4, 39:9, 183:12
**old** [1] - 33:19
**once** [17] - 13:16, 16:13, 58:5, 134:6, 157:3, 163:5, 170:3, 184:3, 195:20, 196:19, 207:19, 213:8, 215:3, 215:15, 235:24, 255:15, 266:15
**One** [3] - 1:20, 2:19, 4:13
**one** [81] - 9:14, 11:2, 13:5, 19:19, 19:25, 29:24, 34:17, 40:24, 45:9, 45:10, 46:8, 46:9, 46:10, 46:15, 48:7, 48:21, 52:14, 53:22, 54:2, 54:6, 54:7, 54:21, 54:22, 57:10, 57:15, 65:9, 65:12, 68:14, 81:17, 82:16, 82:17, 102:9, 102:10, 106:21, 110:11, 112:3, 115:3, 125:18, 133:22, 135:23, 138:2, 147:4, 154:25, 160:20, 160:22, 161:17, 175:15, 175:20, 176:20, 198:8, 198:25, 204:17, 207:6, 207:15, 207:16, 210:12, 211:23, 212:17, 222:24, 225:23, 226:9, 228:9, 228:18, 229:18, 230:10, 231:17, 247:19, 253:5, 261:15, 261:16, 262:17, 263:14, 265:17, 270:5, 270:6, 270:7, 274:19, 281:8
**one's** [1] - 81:17
**ones** [1] - 65:23
**online** [9] - 59:14, 59:22, 60:5, 60:18, 61:3, 128:18, 268:20, 269:5, 272:23
**open** [3] - 25:20, 84:22, 85:2
**opened** [5] - 25:19, 54:4, 54:13, 54:25, 55:3
**opening** [1] - 4:8
**operating** [1] - 161:18
**opinion** [8] - 178:4, 185:5, 185:25, 186:2, 189:9, 195:4, 196:14, 287:8

**opportunities** [3] - 47:2, 55:21, 136:9
**opportunity** [11] - 22:21, 22:24, 30:10, 30:12, 36:9, 59:16, 68:11, 68:16, 156:17, 197:15, 198:16
**opposed** [6] - 123:6, 159:5, 174:3, 174:4, 240:9, 251:13
**opposite** [1] - 221:15
**opposition** [1] - 243:10
**opted** [1] - 233:4
**optimize** [1] - 258:12
**option** [27] - 109:11, 109:13, 109:16, 109:17, 109:21, 110:11, 110:14, 110:25, 111:2, 111:9, 111:12, 111:13, 247:24, 248:2, 273:22, 273:23, 274:9, 274:23, 275:9, 275:10, 275:11, 275:15, 275:16, 275:25, 276:3, 276:4, 276:6
**options** [23] - 108:23, 108:25, 109:4, 109:8, 109:25, 110:2, 110:15, 110:22, 110:24, 111:15, 111:18, 242:4, 242:9, 248:16, 249:5, 249:13, 249:16, 249:19, 250:2, 267:14, 273:24, 274:14, 274:16
**oral** [1] - 177:14
**order** [15] - 58:21, 60:18, 85:22, 185:5, 185:25, 186:2, 189:10, 195:5, 196:14, 255:14, 255:18, 262:12, 262:22, 277:4, 287:8
**ordered** [1] - 274:16
**orders** [2] - 262:15, 262:20
**ordinarily** [1] - 277:9
**organization** [8] - 30:16, 35:2, 36:4, 36:5, 36:10, 37:3, 130:15, 159:7
**organizations** [1] - 167:2
**otherwise** [2] - 158:14, 214:9
**ought** [3] - 21:9, 232:6
**out-of-pocket** [1] - 278:9
**outcome** [5] - 80:19, 84:20, 84:21, 85:2, 285:20
**outcomes** [1] - 111:4
**outside** [8] - 9:14, 40:14, 176:23, 177:10, 178:15, 178:21, 179:9, 197:8
**outsider** [1] - 153:21
**outstanding** [3] - 100:22, 102:22, 103:12
**overall** [1] - 150:16
**Overseas** [3] - 2:17, 72:6, 74:22
**OVERSEAS** [1] - 1:9

**overstating** [1] - 228:8
**owe** [3] - 97:2, 97:7, 245:21
**owed** [8] - 93:12, 93:14, 94:18, 96:17, 96:19, 96:22, 103:18, 240:9
**own** [16] - 40:25, 42:24, 43:10, 47:5, 47:25, 52:9, 53:11, 53:17, 54:16, 101:7, 103:22, 104:10, 105:3, 241:2, 270:16, 271:2
**owned** [1] - 43:13
**ownership** [1] - 130:6

# P

**p.m** [10] - 126:16, 127:3, 127:6, 194:16, 194:22, 222:4, 222:9, 243:3, 282:4, 282:10
**P.S** [2] - 20:20, 20:22
**Pacific** [1] - 84:19
**package** [1] - 118:12
**packages** [1] - 272:20
**PAGE** [3] - 286:5, 286:9, 287:5
**page** [44] - 14:13, 74:25, 75:25, 76:24, 78:2, 79:25, 80:5, 90:17, 116:9, 116:22, 129:2, 129:14, 134:15, 142:25, 143:6, 143:25, 144:23, 145:3, 176:11, 180:18, 182:25, 185:13, 185:21, 186:5, 186:9, 187:2, 187:17, 193:24, 195:10, 208:15, 243:21, 243:22, 246:17, 246:18, 247:5, 252:6, 252:9, 255:24, 256:9, 256:10, 274:22, 276:14, 277:18, 277:24
**PAGE/LINE** [1] - 283:6
**pages** [4] - 76:25, 143:4, 206:25, 252:10
**paid** [21] - 38:11, 38:12, 38:14, 38:19, 39:4, 39:20, 39:24, 43:3, 96:11, 96:14, 96:21, 96:25, 97:4, 98:10, 105:8, 167:3, 176:21, 240:3, 245:23, 273:7, 276:5
**Panasonic** [1] - 217:20
**paper** [6] - 95:3, 95:5, 175:13, 175:14, 175:17, 175:18
**papers** [1] - 169:16
**paragraph** [20] - 117:9, 117:10, 185:16, 186:13, 187:13, 187:17, 195:18, 202:15, 218:23, 219:2, 219:9, 219:10, 221:6, 221:7, 267:22, 267:23, 276:14, 277:18, 277:19, 277:23
**paragraphs** [1] - 221:8

**Park** [2] - 2:7, 4:13
**part** [18] - 38:3, 44:18,
51:12, 123:3, 128:7, 144:10,
148:23, 156:19, 158:15,
212:22, 213:9, 226:14,
226:22, 245:14, 248:18,
248:22, 248:25, 249:5
**partial** [1] - 233:5
**participant** [3] - 56:16,
153:19, 166:18
**participated** [1] - 226:12
**particular** [11] - 39:6, 56:7,
68:20, 106:25, 142:24,
153:24, 168:8, 170:11,
208:23, 216:24, 264:21
**particularly** [3] - 20:13,
50:19, 241:14
**parties** [7] - 3:6, 18:14,
88:17, 90:10, 163:7, 165:12,
285:18
**partner** [1] - 24:23
**PARTNERS** [1] - 1:8
**Partners** [3] - 2:15, 72:4,
74:20
**parts** [2] - 124:19, 124:24
**party** [3] - 80:9, 81:8, 90:23
**passed** [1] - 22:22
**past** [2] - 29:6, 206:16
**pastime** [1] - 106:23
**pattern** [1] - 235:2
**Pause** [14] - 72:8, 72:16,
73:5, 74:16, 76:12, 79:19,
113:20, 116:3, 181:6,
187:22, 193:12, 221:17,
243:15, 278:4
**pay** [8] - 41:3, 99:11,
109:12, 233:17, 233:20,
255:14, 255:18, 277:10
**paying** [5] - 98:12, 100:2,
100:9, 233:12, 233:13
**payment** [14] - 84:25, 94:2,
95:18, 97:9, 97:11, 97:15,
98:23, 99:3, 99:6, 100:4,
276:24, 276:25, 280:19
**payments** [5] - 99:12,
99:13, 99:15, 104:25, 105:16
**penalty** [2] - 26:4, 82:12
**pending** [3] - 80:16, 80:20,
187:25
**pension** [9] - 26:3, 130:17,
134:24, 135:23, 136:21,
137:20, 140:16, 142:2,
143:22
**people** [12] - 26:10, 56:5,
56:22, 66:13, 110:19,
131:20, 158:5, 161:5,
183:11, 216:5, 229:23,
248:15
**per** [10] - 38:15, 39:5,
39:20, 39:23, 87:23, 88:15,
105:8, 105:16, 119:14,

119:17
**per-diem** [4] - 39:5, 39:20,
105:8, 105:16
**percent** [6] - 26:3, 26:12,
29:9, 31:9, 31:11, 241:16
**percentage** [3] - 150:16,
209:9, 277:5
**perception** [1] - 154:20
**perceptions** [1] - 161:5
**perform** [2] - 118:2, 281:2
**performance** [2] - 226:16,
226:17
**performance-enhancing**
[1] - 226:16
**perhaps** [34] - 7:12, 10:22,
14:25, 16:25, 22:16, 22:25,
24:12, 25:9, 34:24, 49:6,
68:15, 92:15, 97:4, 106:5,
123:16, 123:18, 138:12,
138:15, 138:18, 154:23,
156:11, 156:24, 164:6,
164:7, 166:24, 178:12,
178:14, 178:17, 206:25,
224:25, 237:17, 272:15
**period** [92] - 10:16, 10:17,
11:3, 12:16, 12:17, 12:18,
13:4, 13:24, 15:16, 23:2,
31:12, 41:10, 44:12, 49:9,
50:22, 51:8, 52:13, 53:2,
53:3, 62:11, 99:11, 109:9,
110:11, 117:20, 118:6,
145:10, 148:11, 153:2,
156:3, 156:5, 156:6, 156:7,
156:10, 157:12, 157:25,
158:6, 158:22, 159:2,
159:16, 159:25, 160:3,
160:9, 160:18, 161:9,
161:11, 161:14, 162:4,
162:6, 162:15, 166:12,
200:17, 204:25, 205:5,
207:25, 208:13, 208:24,
210:7, 212:7, 212:19, 214:4,
216:12, 216:16, 216:18,
216:22, 219:19, 220:2,
220:13, 220:14, 220:21,
236:14, 237:7, 237:8,
244:18, 244:19, 244:20,
245:11, 245:12, 266:2,
266:6, 266:11, 266:22,
266:24, 268:2, 270:11,
271:20, 271:23, 272:13,
272:14, 273:8, 281:18,
281:19
**Period** [2] - 13:11, 13:21
**periods** [30] - 10:2, 10:11,
10:15, 10:25, 11:6, 12:7,
13:2, 50:10, 50:11, 51:10,
51:23, 68:18, 141:13, 152:8,
152:23, 165:18, 203:12,
203:16, 203:20, 205:16,
205:17, 206:4, 218:16,
234:19, 234:20, 235:21,

237:21, 239:13, 240:15,
271:15
**perjury** [1] - 82:12
**permitted** [1] - 6:10
**person** [4] - 7:6, 68:3,
120:8, 134:3
**personal** [7] - 47:5, 98:17,
105:3, 132:18, 132:20,
134:4, 233:16
**personally** [5] - 15:23,
68:3, 114:9, 123:10, 178:25
**personnel** [2] - 29:19,
29:20
**persons** [6] - 21:13, 154:3,
156:14, 166:25, 207:13,
216:18
**pertinent** [2] - 120:12,
171:21
**petition** [2] - 89:8, 89:18
**PG&E** [2] - 84:7, 280:10
**phone** [2] - 7:11, 90:8
**phrase** [1] - 262:16
**physically** [2] - 15:10,
121:17
**picked** [1] - 57:12
**picture** [2] - 155:23, 158:15
**piece** [2] - 95:3, 175:18
**Piedmont** [1] - 27:3
**Pirozzi** [2] - 4:16, 4:18
**PIVEN** [1] - 2:4
**Piven** [2] - 4:25, 118:19
**Piven's** [1] - 113:13
**Pivens** [4] - 112:16, 112:19,
118:16, 122:6
**place** [8] - 19:17, 34:25,
60:17, 148:21, 182:6,
182:15, 223:9, 238:4
**placed** [2] - 58:20, 96:15
**places** [1] - 58:16
**plaintiff** [9] - 2:5, 5:4, 6:23,
6:24, 15:19, 84:12, 167:17,
194:7, 204:11
**Plaintiff** [3] - 4:25, 74:17,
244:2
**Plaintiff's** [3] - 115:21,
115:25, 286:21
**plaintiff's** [2] - 116:10,
267:24
**plaintiffs** [6] - 12:23, 73:8,
80:8, 90:22, 194:4, 202:17
**Plaintiffs** [1] - 1:5
**plaintiffs'** [1] - 188:9
**Plaintiffs'** [4] - 188:17,
242:21, 243:9, 287:16
**plan** [22] - 97:9, 97:11,
97:16, 98:23, 99:3, 99:6,
99:11, 100:4, 130:15,
131:10, 134:24, 136:3,
136:14, 136:21, 137:8,
137:20, 140:16, 140:24,
142:2, 143:22, 234:14

**plans** [2] - 140:21, 141:5
**plausibly** [1] - 177:4
**play** [1] - 172:23
**player** [1] - 217:9
**Plaza** [3] - 1:20, 2:19, 4:13
**plea** [1] - 223:10
**pleaded** [1] - 229:14
**pleading** [2] - 195:20,
196:19
**pocket** [1] - 278:9
**point** [16] - 25:18, 53:23,
54:2, 56:17, 69:13, 73:16,
95:11, 170:5, 178:22,
180:24, 190:18, 203:15,
212:17, 252:18, 253:6,
253:20
**pointed** [2] - 267:13,
274:23
**pollution** [1] - 22:10
**populated** [1] - 119:21
**portion** [1] - 70:20
**position** [6] - 27:6, 91:6,
162:14, 174:11, 176:16,
235:15
**positions** [3] - 51:17,
53:21, 54:21
**positive** [2] - 30:11, 244:14
**possibilities** [1] - 211:23
**possibility** [6] - 26:11,
46:23, 235:13, 261:16,
274:19, 279:19
**possible** [4] - 48:19, 111:4,
217:12, 272:12
**possibly** [3] - 20:4, 56:10,
148:16
**potential** [1] - 223:11
**Potter** [1] - 104:3
**practice** [3] - 24:21, 59:4
**pre** [1] - 272:12
**pre-class** [1] - 272:12
**Preliminary** [1] - 193:24
**preparation** [2] - 5:19,
14:21
**prepare** [2] - 78:12, 198:14
**prepared** [9] - 116:6, 120:2,
120:4, 121:18, 121:24,
128:12, 198:13, 213:24,
268:21
**preparing** [2] - 8:8, 23:8
**prescription** [1] - 226:21
**PRESENT** [1] - 2:24
**present** [6] - 6:17, 8:7,
81:6, 165:14, 179:2, 179:4
**presentation** [1] - 122:19
**presented** [4] - 154:3,
155:22, 163:8, 163:12
**president** [1] - 38:22
**pretty** [6] - 27:18, 71:6,
105:19, 173:7, 257:3
**previous** [1] - 217:25
**previously** [3] - 135:10,

167:18, 279:21
**price** [37] - 101:24, 119:13, 119:17, 148:20, 151:6, 153:10, 153:22, 156:11, 158:11, 158:13, 159:2, 159:20, 171:19, 176:21, 180:25, 188:12, 190:22, 190:24, 198:5, 198:10, 208:18, 210:16, 212:20, 213:8, 214:4, 214:8, 214:19, 214:23, 215:6, 216:25, 260:25, 261:8, 263:9, 264:12, 264:13, 271:12, 274:13
**prices** [22] - 160:24, 169:18, 169:22, 170:24, 177:2, 177:3, 177:9, 184:21, 188:11, 188:13, 188:19, 188:21, 189:23, 191:7, 196:23, 196:24, 197:8, 201:21, 271:13, 271:20, 271:21, 274:6
**PRIMARY** [1] - 1:8
**primary** [1] - 229:19
**prison** [2] - 21:12, 29:22
**private** [6] - 24:20, 24:21, 64:20, 79:2, 136:7, 136:11
**privilege** [2] - 112:25, 232:7
**privy** [4] - 91:14, 91:16, 142:10, 214:15
**problems** [2] - 21:14, 33:7, 240:23
**procedure** [2] - 18:10, 102:12
**procedures** [1] - 224:8
**proceed** [1] - 5:15
**proceeded** [1] - 99:23
**proceeding** [12] - 87:8, 87:12, 87:15, 87:18, 87:23, 88:2, 88:8, 88:14, 88:19, 90:11, 92:25, 279:6
**proceedings** [2] - 17:12, 83:12
**process** [9] - 18:3, 18:8, 18:11, 18:12, 18:13, 58:20, 85:12, 148:24, 224:8
**produce** [5] - 114:16, 114:19, 114:23, 114:25, 151:15
**produced** [12] - 86:11, 114:8, 115:4, 115:11, 115:16, 115:17, 165:6, 165:17, 165:22, 167:6, 167:9, 167:13
**product** [2] - 67:11, 217:24
**production** [2] - 18:17, 73:10
**productive** [1] - 30:9
**products** [1] - 68:11
**professional** [3] - 57:5, 132:6, 132:8

**Professional** [2] - 1:22, 285:9
**Professionals** [5] - 30:18, 38:23, 130:17, 135:9, 135:25
**proffered** [1] - 32:22
**profit** [7] - 12:3, 110:13, 249:18, 251:2, 251:4, 258:12, 275:9
**profited** [1] - 212:3
**profits** [5] - 22:15, 63:8, 64:2, 98:9, 166:12
**Program** [1] - 37:25
**program** [1] - 38:3
**promise** [1] - 257:11
**properties** [1] - 101:3
**property** [19] - 91:19, 96:3, 96:5, 96:6, 96:16, 101:4, 101:5, 101:8, 101:15, 102:9, 102:18, 102:23, 103:21, 103:22, 104:8, 104:13, 104:22, 104:25
**proposing** [1] - 232:17
**propounded** [1] - 281:22
**prosecution** [2] - 230:8, 230:12
**prostitutes** [1] - 227:3
**protect** [1] - 95:23
**prove** [1] - 228:19
**provide** [14] - 19:2, 63:7, 67:8, 72:18, 80:16, 80:20, 107:25, 117:14, 121:8, 121:10, 153:20, 165:9, 167:19, 232:22
**provided** [29] - 9:13, 17:15, 33:3, 75:19, 90:3, 116:14, 116:16, 118:15, 118:17, 119:4, 121:7, 121:11, 121:21, 122:17, 128:14, 155:8, 165:11, 166:17, 167:18, 167:23, 168:4, 170:8, 170:14, 179:6, 180:4, 181:2, 181:15, 190:15, 280:21
**providing** [1] - 30:21
**provision** [2] - 85:8, 85:10
**PSLRA** [2] - 200:22, 268:21
**public** [8] - 23:11, 24:10, 24:18, 84:23, 85:3, 136:7, 215:13, 215:19
**Public** [2] - 1:22, 285:9
**publicity** [1] - 78:22
**pulled** [1] - 154:18, 218:2
**pulling** [2] - 157:4
**pumped** [1] - 154:17
**pumping** [1] - 215:4
**purchase** [29] - 11:25, 58:21, 59:17, 101:15, 119:16, 124:8, 125:2, 125:18, 143:15, 145:9, 146:9, 146:20, 168:20, 198:10, 213:14, 227:2,

251:24, 253:2, 253:3, 253:10, 259:25, 260:15, 263:8, 264:6, 264:7, 274:4, 275:13
**purchased** [53] - 13:5, 13:7, 13:13, 13:15, 13:23, 47:24, 55:13, 59:19, 64:9, 65:5, 65:8, 68:2, 101:22, 108:20, 144:16, 147:7, 149:17, 151:19, 161:15, 162:14, 170:10, 171:19, 172:10, 199:4, 201:22, 201:24, 202:3, 202:6, 208:16, 208:19, 210:11, 212:10, 213:3, 214:19, 215:14, 217:24, 221:2, 244:11, 244:23, 252:19, 256:5, 256:19, 257:6, 257:17, 257:18, 259:6, 261:22, 262:25, 263:19, 271:10, 271:11, 271:20, 271:23
**purchased/sold** [1] - 119:13
**purchaser** [2] - 159:10, 213:12
**purchasers** [1] - 154:9
**purchases** [16] - 12:6, 12:15, 141:12, 144:6, 144:10, 152:7, 152:20, 165:23, 208:18, 212:2, 212:6, 212:8, 214:3, 220:18, 258:21, 260:5
**purchasing** [2] - 218:7, 252:8
**purport** [5] - 10:25, 11:6, 12:22, 216:15, 220:3
**purported** [1] - 204:11
**purporting** [1] - 248:15
**purpose** [5] - 57:16, 130:20, 201:3, 201:14, 250:20
**purposes** [1] - 62:19
**pursuant** [3] - 1:18, 32:14, 273:23
**pursue** [1] - 91:18
**pursuing** [1] - 14:18
**push** [1] - 168:19
**pushed** [4] - 155:19, 155:21, 212:20, 214:4
**pushing** [5] - 156:12, 158:11, 214:22, 215:6
**put** [15] - 38:2, 45:2, 73:22, 97:12, 109:20, 109:21, 111:12, 136:9, 139:20, 153:12, 189:24, 190:8, 231:18, 243:18

## Q

**qualifications** [1] - 98:14
**quantities** [2] - 210:11,

210:12
**quantity** [1] - 217:24
**quarter** [3] - 52:5, 217:25, 218:2
**QUESTION** [1] - 183:10
**questions** [6] - 6:9, 17:5, 77:2, 267:6, 273:3, 281:6
**quick** [1] - 17:11
**quickly** [2] - 217:11, 258:2
**quite** [15] - 20:11, 20:12, 26:4, 26:21, 29:11, 44:25, 112:6, 118:11, 135:7, 141:2, 147:24, 179:23, 215:25, 224:25, 251:17
**quote** [1] - 50:7

## R

**R-A-F-F-L-E-S-O-N** [1] - 107:14
**Raffleson** [2] - 107:12, 112:11
**raises** [1] - 40:9
**Rakoff** [1] - 196:17
**Ralph** [2] - 22:7, 22:13
**range** [8] - 69:12, 105:15, 176:23, 177:10, 188:12, 188:20, 197:9, 234:13
**rarely** [1] - 106:15
**rather** [10] - 36:6, 79:5, 116:13, 131:24, 213:12, 214:14, 215:10, 264:23, 272:14, 277:7
**rating** [1] - 241:14
**rational** [3] - 246:2, 246:3, 246:14
**re** [1] - 98:21
**RE** [1] - 281:9
**RE-EXAMINATION** [1] - 281:9
**re-read** [1] - 98:21
**reach** [3] - 109:10, 184:25, 249:21
**reached** [4] - 111:5, 165:8, 231:21, 280:10
**reaches** [1] - 157:3
**reaching** [2] - 25:21, 251:2
**reaction** [1] - 140:3
**read** [51] - 55:21, 55:22, 56:2, 56:22, 57:7, 57:17, 57:22, 58:7, 66:22, 72:14, 98:21, 98:22, 116:2, 117:13, 149:7, 173:12, 178:2, 178:3, 178:24, 181:7, 181:8, 181:10, 187:12, 188:15, 189:9, 189:12, 191:2, 193:8, 193:10, 195:16, 197:11, 197:15, 199:13, 224:14, 224:18, 225:5, 225:7, 225:18, 230:22, 231:2, 241:22, 267:23, 276:13,

276:15, 277:21, 277:22, 277:23, 277:25, 282:9
**reading** [10] - 57:25, 110:16, 169:24, 178:7, 190:25, 193:9, 193:11, 202:12, 202:13, 225:10
**ready** [1] - 279:12
**real** [5] - 66:25, 96:16, 105:4, 155:3, 240:8
**really** [29] - 18:10, 28:18, 30:11, 47:7, 55:19, 56:17, 57:6, 61:9, 97:5, 105:18, 106:3, 108:2, 132:24, 135:15, 149:20, 168:12, 168:22, 168:23, 179:2, 212:4, 228:21, 230:5, 233:24, 245:9, 245:18, 255:6, 262:13, 267:4
**realtime** [1] - 59:17
**reason** [11] - 39:12, 147:23, 148:16, 164:5, 177:22, 229:19, 253:9, 253:19, 257:8, 277:7, 280:25
**reasonable** [4] - 221:18, 232:2, 250:10, 253:18
**reasons** [2] - 229:18, 255:10
**receive** [7] - 38:12, 84:24, 85:19, 89:14, 110:12, 192:24, 223:2
**received** [20] - 14:11, 16:8, 32:25, 61:25, 63:9, 75:14, 75:15, 94:12, 95:10, 125:25, 127:24, 128:2, 155:11, 176:22, 191:25, 192:7, 214:18, 253:13, 269:16, 271:21
**receiving** [2] - 226:21, 229:20
**recent** [1] - 207:8
**recently** [9] - 13:9, 13:17, 31:23, 167:6, 167:9, 169:8, 207:11, 207:21, 266:18
**recess** [1] - 126:16
**Recess** [4] - 69:25, 194:19, 222:6, 242:20
**recession** [1] - 48:9
**recites** [1] - 188:17
**recognize** [11] - 14:8, 14:11, 72:2, 76:8, 86:23, 113:19, 115:24, 179:22, 192:9, 193:17, 222:17
**recognizes** [1] - 72:11
**recollection** [29] - 6:12, 8:4, 12:11, 63:5, 92:7, 105:24, 110:23, 120:15, 120:21, 121:5, 128:19, 128:21, 130:21, 180:21, 192:3, 203:22, 205:16, 206:15, 217:16, 224:24, 232:21, 239:15, 258:23, 259:2,

261:20, 268:23, 269:20, 269:21
**recommendation** [1] - 230:12
**reconcile** [1] - 61:15
**reconstruct** [1] - 258:17
**record** [21] - 4:5, 42:9, 69:24, 70:6, 85:18, 115:10, 126:14, 127:8, 139:15, 139:21, 194:18, 194:24, 221:5, 222:5, 222:10, 242:19, 243:5, 267:23, 277:25, 282:7, 285:15
**records** [27] - 61:7, 61:10, 61:12, 127:15, 127:18, 127:23, 128:4, 128:14, 128:18, 128:20, 142:16, 164:21, 165:17, 165:22, 167:7, 184:19, 239:17, 239:23, 239:25, 246:17, 246:23, 246:25, 252:18, 256:17, 268:10, 286:22
**recover** [1] - 277:9
**recovery** [1] - 277:8
**redacted** [1] - 276:10
**reduced** [1] - 230:15
**reference** [2] - 58:15, 191:16
**referencing** [2] - 187:15, 198:2
**referred** [1] - 179:7
**referring** [5] - 57:23, 64:23, 70:12, 116:7, 196:21
**refers** [1] - 262:11
**reflect** [8] - 88:19, 150:18, 150:19, 159:4, 183:19, 184:20, 187:23, 205:21
**reflected** [9] - 61:4, 92:6, 119:23, 189:23, 196:14, 196:24, 197:23, 199:7, 203:24
**reflecting** [2] - 95:3, 127:19
**reflects** [5] - 144:6, 180:23, 219:18, 249:10
**reform** [2] - 37:7, 37:11
**regaled** [1] - 23:13
**regard** [2] - 93:23, 134:8
**regarding** [4] - 111:18, 181:2, 208:13, 280:19
**regards** [2] - 12:12, 87:22
**Registered** [2] - 1:21, 285:8
**regular** [4] - 38:18, 38:20, 105:11, 133:11
**regularity** [1] - 16:6
**regularly** [5] - 16:9, 127:24, 146:4, 188:10, 188:18
**reimbursement** [1] - 277:2
**related** [5] - 35:13, 42:12, 135:8, 285:18
**relationship** [1] - 133:19
**relatively** [5] - 79:8, 82:17,

215:5, 235:10, 238:8
**relayed** [1] - 217:18
**relevance** [3] - 97:18, 170:6, 179:24
**relevant** [4] - 12:14, 98:6, 142:9, 200:17
**reliable** [1] - 250:8
**relied** [2] - 120:21, 122:18
**relief** [1] - 80:18
**reluctant** [1] - 280:3
**rely** [1] - 166:16
**relying** [4] - 10:3, 106:7, 148:25, 177:4
**remain** [1] - 257:12
**remainder** [1] - 216:10
**remaining** [1] - 65:11
**remarried** [1] - 41:7
**remember** [28] - 22:8, 33:24, 35:24, 45:8, 47:13, 67:21, 78:18, 90:5, 91:5, 111:24, 113:21, 118:12, 130:12, 136:13, 165:8, 180:18, 190:25, 191:3, 197:18, 203:15, 224:2, 224:4, 224:23, 226:14, 233:8, 254:25, 262:21, 267:16
**remembering** [1] - 53:2
**remuneration** [2] - 209:8, 209:9
**rent** [4] - 41:3, 41:5, 43:3, 104:22
**repeat** [1] - 229:9
**rephrase** [2] - 51:21, 58:25
**reply** [2] - 193:13, 287:11
**report** [1] - 184:14
**Reporter** [2] - 1:22, 285:9
**reporter** [2] - 4:15, 5:8
**reports** [1] - 149:3
**represent** [20] - 9:4, 9:22, 9:24, 9:25, 10:5, 10:25, 11:2, 11:6, 12:23, 88:21, 134:7, 194:5, 199:10, 203:8, 204:11, 216:15, 220:3, 248:15, 276:17, 276:20
**representative** [11] - 7:15, 80:10, 81:9, 90:23, 98:15, 107:5, 113:10, 131:23, 132:16, 164:12, 281:3
**represented** [7] - 65:23, 168:7, 169:19, 171:15, 190:23, 199:3, 273:22
**representing** [12] - 158:5, 202:21, 205:10, 214:11, 220:13, 220:21, 220:22, 220:25, 265:15, 266:12, 277:14, 278:8
**represents** [3] - 8:16, 129:6, 202:24
**reputation** [1] - 161:3
**request** [8] - 36:2, 36:21,

73:9, 95:17, 99:23, 118:7, 230:9, 269:19
**REQUEST** [1] - 287:19
**requested** [5] - 35:21, 35:23, 38:6, 39:5, 168:5
**requests** [5] - 17:23, 18:2, 18:17, 19:4, 74:6
**required** [8] - 34:10, 85:12, 91:23, 200:13, 229:2, 251:3, 251:9, 251:13
**requirement** [1] - 82:15
**RESEARCH** [1] - 1:8
**research** [2] - 66:9, 151:12
**researched** [2] - 34:12, 224:12
**reserved** [1] - 3:7
**reside** [1] - 107:15
**residence** [2] - 42:21, 42:25
**resign** [5] - 25:25, 29:25, 30:2, 34:10, 34:15
**resignation** [2] - 32:22, 33:2, 33:12
**resigned** [4] - 30:23, 34:7, 34:8, 34:19
**resigning** [1] - 32:13
**resolution** [1] - 95:17
**resolved** [6] - 78:24, 84:10, 88:15, 91:13, 91:17, 92:8
**Resources** [1] - 22:11
**respect** [12] - 45:16, 59:7, 62:25, 152:25, 162:3, 165:17, 203:5, 203:17, 234:16, 278:9, 280:14, 280:18
**respective** [1] - 3:5
**respectively** [1] - 259:7
**respond** [1] - 89:12
**response** [2] - 73:9, 80:24, 81:4, 83:13
**responses** [9] - 19:3, 72:23, 73:8, 73:21, 74:5, 74:12, 74:18, 79:21, 286:14
**responsibility** [3] - 28:19, 98:18, 164:16
**responsible** [1] - 170:22
**restart** [1] - 200:9
**restate** [2] - 11:13, 201:20
**result** [6] - 90:9, 90:11, 92:24, 237:22, 280:16, 280:21
**results** [2] - 78:25, 134:10
**retain** [2] - 213:13, 215:10
**retained** [3] - 113:12, 209:7, 214:14
**retainer** [1] - 276:10
**retaining** [2] - 113:7, 238:5
**retired** [1] - 106:23
**retirement** [9] - 46:13, 47:6, 49:2, 65:15, 65:17, 65:19, 130:14, 132:18, 140:21
**retirement-type** [2] - 46:13,

49:2

**retirements** [1] - 49:14
**return** [6] - 29:25, 34:14, 63:10, 85:13, 111:7, 111:8
**returned** [6] - 30:25, 73:14, 73:17, 73:18, 74:3, 238:24
**returning** [2] - 23:3, 35:7
**Revenue** [4] - 87:5, 87:10, 88:22, 93:2
**review** [13] - 17:4, 18:23, 19:11, 74:2, 119:3, 121:22, 149:11, 164:16, 197:12, 198:16, 206:17, 212:12, 243:17
**reviewed** [10] - 12:4, 13:9, 13:17, 17:22, 18:19, 73:24, 118:14, 118:20, 142:11, 212:15
**reviewing** [4] - 18:16, 73:12, 73:21, 253:14
**revisit** [1] - 186:19
**revisited** [3] - 189:6, 195:20, 196:19
**rings** [1] - 226:23
**rise** [3] - 235:9, 244:21, 257:15
**risen** [1] - 152:19
**risks** [1] - 241:19
**risky** [1] - 240:17
**River** [2] - 84:3, 103:23
**river** [1] - 84:4
**Road** [1] - 104:4
**role** [1] - 16:7
**rolled** [1] - 130:22
**rollover** [9] - 129:22, 130:10, 130:11, 131:3, 131:8, 136:19, 137:23, 140:18, 141:25
**Ron** [2] - 35:20, 36:16
**room** [5] - 58:11, 66:6, 70:3, 70:19, 268:25
**round** [1] - 164:8
**RPR** [1] - 285:24
**rules** [1] - 240:12
**run** [1] - 23:10
**running** [5] - 26:7, 26:9, 36:5, 225:14, 226:19
**runs** [1] - 204:25, 207:25
**Russian** [2] - 84:3, 103:23

## S

**sacrifices** [3] - 30:13, 37:13, 37:16
**salary** [4] - 38:12, 38:18, 38:19, 105:12
**sale** [17] - 93:12, 101:18, 102:21, 111:21, 111:23, 112:2, 119:16, 124:20, 146:21, 146:22, 259:4,
260:2, 260:14, 260:20, 273:23, 274:5, 274:9
**sales** [30] - 12:6, 12:14, 102:9, 112:8, 124:10, 124:13, 124:14, 124:19, 125:17, 141:13, 147:4, 148:21, 149:24, 152:7, 165:23, 202:8, 202:9, 203:6, 212:9, 214:8, 220:6, 220:17, 221:2, 221:13, 255:13, 258:21, 264:9, 265:4, 265:8, 271:22
**San** [4] - 32:5, 40:16, 63:23, 225:14
**Santa** [2] - 23:18, 24:11
**sat** [6] - 29:7, 29:8, 32:4, 38:8, 278:17
**satisfactory** [1] - 280:24
**satisfied** [1] - 280:15
**satisfies** [1] - 187:11
**saved** [1] - 70:16
**savvy** [1] - 216:2
**saw** [7] - 92:5, 107:2, 110:19, 152:18, 192:3, 206:11, 235:9
**schedule** [1] - 128:16
**scheduled** [1] - 19:23
**scheme** [1] - 153:20
**school** [3] - 18:9, 20:25, 21:25
**School** [2] - 20:24, 21:3
**Scott** [1] - 77:18
**se** [2] - 87:23, 88:15
**seal** [1] - 187:5
**sealing** [1] - 3:14
**second** [35] - 29:15, 76:24, 104:17, 104:20, 117:9, 175:17, 189:20, 192:19, 196:5, 196:8, 196:12, 197:3, 197:12, 199:10, 200:3, 201:11, 203:11, 204:15, 205:4, 206:6, 206:20, 207:5, 207:24, 208:5, 208:7, 208:13, 210:6, 212:19, 213:9, 214:4, 218:14, 242:22, 243:12, 287:13, 287:16
**securities** [40] - 11:7, 11:10, 11:15, 11:19, 13:5, 13:13, 13:23, 44:10, 44:13, 44:16, 45:21, 47:12, 47:17, 48:2, 48:11, 50:24, 51:15, 52:8, 53:11, 53:17, 54:16, 57:24, 59:8, 62:4, 62:10, 62:14, 62:15, 64:10, 65:5, 70:11, 123:10, 141:21, 170:10, 172:11, 200:15, 200:16, 212:20, 234:9, 235:5, 255:18
**security** [8] - 55:13, 58:21, 62:25, 65:8, 133:14, 144:16,
144:17, 209:15
**see** [63] - 48:16, 52:23, 77:4, 77:16, 77:20, 77:24, 78:3, 87:6, 89:13, 89:24, 91:3, 94:11, 95:2, 117:11, 119:20, 129:24, 133:8, 142:15, 142:18, 143:14, 143:17, 144:3, 146:21, 146:22, 146:24, 147:3, 149:13, 152:8, 152:18, 159:19, 159:21, 162:19, 174:21, 176:15, 178:23, 180:22, 185:22, 188:14, 190:7, 193:21, 194:8, 194:9, 195:14, 199:21, 200:7, 204:18, 204:22, 205:7, 205:12, 205:13, 220:11, 243:20, 243:23, 249:9, 252:8, 256:8, 258:21, 259:25, 260:2, 262:4, 272:17, 274:5
**seeing** [1] - 90:5
**seek** [1] - 276:24
**sees** [1] - 72:10
**segment** [1] - 216:24
**selected** [1] - 25:11
**sell** [33] - 12:2, 43:18, 45:20, 48:2, 54:18, 58:21, 59:11, 101:12, 101:21, 102:10, 102:13, 110:22, 111:13, 111:15, 125:2, 125:11, 133:14, 148:5, 148:18, 151:5, 168:20, 213:12, 215:10, 218:5, 236:12, 240:21, 244:24, 258:5, 258:8, 261:9, 273:2, 275:9
**seller** [10] - 11:14, 11:18, 11:21, 12:8, 157:25, 159:10, 188:9, 244:19, 266:13
**sellers** [13] - 10:5, 10:14, 11:2, 11:7, 160:16, 161:10, 162:11, 163:15, 204:12, 214:12, 215:7, 220:3, 220:15
**selling** [45] - 9:20, 10:4, 10:6, 11:7, 11:15, 11:22, 11:23, 12:19, 59:5, 62:14, 101:24, 110:7, 156:3, 156:5, 156:7, 156:9, 158:13, 158:21, 161:6, 164:25, 209:7, 218:8, 218:10, 218:15, 219:19, 220:2, 234:20, 235:3, 235:5, 244:18, 249:12, 249:15, 249:16, 249:25, 250:2, 250:13, 250:17, 250:23, 251:4, 251:14, 254:23, 266:7, 272:12, 272:14, 273:6
**send** [1] - 93:24
**sendoff** [1] - 33:8
**senior** [1] - 31:20
**sense** [6] - 135:14, 152:17,
156:20, 170:18, 170:21, 172:8
**sent** [10] - 89:17, 90:6, 95:6, 118:11, 118:18, 118:19, 121:15, 127:23, 128:19, 223:22
**sentence** [7] - 176:15, 185:17, 194:2, 195:16, 229:21, 230:2, 230:15
**sentenced** [1] - 233:12
**sentences** [1] - 230:11
**separate** [9] - 8:14, 125:17, 130:2, 140:21, 220:13, 220:14, 264:6, 264:7, 281:15
**September** [9] - 157:13, 157:15, 182:7, 193:14, 193:21, 204:25, 205:9, 208:2, 287:12
**series** [1] - 155:13
**serious** [4] - 33:7, 79:5, 160:13, 166:7
**serve** [1] - 39:6
**served** [11] - 17:16, 17:24, 18:24, 19:4, 19:12, 27:10, 31:23, 73:23, 79:22, 107:4, 178:20
**Service** [1] - 88:23
**service** [2] - 30:21, 272:23
**services** [2] - 105:16, 280:20
**SESSION** [1] - 127:2
**set** [7] - 29:17, 71:19, 75:10, 128:22, 238:4, 285:13, 286:11
**setting** [1] - 21:16
**settled** [1] - 78:23
**settlement** [21] - 84:22, 85:5, 85:7, 123:7, 147:9, 147:11, 167:17, 168:14, 168:21, 169:3, 174:4, 179:12, 197:7, 231:22, 231:25, 232:12, 233:4, 233:5, 280:9, 280:11, 280:22
**seven** [2] - 123:16, 258:15
**several** [8] - 7:19, 7:23, 50:17, 67:2, 76:25, 131:21, 206:13, 272:4
**SEWARD** [2] - 1:19, 2:12
**Seward** [2] - 4:12, 4:22
**shaking** [1] - 139:24
**share** [9] - 41:5, 56:24, 119:14, 119:17, 148:2, 156:25, 198:10, 201:21, 208:18
**shared** [1] - 209:13
**shareholder** [2] - 113:25, 213:11
**shares** [97] - 47:24, 50:23, 52:24, 61:5, 119:12, 119:14, 124:9, 125:2, 125:12, 145:10, 146:10, 146:23,

147:8, 147:14, 148:3, 148:4, 148:6, 148:17, 148:18, 149:17, 149:18, 150:5, 150:6, 150:9, 161:19, 171:19, 176:22, 177:2, 198:6, 198:11, 199:3, 199:12, 201:21, 201:22, 201:24, 202:16, 202:22, 203:7, 208:16, 208:19, 208:21, 214:14, 218:5, 218:6, 218:16, 237:18, 244:8, 244:24, 245:11, 245:20, 249:16, 249:19, 251:25, 252:20, 253:23, 253:25, 254:23, 256:6, 256:20, 257:17, 257:23, 258:2, 258:9, 259:7, 260:13, 260:15, 261:23, 261:24, 262:25, 263:4, 263:5, 263:6, 263:8, 263:19, 263:20, 263:23, 264:6, 264:8, 270:25, 271:10, 271:13, 271:17, 271:19, 271:22, 272:4, 272:5, 272:13, 272:14, 272:16, 272:25, 273:2, 273:6, 273:7, 273:23, 274:14, 274:16

**SHARON** [1] - 285:24
**Sharon** [3] - 1:21, 4:15, 285:8
**sharper** [1] - 167:11
**short** [8] - 111:21, 111:23, 112:2, 112:7, 148:10, 148:13, 188:9, 221:19
**short-seller** [1] - 188:9
**short-term** [2] - 148:10, 148:13
**shorter** [1] - 24:15
**shortly** [1] - 244:25
**shoulders** [1] - 139:25
**show** [6] - 127:13, 200:22, 201:16, 201:19, 201:21, 259:20
**showing** [2] - 63:8, 269:14
**shown** [2] - 128:5, 250:8
**shows** [8] - 141:12, 145:8, 198:9, 201:23, 251:24, 254:9, 254:12, 256:2
**shrugging** [2] - 139:23, 139:25
**side** [2] - 14:14, 179:10
**Sideman** [1] - 89:4
**sides** [1] - 116:7
**SIDNEY** [1] - 1:4
**Sigma** [97] - 9:12, 9:25, 11:11, 11:16, 11:19, 13:6, 13:13, 13:23, 49:5, 50:7, 50:12, 55:14, 55:18, 56:4, 56:10, 59:5, 59:11, 66:3, 66:10, 67:4, 68:2, 68:10, 93:13, 94:15, 94:19, 98:8,

98:9, 107:2, 107:22, 108:4, 108:12, 108:19, 109:8, 109:10, 111:18, 117:16, 118:4, 123:23, 125:8, 127:19, 141:13, 143:15, 144:16, 144:17, 145:10, 147:21, 148:4, 148:6, 148:17, 150:22, 150:23, 151:4, 151:10, 152:9, 152:23, 164:23, 165:18, 165:22, 166:12, 176:17, 176:22, 176:24, 198:9, 201:22, 201:24, 202:16, 202:22, 203:7, 208:16, 210:13, 212:20, 213:2, 214:5, 216:6, 218:3, 234:17, 235:3, 235:17, 236:3, 237:6, 238:5, 238:7, 238:9, 238:23, 241:13, 241:25, 242:8, 244:3, 244:15, 250:7, 252:2, 252:20, 267:25, 270:16, 271:2, 271:11
**sign** [1] - 282:9
**signals** [1] - 138:9
**signature** [4] - 75:7, 75:9, 116:25, 187:3
**signed** [5] - 3:10, 75:24, 91:21, 116:5, 116:15
**significance** [1] - 123:6
**significant** [2] - 26:5, 46:24
**significantly** [3] - 105:19, 176:23, 177:10
**signing** [1] - 113:22
**similar** [3] - 25:12, 28:15, 198:7
**similarly** [1] - 203:5
**simplicity** [2] - 270:3, 270:4
**simplified** [6] - 134:24, 136:20, 137:19, 140:16, 142:2, 143:21
**simply** [4] - 82:18, 209:14, 251:16, 253:19
**simultaneously** [2] - 274:10, 274:17
**single** [4] - 10:16, 124:20, 254:17, 254:19
**siphoned** [1] - 155:16
**sister** [2] - 107:10, 107:19
**sit** [9] - 13:3, 13:12, 13:22, 31:7, 31:14, 31:16, 31:22, 151:2, 266:21
**sitting** [5] - 91:5, 249:24, 253:8, 263:10, 280:4
**situation** [2] - 22:6, 233:17
**six** [9] - 16:12, 27:9, 27:11, 54:12, 55:9, 123:16, 213:3, 233:8, 279:3
**six-year** [1] - 27:11
**size** [1] - 253:11
**skipped** [1] - 29:11
**slightly** [2] - 124:5, 264:10

**small** [6] - 28:13, 40:13, 67:11, 154:21, 154:23, 215:5
**smaller** [1] - 147:4
**smirking** [1] - 138:20
**sold** [64] - 13:6, 13:14, 13:24, 43:16, 43:19, 55:13, 64:9, 65:5, 65:8, 68:2, 101:10, 101:23, 102:5, 102:18, 103:11, 108:20, 144:16, 147:14, 149:17, 150:5, 151:21, 158:5, 158:22, 161:15, 162:15, 170:10, 172:10, 177:2, 198:6, 198:11, 199:4, 199:11, 202:16, 202:22, 203:7, 208:21, 210:16, 211:25, 212:11, 213:12, 214:10, 214:15, 218:17, 221:2, 245:16, 245:19, 253:24, 255:3, 255:17, 256:23, 257:23, 258:2, 260:24, 261:13, 263:16, 263:20, 271:13, 271:17, 272:16, 274:14, 274:17, 275:4
**solely** [1] - 94:4
**someone** [6] - 9:12, 36:11, 39:17, 157:2, 173:17, 269:8
**sometime** [6] - 15:15, 22:16, 30:23, 153:3, 207:22, 241:3
**sometimes** [10] - 16:13, 20:15, 105:20, 124:10, 125:15, 168:16, 169:10, 169:11, 169:12, 255:6
**somewhat** [2] - 58:6, 68:19
**somewhere** [5] - 53:19, 101:25, 103:4, 104:18, 225:22
**SONAR** [4] - 1:7, 1:8, 1:8, 1:9
**sonar** [1] - 2:14
**Sonar** [57] - 2:15, 2:16, 2:17, 4:9, 4:22, 5:6, 72:3, 72:4, 72:5, 72:6, 74:19, 74:20, 74:21, 155:8, 155:9, 155:18, 156:10, 158:10, 158:20, 158:25, 161:15, 162:14, 164:22, 165:16, 165:21, 166:11, 166:24, 176:5, 192:16, 198:6, 201:23, 208:17, 208:20, 209:6, 209:9, 209:12, 209:14, 210:2, 210:18, 211:2, 211:3, 211:7, 211:8, 211:11, 211:15, 211:16, 212:19, 213:15, 214:16, 214:19, 214:22, 215:12, 215:13, 216:21, 217:13, 243:10
**Sonar's** [7] - 74:6, 160:15, 160:17, 192:3, 198:9,

210:19, 214:3
**sophisticated** [2] - 45:6, 66:18
**sorry** [24] - 36:17, 51:20, 63:15, 63:17, 64:17, 64:19, 79:18, 134:20, 143:5, 146:14, 165:19, 166:3, 170:2, 185:20, 202:6, 218:18, 230:20, 246:22, 247:4, 259:16, 260:4, 263:8, 270:6, 274:15
**sort** [5] - 42:8, 46:19, 61:4, 151:9, 189:13
**sorts** [1] - 137:23
**sought** [3] - 42:17, 68:3, 80:18
**sounds** [1] - 204:14
**source** [1] - 70:9
**sources** [1] - 147:22
**South** [1] - 2:7
**SOUTHERN** [1] - 1:2
**speaking** [1] - 211:10
**special** [1] - 91:10
**specific** [5] - 63:4, 121:6, 182:15, 253:19, 279:17
**specifically** [8] - 23:5, 113:21, 209:25, 210:8, 211:21, 223:16, 244:16, 264:20
**specifics** [1] - 257:13
**speculate** [1] - 215:16
**Speculation** [1] - 171:4
**spell** [1] - 107:13
**spend** [1] - 151:4
**spending** [1] - 139:17
**spent** [2] - 268:4, 279:22
**spoken** [4] - 7:5, 7:17, 7:19, 163:5
**spokespersons** [1] - 68:17
**sponsored** [2] - 131:10, 136:3
**spots** [1] - 262:5
**ss** [1] - 285:5
**stand** [12] - 4:2, 69:20, 126:12, 127:4, 194:14, 194:20, 222:2, 222:7, 228:25, 242:15, 242:25, 282:2
**standard** [2] - 20:9, 228:22
**staring** [1] - 140:11
**start** [9] - 53:13, 53:16, 88:10, 142:18, 142:25, 187:16, 198:4, 200:10, 240:25
**started** [13] - 47:14, 53:11, 53:20, 54:11, 54:15, 54:24, 55:10, 66:8, 67:3, 123:12, 140:23, 236:9, 272:2
**starting** [9] - 32:21, 119:11, 176:15, 185:19, 195:11, 195:13, 236:4, 254:10, 256:9

**starts** [2] - 117:10, 266:3
**State** [12] - 1:23, 76:17, 76:20, 77:12, 79:6, 81:23, 82:6, 82:25, 245:22, 281:14, 285:10
**state** [4] - 13:12, 80:18, 194:4, 230:7
**STATE** [1] - 285:4
**statement** [4] - 61:16, 61:20, 164:14, 194:10
**Statement** [1] - 193:25
**statements** [4] - 61:24, 268:13, 268:14, 269:13
**STATES** [1] - 1:2
**states** [2] - 80:6, 81:6
**States** [6] - 23:3, 30:20, 35:4, 86:20, 87:2, 286:18
**stating** [2] - 93:25, 139:14
**status** [1] - 80:21
**stay** [3] - 30:2, 141:17
**stayed** [1] - 245:13
**steady** [1] - 38:19
**step** [1] - 39:10
**steps** [1] - 166:10
**Steven** [2] - 88:25, 92:11
**stick** [2] - 116:9, 237:24
**still** [21] - 31:14, 31:18, 63:19, 80:19, 88:17, 92:16, 92:18, 95:19, 101:7, 104:10, 104:11, 107:18, 108:11, 116:21, 157:5, 168:12, 217:6, 246:19, 257:10, 278:24
**STIPULATED** [3] - 3:4, 3:9, 3:13
**STIPULATIONS** [1] - 3:2
**stock** [92] - 9:25, 10:4, 10:6, 10:8, 12:2, 43:22, 48:19, 56:8, 57:12, 59:14, 68:20, 93:13, 94:15, 106:24, 108:20, 109:8, 110:10, 110:12, 111:5, 112:4, 124:8, 151:5, 151:20, 152:19, 153:13, 153:24, 154:5, 154:11, 154:13, 154:18, 154:21, 155:16, 155:18, 155:19, 156:14, 156:16, 156:22, 157:6, 158:11, 159:5, 159:8, 159:13, 159:14, 160:12, 160:14, 160:19, 160:21, 161:3, 161:4, 161:6, 161:16, 161:20, 162:20, 168:20, 171:20, 176:24, 209:7, 209:21, 209:22, 210:13, 210:16, 213:2, 213:13, 213:14, 215:6, 215:10, 215:23, 217:7, 235:9, 241:8, 248:6, 248:8, 248:16, 250:6, 250:9, 251:8, 251:13, 257:2, 257:11, 267:25, 268:7,

270:16, 271:3, 272:21, 274:15, 275:17, 275:18, 275:22
**Stock** [1] - 244:4
**stock-trading** [1] - 59:14
**stockholder** [2] - 154:22, 154:24
**stockholders** [2] - 155:23, 217:3
**stockowners** [1] - 236:13
**stocks** [12] - 9:20, 48:16, 51:2, 57:18, 58:8, 59:17, 59:18, 123:13, 153:21, 169:18, 236:11, 251:2
**stop** [2] - 172:18, 172:22
**stories** [1] - 23:13
**story** [1] - 29:12
**straight** [1] - 225:21
**straighten** [1] - 137:17
**strange** [1] - 172:14
**strategies** [1] - 57:14
**strategy** [3] - 95:14, 148:7, 148:8
**streams** [1] - 67:7
**streets** [1] - 225:14
**strength** [3] - 156:14, 159:5, 159:8
**strictly** [1] - 160:6
**strong** [1] - 157:6
**stuck** [1] - 191:4
**stuff** [3] - 225:16, 226:24, 233:7
**subject** [2] - 81:4, 277:3
**submitted** [3] - 73:8, 82:21, 225:18
**Subscribed** [1] - 284:10
**subsequent** [2] - 7:20, 143:4
**substance** [4] - 35:13, 42:12, 42:18, 184:7
**substance-related** [2] - 35:13, 42:12
**substantial** [7] - 94:14, 157:9, 161:23, 217:8, 228:7, 236:3, 236:19
**substantially** [7] - 124:18, 152:20, 156:18, 212:3, 213:4, 241:10, 257:3
**successful** [1] - 30:15
**sue** [1] - 79:5
**suggest** [1] - 148:22
**suggested** [4] - 66:24, 177:22, 189:3, 211:23
**suggesting** [3] - 86:6, 190:2, 214:21
**suggests** [2] - 188:9, 188:17
**suit** [11] - 10:14, 76:15, 76:19, 77:12, 78:19, 78:21, 78:23, 79:10, 82:5, 112:12, 152:11

**sum** [3] - 63:11, 93:12, 107:2
**summarize** [2] - 8:21, 9:10
**summarizing** [1] - 142:7
**summary** [1] - 141:12
**summer** [8] - 10:21, 12:17, 57:2, 84:2, 96:8, 146:6, 193:6, 242:5
**summons** [2] - 76:5, 286:16
**Summons** [1] - 76:24
**superior** [12] - 27:22, 28:24, 29:2, 29:4, 29:7, 30:24, 31:13, 31:14, 31:16, 35:8, 278:17, 280:5
**Superior** [1] - 32:6
**supervisory** [1] - 16:7
**supplying** [1] - 227:3
**support** [4] - 176:6, 191:20, 192:4, 192:18
**supported** [1] - 205:18
**supporting** [2] - 36:2, 156:11
**suppose** [4] - 25:12, 25:22, 215:7, 255:11
**supposed** [1] - 161:21
**surmise** [1] - 183:15
**surmising** [1] - 212:23
**surprised** [2] - 152:21, 152:24
**surprises** [1] - 234:23
**swear** [3] - 5:8, 113:23, 115:8
**swore** [1] - 172:10
**sworn** [4] - 3:10, 5:11, 284:10, 285:14
**system** [2] - 25:13, 162:10

**T**

**Talbert** [1] - 24:22
**Tape** [5] - 4:4, 69:23, 70:6, 126:15, 127:7
**TAUBER** [7] - 1:4, 1:18, 5:9, 284:8, 285:12, 286:9, 287:5
**Tauber** [53] - 2:6, 4:9, 4:25, 5:16, 14:3, 14:6, 14:8, 14:9, 70:9, 71:20, 71:23, 72:2, 74:10, 74:14, 76:6, 76:9, 81:5, 81:7, 86:21, 87:4, 113:17, 114:5, 115:17, 115:22, 116:11, 119:10, 127:11, 127:16, 129:4, 129:22, 143:8, 155:25, 175:4, 175:23, 176:16, 176:25, 182:3, 185:6, 188:6, 188:8, 188:10, 188:18, 192:14, 193:15, 194:6, 196:9, 202:20, 222:15, 242:23, 244:3, 267:10,

282:6, 286:6
**Tauber's** [1] - 74:18
**taught** [1] - 21:9
**Tax** [3] - 86:20, 87:2, 286:18
**tax** [11] - 62:19, 63:9, 63:10, 87:20, 88:16, 88:20, 91:9, 92:12, 92:13, 92:17, 93:22
**taxes** [7] - 93:14, 94:2, 94:18, 95:18, 98:8, 245:23, 255:18
**tech** [7] - 46:21, 52:16, 52:17, 52:18, 52:20, 55:21, 57:18
**technical** [1] - 160:6
**telephone** [3] - 120:7, 120:9, 223:25
**telephonically** [1] - 15:25
**ten** [17] - 52:10, 62:9, 80:7, 81:8, 83:24, 84:2, 85:15, 90:19, 90:21, 147:14, 147:16, 186:12, 221:20, 221:22, 234:14, 281:20, 281:21
**ten-year** [1] - 234:14
**tendered** [1] - 33:11
**tens** [2] - 154:16, 155:15
**term** [7] - 25:22, 26:8, 27:8, 27:11, 111:20, 148:10, 148:13
**terms** [12] - 30:19, 99:6, 99:8, 159:11, 161:2, 161:4, 184:21, 223:9, 240:8, 240:9, 274:13, 280:8
**testified** [15] - 5:11, 37:8, 137:2, 137:4, 137:8, 137:14, 155:20, 182:16, 189:18, 191:24, 225:4, 238:11, 266:25, 269:8
**testify** [3] - 13:4, 13:22, 128:13
**testimony** [11] - 5:19, 89:16, 90:2, 158:24, 174:12, 174:22, 189:21, 225:8, 229:3, 236:22, 285:15
**Thai** [1] - 231:9
**THE** [29] - 4:2, 5:7, 5:14, 6:4, 14:7, 63:15, 69:20, 70:4, 119:2, 126:12, 127:4, 129:18, 143:7, 166:3, 173:10, 175:15, 175:19, 175:25, 194:14, 194:20, 196:4, 196:7, 222:2, 222:7, 232:8, 232:20, 242:15, 242:25, 282:2
**themselves** [4] - 4:20, 163:14, 219:5, 270:21
**theory** [4] - 208:12, 208:15, 215:23, 216:21
**thereabouts** [1] - 33:20
**thereafter** [4] - 76:25,

111:2, 113:12, 244:25

**therefore** [1] - 106:10

**thesis** [5] - 46:20, 47:4, 47:25, 234:8, 266:24

**they've** [1] - 217:2

**thick** [1] - 118:14

**thinking** [2] - 237:17, 238:15

**third** [21] - 24:23, 134:14, 135:2, 135:3, 206:4, 206:9, 206:24, 207:4, 216:11, 216:15, 217:25, 220:20, 221:6, 222:14, 222:20, 236:14, 237:7, 237:8, 266:2, 287:14

**thousand** [6] - 30:8, 49:8, 65:11, 108:13, 123:22, 125:2

**thousands** [2] - 123:18, 218:9

**three** [31] - 12:23, 13:2, 25:18, 46:5, 46:6, 47:9, 48:25, 49:13, 55:11, 65:2, 68:15, 68:24, 69:9, 70:10, 70:11, 100:19, 118:13, 131:4, 139:3, 144:11, 149:24, 152:8, 168:16, 169:12, 221:8, 234:15, 234:18, 235:20, 252:9, 262:5, 271:14

**three-way** [1] - 139:3

**THROUGH** [1] - 1:9

**tied** [1] - 98:7

**timeframe** [2] - 51:14, 159:3

**title** [1] - 134:16

**titles** [1] - 202:14

**today** [19] - 5:19, 13:4, 13:12, 13:22, 14:17, 19:25, 30:16, 31:18, 91:5, 151:2, 191:24, 239:5, 249:24, 253:9, 263:11, 264:22, 266:21, 268:5, 270:15

**today's** [2] - 4:6, 282:5

**together** [1] - 231:19

**took** [10] - 22:20, 22:21, 23:18, 106:9, 168:2, 182:6, 199:4, 269:18, 269:22, 279:4

**top** [6] - 86:25, 129:2, 129:20, 183:3, 193:20, 277:24

**topped** [1] - 236:5

**total** [9] - 63:11, 68:22, 68:23, 69:8, 71:4, 104:20, 104:21, 208:19, 264:8

**touched** [1] - 244:6

**towards** [1] - 77:16

**town** [1] - 40:13

**tracked** [2] - 266:17, 266:18

**trade** [46] - 43:21, 44:13, 47:12, 48:11, 50:24, 55:6, 70:11, 117:19, 117:23,

119:13, 119:16, 122:25, 123:6, 126:5, 144:20, 145:14, 145:20, 147:10, 158:21, 167:16, 168:8, 168:14, 168:18, 169:2, 171:14, 171:16, 174:4, 179:11, 181:2, 181:16, 194:5, 196:23, 197:7, 203:2, 203:8, 239:9, 239:12, 241:9, 244:12, 247:10, 251:7, 254:17, 254:19, 269:14, 269:25

**traded** [18] - 44:10, 46:19, 47:8, 47:17, 63:2, 67:25, 109:25, 111:18, 169:19, 188:6, 188:10, 188:11, 188:18, 188:19, 209:15, 213:17, 213:18, 242:4

**trader** [4] - 123:5, 148:10, 148:13, 188:8

**trades** [15] - 50:15, 59:23, 59:25, 64:3, 108:18, 127:19, 133:8, 151:24, 157:19, 168:7, 176:21, 183:16, 200:16, 239:18, 239:23

**Trades** [1] - 244:3

**Trading** [2] - 127:15, 286:22

**trading** [85] - 9:2, 10:2, 10:3, 10:7, 47:4, 48:16, 49:16, 50:12, 50:23, 51:16, 53:11, 53:17, 54:6, 54:8, 54:9, 54:11, 54:16, 57:11, 57:13, 59:14, 62:5, 62:8, 62:9, 98:8, 106:7, 117:15, 118:4, 123:10, 123:13, 127:18, 128:6, 128:14, 132:16, 132:17, 133:4, 133:23, 142:7, 142:16, 144:21, 145:25, 152:23, 153:11, 160:17, 164:23, 165:17, 165:18, 165:22, 166:19, 167:6, 176:23, 177:10, 177:23, 178:13, 178:21, 179:9, 180:4, 183:17, 183:20, 184:19, 189:4, 189:16, 189:19, 189:22, 190:8, 190:21, 191:7, 209:19, 211:4, 221:15, 235:17, 238:7, 238:13, 239:17, 240:13, 240:25, 241:19, 246:17, 246:23, 246:24, 254:13, 263:12, 268:10, 272:2, 275:23

**trained** [1] - 21:10

**training** [2] - 29:17, 91:10

**transaction** [6] - 59:12, 60:7, 117:20, 273:15, 273:18, 273:19

**transactions** [20] - 94:19, 123:19, 123:22, 123:24,

141:22, 141:23, 141:24, 151:10, 157:23, 159:18, 204:19, 234:17, 252:15, 256:2, 259:20, 265:10, 265:12, 267:14, 267:24, 268:6

**transcript** [6] - 95:22, 177:19, 182:2, 182:5, 182:17, 287:7

**transcripts** [2] - 169:24, 225:8

**transferring** [1] - 132:2

**transition** [1] - 27:20

**traveled** [1] - 22:25

**treatment** [1] - 42:18

**treatments** [2] - 21:12, 29:22

**trial** [8] - 3:8, 28:2, 225:4, 225:9, 227:12, 227:20, 227:22

**trials** [6] - 27:19, 27:22, 28:3, 28:5, 28:6, 227:16

**triathlons** [1] - 226:13

**tribunal** [4] - 80:12, 80:15, 81:11, 90:25

**tried** [2] - 48:17, 68:6

**trip** [4] - 22:21, 22:24, 22:25, 24:8

**trouble** [1] - 240:20

**true** [15] - 82:12, 138:14, 138:17, 139:11, 158:8, 161:9, 183:15, 189:15, 191:10, 194:10, 227:6, 228:6, 285:15

**truly** [1] - 170:2

**trust** [1] - 276:18

**truth** [4] - 81:16, 81:17, 81:18, 164:13

**truthful** [3] - 81:14, 81:16, 82:16

**truthfully** [1] - 20:6

**try** [4] - 56:3, 112:22, 113:7, 232:10

**trying** [18] - 11:25, 22:8, 28:17, 35:23, 45:8, 47:13, 58:5, 111:24, 118:12, 135:13, 148:15, 224:22, 225:20, 231:18, 233:8, 258:11, 258:20

**turn** [2] - 14:13, 119:5

**turned** [3] - 33:25, 62:20, 94:7

**turning** [1] - 267:22

**turns** [1] - 153:25

**TVs** [1] - 67:9

**Twenty** [1] - 194:3

**twice** [2] - 61:8, 192:6

**two** [45] - 7:12, 7:18, 10:14, 10:24, 12:25, 14:13, 14:25, 16:14, 17:2, 24:12, 25:17, 46:12, 47:5, 49:2, 49:6,

49:13, 55:10, 57:10, 65:15, 68:15, 78:2, 118:13, 136:17, 137:13, 138:24, 140:22, 149:24, 155:12, 169:12, 175:6, 175:12, 205:16, 206:2, 218:15, 238:15, 238:22, 239:4, 240:4, 240:5, 256:23, 257:19, 258:6, 272:15

**two-page** [2] - 14:13, 78:2

**type** [4] - 46:13, 49:2, 149:2, 273:3

**types** [2] - 27:16, 268:5

**typically** [1] - 279:15

## U

**ultimately** [5] - 121:21, 155:16, 232:17, 235:16

**un-factual** [1] - 154:4

**unaware** [1] - 168:10

**unbiased** [2] - 160:21, 228:13

**unclear** [1] - 188:6

**uncomfortable** [1] - 232:4

**under** [15] - 6:9, 40:2, 82:11, 85:21, 85:23, 90:8, 145:20, 157:5, 170:9, 193:24, 202:19, 215:23, 217:6, 228:18, 244:7

**undermines** [1] - 209:20

**underneath** [1] - 175:20

**understand** [52] - 9:10, 9:11, 9:15, 10:13, 14:17, 14:19, 50:21, 69:4, 87:11, 93:5, 108:3, 109:18, 110:2, 115:13, 122:25, 123:2, 125:10, 132:12, 150:4, 153:17, 154:14, 155:2, 155:7, 161:20, 163:11, 165:5, 165:9, 165:20, 166:20, 166:22, 169:23, 169:24, 174:13, 174:15, 179:16, 179:18, 181:11, 181:20, 189:2, 189:7, 196:2, 197:2, 203:3, 203:9, 207:7, 210:23, 218:18, 248:12, 248:19, 250:24, 258:18

**understood** [17] - 16:6, 67:13, 92:2, 92:7, 93:7, 96:16, 96:19, 102:20, 109:7, 119:22, 137:25, 149:5, 169:13, 171:22, 205:23, 240:11

**undertake** [1] - 118:2

**underwear** [1] - 225:15

**unexpected** [1] - 34:23

**unfair** [4] - 155:23, 156:13, 179:25, 180:7

**unfairly** [1] - 155:5

**unfortunate** [1] - 180:6

**unfortunately** [1] - 179:21
**United** [6] - 23:3, 30:20, 35:4, 86:20, 87:2, 286:18
**UNITED** [1] - 1:2
**University** [2] - 21:3, 22:4
**unlawful** [1] - 28:14
**unless** [1] - 197:10
**unusual** [1] - 22:6
**up** [48] - 6:21, 12:6, 25:19, 25:20, 29:17, 50:15, 54:5, 57:12, 109:8, 114:20, 119:25, 120:2, 120:23, 128:22, 129:2, 129:20, 134:23, 139:23, 152:7, 153:22, 156:12, 156:18, 156:24, 157:13, 158:12, 160:24, 162:8, 166:21, 174:25, 183:3, 190:18, 193:20, 198:8, 212:21, 214:5, 214:23, 215:6, 215:23, 216:25, 237:6, 241:23, 253:5, 264:10, 265:11, 270:7, 270:8, 271:16
**useful** [1] - 56:20
**user** [1] - 224:21
**utilize** [1] - 108:23
**utilized** [3] - 63:25, 239:22, 242:9
**utilizing** [1] - 240:25

**V**

**vacation** [4] - 101:4, 103:20, 103:21, 279:4
**vague** [1] - 224:24
**vaguely** [2] - 225:16, 230:20
**Valley** [1] - 104:4
**value** [5] - 69:7, 69:8, 201:17, 208:18, 208:19
**varied** [1] - 105:19
**various** [4] - 21:14, 110:17, 149:8, 253:15
**Vegas** [1] - 106:14
**verification** [10] - 75:2, 75:3, 75:5, 75:13, 75:24, 79:24, 82:2, 82:10, 82:21, 91:21
**verified** [1] - 172:11
**verify** [2] - 164:13, 166:10
**verifying** [1] - 75:9
**versus** [3] - 87:5, 179:11, 196:23
**vicinity** [1] - 236:8
**victims** [2] - 161:10, 161:12
**videographer** [2] - 2:25, 4:17
**VIDEOGRAPHER** [14] - 4:2, 5:7, 5:14, 69:20, 70:4, 126:12, 127:4, 194:14,

194:20, 222:2, 222:7, 242:15, 242:25, 282:2
**Videotaped** [1] - 1:17
**violation** [1] - 200:14
**virtually** [4] - 94:16, 140:11, 223:24, 260:25
**voluminous** [1] - 118:12
**vote** [1] - 26:12

**W**

**waived** [1] - 3:15
**waiving** [1] - 81:5
**warranted** [1] - 154:8
**wash** [1] - 273:18
**Washington** [12] - 29:17, 30:3, 30:5, 30:7, 33:4, 34:2, 34:4, 34:21, 35:11, 36:11, 40:18, 40:19
**Watch** [3] - 58:2, 66:23
**watched** [1] - 56:21
**watching** [1] - 156:22
**water** [2] - 22:10, 84:6
**ways** [4] - 102:8, 157:10, 238:4, 253:13
**website** [1] - 56:8
**week** [6] - 16:13, 21:8, 33:18, 233:25, 259:5, 272:15
**week-long** [1] - 21:8
**weeks** [9] - 16:13, 149:24, 197:5, 213:3, 256:23, 258:5, 258:6, 269:23, 279:3
**weigh** [2] - 228:13, 231:24
**West** [1] - 37:14
**whereas** [1] - 217:9
**white** [1] - 171:11
**whole** [3] - 29:12, 154:9, 233:24
**willing** [1] - 36:12
**Winnie** [2] - 225:4, 225:8
**wire** [1] - 230:18
**wish** [4] - 166:13, 246:13
**withdrawals** [2] - 49:18, 49:21
**withdrew** [2] - 65:13, 217:3
**witness** [12] - 5:8, 5:10, 95:24, 139:18, 189:17, 210:25, 228:24, 228:25, 230:8, 282:8, 285:12, 285:16
**WITNESS** [16] - 6:4, 14:7, 63:15, 119:2, 129:18, 143:7, 166:3, 173:10, 175:15, 175:19, 175:25, 196:4, 196:7, 232:8, 232:20, 286:5
**witness'** [1] - 229:3
**won** [1] - 26:12
**word** [5] - 44:19, 117:10, 117:23, 137:10, 195:13
**words** [2] - 36:19, 44:18
**wore** [1] - 230:18

**world** [1] - 33:5
**worth** [3] - 213:2, 258:6, 258:7
**worthless** [2] - 94:16
**wow** [1] - 55:15
**written** [3] - 99:2, 99:6, 149:7
**wrongdoing** [3] - 208:23, 210:2, 216:21
**wrote** [2] - 22:10, 223:22

**Y**

**Yahoo** [4] - 55:25, 57:17, 57:23
**year** [21] - 10:21, 23:2, 24:20, 27:11, 30:24, 31:23, 32:19, 33:25, 34:2, 40:23, 40:24, 54:12, 55:10, 105:6, 166:23, 190:10, 233:9, 234:14, 279:22, 279:23
**year's** [2] - 29:23, 32:20
**years** [46] - 7:12, 7:18, 16:14, 21:2, 21:18, 24:12, 25:10, 25:18, 27:9, 29:7, 29:10, 31:10, 32:5, 32:6, 33:19, 38:8, 43:7, 49:7, 50:17, 63:3, 65:13, 70:17, 80:8, 81:8, 82:18, 83:24, 84:2, 85:15, 90:21, 105:20, 105:21, 123:11, 123:16, 131:21, 135:12, 135:18, 137:5, 151:17, 173:18, 206:2, 234:15, 258:15, 281:20, 281:21
**yesterday** [2] - 14:23, 15:7
**YORK** [8] - 1:2, 285:4
**York** [8] - 1:20, 1:23, 2:8, 2:20, 4:13, 4:14, 15:14, 285:10
**yourself** [9] - 59:5, 78:13, 117:14, 134:10, 195:17, 202:3, 241:19, 277:11, 277:24