UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SIDNEY GORDON and JEFFREY TAUBER,  :
                                   :        11-cv-9665 (JSR)
        Plaintiffs,                :
                                   :        OPINION AND ORDER
        -v-                        :
                                   :
SONAR CAPITAL MANAGEMENT LLC, et al.
                                   | US_C_NY
        Defendants.               | DOCUMENT
------------------------------------| ELECTRONICALLY FILED
                                   | DOC #: _____
JED S. RAKOFF, U.S.D.J.            | DATE FILED: 3/20/15

        Lead Plaintiffs Sidney Gordon and Jeffrey Tauber ("Plaintiffs")

bring this action individually and on behalf of other investors in

Sigma Designs, Inc. ("Sigma"), against defendants Sonar Capital

Management, LLC ("Sonar"), Sonar's chief executive officer and

portfolio manager Neil Druker, and three hedge funds managed by Sonar

(the "Sonar Hedge Funds"): Sonar Partners LP, Sonar Institutional Fund

LP, and Sonar Overseas Fund LP (collectively, the "Sonar Defendants").

Also named as defendants are numerous investors in the Sonar Hedge

Funds who redeemed their interests or received dividends after July 1,

2007 (collectively, the "Investor Defendants"). See Third Amended

Class Action Complaint dated Dec. 30, 2014 ("TAC"). The procedural

history of this case, familiarity with which is here presumed, is set

forth in this Court's opinion denying defendants' motion to dismiss

the Second Amended Class Action Complaint. See Gordon v. Sonar Capital

Mgmt. LLC, No. 11-cv-9665, 2014 WL 3900560, at *1 (S.D.N.Y. Aug. 1, 2014).[1]

Plaintiffs allege that the Sonar Defendants engaged in an extensive insider-trading scheme that allowed them to realize millions of dollars in profits and in avoided losses, in violation of the federal securities laws. See TAC ¶ 1. Specifically, they allege that between 2006 and 2009, Tai Nguyen, a former employee of Sigma who ran a firm called Insight Research, LLC, id. ¶ 3, regularly provided Sonar's Managing Director Noah Freeman with material, non-public information regarding Sigma, which Nguyen had obtained from a relative who still worked at Sigma. Id. ¶ 51. This information consisted primarily of advance quarterly revenue figures for Sigma, on which the Sonar Defendants then traded several weeks before the information was publicly reported. Id. ¶ 60-71. In exchange, the Sonar Defendants paid Nguyen between $5,000 and $10,000 per month. Id. ¶ 61.

More specifically, Plaintiffs allege that, during the second quarter of 2007, Nguyen informed Freeman, who in turn informed CEO Druker, that Sigma had entered a contract to supply a computer chip for incorporation into a set-top cable box manufactured by Motorola, for which Motorola had received a large order. As a result of this

---

[1] The Third Amended Complaint also names Primary Global Research LLC ("Primary Global"), an investment research firm that allegedly sold material non-public information to investors. All proceedings against Primary Global are stayed because it has filed for protection under the federal Bankruptcy Act. Plaintiffs entered a separate settlement with Noah Freeman, a former Managing Director of Sonar who was originally named as a defendant, and this action was dismissed as to him on June 6, 2013, on consent.

contract, which had not yet been disclosed to the public, Sigma's revenues for that quarter would be significantly greater than expected by market analysis. Id. ¶ 89. On the basis of this information, Druker allegedly caused Sonar and the Sonar Hedge Funds to purchase hundreds of thousands of shares of Sigma stock. Id. ¶¶ 91-98. On August 29, 2007, Sigma issued a press release that disclosed its quarterly revenue figures, which, as the Sonar Defendants knew they would, far exceeded market expectations. Id. ¶ 100. From August 28 to August 30, Sigma's share price increased by over 14%, yielding a profit of approximately $3 million for the Sonar Defendants. Id. ¶¶ 100-101. The press release, however, did not disclose the existence of the large chip order from Motorola or the full extent of revenues that Sigma expected to earn from that order. Id.

Plaintiffs further allege that, during the third quarter of 2007, the Sonar Defendants continued to receive non-public information from Nguyen indicating that, because of the Motorola order, Sigma's revenues would increase to a far greater extent than the market expected. Id. ¶ 102-06. Sonar and the Sonar Hedge Funds accordingly purchased large quantities of Sigma stock. Id. ¶¶ 112. On November 28, 2007, Sigma announced that its net revenues were up by 56% over the previous quarter. Id. ¶ 114. The price of its stock increased by over 10% the next day, yielding profits of over $10 million for the Sonar Defendants. Id. ¶¶ 114-15.

Plaintiffs still further allege, however, that in late December 2007, Nguyen informed Freeman that Motorola had unexpectedly stopped

ordering Sigma's chips altogether. Id. ¶ 118. Druker immediately
caused the Sonar Hedge Funds to liquidate their long positions in
Sigma stock in order to avoid anticipated losses, and also caused them
to engage in short-selling and to purchase a put option in order to
profit from the coming decline in Sigma's stock. Id. ¶¶ 119, 126. On
March 12, 2008, Sigma issued a press release announcing worse-than-
expected results for the fourth quarter and for its fiscal year,
causing its share price to drop by over 20%. Id. ¶ 123. As a result,
the Sonar Defendants avoided approximately $8.9 million in losses,
obtained profits of more than $4 million by selling short, and
obtained a profit of nearly $1.6 million by exercising their put
option. Id. ¶¶ 124-27.

Finally, Plaintiffs allege that, during and after the period of
the insider trading, the Sonar Defendants honored redemption requests
from the Investor Defendants by making cash payments in exchange for
those investors' equity interests in the funds. Id. ¶¶ 135-36. In
doing so, the Sonar Defendants failed to account for their liability
to Sigma shareholders. Id. ¶¶ 137-40. The Investor Defendants'
redemption requests eventually resulted in the liquidation of the
Sonar Hedge Funds. Id. ¶ 139.

On the basis of the foregoing allegations, Plaintiffs assert five
causes of action: violation of Section 10(b) of the Securities
Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated
thereunder against the Sonar Defendants; violation of Section 20A of
the Exchange Act against the Sonar Defendants; violation of Section

4

20(a) of the Exchange Act against Druker; fraudulent transfer in

violation of Massachusetts General Laws Ch. 109A §§ 5, 6 against the

Investor Defendants; and unjust enrichment against the Investor

Defendants.

Plaintiffs now move for certification of two classes[2]:

**The Seller Class:** All persons and entities who sold shares of
Sigma Designs, Inc. ("Sigma") on any day, during the period
from July 13, 2007 through November 28, 2007, listed on
Schedule A hereto (the "Seller Class Period").

**The Buyer Class:** All persons and entities who bought shares
of Sigma on any day, during the period from December 20, 2007
through March 12, 2008, listed on Schedule B hereto (the
"Buyer Class Period").

Each of the proposed classes excludes the defendants and certain

affiliated persons and entities. Schedules A and B contain lists of

non-consecutive dates, representing, respectively, the dates on which

defendants are alleged to have purchased (for the Seller Class Period)

or sold (for the Buyer Class Period) shares in Sigma stock while in

possession of material non-public information. The Seller Class Period

comprises two sub-periods, with the First Seller Class Period

representing the Sonar Defendants' alleged trading dates before

Sigma's August 29, 2007 announcement of its revenues for the second

quarter of 2007, and the Second Seller Class Period representing the

---

[2] On consent of the parties, this action has been bifurcated, with
plaintiffs' claims against the Sonar Defendants to be tried first and
any remaining claims against the Investor Defendants to be tried
thereafter. As the Court stated in its Order dated February 24, 2015,
any decisions made in the first portion of the litigation will be
reconsidered de novo as to the Investor Defendants should those
decisions become relevant.

Sonar Defendants' alleged trading dates between Sigma's August 29, 2007 announcement and its November 28, 2007 announcement of its revenues for the third quarter of 2007. Both Tauber and Gordon seek to represent the Seller Class, and Tauber additionally seeks to represent the Buyer Class.

A party seeking class certification bears the burden to prove, by a preponderance of the evidence, that each of the requirements of Federal Rule of Civil Procedure 23(a), as well as the requirements of at least one subsection of Rule 23(b), has been met. See Amara v. CIGNA Corp., 775 F.3d 510, 519 (2d Cir. 2014). Rule 23(a) permits a case to be litigated as a class action only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known colloquially as numerosity, commonality, typicality, and adequacy. In addition, the prong of Rule 23(b) here invoked is Rule 23(b)(3), which is satisfied when the court finds that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Sonar Defendants oppose certification, primarily on the
ground that neither proposed class representative satisfies the
adequacy requirements of Rule 23(a)(4).

Defendants argue first that Gordon is inadequate because his
relationship with his attorneys evinces, at best, a lack of
independence, and at worst, an actual conflict of interest with the
class. The adequacy of the proposed class representative is widely
considered the most important of the Rule 23(a) factors because it
directly implicates the due process rights of absent class members who
will be bound by the judgment. In re LILCO Sec. Litig., 111 F.R.D.
663, 672 (E.D.N.Y. 1986) (citing Hansberry v. Lee, 311 U.S. 32
(1940)).

As to Gordon, a conflict of interest may exist between a proposed
class representative and the class where the former is too "closely
associated" with class counsel. Under such circumstances, "courts are
concerned that … [the class representative] may permit a settlement
less favorable to the interests of absent class members." In re IMAX
Sec. Litig., 272 F.R.D. 138, 155-56 (S.D.N.Y. 2010) (internal citation
omitted); 5 Moore's Fed. Practice § 23.25[4][b][vi] (3d ed. 2000)
("[C]ourts have recognized that a conflict can exist if the class
representative stands to benefit directly or indirectly from the
goodwill of class counsel created through the class action."). In In
re IMAX, for example, the Court declined to appoint as a class
representative, an entity that failed to disclose that, in addition to
the lead counsel appointed by the Court, it was also represented by

another attorney with whom it had a close business and personal relationship. 272 F.R.D. at 156. In another case, this Court denied class certification because the proposed class representative's husband, an attorney, expected to receive a referral fee from the law firm seeking to serve as class counsel. See Hale v. Citibank, N.A., 198 F.R.D. 606, 607 (S.D.N.Y. 2001). The Court explained that this arrangement would "inevitably cause [the proposed class representative] to confuse her fiduciary duty to the prospective class with her interest in protecting and advancing her husband's contingent financial relationship with [lead counsel]." Id.

In this case, Gordon revealed for the first time at his deposition on January 23, 2015 that he had from the outset consulted with his longtime family attorney and cousin by marriage, David Spirt, Esq., regarding this action, and that Spirt had reached an arrangement with co-Lead Counsel, Shapiro Haber & Urmy LLP ("Shapiro Haber"), pursuant to which Spirt would receive 5% of any fees awarded to that firm. See Decl. of Richard H. Weiss dated Feb. 20, 2015, Ex. B, ECF Dkt. No. 127-2, Deposition of Sidney Gordon ("Gordon Dep.") at 28-50. Neither Gordon nor Shapiro Haber revealed the existence of this arrangement at the hearing on appointment of lead plaintiff and lead counsel, even though the Court inquired into Shapiro Haber's separate fee sharing agreement with another "referring counsel," Kronenberger Rosenfeld, LLP. See Transcript dated Mar. 29, 2012, at 46, ECF Dkt. No. 37. Nor did they disclose this arrangement in response to defendants' interrogatories asking Gordon to identify any third party

with whom he communicated about this action and any third party who had a fee sharing arrangement in this action. Gordon Dep. at 173-75, 186-90.

The Court subsequently took sworn testimony from Gordon and Spirt and reviewed, in camera, unredacted versions of email communications concerning the terms of Spirt's arrangement with Shapiro Haber. See Transcript dated Mar. 9, 2015. The testimony and documents received by the Court revealed troubling inconsistencies. For example, at his deposition, Gordon testified that he had, on several occasions, spoken with Spirt about the case, that he discussed filings in this case with Spirt, that he had consulted with Spirt before making decisions in the case, and that Spirt advised him regarding the settlement agreement with Noah Freeman. See Gordon Dep. at 29-30, 47-48. When subsequently questioned by the Court, however, Gordon testified that Spirt had played no substantive role in the case, and that he had merely asked him to explain the meanings of legal terminology. See Transcript dated Mar. 9, 2015, at 18-20. Similarly, after Spirt traveled from his home in Pennsylvania to Florida to accompany Gordon at his deposition, Gordon stated that "he is my attorney, and I feel comfortable with him here." Gordon Dep. at 28. Later, however, both Gordon and Spirt testified to the Court that Spirt attended the deposition as a "friend of the family," and for "moral support" only, and not in any legal capacity. Transcript dated Mar. 9, 2015, at 11, 31.

Spirt's somewhat murky role in this case creates, at a minimum, the appearance of impropriety. It appears that Gordon has received

some form of legal advice regarding the case from his personal attorney, whose involvement was only recently disclosed to opposing counsel (and to his co-lead plaintiff, Mr. Tauber), and who has never been proposed as co-lead counsel or received the approval of this Court to participate in this action in any respect, but who nevertheless is receiving a 5% referral fee. In these circumstances, the "close association" between Gordon and Spirt, consisting of family, personal, and professional ties going back over a decade, may compromise Gordon's ability to exercise independent judgment in those situations, such as settlement negotiations, in which the interests of the class and counsel may diverge. This concern is particularly acute given that Gordon himself has only a modest financial interest in this case — he sold 500 shares of Sigma stock during the Seller Class Period — and so Spirt's 5% "referral fee" may well materially exceed Gordon's pro rata share of the class recovery. The combination of these circumstances raise serious doubts about Gordon's ability to protect the interests of the class.

Moreover, even if these doubts, standing alone, would not necessarily suffice to render Gordon an inadequate class representative, Gordon's testimony regarding Spirt's involvement in the case suggests another problem, namely, Gordon's difficulty in recalling key facts and responding to straightforward questions regarding this action. For example, when questioned by the Court on March 9, 2015, Gordon could not recall having spoken with Spirt at any time during the prior two weeks. See Transcript dated Mar. 9, 2015, at

10

14. In fact, however, as co-lead counsel subsequently disclosed, Gordon and Spirt had spoken the previous day on a conference call with Shapiro Haber in which they had discussed the kinds of questions that would come up at the hearing and their recollections of the relevant events. Id. at 16, 32-33. Similarly, at his deposition on January 23, 2015, Gordon initially testified that he had had no knowledge of the fee sharing agreement between Spirt and Shapiro Haber until the previous day. Gordon Dep. at 187-88. After a recess, however, he clarified that he had learned about the agreement around the time it was entered, but had completely forgotten about it. Id. at 194-95. Even more troubling, Gordon, at his deposition, could not, without conferring with counsel, recall which of the putative classes he seeks to represent, was unfamiliar with key events in the case, such as the motions to dismiss the First and Second Amended Complaints, and had not seen a copy of the Third Amended Complaint until the day before the deposition. See Gordon Dep. at 143-45, 152-55, 168, 242-43.

In order to satisfy the adequacy requirement, a class representative "must be 'aware of the basic facts underlying the lawsuit and not likely to abdicate his obligations to fellow class members.'" In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008). Admittedly, "the requirement is modest: class representative status may be denied only 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the

11

attorneys.'" Id. (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec.
Corp., 222 F.3d 52, 61 (2d Cir. 2000)). In this case, however, while
the Court has no doubt that Gordon is sincere in his desire carry out
the duties of class representative, his difficulties with recollection
and lack of familiarity with the litigation indicate that he is wholly
dependent on counsel to make crucial decisions affecting the interests
of absent class members. This lack of independent judgment, combined
with his intimate relationship with one of the counsel having a
financial interest in the outcome, render him inadequate to serve as
class representative.

As to Tauber, defendants argue that he is subject to the unique
defense that he suffered no economic loss. The issue of unique
defenses is relevant not only to adequacy, but also to the typicality
and commonality prongs of Rule 23(a). Regardless of the prong under
which this issue is analyzed, "there is a danger that absent class
members will suffer if their representative is preoccupied with
defenses unique to it." Gary Plastic Packaging Corp. v. Merrill Lynch,
Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990).
Moreover, "[t]he defendant need not show at the certification stage
that the unique defense will prevail, only that it is meritorious
enough to require the plaintiff to 'devote considerable time to rebut
the unique defense.'" Hallet v. Li & Fung Ltd., No. 95-cv-8917, 1997
WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997). Although it has been said
that "[t]he rule barring certification of plaintiffs subject to unique
defenses is not 'rigidly applied in this Circuit,'" and that "'a

representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him [or her] that would not impact other class members,'" In re Frontier Ins. Group Sec. Litig., 172 F.R.D. 31, 41 (E.D.N.Y. 1997) (internal citation omitted), the requirements of Rule 23(a) are not met where the unique defenses to which the proposed class representative is subject "threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990).

In this case, defendants argue that Tauber is subject to the unique defense that, taking account of all his purchases and sales of Sigma stock during the class periods, he suffered no economic loss. During the First Seller Class Period, Tauber bought and sold the same number of shares, for a net of zero. During the Second Seller Class Period, Tauber bought more Sigma shares than he sold, making him, like the Sonar Defendants, a net buyer. During the Buyer Class Period, Tauber sold more shares than he bought, making him, like the Sonar Defendants, a net seller. Thus, defendants contend that, on net, Tauber's gains and avoided losses during the various class periods exceeded any losses he may have suffered during those periods.

Plaintiffs do not dispute defendants' factual contentions, but argue that, in an insider trading case, it is inappropriate to net out a plaintiff's losses and gains. They contend that "netting purchases and sales is irrelevant here since Plaintiffs are seeking

13

'disgorgement' in connection with their insider trading claims rather than simply 'traditional out-of-pocket damages based on the true "value" of the shares purchased or damages claimed by reason of market erosion attributable to tippee trading.'" See Corrected Mem. in Support of Pl.'s Motion for Class Certification dated Jan. 29, 2015, ECF Dkt. No. 118 ("Pl.'s Mem.") at 6 n.10 (quoting Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 172 (2d Cir. 1980)).

Courts of this Circuit have not squarely decided this question, and the Court here finds that it is unnecessary to give a definitive answer at this time. But this much may be said:

As a general matter in securities fraud cases brought under Section 10(b) of the Exchange Act, the prevailing approach is to offset the plaintiff's losses by any gains that are attributable to the same conduct:

> As a general rule, plaintiffs cannot claim damages where the same fraud alleged to be the cause of a loss also permitted a countervailing gain. In other words, where both a plaintiff's losses and gains derived from a single causal event, the losses it sustains are netted against all of that plaintiff's gains. For instance, losses resulting from a securities fraud are netted against recovered gains where both follow from a single disclosure.

In re Refco Inc. Sec. Litig., No. 08-cv-3065, 2013 WL 4078410, at *2 (S.D.N.Y. Aug. 2, 2013) (citations omitted); see also Abrahamson v. Fleschner, 568 F.2d 862, 878 (2d Cir. 1977) ("This is not to say, however, that a plaintiff may recover for losses, but ignore his profits, where both result from a single wrong."); Minpeco, S.A. v. Conticommodity Servs., Inc., 676 F. Supp. 486, 488-89 (S.D.N.Y. 1987)

("Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall.").

Nonetheless, within this Circuit, netting of gains and losses is not a hard-and-fast rule. Courts decline to net where doing so would "unjustly enrich" the defendant, "shelter it from any appreciable liability," or "undermine the goal of deterrence." Apex Oil Co. v. DiMauro, 744 F. Supp. 53, 55 (S.D.N.Y. 1990). More generally, courts have "considerable discretion in determining how best to calculate compensable losses." In re Vivendi Universal, S.A. Sec. Litig., 284 F.R.D. 144, 159 (S.D.N.Y. 2012). In addition to the "traditional out-of-pocket measure for damages," Acticon AG v. China North East Petroleum Holdings Ltd., 692 F.3d 34, 39 (2d Cir. 2012), courts have "utilized their discretion to endorse several different compensatory damage theories," ranging from disgorgement, to benefit-of-the-bargain, to rescission. Panos v. Island Gem Ents., Ltd., N.V., 880 F. Supp. 169, 176 (S.D.N.Y. 1995) (collecting cases). Prudence suggests that in many instances this difficult decision may best be reserved until the time of trial.

Plaintiffs argue that in insider trading cases, unlike run-of-the-mill securities fraud cases, netting is inappropriate because of the language of Section 20A of the Exchange Act and because of the nature of the alleged injury. Subsection 20A(a), entitled "Private rights of action based on contemporaneous trading," provides:

15

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, non-public information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1(a). Subsection 20A(b) then sets a caps on damages,

which are further reduced by any disgorgement to the Securities and

Exchange Commission:

(1) Contemporaneous trading actions limited to profit gained or loss avoided

The total amount of damages imposed under subsection (a) of this section shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.

(2) Offsetting disgorgements against liability

The total amount of damages imposed against any person under subsection (a) of this section shall be diminished by the amounts, if any, that such person may be required to disgorge, pursuant to a court order obtained at the instance of the Commission, in a proceeding brought under section 78u(d) of this title relating to the same transaction or transactions.

Id. § 78t-1(b). Plaintiffs argue that Section 20A creates a

"statutory formula for damages," under which the Court may consider

only those transactions in Sigma stock made contemporaneous to, and

in the opposite direction from, the defendants' transactions. See

Reply Mem. in Support of Pl.'s Motion for Class Certification, dated

Feb. 20, 2015, ECF Dkt. No. 126, at 6. Thus, according to Plaintiffs,

Tauber's damages must be calculated on the basis of his sales during

16

the Seller Class Periods and purchases during the Buyer Class
Periods, irrespective of his other trading activity.

As an initial matter, the Third Amended Complaint alleges
violations of Section 10(b) and Rule 10(b)-5, and seeks "compensatory
damages … for all losses and damages suffered as a result of the
Defendants' wrongdoing." See TAC ¶¶ 154-70 & p. 66. Proof of a
predicate violation of another provision of the Exchange Act is
necessary to establish liability under Section 20A. See Jackson Nat.
Life Ins. Co. v. Merrill Lynch & Co., No. 93-cv-0739, 1993 WL 464730,
at *5 (S.D.N.Y. Nov. 8, 1993) aff'd, 32 F.3d 697 (2d Cir. 1994) ("[A]
defendant is liable under section 20A only where an independent
violation of the 1934 Securities Exchange Act or the rules and
regulations promulgated thereunder has occurred." (citation
omitted)). Thus, Plaintiffs retain the burden to prove the "economic
loss" element of their Rule 10(b)-5 claim, regardless of their
Section 20A claim or the damages they seek thereunder. See
Pennsylvania Ave. Funds v. Inyx Inc., No. 08-cv-6857, 2011 WL
2732544, at *6 (S.D.N.Y. July 5, 2011) (listing elements of Rule
10(b)-5 claim).

Furthermore, Section 20A, on its face, says nothing about the
netting of a plaintiff's gains and losses in calculating her damages.
As Congress explained at the time of its enactment, the purpose of
Section 20A is simply to codify the existence of a private right of
action for insider trading violations. See H.R. Rep. No. 100-910, at
12-14, 26 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 1988 WL 169923

17

("Although the courts have recognized an implied private right of action in insider trading cases, this section would codify an express right of action against insider traders and tippers for those who traded the same class of securities 'contemporaneously' with and on the opposite side of the market from the insider trader."). In order to permit a broader class of potential victims to sue, while at the same time protecting defendants from limitless liability, Section 20A defines those who may sue as anyone who traded contemporaneously with, and opposite to, the defendant, even if they traded on an impersonal market and therefore cannot prove that they actually bought shares from the defendant or sold shares to the defendant. See Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1337 (7th Cir. 1997) (Posner, J.) ("[T]he purpose of section 20A was to extend the protections of the existing insider-trading prohibition to persons not in privity with the insider.").

The limitations on damages found in Section 20A(b) are just that — limitations on damages. They cap the defendant's liability at its total profits and avoided losses minus any disgorgement to the Securities and Exchange Commission. Because the insiders' profits from their unlawful trading are likely to pale in comparison to the losses sustained by the far more numerous traders on the open market, such a cap is necessary to "bar[] windfall recoveries of exorbitant amounts bearing no relation to the seriousness of the misconduct."

Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 172 (2d Cir. 1980).[3]
The existence of such a cap, however, does not necessarily relieve a
plaintiff of the burden of proving her actual damages or permit her
to recover for her losses without any offset for countervailing
gains.

In Elkind, which preceded the enactment of Section 20A, the
Second Circuit determined that a "disgorgement measure" of damages,
capped at the amount of the defendant's gain, was most appropriate in
an insider trading case. 635 F.2d at 172. However, the "disgorgement
measure" applied in that case was not totally divorced from the
plaintiff's actual losses, as the plaintiff retained the burden to
prove the "post-purchase decline in market value of his shares up to
a reasonable time after he learns of the tipped information or after
there is a public disclosure of it." Id. Furthermore, Elkind was
silent on whether the plaintiff's losses should be offset by any
gains. Id. Accordingly, the Court is not persuaded that Section 20A
abrogates existing case law granting the Court substantial discretion
regarding the calculation of damages in securities fraud cases
generally or forbids netting of Plaintiffs' losses and gains in
insider trading cases.

Nor does the nature of the injury arising from insider trading
necessarily render netting of losses and gains inappropriate.

---

[3] But see Newby v. Enron Corp., 188 F. Supp. 2d 684, 700 (S.D. Tex.
2002) (stating that Section 20A "incorporates disgorgement of the
defendant's profits"). Newby, of course, is not binding on this Court.

Plaintiffs contend that, by wrongfully failing to disclose the information they received from their source at Sigma to the public, defendants were able to take advantage of the fact that the stock price did not reflect that information. Thus, during the Seller Class Period, defendants were able to buy shares at a lower price than they could have if the market had known the inside information. See TAC ¶ 166 ("Plaintiffs and the members of the Seller Class sold Sigma stock at prices that were artificially deflated by reason of Defendants' failure to disclose the material, positive, non-public information about Sigma and suffered damages."). Conversely, during the Buyer Class Period, defendants were able to sell shares at a higher price than they could have if the market had known the information. See TAC ¶ 169 ("Plaintiff Tauber and other members of the Buyer Class bought Sigma stock at artificially high prices."). Plaintiffs argue that anyone who traded contemporaneously with defendants and in the opposite direction was defrauded of the difference between the market price at the time of the transaction and what the market price would have been if the defendants had disclosed the information.

Plaintiffs' expert, Professor Steven Feinstein of Babson College, calculates the per-share dollar amount of such artificial inflation or deflation during each class period by analyzing the change in Sigma's share price after the information was disclosed. See Aff. of Mark J. Hyland dated Feb. 13, 2015, Ex. Q, ECF Dkt. No. 124-17, Expert Report of Professor Steven Feinstein, at ¶¶ 147-48. He contends that the per-share inflation/deflation figures represent the amount by which class

members overpaid for shares purchased during the Buyer Class Period, or were underpaid for shares they sold during the Seller Class Periods. Professor Feinstein then calculates the aggregate damages suffered by each respective class by multiplying the per-share inflation/deflation figure for each class period by the number of shares traded contemporaneously with defendants during the relevant class period. Id. ¶¶ 149-52.

On Plaintiffs' own theory, therefore, anyone who traded in the same direction as the defendants during the relevant periods also benefitted from the market's ignorance of the inside information. Consider, for example, a person who, during the Buyer Class Period, simultaneously bought one share and sold two shares at a price of $100. On the same day, defendants sold off their stock while in possession of negative non-public information that, if disclosed, would cause the stock price to drop to $80. In that situation, the person overpaid for one share by $20, but also avoided $40 in losses by selling two shares on a market that was ignorant of the information, for a net gain of $20. In this case, the "same fraud alleged to be the cause of a loss also permitted a countervailing gain." In re Refco Inc. Sec. Litig., 2013 WL 4078410, at *2. The same would be true for a net buyer during the Seller Class Period. Thus, contrary to Plaintiffs' contentions, there is nothing inherently illogical in offsetting an insider trading victim's losses by any gains he or she reaped, albeit innocently, from the very same conduct.

For these reasons, the Court finds that Tauber is subject to the potentially meritorious defense that he suffered no economic loss attributable to defendants' alleged wrongdoing. Of course, the Court retains discretion regarding the appropriate measure of damages and may ultimately decide that a disgorgement measure, without any offset for countervailing gains, is appropriate. The Court need not resolve this question here, however, as the inquiry at this stage is whether Tauber is "subject to unique defenses which threaten to become the focus of the litigation." Romero v. Flaum Appetizing Corp., No. 07-cv-7222, 2011 WL 812157, at *3 (S.D.N.Y. Mar. 1, 2011) (citation omitted) (Jones, J.). For most class members, the netting question is of only secondary importance, as the more pressing issue for those who are net losers is establishing liability. For Tauber, by contrast, the netting issue is paramount, since for him it means the difference between a substantial recovery and no recovery at all. He is therefore highly likely to focus on this issue to the detriment of the class. Accordingly, the Court finds that Tauber is also not an appropriate class representative.

For the foregoing reasons, the Court concludes that neither Gordon nor Tauber is appropriate to serve as representative plaintiff for the putative class. Nonetheless, although defendants attempt to raise other objections to certification, the Court is preliminarily of the view that none of these other objections is persuasive. Thus, if Plaintiffs' counsel could find an adequate alternate class representative, certification might still be in order — and there is

precedent for giving plaintiffs' counsel an opportunity to do so. <u>See,</u> <u>e.g.</u>, <u>Cohen v. Laiti</u>, 98 F.R.D. 581, 584 (E.D.N.Y. 1983).

      Accordingly, Plaintiffs' motion for class certification is hereby denied, but without prejudice to being renewed if plaintiff is able within the next 30 days to locate and join one or more additional plaintiffs who would be prepared to serve as appropriate class representatives. Plaintiffs' counsel are therefore directed to notify the Court in writing by no later than April 20, 2015 whether they intend to add new lead plaintiffs and renew their motion for class certification or simply proceed on Messrs. Gordon's and Tauber's individual claims. All proceedings in the case are stayed until that date. The Clerk is directed to close document number 115 on the docket of this case.

      SO ORDERED.

Dated: New York, NY
     March 19, 2015

                                JED S. RAKOFF, U.S.D.J.